IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JACOB N. JONES and<br>PEGGY C. JONES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No.  2:05-cv-1119-WKW |
| | ) | |
| STATE FARM INSURANCE<br>COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF

NOW COME Defendants Ron Nall and State Farm Fire and Casualty Company (hereinafter

"State Farm"), pursuant to Rule 56, FEDERAL RULES OF CIVIL PROCEDURE, and move the Court to

enter Judgment as a matter of law in their favor on the basis that the Plaintiffs Jacob Jones and Peggy

Jones do not have substantial evidence to support their claims against these Defendants.  In support

of said motion, Defendants submit the following Memorandum of Law setting forth the Undisputed

Facts and Authorities of Law.

## INTRODUCTION

The Joneses built their house in 1970 or 1971.  They obtained a homeowners policy from

State Farm through Agent Mark King in 1981.  The Joneses did not obtain a policy which provided

replacement cost without regard to the limits for the dwelling coverage amount set forth on the

Declarations Page of the policy.  Even if they got that type of coverage in 1981, in 1998 State Farm

changed the coverage afforded by its homeowners policies to eliminate guaranteed replacement cost

coverage and to substitute in its place replacement cost coverage subject to stated limits on the

Declarations Page. State Farm also offered an optional coverage named "Increased Dwelling" which provided up to 20% more of the stated limits in the event that replacement cost exceeded the stated limits of the insurance policy. A letter was sent prior to renewal date in 1998 to all policyholders. A new policy with the new coverage and a notice of the changes was sent to all policyholders in 1998. The Joneses' new policy was effective October 8, 1998.

The Joneses suffered a fire loss on July 28, 2004. The estimates to replace the dwelling exceeded the applicable limits of insurance as adjusted by the "Increased Dwelling" coverage. Therefore, State Farm paid the Joneses the limits of insurance for the dwelling.

The Joneses sued Ron Nall and State Farm alleging, *inter alia*, that Nall represented to the Joneses that they had replacement cost coverage and that the policy did not provide replacement cost to replace the dwelling. The Joneses contend they are entitled to "replacement cost period."

The only thing at issue between the Joneses and State Farm is the amount of money paid to them for the dwelling coverage. There is no dispute about contents coverage or additional living expense coverage.

The Complaint against Nall and State Farm contains five counts: Breach of Contract; Bad Faith; Fraud; Negligent/Wanton Failure to Issue Insurance; and Wanton Failure to Procure Insurance.

## UNDISPUTED FACTS

Jacob Jones attended Troy State University, majored in Mathematics and minored in Accounting. (Depo. of Jacob Jones, p. 7, L. 9-14, attached hereto as Exhibit "A"). He is currently the Manager of Finance and Accounting of Alabama Electric Cooperative. (Id. at p. 8, L. 7) and has been for 21 years. (Id. at p. 7, L. 22).

2

The Joneses built the house which is the subject of this case sometime in 1970 or 1971. (Exhibit "A" p. 20, L. 11).  Although Jones testified in deposition that, at the time the Joneses built the house, they already had a business relationship with State Farm Agent Mark King (Exhibit "A" p. 19, L. 9-19), and that they obtained insurance for this house when it was built from State Farm through King (Id. at p. 20, L. 16-20), King did not become a State Farm agent until 1977.  (Depo. of Mark King, p. 8, L. 2-10, attached as Exhibit "C").  The application shows that there was a previous insurer which provided insurance on the home -- Royal Globe.  (Affidavit of Bill Lovell, attached as Exhibit "D" ¶ 6).

Jacob Jones contacted Mark King to obtain homeowners insurance on the house from State Farm. (Exhibit "A" p. 22, L. 14 to L. 20).[1]  An application was completed on September 28, 1981 and an HO3 homeowners insurance policy was issued on October 8, 1981.  (Exhibit "D" ¶ 6).  The application states that the home was built in 1970 at a price of $30,000.  (Id. at ¶ 7).  The current market value of the dwelling when the application was completed in 1981 is listed as $50,000.  (Id.). The application calculates estimated replacement cost to be $63,450.  (Id.).  Jones requested insurance coverage for the dwelling in the amount of $55,000.  (Id.).  Jacob Jones signed the application below a statement "I hereby apply for the insurance indicated... ."  (Id.).  State Farm issued the policy with the limits requested by Jones in 1981.  (Id.).  Thus, in 1981 the Joneses did not request the full estimated replacement cost of the dwelling.  (Id.).  The dwelling coverage in 1981 was subject to the stated limits of $55,000.  (Id.).

---

[1] Jones recalls showing the plans for the house to be built to Mark King in 1970 or 1971(Exhibit "A" p. 23, L. 10) because Jones kept the plans with him constantly while the house was being built (Id. p. 23, L. 15-18) and, as noted, Jones thinks he dealt with King in 1970 or 1971 when the house was built, which is not possible since King did not become an agent until 1977 and the application was not completed until 1981.

Regarding the policy issued to Jones in 1981, State Farm rated the exposure and charged and collected a premium based upon the policyholder's selection of the dwelling coverage amount. (Exhibit "D" ¶ 8). Therefore, State Farm had every reason for the dwelling coverage amount to be as high as possible and no reason for it to be understated. (Id.). State Farm would have issued the policy in 1981 with limits equal to the estimated replacement cost had the insured requested that amount. (Id.).

On HO3 policies issued by State Farm to policyholders, by the terms of the policy, the policy is automatically renewed at the anniversary date of the policy. (Id. at ¶ 9). The policyholder may cancel at any time. (Id.). State Farm may non-renew at the end of the policy term or may cancel the policy mid-term but only pursuant to the terms of the policy issued. (Id.). Otherwise, the policy is automatically renewed. (Id.).

Prior to the anniversary date of the policy a Renewal Certificate is automatically generated and sent to the policyholder. (Id. at ¶ 10). In HO3 policies, like the one issued to Jones in 1981, there was an inflation provision which increased the dwelling coverage amount by an inflation factor. (Id.). The system would automatically calculate the premium charged for the dwelling coverage amount. (Id.). The Renewal Certificate sent to the policyholder would set forth the updated dwelling coverage amount and the premium being charged for the next policy period. (Id.).

When the policy was first issued to Jones in 1981, it had a Declarations Page which stated an amount of coverage for the dwelling. (Exhibit "A" p. 27, L. 21 to p. 28, L. 7). Jones knew the price to build the home. (Id. at p. 30, L. 5-7). Jones does not remember comparing the amount set on the Declarations Page with the price of the home. (Id. at p. 32, L. 12 to p. 33, L. 15).

4

The policy was renewed from year-to-year automatically (Id. at p. 34, L. 1-4) with increases in the stated dwelling coverage amount of the policy and the premium. (Id. at p. 82, L. 20 to p. 83, L. 3; p. 90, L. 14-17). A Renewal Certificate was sent prior to renewal each year. (Id. at p. 27, L. 21 to p. 28, L. 15; p. 34, L. 9-12; p. 93, L. 5-7). Some years a new policy was also sent. (Id. at p. 81, L. 18 to p. 82, L. 3; p. 93, L. 1-7). Jones received them, reviewed them and filed them in a file he maintained at his office at Alabama Electric Cooperative. (Id. at p. 16, L. 18; p. 17, L. 9; p. 27, L. 10-15; p. 28, L. 3-15; p. 37, L. 15-18; p. 39, L. 6-20; p. 80, L. 3-19; p. 83, L. 6-14; p. 89, L. 20 to p. 90, L. 7; p. 90, L. 20 to p. 91, L. 6; p. 90, L. 9-18; p. 95, L. 11-23; p. 96, L. 3-6).

Over the years from 1981 to 1997, the Joneses remodeled the house and added rooms onto the house. (Id. at p. 40, L. 4 to p. 43, L. 9; p. 44, L. 14 to p. 45, L. 33; p. 47, L. 5 to p. 48, L. 3; and p. 48, L. 23 to p. 50, L. 20). According to Jacob Jones, he informed Mark King of these changes to the home in passing conversations when he would see King around town or other chance meetings (as opposed to making a specific appointment to discuss same with Mark King). (Id. at p. 37, L. 4-14; p. 54, L. 2-7). Jones volunteered that "the policy says something about you need to notify them [State Farm] when you make changes." (Id. at p. 51, L. 2), proving that Jones in fact read a policy sometime.

According to Jacob Jones, over the years from 1981 to 1997, again in passing conversations, Mark King told Jacob Jones "you're covered" and that he had "replacement cost coverage" on the house. (Exhibit "A" p. 25, L. 8 to p. 26, L. 4 and p. 35, L. 8 to p. 36, L. 3; p. 37, L. 4-14).

Peggy Jones testified that, following one remodeling job, in which a carport was enclosed and made into a playroom, Mark King came to the house and measured the exterior dimensions of

the house. (Depo. of Peggy Jones, p. 25, L. 3-10; p. 41, L. 11 to p. 42, L. 12, attached hereto as Exhibit "B"). She did not have any conversation with King on that occasion. (Id. p. 25, L. 19 to p. 26, L. 10). He measured the house and left without discussing anything with Peggy Jones. (Id.). Peggy Jones says that the carport was converted to a playroom in 1989 or 1990. (Id. at p. 38, L. 14). Jacob Jones also said that the carport was enclosed and converted to a playroom in 1989 or 1990. (Exhibit "A" p. 48, L. 12-16). However, Jacob Jones said that King came to the house and measured after the kitchen was remodeled in 1997. (Id. at p. 26, L. 6-14).

King recalls reinspecting the home in 1994 before Hurricane Opal hit Alabama. (Exhibit "C" p. 11, L. 9 to p. 12, L. 9). He does not recall inspecting after that occasion. (Id. at p. 13, L. 12-22). King said he reinspected all dwellings in 1994 at State Farm's directive. (Id. at p. 11, L. 14). This matches up with the mandatory reinspection of all dwellings insured by State Farm beginning in 1994. (Exhibit "D" ¶ 22).

There is a document produced by Jones which he says he got from Ron Nall's office assistant on September 1, 2004 when Jones went to Nall's office after the loss on July 28, 2004. (Exhibit "A" p. 73, L. 15 to p. 74, L. 3). The document is a hard copy of information maintained on Nall's computer. (Id. at p. 73, L. 7-14). The document has on it "Inspection" below which is: "REINSP 3-11-97 Completed by Agent." (Exhibit "C" p. 15, L. 2). King said this document indicates that he inspected the property in 1997 (Id. at p. 15, L. 7), even though he does not recall doing so. (Exhibit "C" p. 15, L. 17). However, the inspection conducted by King in March 1997 was requested by the Underwriting Department in State Farm's Birmingham office. (Exhibit "D" ¶ 21). It was a "quality inspection" which inspects the home for quality and condition of the roof and

6

exterior of the house. (Id.). A "quality inspection" does not involve a measurement of the house or a calculation of estimated replacement cost. (Id.).[2]

Accepting 1997 as the latest date King *measured* the house, Jones said that, after King measured, he (King) called Jones and told Jones what he had calculated to be the estimated replacement cost. (Exhibit "A" p. 34, L. 13 to p. 35, L. 2). Jones said that he agreed with King after King told Jones what King estimated the replacement cost to be. (Id. at p. 34, L. 22-23; p. 105, L. 17-22). However, Jones testified that he relied upon King being "the expert" (Id. at p. 60, L. 8-13) and getting enough insurance to replace the dwelling (Id. at p. 124, L. 10-15) and relied upon King's measurement in 1997 (Id. at p. 34, L. 13 to p. 35, L. 2; p. 54, L. 21 to p. 55, L. 22) and the dwelling coverage amount set forth on the Declaration Page following that measurement to be adequate. (Id. at p. 56, L. 17-21; p. 57, L. 14 to p. 58, L. 13).

Jones also testified that he believed he had "replacement cost period" -- *i.e.,* coverage regardless of the dwelling coverage amount set forth on the Declarations Page (Id. at p. 93, L. 19-21; p. 94, L. 7; p. 94, L. 14 to p. 94, L. 19), based upon King's representations to him between 1981 and 1997 that he had replacement cost protection on the house. (Id. at p. 29, L. 13-17; p. 68, L. 12-15). Jones denies discussing square footage with King. (Id. at p. 26, L. 15-22; p. 56, L. 4-8). King testified that Jones was active in discussing insurance and that he and Jones discussed square footage, replacement cost and dwelling coverage amount every time there was a change in the

---

[2] While there may be a dispute about when King last measured, it is undisputed by Jones that King did not measure the house after 1997 and that he measured it before the 1997 renewal which was in October 1997. For purposes of this motion, that undisputed fact is the operative fact.

amount of coverage. (Exhibit "C" p. 22, L. 2 to p. 23, L. 2). King says Jones called him every time there was a change in coverage. (Id. at p. 57, L. 1-14).[3]

According to Jacob Jones, the last remodeling or additions to the home were completed before the 1997 renewal (October 8, 1997). (Id. at p. 49, L. 4). Neither Jacob Jones nor Peggy Jones testified to any conversation with Mark King after 1997. Peggy Jones, as noted, never talked to King about insurance matters. Thus, according to Jacob Jones, the latest conversation Jones had with King regarding insurance was during the 1997 calendar year, prior to the October 8, 1997 renewal of the policy.

In 1998, State Farm began converting its HO1, HO3, and HO5 policies to an HOW policy. (Exhibit "D" ¶ 11). Jones's policy was converted as of the October 3, 1998 renewal date. (Id.). A letter was mailed seven days prior to the new 1998 policy being sent. (Id. at ¶ 12). The letter stated:

> You are a valued policyholder and I want to let you know about some upcoming changes which will affect your homeowners insurance. You will receive a new Homeowners Policy. This new policy allows you to choose different coverage options and limits to tailor your coverage to best suit your needs. And, there will be a notice about changes to the policy you have now.
>
> I've enclosed information that provides an overview about these changes and hope you will call me at (XXX)-XXX-XXXX should you have any questions.
>
> Thanks for allowing me to continue to serve you.

(Id.). The telephone number was the number for the agent of record for the policyholder and in the case of Jones was the number for Mark King. (Id.).

---

[3] This is not a dispute of material fact because the motion is based upon accepting Jones's version of the facts as being true. State Farm and Nall are not relying upon King's statement that Jones called King every time there was a change in coverage and discussed insurance. State Farm and Nall are simply providing it to make the picture complete.

A Renewal Certificate was not sent to Jones in 1998 because a new policy was sent. With the new 1998 policy, all policyholders were sent a notice which states:

## IMPORTANT NOTICE . . .

## about changes to your policy

Enclosed with this message is your new State Farm Homeowners Policy which replaces your current policy. In an effort to provide protection for policyholders at an affordable price, we periodically make changes to your policy. Some of these changes reduce or eliminate coverage. Others, although not intended to change coverage, could potentially reduce or eliminate coverage depending on court interpretations, and should, in that sense, be viewed as either actual or potential reductions in or eliminations of coverage. Some changes broaden or add coverage. One very important change in your policy is the elimination of Guaranteed Replacement Cost and Guaranteed Extra Coverage.

We want to point out that every policy contains limitations and exclusions. We encourage you to read your entire policy, and note the following changes:

1. **REDUCTIONS OR ELIMINATIONS OF COVERAGE**

   GUARANTEED EXTRA COVERAGE (*Current Homeowners Extra Form 5*) and
   GUARANTEED REPLACEMENT COST COVERAGE (*Current Endorsement to Homeowners Special Form 3*)

   • These coverages are eliminated. Your policy now has a stated limit of liability under Coverage A that reflects the maximum that will be paid in case of loss. If Option ID - Increased Dwelling Limit is shown in the Declarations of your new policy, it may provide an additional limit for damaged building structures. However, the most State Farm will pay for loss to property under Coverage A is the stated limit of liability, plus any additional limit provided by Option ID, if shown in the Declarations. The policy no longer provides a guarantee to replace your home regardless of the cost.

* * *

(Exhibit "E")(Exhibit "D" ¶ 13). The notice contained text in addition to that set out above, which explained changes in the policy. (Exhibit "E"). This notice was sent out to Jones with the policy for policy period October 8, 1998 to October 8, 1999. (Exhibit "C" p. 42, L. 6 to L. 17)(Exhibit "D" ¶ 13). Jones does not recall receiving this notice but has no reason to doubt that it was sent to him. (Exhibit "A" p. 84, L. 4-11). He also understood it when he read it at his deposition. (Id.). Jones does not recall receiving a policy for the 1998/1999 policy period but does not deny receiving one, and says, consistent with other years, if he did get one he "glanced" at it and filed it. (Id. p. 86, L. 17 to p. 87, L. 9).

Other changes in the 1998 policy included claim record rating plan, rate changes, minimum policy deductible, back-up of sewer or drain, utilities rating plan, hurricane deductible and Increased Dwelling coverage. (Exhibit "D" ¶ 14). Increased Dwelling coverage provided an additional twenty percent (20%) of the dwelling coverage amount set forth on the Declarations Page of the policy in the event that the replacement cost of the dwelling exceeded the stated dwelling coverage amount set forth on the Declarations Page. (Id.).  Jones had Increased Dwelling coverage on his policy beginning the October 8, 1998 policy period and continuing each year after that. (Id.). The Increased Dwelling coverage was listed for the first time on the 1998 Declarations Page under the section headed: Forms, Options and Endorsements. (Exhibit "H").

The Renewal Certificates beginning in 1999 for the new insurance policies which had been sent to policyholders during calendar year 1998 had a special inflation coverage statement added on them, which stated:

> The State Farm replacement cost is an estimated replacement cost based on general information about your home. It is developed from

> models that use cost of construction materials and labor rates for like homes in that area. The actual cost to replace your home may be significantly different. State Farm does not guarantee that this figure will represent the actual cost to replace your home. You are responsible for selecting the appropriate amount of coverage and you may obtain an appraisal or contractor estimate which State Farm will consider and accept, if reasonable. Higher coverage amounts may be selected and will result in higher premiums.

(Exhibit "F") (Exhibit "A" p. 104, L. 7 to p. 105, L. 11)(Exhibit "D" ¶ 16). Since Jones got a new policy in October 1998, his first Renewal Certificate was sent prior to the renewal of that policy on October 1999. (Id. at ¶ 17). Due to State Farm's record-keeping policies, it does not have a copy of the Renewal Certificate sent in 1999 to provide to the Court.[4]   However, this same statement appeared on each Renewal Certificate sent to Jones from 2000 to 2003. (Id. at ¶¶ 17, 18) (Exhibits "H" - "K"). Jones understood this notice when he read it at the deposition. (Exhibit "A" p.103, L. 19 to p. 104, L.5).

In the month of March 2001, Mark King retired. (Exhibit "A" p. 62, L. 21-23; Exhibit "C" p. 76, L. 16). Ron Nall took over King's book of business (Exhibit "A" p. 63, 1-4; Exhibit "C" p. 86, L. 16 to p. 87, L. 1) and became the servicing agent for policyholders who had obtained insurance with State Farm through Mark King. (Exhibit "C" p. 86, L. 16 to p. 87, L. 1). According to Jones, he never had any conversations with Ron Nall about his insurance coverage. (Exhibit "A" p. 63, L. 8 to p. 64, L. 6). Peggy Jones also says that she never had conversations with Ron Nall about insurance coverage. (Exhibit "B" p. 18, L. 18 to p. 19, L. 12).

---

[4] The Court may be wondering why State Farm has a copy of the Declarations Page of the 1998 policy but not the 1999 Renewal Certificate. The reason is that the 1998 policy was a new policy, not a renewal of the 1997 policy. State Farm did retain a copy of the 1999 Renewal back in the year 1999 and for some years following but, due to the passage of time, no longer retains one.

Prior to the October 2003 renewal for the 2003/2004 policy period, Jones received the Renewal Certificate attached as Exhibit "F". (Exhibit "A" p. 104, L. 7 to p. 105, L. 17). This Renewal Certificate was prepared August 25, 2003. (Exhibit "F" bottom of page). It was produced by Jones in his Responses to Defendants' Request for Production. This Renewal Certificate contains the statement set forth on pages 7-8 supra.     The fire loss occurred on July 28, 2004. (Exhibit "A" p. 10, L. 7). The policy in force and effect on the date of loss (July 28, 2004) states the way losses will be adjusted:

**SECTION I - LOSS SETTLEMENT**

Only the Loss Settlement provisions in the **Declarations** apply. We will settle covered property losses according to the following:

**COVERAGE A - DWELLING**

1.  **A1 - Replacement Cost Loss Settlement - Similar Construction**

    a.  We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the **Declarations**, the damaged part of the property covered under **SECTION I-COVERAGES, COVERAGE A - DWELLING**, except for wood fences, subject to the following:

        (1)  until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit shown in the **Declarations**, not to exceed the cost to repair or replace the damaged part of the property;

        (2)  when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the

12

       property, or an amount up to the applicable limit of liability shown in the **Declarations**, whichever is less.

(3)      to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed;

* * *

(Exhibit "G").

Jones obtained two estimates from local contractors to rebuild the home and had them sent directly to Claims Representative Mims Hackett at State Farm. (Exhibit "A" at p. 10, L. 19-23). The two estimates to replace the dwelling were each in excess of $200,000, which exceeded the limits ($116,856) of insurance in place at the time of the fire. (Exhibit "A" at p. 67, L. 17). Jones also had the "Increased Dwelling" coverage which provided an additional 20% of the stated insurance limits in the event that replacement cost exceeded the limits. (Id. at p. 65, L.12-16). Since the estimates exceeded limits ($116,856) and the Increased Dwelling coverage ($23,371), State Farm paid the Joneses $140,227, which represented the limits and Increased Dwelling coverage amount on the loss. (Id. p. 78, L. 22 to p. 79, L. 14).

After the State Farm claim representative told Jones that the estimates obtained exceeded the limits as adjusted by the Increased Dwelling coverage and that State Farm was going to pay the limits of the policy and the Increased Dwelling amount, Jones went to Ron Nall's office. (Id. at p. 72, L. 14 to p. 74, L. 3). Nall was not there. As noted earlier, Jones obtained from Nall's office assistant in September 2004 two printed papers of information contained in Ron Nall's computer system.

13

(Id.).  One piece of paper had the notation "Inspection" and the date 3-11-97.  (Id.).  Also, on this same document Jones obtained, is a line which states "SF 2128" (Exhibit "A" p. 73, L. 21) which means square footage 2128.  Jones interpreted this document to mean that someone (he assumes King) (Id. at p. 117, L. 7-10) measured the house in 1997 (Id. at p. 73, L. 18 to p. 74, L. 6) and measured it wrong (Id. at p. 72, L. 9-12) at 2128 square feet.  Jones says this is wrong because the house as built in 1970 was 80 feet by 30 feet (including the carport) (Exhibit "A" p. 22, L. 4 to L. 13) and was added on to twice, adding some 480 square feet (Id. at p. 43, L. 7-9) and 600 square feet (Id. at p. 44, L. 14 to p. 45, L. 18; p. 47, L. 5 to p. 48, L. 3) respectively.

There is no correlation between the language regarding an inspection done March 11, 1997 and the square footage noted on the document.  (Exhibit "D" ¶ 22).  As noted, the inspection was a quality inspection and no measurement was made.  (Id.).  The square footage of 2128 was not measured on March 11, 1997.  (Id.).  A policy was first issued to the Joneses in 1981, which is why 1981 is reflected on the document.  The square footage of 2128 reflected on the document was put in the system sometime between 1981 and the date the document was printed on September 4, 2004.  (Id.) .  There was a mandatory reinspection of all dwellings insured by State Farm which began in 1994 and continued into 1995.  (Id.).  There is no way to tell with the information still available to State Farm whether the 2128 square feet was entered into the system after that reinspection.  (Id.).

But for the amount paid on the dwelling coverage the Joneses are satisfied with State Farm's handling of the claim and have no complaints.  (Exhibit "A" p. 14, L. 1-12).  Jones does not think King intentionally mis-stated the square footage of the house but made a mistake.  (Id. at p. 117, L. 7-15).  Jones has known King for years and believes King has good character.  (Id. at p. 117, L. 8-10).  Jones does not think King would intentionally cheat Jones.  (Id. at p. 117, L. 11-13).

14

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the FEDERAL RULES OF CIVIL PROCEDURE, the moving party is entitled to a judgment as a matter of law where no genuine issues as to any material fact exist. The moving party bears the initial burden of proof of showing the absence of any genuine issue of material fact on the matters covered by the Motion for Summary Judgment; however, once the moving party has sustained its burden, the burden then shifts to the non-moving party to demonstrate by "substantial evidence that genuine issues of material fact do exist to warrant the matter being submitted to the finder of fact." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242 (1986); *Behalf of Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir. 1988). *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994), opinion modified on rehearing 30 F.3d 1347 (11th Cir. 1994).

In interpreting the substantial evidence rule, the United States Supreme Court has held that "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 447 U.S. at 249-50; citing *Adickes v. S.H. Kess & Co.*, 398 U.S. 144 (1970); *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 (1968); *Dombrowski v. Eastling*, 387 U.S. 82 (1967).

Summary judgment must be granted, under the undisputed facts, if the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Real Estate Financing v. Resolution Trust Corp.*, 950 F.2d 1540 (11th Cir. 1992), rehearing denied. Furthermore, if the non-moving party fails to establish a genuine issue of fact as to an essential element of his case, then the moving

party is entitled summary judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

To successfully defeat a motion for summary judgment, the non-moving party must offer evidence of specific facts showing a genuine issue of fact for trial. *United Steelworkers of America, AFL-CIO v. University of Alabama*, 599 F.2d 56, 61 (5th Cir. 1979). The non-moving party must show more than mere allegations and conclusory statements. *Id.* When a party moving for summary judgment "supports his motion with documents evidencing a high degree of credibility, the opponent must produce convincing proof attacking the documents in order to defeat the motion." *Hales v. First Appalachian Corp.*, 494 F.2d 330, 332-333 (D.C. Ala. 1980). *See e.g.* 10 Wright and Miller, *Federal Practice and Procedure*, §2727.

## ARGUMENT

### I.    THE JONESES HAVE NO CLAIM FOR BREACH OF CONTRACT.

As noted, the only dispute between the Joneses and State Farm is the amount of benefits paid for the damage to the dwelling.  The Joneses contend that the policy *should have* paid the average of the estimates obtained by Jones to replace the dwelling because that is the "replacement cost" of the dwelling.  While the estimates are evidence of the replacement cost of the dwelling, the policy in effect on the date of loss, July 28, 2004, pays the least of replacement cost or limits.  The Loss Settlement provisions clearly state that State Farm will pay the least of the cost to repair or replace or the limits for dwelling coverage set forth on the Declarations Page of the policy.  (Exhibit "G").  That policy language is unambiguous.  See *Hilley v. Allstate Ins. Co.,* 562 So.2d 184, 189-190 (Ala. 1990); *Huggins v. Hanover Ins. Co.,* 423 So.2d 147, 149 (Ala. 1982); *Blevins v. State Farm Fire & Cas. Co.,* No. CV-86-DT-0114-M (N.D. Ala. 1986)(Propst, Dist. Judge)(quoted in *Hilley*; applying Alabama law).   It is undisputed that State Farm paid the limits of the policy as reflected on the Declaration Page in effect at the time of the fire loss and paid the additional  "Increased Dwelling" coverage which the Joneses had in addition to the limits.  Thus, State Farm complied with the terms and conditions of the insurance policy in force and effect at the time of the fire loss.

Jones contends that the policy provided  "replacement cost" without regard to limits. [5] However, he has no substantial evidence to support that claim.  The policy between the Joneses and

---

[5] The policy does provide "replacement cost" subject to the limits.  The Loss Settlement provisions clearly state that, when the insured rebuilds, State Farm will pay the cost to repair or replace without regard to depreciation, which is taken into account when determining "actual cash value."  If the insured does not rebuild, he gets an "actual cash value" settlement up to the stated limits.

State Farm in effect on the date of loss (July 28, 2004) clearly provides that State Farm will pay the least of replacement cost or limits.

Although Jones does not have a specific recollection of doing so, he testified that generally when he got a new Renewal Certificate or new insurance policy, he would read same before putting it in his file at work. Jones does not recall receiving the Notice to Policyholders sent with the new insurance policy he obtained in October 1998. However, his lack of recollection of receiving the notice or the new policy does not change the terms and conditions of the policy which was in effect at the time of the fire loss in 2004. The 1998 policy was renewed in October from 1999 to 2003 and Jones received a Renewal Certificate each year it was renewed, the last one being almost a year before the fire. There is no doubt he received that one because he produced it in discovery. While Jones does not have a specific recollection of receiving the 1998 policy or the Renewal Certificates before the 2003 Renewal Certificate, he testified that he has no reason to doubt that they were sent to him and that he received them. He does not deny receiving the new policy and notice in 1998; he just doesn't recall it. Also, he paid the premium for the policy periods (October 8, 1998 to October 8, 2004) and is bound by the terms and conditions of that policy. There is no genuine issue of material fact as to those terms and conditions.

Jones contends that the insurance policy "should have" provided replacement cost coverage based on representations made by former agent Mark King in March 1997 and before. Stating the obvious, those representations, if made, were made prior to the issuance and acceptance of the policy in effect July 28, 2004. Therefore, the doctrine of merger and the parol evidence rule bar any evidence of discussions prior to the issuance of the contract which are inconsistent with the terms of the contract. *Concrete Metal Forms, Inc. v. Cole-Farley & Associates, Inc.,* 2000 WL 1848162

at *5 (S.D. Ala. 2000) citing *Hartford Fire Ins. Co. v. Shapiro*, 270 Ala. 149, 155, 117 So.2d 348, 354 (1960). All negotiations or representations made prior to the making of the contract are merged into the contract which then controls the obligations of each party, even if the policy does not conform to the preliminary negotiations/representations. *Concrete Metal Forms, supra* at *5.

The only way the Joneses would be able to maintain a breach of contract action for State Farm not paying "replacement cost period" in 2004 is to provide substantial evidence that an oral contract was made before July 28, 2004 and that the oral contract provided for "replacement cost period." The Joneses cannot produce such evidence. The conversations with King were before 1997, and King retired in March 2001. Jones never talked about insurance with Ron Nall. Nall, not King, was Jones's agent in 2003. Thus, there is no evidence at all, much less substantial evidence of a verbal contract entered into in 2003 which is different from the written contract sent to and accepted by Jones.

Because State Farm paid all benefits for the dwelling set forth in the contract between the Joneses and State Farm, which was in force and effect on July 28, 2004, State Farm is entitled to Judgment as a matter of law on the breach of contract claim.

## II.    THERE IS NO BAD FAITH.

This count is directed only to State Farm as there is no contract between the Joneses and Ron Nall. Based upon the discussions set forth on the breach of contract claim, the bad faith claim must fail as a matter of law. There must be a breach of contract before there can be bad faith. *State Farm Fire & Casualty Co. v. Slade*, 747 So.2d 293, 318 (Ala. 1999)("We think it clear that these authorities limit bad-faith liability to those cases in which the insured is entitled to benefits under

19

the policy."). Since Jones is not entitled to any more benefits under the policy, the bad faith claim fails.

State Farm anticipates that Jones will argue that State Farm had a duty to investigate whether a mistake had been made by King in the measurement of the square footage of the home in 1997 that carried over into the calculation of estimated replacement cost in 1997 and *ipso facto* carried over into the dwelling coverage amounts set forth on the Declaration Pages of the policies in force and effect for the policy periods 1997/1998 to 2003/2004.

While this argument does not change the contract which was in force on the date of loss, this argument assumes several things. First, it assumes King measured the home in 1997. Then the argument assumes he measured the home wrong. Then it assumes he calculated the estimated replacement cost wrong. Then it assumes that State Farm unilaterally "force places" the dwelling coverage amount of the insurance policy to match the agent's estimated replacement cost without any input or agreement from the policyholder.

It is undisputed King *inspected* the home in March 1997. For purposes of this motion, Jones says King *measured* in 1997 and that fact must be accepted when construing the facts most strongly in favor of the non-moving party. However, there is no evidence that King measured wrong in 1997. The same document which has "SF 2128" does not provide any information about when that figure was added to the system or by whom. Thus, it is sheer speculation to assume that King *measured* 2128 square feet in 1997 and calculated estimated replacement cost using that square footage.

It is not speculation to say that Jones agreed with whatever estimated replacement cost King gave to Jones in 1997 when King gave it to him because ***Jones says he did agree with King***. It is also not speculation to say that beginning no later than October 1998, Jones was on notice that the

20

policy was going to provide replacement cost up to the stated limits on the Declarations Page. Beginning no later than 2000,[6] and every renewal after that, it is also undisputed that Jones was advised that State Farm's estimate of replacement cost was not a guarantee and that Jones had the responsibility to select the amount of insurance he wanted.

Assuming, *arguendo*, that a mistake was made in the measurement of the house in 1997 and carried over into the calculation of estimated replacement cost and the amount of dwelling coverage amount set forth on the Declaration Page in 1997, none of that changes the policy which was in force and effect between the parties on the date of loss, July 28, 2004. Those facts do not alter or change the terms and conditions of the contract between the parties on that date. The last renewal date prior to the July 2004 fire was October 2003 and Jones had received the Renewal Certificate in August 2003 (and August each year starting in 1998 up to 2003) notifying him that he had the responsibility to obtain the appropriate amount of coverage and that State Farm's estimate of replacement cost was not a guarantee.

The claim was adjusted pursuant to the contract between the parties. Even if it be assumed that an investigation was done and that State Farm agreed that a mistake had been made in 1997, that would not change the terms and conditions of the insurance policy in effect on the date of loss in July 2004. Stated another way, State Farm would not be obligated to pay benefits pursuant to a mistake.

State Farm was obligated to pay the benefits provided by the insurance policy in force and effect on July 28, 2004, not a policy which "might have been" or "should have been." State Farm was not ***contractually*** obligated to pay benefits pursuant to a mistake made. That may give rise to

---

[6] As noted, since State Farm does not have a copy of the 1999 Renewal Certificate, it cannot, and will not, say definitively that the 1999 Renewal Certificate contained the statement.

a different cause of action (which will be addressed) but it does not give rise to a bad faith claim, which is based on contract. Since State Farm paid all benefits it was obligated to pay pursuant to the contract which was in force and effect on the date of loss, State Farm is entitled to Judgment as a matter of law on the bad faith claim.

## III.    THE JONESES HAVE NO CLAIM FOR FRAUD.

Neither Peggy Jones nor Jacob Jones had any conversations with Ron Nall about insurance coverage up to July 28, 2004. Thus, their fraud claim cannot be based upon discussions with Nall. There are no allegations of fraud against Ron Nall and he is entitled to Judgment on this claim.

Peggy Jones can recall no conversations at all with Mark King, other than the one time Mark King came to the residence and measured the exterior of the house. She had no conversations with King regarding insurance coverage on that occasion and has had no other conversations with King. Thus, the Joneses' fraud claim cannot be based upon any representations to Peggy Jones.

The Complaint alleges that in 1997 Mark King represented to the Joneses that they had replacement coverage insurance on their home since the inception of the policy. (Doc. 1, Complaint ¶26). "The representations made by prior State Farm agent Mark King misrepresented to the Joneses they had replacement coverage on their homeowner's insurance policy." (Id. ¶27).

As noted in the Statement of Undisputed Facts, Jacob Jones states that, over the years from 1981 to 1997, in passing conversations, he told King about changes (remodels, additions) to the house and King made statements to Jones that "you're covered" or that the Joneses had "replacement cost" coverage for the house. There is one document indicating King inspected the home March 11, 1997. Jacob Jones uses this document to place King's measurement and alleged conversation with Jones following same in March 1997.

Regardless of what Jones says King said from 1981 to 1997, a couple of very important facts are undisputed. First, in 1997, after Jones says King measured the home and called Jones and told Jones what he estimated the replacement cost to be, Jones agreed with King's figures. That shows disclosure by King and knowledge and agreement by Jones. Second, it is undisputed that in 1998 State Farm sent Jones a new policy and a notice that the new policy changed coverage provided by the previous policies. The notice and the policy sent in 1998 clearly state that the new policy provides replacement cost coverage subject to stated limits. Thus, if Jones thought he had "replacement cost period" prior to 1998, he was put on notice that with the new policy in 1998 he no longer did. At that time, State Farm also offered an additional coverage, "Increased Dwelling," which provided an additional 20% of limits in the event that replacement cost exceeded limits. Jones got this "Increased Dwelling" coverage. Why would he need this additional benefit if he had "replacement cost period?" The fact that he had this Increased Dwelling Coverage to provide additional benefits in the event that the replacement cost exceeded the limits shows that he knew (or should have known) that the limits on the Declarations Page were in fact limits of coverage. Otherwise, the Increased Dwelling Coverage had no field of operation.

Jones does not recall any conversations with King or representations made by King after 1997. Joneses' new policy was effective for the October 8, 1998 to October 8, 1999 policy period. A notice setting forth changes from previous policies, a new policy and a Declaration Page listing Option ID - Increased Dwelling Coverage were sent to Jones in 1998. If the March 11, 1997 date is accepted, and if the inspection, measurement and phone conversation in March 1997 are accepted, all of those were done more than a year prior to the new policy being issued in October 1998. Moreover, the doctrine of merger would bar evidence of any negotiations or conversations prior to

23

the issuance of the new policy October 8, 1998. *Concrete Metal Forms, supra*, citing *Hartford Fire Ins. Co. v. Shapiro*, 270 Ala. 149, 155, 117 So.2d 348, 354 (1960).

Jones does not say that King made any representations regarding coverage after the 1998 policy was issued which were inconsistent with the provisions of the policy. Even if he did, any such misrepresentation could not form the basis of a fraud action because, as a matter of law, a policyholder cannot rely upon such representations which are inconsistent with the policy language. *Syx v. Midfield Volkswagen, Inc.,* 518 So.2d 94, 95 (Ala. 1987); *Torres v. State Farm Fire & Cas. Co.,* 438 So.2d 757, 758-759 (Ala. 1983).

In *Syx, supra*, Mr. Syx purchased a motor vehicle and applied to the defendant insurance agency for an automobile insurance policy issued by the defendant insurance company. Mr. Syx testified that the insurance agent told him that "he was applying for 'full coverage,' including liability coverage." *Id.* at 95. Although Mr. Syx was given the opportunity to read the insurance application, he chose not to do so, and he also chose not to read the issued policy sent to him in the mail by the insurance company. *Id.* Five and one-half months after receiving the policy in the mail, Mr. Syx was involved in an accident and learned for the first time that he had no liability coverage. *Id.* Mr. Syx sued the insurance agent and the insurance company, among others, claiming that the insurance agent had fraudulently misrepresented to him that he had "'full coverage,' including liability coverage." *Id.* Noting that reasonable reliance was "an essential element of a fraud action," *id.* at 96, the Supreme Court of Alabama held that Mr. Syx had acted unreasonably as a matter of law by failing to read the insurance application and the insurance policy and thereby failing to discover that his policy did not contain liability coverage. *Id.* at 96-97. No fraud.

That case is remarkably similar to this case. Jones says that he wanted "replacement cost period" and that King repeatedly represented to him between 1981 and 1997 that he had "replacement cost coverage." While there were no representations made after 1997, even if there were representations made after 1997 similar to those made between 1981 and 1997, the letter and notice sent prior to the new policy issued in 1998, and the new policy itself, clearly state that State Farm will pay the least of replacement cost or limits, whichever is less. Jones understood the notice and Renewal Certificate at the time of his deposition. He is well educated and has no infirmities which would have prevented him from reading them in 1998 and each year thereafter up to and including 2003.

A policyholder has a duty to read his policy. *Foremost Ins. Co. v. Parham*, 693 So.2d 409, 421 (Ala. 1997). The Eleventh Circuit has recognized this "duty to read" requirement: "Alabama law imposes upon a party the duty to read and inspect any document which might affect that person's legal rights of liabilities. It must be said that the receipt of such a document would 'provoke inquiry by a person of ordinary prudence,' and that inquiry necessarily would consist of actually reading the document. This obligation is part of the 'concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests,' as stated in *Torres*. If the facts constituting an alleged fraud claim would be apparent from simply reading a given document, a plaintiff's failure to do so renders his reliance on previous misrepresentations unreasonable under the circumstances". *Ramp Operations, Inc. v. Reliance Ins. Co.*, 805 F.2d 1552, 1556 (11th Cir. 1986). A policyholder cannot rely upon statements that are inconsistent with the language set forth in the policy. *Syx, supra; Torres, supra*. Statements by an agent that a policy is "all risk" or "full coverage" or "the

25

best" or "a cadillac" are not actionable. *State Farm Fire & Casualty Co. v. Slade*, 747 So.2d 293, 323 (Ala. 1999). Such statements have been held to be "puffery", not statements of fact. *Id.*

In the face of the documents sent to him in October 1998 clearly stating that the policy was subject to stated limits and that guaranteed replacement cost was being eliminated, Jones could not reasonably think that he had "replacement cost period." Jones understood the notice sent in 1998 when he read it in his deposition. Jones also understood the notice printed on the 2003 Renewal Certificate (which he produced) which said that the policyholder is responsible for selecting the appropriate amount of coverage. This same language was on each Renewal Certificate from at least 2000 to and including 2003. The 2003 Renewal Certificate was sent to Jones in August 2003, almost a year before the July 2004 loss. Jones was on notice that he was responsible to select limits and that the policy's replacement cost coverage would pay no more than those limits (as adjusted by Increased Dwelling, if applicable). Thus, State Farm is entitled to Judgment on the fraud claim.

## IV.    JACOB JONES HAD THE DUTY TO SELECT THE APPROPRIATE AMOUNT OF COVERAGE.

Jones contends that Mark King did not accurately measure his house in 1997 and did not select the appropriate amount of insurance to provide "replacement cost" benefits in the event of a total loss. Jones says that King measured the exterior of the home in 1997; that King did not measure it correctly; that the estimated replacement cost was based upon the inaccurate measurement; that the dwelling coverage amount in 1997 was based upon the erroneous estimated replacement cost and was too low in 1997; and that this error continued into the 1998 policy and beyond.

26

This contention misses several points. First, Jones has the duty to select the coverage amount. The Renewal Certificate which was sent to Jones before the new 1998 policy renewed again on October 8, 2003 (and almost one year before the fire loss) has a clear statement that the limits are only an estimate of replacement cost and that it is up to the policyholder to secure the appropriate amount of insurance coverage. Second, Nall was the Joneses' agent in 2003 when the policy renewed October 8, 2003. Neither Nall nor State Farm undertook a duty to select the limit of insurance. Third, Jones knew the square footage of his home. (Exhibit "A" p. 21, L. 2; p. 55, L. 7-10). Fourth, in 1997, Jones knew more about his home than King did. He knew what additions and remodels had been done, how many square feet had been added (Id. at p. 55, L. 20 to p. 56, L. 2) and he knew what those additions and remodels cost. (Id. at p. 56, L. 8-11). Jones could have divided the square footage of the additions into the cost of the additions to arrive at a per square foot price of what the additions cost. (Id.). Thus, Jones had superior knowledge to King. Actual knowledge of construction cost is superior to estimates. Fifth, the limits of insurance were clearly stated on the Renewal Certificate sent before each renewal. Jones received the Renewal Certificates and noted what those limits were. Therefore, Jones had the ability to divide the limits by the square footage which he knew the house to be to arrive at a per square foot amount that the limits of insurance represented. He could then compare that to the per square foot cost of the construction costs which he (not King) knew. Sixth, Jones received property appraisals from the tax assessor each year. Therefore, Jones had information related to the value of the home. Seventh, Jones is presumed to know the value of his home. A homeowner can testify to the before and after value of his home, *Alabama Power Co. v. Cummings*, 466 So.2d 99, 102-103 (Ala. 1985), because the law presumes he knows what that value is.

Jones says that he was relying upon King to select the correct amount of insurance to insure that there was sufficient replacement cost in effect in the event of a total fire loss.  In view of the clear notice to Jones in 1998 and the statement set forth on the 2000, 2001, 2002 and 2003 Renewal Certificates, Jones could not rely upon the fact, if it is a fact,[7] that King had selected the appropriate amount of coverage in 1997 to mean that it was still the appropriate amount of coverage in 2003. King did not undertake any duty to select the appropriate amount of coverage in 1998 when the new policy was issued, nor could he unilaterally do so, and the notices provided by State Farm to Jones between 1999 and 2003 clearly state that it is Jones's duty to select the coverage amount.  Jones is not uneducated when it comes to math and financial figures.  He majored in Math at Troy State University and is Manager of Finance and Accounting of Alabama Electric Cooperative and has been for 21 years.  King retired in 2001.  There is no evidence that he or Ron Nall undertook a duty to select the coverage amount in October 2003.  Jones had that duty.

## V.      THERE WAS NO NEGLIGENT FAILURE TO ISSUE INSURANCE.

Count V of the Plaintiffs' Complaint alleges negligent and wanton failure to issue a policy of insurance.  This claim can be disposed of by the simple fact that a policy was, in fact, issued. Therefore, State Farm did not fail to issue a policy.

To the extent that this count can be read as a negligent failure to procure insurance (given Count VI Wanton Failure to Procure a Policy of Insurance, it appears that Plaintiffs intended to state

---

[7] In his deposition, as set forth in the Statement of Undisputed Facts, Jones said that when King measured the home in 1997 and called Jones and told Jones what he had measured and what King's estimated replacement cost was that Jones agreed with King's figures.  If he had "replacement cost period", there was no need for King to calculate replacement cost and communicate it to Jones.

a claim for a failure to issue in Count V as opposed to failure to procure in Count VI), there was no negligent failure to procure insurance either.

Negligent failure to procure insurance requires the normal elements for negligence: (1) duty; (2) breach of duty; (3) proximate cause; and (4) damage. *Kanellis v. Pacific Indem. Co.,* 917 So.2d 149, 155 (Ala.Civ.App. 2005), citing *Albert v. HSU*, 602 So.2d 895, 897 (Ala. 1992). A duty to procure insurance does not arise unless and until there is an agreement between the agent and the insured as to the insurance wanted by the insured. *Lewis v. Roberts*, 630 So.2d 355, 357 (Ala. 1993)("once the parties have come to an agreement on the procurement of insurance, the agent or broker must exercise reasonable skill, care and diligence in effecting coverage."). The essential terms of an insurance contract are rate of premium, duration of policy, nature of risk, description of person or property or interest to be insured and its location, and amount of insurance. *Gulf Gate Management Corp. v. St. Paul Surplus Lines,* 646 So.2d 654, 658 (Ala. 1994); *Sun Ins. Office of London v. Mitchell*, 188 Ala. 420, 65 So. 143, 146 (Ala. 1914).

As the previous section establishes, there was not a duty on the part of Mark King or State Farm to select or "force place" a particular amount of insurance in 1997. Either there was discussion and agreement with Jones as to the amount of insurance per the testimony of Mark King, which negates a claim for negligent failure to procure insurance; or there was no discussion at all between Jones and King concerning insurance per the testimony of Jones, which again negates a claim for negligent failure to procure. If Jones says that he left it totally up to King to procure a policy which King thought was adequate, then King procured that policy. In order for there to be a negligent failure to procure, there has to be an agreement between the agent and the policyholder as to the insurance the policyholder wants and then failure by the agent to procure that coverage after the

29

policyholder has provided to the agent everything the agent needs to procure coverage. *Timmerman Ins. Agency, Inc. v. Miller*, 285 Ala. 82, 229 So.2d 475 (Ala. 1969). That is, there must be a meeting of the minds between the insured and the insurance company and a failure of the agent to procure the insurance agreed upon.

If there was no discussion at all about insurance matters per the testimony of Jacob Jones and King just picked the dwelling coverage amount and Jones agreed to what King picked, then King procured the insurance agreed upon -- no failure to procure. On the other hand, if in fact there was discussion and agreement between King and Jones as to the type or amount of coverage Jones wanted, including the dwelling coverage amount, there is no negligent failure to procure insurance. The only way there would be failure to procure in this case would be if Jones produced substantial evidence that Jones wanted, for example, $150,000 in coverage and King agreed to procure it and then procured only $100,000 or failed to procure it at all.

There is no evidence that the Joneses applied for "replacement cost period" in 1981 when the Joneses first obtained insurance from State Farm. There is no evidence that, after 1981, the Joneses ever applied for a different type of coverage. There is evidence that King told Jones "you're covered" and that the Joneses had "replacement coverage" from time to time but that is not evidence of a "meeting of the minds" sufficient to sustain a negligent failure to procure claim.

There is simply no substantial evidence that King or State Farm undertook a unilateral duty to pick the coverage amount. Even if King unilaterally undertook a duty to procure, if he picked the dwelling coverage amount, he procured what he picked. Absent a duty, there can be no negligence. Moreover, the doctrine of merger would bar evidence of any negotiations or conversations prior to the issuance of the policy October 8, 1998. *Concrete Metal Forms, supra.*

Jones's allegation is that King failed to procure "adequate" insurance in 1997. As set forth in the earlier sections of this brief, a new policy was issued in 1998 eliminating "guaranteed replacement cost" coverage and if Jones thought up to that point that he had "replacement cost period" he was on notice from that point on that he did not. There is no evidence at all, let alone substantial evidence, that there was any meeting of the minds in 1998 that King would procure "replacement cost period." He could not. With the change in the policies and the new policy issued in 1998, Jones could not have obtained "replacement cost period" without regard to limits. Even though State Farm contends Jones *never* had replacement cost not subject to limits, even if Jones did or thought he did, he could not get that kind of coverage anymore from State Farm beginning October 1998. King could not be responsible to procure insurance that it was impossible to procure.

Jones's argument essentially is that King did not estimate the replacement cost correctly in 1997 and that his negligence rolled over into 1998. It was not foreseeable to King in 1997 that the policy was going to change in 1998, and since Jones does not provide any evidence that King agreed to procure "replacement cost period" in 1998, there was no duty to do so.

Moreover, the doctrine of contributory negligence applies to a claim for negligent failure to procure adequate insurance. *Kanellis v. Pacific Indemn. Co.*, 917 So.2d 149, 154-155 (Ala.Civ.App. 2005). In *Kanellis*, the owner of a Porsche automobile secured an insurance policy from Pacific Indemnity Company. The automobile was involved in an accident and Pacific Indemnity Company paid the cost to repair the vehicle. However, the Kanellises claimed to have suffered diminution of value of $35,000. The Kanellises sued Pacific Indemnity Company and the agents from whom the insurance policy was obtained alleging that they wanted a policy of insurance which would pay them a separate benefit to compensate them for any depreciation in the value of the Porsche that might

31

result from a collision. *Id.* at 155. The insurance policy had an "agreed value" of $121,000 on the automobile. The insurance policy provided that in the event of a collision that caused the Porsche automobile to be "partially damaged," Pacific Indemnity would "pay the amount required to repair or replace, whichever is less, the damaged part(s) without deduction for depreciation, up to the amount of coverage." *Id.* In reviewing the Kanellises' negligent failure to procure claim, to which the trial court had granted summary judgment, the Alabama Court of Civil Appeals held that an insured has a duty to read his policy and is presumed to be familiar with the provisions of the policy (citing *Hartford Fire Ins. Co. v. Shapiro*, 270 Ala. 149, 155, 117 So.2d 348, 354 (1960). *Id.* The Court of Civil Appeals stated:

> In this case, the Kanellises were issued a policy of insurance by Pacific that provided that Pacific's sole duty in the event of a collision that caused the Kanellises' Porsche automobile to be "partially damaged," was to "pay the amount required to repair or replace, whichever is less, the damaged part(s) without deduction for depreciation, up to the amount of coverage." While the policy that Pacific issued to the Kanellises states that the Porsche automobile had an "agreed value" of $121,000, that amount simply represented the "amount of coverage," *i.e.,* the ceiling of Pacific's potential liability, under the policy. There is no language in the Pacific policy that would tend to indicate that Pacific would pay the Kanellises a separate benefit to compensate them for any depreciation in the value of the Porsche that might result from a collision, and a review of the policy would have revealed that no such depreciation coverage was afforded thereunder. Moreover, the Kanellises adduced no evidence that would tend to indicate that they were anything less than "competent in intelligence and background to understand insurance policy language." *Allstate Ins. Co. [v. Ware]*, 824 So.2d 739, 745 (Ala. 2002).

> Like any negligence claim, a claim in tort alleging a negligent failure of an insurance agent to fulfill a voluntary undertaking to procure insurance, such as that asserted by the Kanellises in this case, requires demonstration of the classic elements of a negligence theory, *i.e.,* "(1) duty, (2) breach of duty, (3) proximate cause, and (4) injury." *Albert*

> *v. HSU*, 602 So.2d 895, 897 (Ala. 1992).   Under Alabama law,
> however, contributory negligence is a complete defense to a claim
> based on negligence.  *Mitchell v. Torrence Cablevision USA, Inc.*,
> 806 So.2d 1254, 1257 (Ala.Civ.App. 2000).  We agree with CAH and
> Chambers that in light of the clear language of the Pacific policy
> issued to the Kanellises, the record is susceptible only to the
> conclusion that, as a matter of law, the Kanellises "'put [themselves]
> in dangers way'" and had a "'conscious appreciation of the danger'"
> of suffering a monetary loss in the event of a collision involving the
> Porsche automobile resulting in a diminution of value of the Porsche.
> *See Hannah v. Gregg, Bland & Berry, Inc.,* 840 So.2d 839, 860 (Ala.
> 2002).

*Id*. at 155.  *Kanellis* is remarkably similar to this case.  Jones claims that the policy in force on July

28, 2004 was a "replacement cost" policy and that the limits stated on the Renewal Certificate did

not mean that was the maximum that State Farm would pay in the event of a total loss.  However,

the clear language of the State Farm policy issued to Jones in 1998 revealed to Jones that State Farm

would pay replacement cost up to the limits set forth in the Declarations of the policy plus an

additional 20% of those limits if he had Increased Dwelling.  Thus, as a matter of law, Jones was

guilty of contributory negligence in failing to understand that the dwelling coverage was subject to

limits of coverage.

The elements necessary for the Plaintiffs to proceed on a theory of negligent (or wanton)

failure to procure insurance are simply not supported by substantial evidence.  Since Ron Nall did

nothing wrong, he is entitled to Judgment.  Since King did nothing wrong, State Farm is entitled to

Judgment.  Therefore, Ron Nall and State Farm are entitled to Judgment on the Plaintiffs' claim for

negligent/wanton failure to issue a policy of insurance.

## VI.    THERE IS NO WANTON FAILURE TO PROCURE A POLICY OF INSURANCE.

Count VI of the Complaint alleges that Plaintiffs sought and relied upon the advice and counsel of Agent Ron Nall, prior State Farm agent Mark King, and fictitious defendants regarding the appropriate procedure for procuring insurance policies to provide adequate coverage for the dwelling.  (Doc. 1, Complaint ¶34).  The Complaint further alleges that the Jones relied on the Defendants' knowledge and expert when writing the insurance policy and that the Defendants indicated to the Plaintiffs that they had homeowners replacement value coverage insurance.  (Id. ¶35).  Finally, this count alleges that the Defendants' failure to procure insurance policies to the Plaintiffs caused the Plaintiffs damage and that State Farm has refused the Plaintiffs' claim.  (Id. ¶36).  The undisputed evidence is that the Plaintiffs never talked to Agent Ron Nall about insurance and did not seek and rely upon his advice.  Therefore, Ron Nall is entitled to Judgment on this claim. The undisputed evidence is further that State Farm did not refuse the Plaintiffs' claim.  State Farm paid the limits of the insurance policy pursuant to the terms and conditions of the policy.

The allegations of Count VI do not support a claim for wantonness.  Plaintiffs allege failure to exercise due care in the procurement and sale of policies of insurance to the Plaintiffs.  (Id. ¶35). This is insufficient to state a claim for wantonness.  Cf. *Jackson v. Vaughn*, 204 Ala. 543, 86 So. 469, 470 (1920).

Furthermore, there is no substantial evidence to support a claim for wanton failure to procure a policy of insurance.  As previously discussed, the most that the Plaintiffs allege is that a mistake was made in the measurement of the home and the calculation of estimated replacement cost.  There is certainly no substantial evidence to support any claim of reckless indifference with regard to the Joneses.  Wantonness requires conscious disregard, which requires knowledge on the part of the

34

Defendants. *Thompson v. United Companies Lending Corp.*, 699 So.2d 169, 175 (Ala.Civ.App. 1997)("the Thompsons failed to adduce any evidence of Rains's state of mind tending to indicate that he consciously or intentionally misrepresented the Thompson's ... insurance coverage.").

State Farm sent all policyholders a notice of changes to the policy, a new policy, and a new Declaration Page in 1998. According to Jones, there was no discussion with Mark King after this change. The legal effect is that the Joneses paid a premium for an insurance policy which provided replacement cost coverage up to the limits set forth on the Declaration Page beginning in 1998 and continuing into 2003. Jones now says that he did not agree to any such limitation because he thought the policy provided "replacement cost" without regard to limits based upon the representations made to him by Mark King from 1981 to 1997. However, those representations all preceded 1998. Therefore, there was no agreement or meeting of the minds of a different policy than the one in force and effect on the date of loss, July 28, 2004. There is certainly no substantial evidence of conscious knowledge on the part of Mark King that the limits set forth in the 1998 policy and thereafter were inadequate and that King did nothing about it in conscious disregard of the rights of the Joneses. Jones admitted that King has good character and did not and would not intentionally harm Jones. Jones simply thinks King made a mistake. State Farm is entitled to Judgment on the wanton failure to procure insurance claim.

## CONCLUSION

Ron Nall and State Farm are entitled to Judgment as a matter of law.  State Farm paid all benefits pursuant to its contract with the Joneses.  There is no cause of action against Ron Nall because he did nothing other than act as servicing agent for Jones after Mark King retired in March 2001.  There is no fraud claim against State Farm based upon King's actions.  King made no misrepresentations about the new policy issued in 1998 and did not fail to procure a policy Jones and he agreed upon.  Jones failed to read the notices to him advising him of changes in coverage provided by the new policy beginning in 1998 and failed to perform his responsibility to select the appropriate amount of insurance.  No one undertook that duty for Jones after the new policy was issued in 1998.  Jones accepted that policy and is bound by the terms and conditions of that policy which was in force and effect on July 28, 2004.

**RESPECTFULLY SUBMITTED** this the 20th day of February, 2007.

      /s/ Micheal S. Jackson

**MICHEAL S. JACKSON [JACKM8173]**
**MICHAEL B. BEERS [BEERM4992]**
Attorneys for Defendants Ronald Nall and
State Farm Fire and Casualty Company

BEERS, ANDERSON, JACKSON,
  PATTY, VAN HEEST & FAWAL, P.C.
P. O. Box 1988
Montgomery, Alabama  36102-1988
(334) 834-5311
(334) 834-5362 (fax)
mjackson@beersanderson.com
mbeers@beersanderson.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2007, I electronically filed **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Marcus Jones, Esq.
LAW OFFICE OF MARCUS JONES
2416 Walking Fern Lane
Hoover, Alabama 35244


and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

Brian P. Winter, Esq.
ADCOX WINTER, LLP
611 Helen Keller Blvd.
Tuscaloosa, AL 35404


/s/ Micheal S. Jackson_____
**OF COUNSEL**
