## <u>INDEX OF EXHIBITS</u>

Exhibit "A"        -        Deposition Transcript of Jacob Jones

Exhibit "B"        -        Deposition Transcript of Peggy Jones

Exhibit "C"        -        Deposition Transcript of Mark King

Exhibit "D"        -        Affidavit of Bill Lovell

Exhibit "E"        -        Notice of Changes

Exhibit "F"        -        2003 Renewal Certificate

Exhibit "G"        -        Loss Settlement Provisions

Exhibit "H"        -        2000 Renewal Certificate

Exhibit "I"        -        2001 Renewal Certificate

Exhibit "J"        -        2002 Renewal Certificate

Exhibit "K"        -        2003 Renewal Certificate

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JACOB N. JONES and
PEGGY C. JONES,

     Plaintiff,

  vs.                        CASE NO.
                      2:05-CV-1119-WKW-SRW

STATE FARM INSURANCE
COMPANY, et al.,

     Defendants.


\* \* \* \* \* \* \* \* \* \* \* \*



     DEPOSITION OF JACOB JONES, taken

pursuant to stipulation and agreement before Tracye

Sadler, Certified Shorthand Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Beers, Anderson, Jackson, Patty,

Van Heest & Fawal, Suite 100, 250 Commerce Street,

Montgomery, Alabama, on January 17, 2007,

commencing at approximately 11:40 a.m.



\* \* \* \* \* \* \* \* \* \* \* \*



EXHIBIT
A

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
Mr. Bryan P. Winter
ADCOX-WINTER, LLP
Attorneys at Law
611 Helen Keller Boulevard
Tuscaloosa, Alabama 35404

ON BEHALF OF THE DEFENDANT:

Mr. Micheal S. Jackson
BEERS, ANDERSON, JACKSON, PATTY,
VAN HEEST & FAWAL, P.C.
Attorneys at Law
Suite 100
250 Commerce Street
Montgomery, AL 36104

ALSO PRESENT:
Mr. Jacob Jones

* * * * * * * * * * *

EXAMINATION INDEX

BY MR. JACKSON . . . . . . . . . .  6

(Index continued on next page)

Page 3

DEFENDANT'S EXHIBITS
1   Computer Screen Printout                          74
2   Computer Screen Printout                          74
3   Computer Screen Printout                          76
4   Alabama Property Record Card                      78
5   9-1-04 Ltr to the Jones from Hackett              79
6   Declarations Page for '96-'97                     81
7   Homeowner's Policy for '96-'97                    82
8   Declarations Page for '97-'98                     83
9   Declarations Page for '98-'99                     84
10  Document:  Important Notice About          84
    Changes to Your Policy

11  Homeowner's Policy                                87

12  Declarations Page for '99-'00                     90

13  Homeowner's Policy                                91

14  Declarations Page for '00-'01                     92

15  Homeowner's Policy                                92

16  Declarations Page for '01-'02                     93

17  Homeowner's Policy                                93

18  Declarations Page for '02-'03                     94

19  Homeowner's Policy                                96

20  Declarations Page for '03-'04                     97

21  State Farm Document                               98

Page 4

STIPULATIONS

It is hereby stipulated and agreed by and
between counsel representing the parties that the
deposition of JACOB JONES is taken pursuant to the
Federal Rules of Civil Procedure and that said
deposition may be taken before Tracye Sadler,
Certified Shorthand Reporter and Commissioner for
the State of Alabama at Large, without the
formality of a commission, that objections to
questions other than objections as to the form of
the question need not be made at this time but may
be reserved for a ruling at such time as the said
deposition may be offered in evidence or used for
any other purpose by either party provided for by
the Statute.

It is further stipulated and agreed by and
between counsel representing the parties in this
case that the filing of said deposition is hereby
waived and may be introduced at the trial of this
case or used in any other manner by either party
hereto provided for by the Statute regardless of
the waiving of the filing of the same.

It is further stipulated and agreed by and

Page 5

between the parties hereto and the witness that the
signature of the witness to this deposition is
hereby waived.

* * * * * * * * * * * *

JACOB JONES

The witness, after having first been duly sworn
to speak the truth, the whole truth, and nothing
but the truth, testified as follows:

EXAMINATION

BY MR. JACKSON:

Q.  Mr. Jones, I introduced myself before the
    deposition of your wife, Peggy, started.
    I'm Mike Jackson representing State Farm
    Fire & Casualty Company and Ron Nall.  You
    sat through your wife's deposition.  So I
    can kind of give you the same instructions
    in terms of head-nods and saying uh-huh and
    huh-uh.  Please don't think I'm rude if I
    ask you to follow that up with a verbal
    response.
       If you would state your full name,

Page 6

```
 1    please.
 2    A.  Jacob Nolan Jones.
 3    Q.  And you were born and raised in Covington
 4        County?
 5    A.  Correct.
 6    Q.  In what community?
 7    A.  Straughn community.
 8    Q.  Your wife has already told me about your
 9        children.  Did you have any relatives on
10        the Jones side of the family in Covington
11        County?
12    A.  Yes.
13    Q.  What are their last names?
14    A.  Jones, Wilkes, Andrews.  That's basically
15        all.
16    Q.  What community are the Jones relatives
17        from?
18    A.  Straughn community.  Wilkes, Straughn
19        community also.  And Andrews, Rose Hill
20        community, an adjacent community.
21    Q.  Okay.  Very good.  Do you have any
22        relatives in the surrounding counties,
23        Crenshaw, Pike --
```

Page 7

```
 1    A.  No.
 2    Q.  And how far did you go through school?
 3    A.  I finished high school, finished college.
 4    Q.  You went to Straughn High School?
 5    A.  Yes.
 6    Q.  And what year did you graduate?
 7    A.  1962.
 8    Q.  And where did you go to college?
 9    A.  Troy.
10    Q.  And graduated when?
11    A.  In '66.
12    Q.  With what degree?
13    A.  B.S. in mathematics and minor in accounting
14        and physical science.
15            MR. JACKSON:  Off the record.
16            (Off-the-record discussion.)
17    Q.  And as I understand it you're currently
18        working with Alabama Electric Co-op?
19    A.  Correct.
20    Q.  And how long have you worked with that
21        organization?
22    A.  Since November of 1967.
23    Q.  So that was shortly after Troy State?
```

Page 8

```
 1    A.  Right.  I worked one year as a salesman for
 2        Mann Rental Service in Andalusia, Alabama.
 3    Q.  What does that business sell?
 4    A.  They service and supply restaurants and
 5        hotels with linen supplies.
 6    Q.  What's your current position with AEC?
 7    A.  Manager of finance and accounting.
 8            MR. JACKSON:  Off the record.
 9            (Off-the-record discussion.)
10    Q.  When you started with AEC in '67, what was
11        your first position?
12    A.  I was right of way -- procured right of way
13        to build new lines.
14    Q.  What was your next position after that?
15    A.  Moved into the accounting department.
16    Q.  Been there ever since?
17    A.  Right.
18    Q.  And when did you become manager of it?
19    A.  Mid '80s, mid -- '85, '87.
20    Q.  So you're going on 40 years?
21    A.  Right.
22    Q.  In November of '07 you will be there 40
23        years?
```

Page 9

```
 1    A.  Right.
 2    Q.  Your wife said something about retiring.
 3        Prior to this house fire did you have plans
 4        to retire?
 5    A.  I had planned to retire at age 60, which
 6        was --
 7    Q.  What year would that have been?
 8    A.  That would have been the end of 2005.
 9    Q.  Okay.  Does AEC have some kind of
10        retirement plan that combines age and
11        service?
12    A.  No.  They have a 62 retirement plan, but
13        anytime after 55 with a small cut you can
14        leave.
15    Q.  Early retirement?
16    A.  Early retirement.
17    Q.  And obviously you did not retire in '05.
18        You're still working?
19    A.  Right.
20    Q.  Do you attribute that directly to the fact
21        that there is a mortgage on the new home?
22    A.  Probably 90 to 95 percent of that is the
23        reason.
```

Page 10

1   Q.  What other factor besides that?
2   A.  Well, just -- I guess I began to look at
3       the fact of maybe I should have stayed on
4       till I was 62 and --
5   Q.  To get more benefits?
6   A.  To get full benefits.
7   Q.  Now, after the fire that occurred on July
8       28th of 2004, you got a couple of
9       estimates, one from Scott Dutton
10      Construction and one from Wyatt Sasser; is
11      that right?
12  A.  That's true.
13  Q.  Just subject to check -- I don't expect you
14      to know these to the exact amount.  But it
15      appears that the one from Scott Dutton
16      Construction was for $237,840 and the one
17      from Wyatt Sasser Construction was for
18      $213,456.  Does that sound right to you?
19  A.  I do not know.  Because my instructions
20      from Mims Hackett was that I was to get two
21      contractors to give a bid, send them
22      directly to him -- not through me, but to
23      him.  And I never saw nor have I to this

Page 11

1       day seen the two.
2   Q.  So your involvement with it was contacting
3       the builders and asking them if they would
4       provide an estimate for the reconstruction
5       of the home?
6   A.  I asked Mr. Sasser because I knew him.  I
7       asked two or three other contractors, and
8       they were not interested in doing it.  They
9       said they were booked for two to three
10      years.  I contacted Mr. Dutton.  I believe
11      he was like the third person, maybe the
12      fourth one I contacted.  He said he would
13      be glad to.  So Mims asked for two and that
14      was the two.
15  Q.  Did you provide any information to either
16      Scott Dutton Construction or Wyatt Sasser
17      in the sense of plans or size or
18      configuration of the existing home that had
19      been destroyed?
20  A.  No.  Both of them were familiar with the
21      home.  I would not say that I did not say
22      there was approximately "X" number of
23      square feet, but I don't think I did.  I

Page 12

1       think it was -- they were both very
2       familiar with my home.
3   Q.  Was that from doing work out there?
4   A.  No, not from doing work.  Just knowing me
5       and knowing my -- you know, where I lived
6       and things of this nature.  Neither one of
7       them had ever done any work for me before.
8   Q.  To your knowledge did either one of them
9       come out there to the premises and walk
10      around the house and make measurements or
11      anything to kind of get an idea of what you
12      had?
13  A.  I'm not sure either one of them -- I think
14      both of them made measurements.  But both
15      of them did visit the site because both of
16      them asked for permission to go on the site
17      so they could properly -- while the
18      construction was -- what was left was still
19      there.
20  Q.  Did you have any discussion with either one
21      of them about what was there before the
22      fire in terms of bedrooms, baths, playroom,
23      that kind of thing?

Page 13

1   A.  Did not.
2   Q.  No specifics about that?
3   A.  I do not remember any conversation at all.
4   Q.  Who ended up rebuilding the house across
5       the street?
6   A.  Wyatt Sasser or Sasser Construction
7       Company.
8   Q.  And did he build it for this estimated
9       price here or was it a different price?
10  A.  No.  It was a different price.
11  Q.  And how much was that?
12  A.  293,000, I believe.  That was the original
13      estimate on the home.
14  Q.  And that was based upon the take-off from
15      the plans that you had gotten from Denita
16      Messick?
17  A.  True.  But that was not the final price
18      that I actually paid.
19  Q.  Right.  What was that?
20  A.  Well, with landscaping and the paving of
21      the driveway and my heating and cooling
22      system which was not included in the bid,
23      approximately $327,000.

Page 14

1   Q.  Okay.  Of course, we're going to talk about
2       this insurance issue.  You heard some
3       questions I asked your wife just kind of
4       preliminarily just to make sure what we
5       are -- you know, have issues about and what
6       we don't have issues about.  But for the
7       amount paid to you and Ms. Jones for the
8       house itself, were you satisfied with what
9       State Farm did and how State Farm went
10      about adjusting the other part of the
11      claim, contents, additional living?
12  A.  Yes.
13  Q.  I know at some point in time while y'all
14      were out of the house somebody came in and
15      stole some stuff.
16  A.  True.
17  Q.  So you also had a theft claim in addition
18      to this fire claim?
19  A.  Right.
20  Q.  Are you satisfied with the way that theft
21      claim was handled?
22  A.  No, sir.
23  Q.  You're not.  Okay.

Page 15

1   A.  I was satisfied with what they gave me.  I
2       think what they gave me was fair.  But the
3       thing they didn't bother to tell me was by
4       me filing two claims in the same policy
5       year, then the next time I went back in for
6       renewal I was going to get hit with a
7       penalty because of filing two claims.  I
8       only got a small amount of money.  If they
9       had told me, I would have never filed a
10      claim.
11  Q.  Okay.  Your lawyer may change things.
12      Right now, as the way the paperwork is set
13      up, the theft claim and the handling of
14      that, you know, that's not part of the
15      lawsuit.
16  A.  I'm not -- I don't want to pursue that.
17      Just the house.
18  Q.  All right.
19  A.  I mean, you just asked the question was I
20      satisfied.
21  Q.  Exactly.  I did.
22      Now, you provided me some documentation
23      through your lawyer.  I made a request for

Page 16

1       documentation that y'all had related to the
2       insurance on the home.
3   A.  True.
4   Q.  And you provided your lawyer and then he
5       provided me some documentation that y'all
6       had related to the various things that I
7       requested.  Let me ask -- just kind of get
8       a general sense and an idea of how you went
9       about maintaining records, your filing
10      system there at the house or whether you
11      filed things at the office or how you kept
12      up with things.  With regard to, for
13      example, insurance, specifically on the
14      home, the homeowner's insurance, how did
15      you maintain documents that you received
16      from State Farm and Mark King over the
17      years?
18  A.  I had a folder in my office that I put them
19      in as they came in.
20  Q.  Your office at AEC?
21  A.  At AEC, yes.
22  Q.  So did you get any mail related to the
23      house -- did you get that delivered to your

Page 17

1       office address as opposed to your home
2       address?
3   A.  Came to my home.
4   Q.  But then you would take it to the office
5       and tend to it?
6   A.  Yes.
7   Q.  And you maintained files at your office on
8       things to do with the home?
9   A.  Right.
10  Q.  Including your car insurance for example?
11  A.  True.
12  Q.  Okay.  Did you have any files at all at the
13      house?
14  A.  No.
15  Q.  So you didn't lose any documents in the
16      house fire that would relate to the
17      insurance on the home?  That was maintained
18      at your office?
19  A.  That would be maintained at the office.
20  Q.  Okay.  Do you still have that file at your
21      office?
22  A.  Yes.
23  Q.  Okay.  Going back to the construction of

1    the new house. You've told me the final
2    purchase price. You told me some reasons
3    that it was more than the original estimate
4    that Mr. Sasser gave you on the original
5    plans, landscaping, paving, the heating and
6    air-conditioning. Did you have any
7    discussion with Mr. Sasser about the
8    difference between the estimate that you
9    had obtained right after the fire occurred
10   versus the estimate for rebuilding it
11   pursuant to the plans you got from Denita
12   Messick?
13   A.  I did not.
14   Q.  Have you ever seen a copy of the estimate
15       that Mr. Sasser gave to Mims Hackett?
16   A.  I have not. Nor Mr. Dutton.
17   Q.  Okay. I asked some questions to Ms. Jones
18       about y'all's previous residences, the
19       places you lived, that kind of thing. You
20       sat in on her deposition. Was she accurate
21       with the information she gave me?
22   A.  Yes.
23   Q.  And the mobile home in Troy, did you have

1    insurance on that?
2    A.  I did.
3    Q.  And what company was it with?
4    A.  I'm not sure. It was through the mortgage
5        company. It was a brand new trailer we
6        bought, financed mortgage insurance.
7    Q.  Probably American Bankers or --
8    A.  Probably so.
9    Q.  Okay. And then after you left living with
10       your parents and y'all built this house on
11       Rural Route 2, Box 214-A ...
12   A.  Bought a home in Red Level.
13   Q.  Yeah, that's right. On Highway 84.
14   A.  Yeah.
15   Q.  Your wife thought that that insurance was
16       with State Farm.
17   A.  I think it was.
18   Q.  And do you remember what agent?
19   A.  It would have been Mark King. And I'm
20       not -- cannot say a hundred percent without
21       any problem that I might have not had State
22       Farm, but I believe it was best of my
23       recollection.

1    Q.  Okay. And Mark King is who you went
2        through to get insurance on the house on --
3        the name changed to Straughn Road School;
4        right?
5    A.  (Witness nods head).
6    Q.  All right. Gene Page built the house. He
7        was the general contractor?
8    A.  Yes, sir.
9    Q.  And what year do you remember it being
10       built?
11   A.  '70, '71.
12   Q.  Do you remember having what some people
13       call builder's risk insurance on the house
14       while it was being built?
15   A.  Yes, I would ...
16   Q.  And then once it was built you got a
17       homeowner's policy on it?
18   A.  Correct.
19   Q.  Through Mark King?
20   A.  Correct.
21   Q.  All right. You dealt with Gene Page
22       regarding the price that it was going to
23       cost to get the house built?

1    A.  Yes.
2    Q.  Where did the plans for that house come
3        from?
4    A.  I'm not sure.
5    Q.  Okay. But you sat down -- at some point in
6        time you sat down with Gene Page and you
7        got an estimate from him as to what it was
8        going to cost?
9    A.  Right.
10   Q.  Were any changes made along the way that
11       affected the price of the house?
12   A.  Not a great amount.
13   Q.  All right. And when you sat down with Page
14       and went over things with him, did you and
15       he discuss the size of the house, the
16       square footage of the house?
17   A.  I do not remember that as a great part of
18       our conversation. We were looking at the
19       plans at the time.
20   Q.  During that whole process of planning,
21       designing, having the house built, even
22       after it was built do you recall ever being
23       made aware of the square footage of the

Page 22

1    home?
2            MR. WINTER:  Object to the form.
3            If you can remember.
4    A.  I knew what the square footage was.
5    Q.  How did you know it?
6    A.  Well, and the reason I know it is -- I can
7        back up and answer a question.  You said
8        who designed the house.
9    Q.  Yeah.
10   A.  James H. Hall, who was an engineer with
11       Alabama Electric Cooperative, drew my plans
12       for me.  And the house basically was an
13       80-by-30 house including the carport.
14   Q.  Now, I know you had to meet with Mark King
15       at some point in time to take out an
16       application, fill in an application to
17       submit to State Farm for homeowner's
18       insurance.  You did that?
19   A.  I'm sure I did.  I do not remember it
20       directly.
21   Q.  I would be surprised if you did 36 years
22       ago.
23   A.  My memory is good, but not that good.

Page 23

1    Q.  Yeah, I understand.  But, now, back when
2        you got the insurance from State Farm
3        through Mark King, did you let Mark King
4        know the amount of money you had spent on
5        building the house?
6    A.  I do not remember that.
7    Q.  Did you let Mark King know the 80-by-30,
8        the dimensions of the house and
9        configuration of it?
10   A.  If I remember correctly, he saw a copy of
11       the plans.
12   Q.  Okay.  And what are you basing that on?
13       You've got a memory of giving him the
14       plans?
15   A.  Well, I remember that during this period of
16       time I kept plans with me constantly
17       because of the construction going on just
18       as I did with the new construction.
19   Q.  Do you remember having a meeting with Mark
20       King in his office or your house, either
21       one?
22   A.  Not at my home, I'm sure, but I'm not
23       positive about the other.

Page 24

1    Q.  Now, whether -- you've already answered you
2        don't recall whether you shared with King
3        the price of the home.  But whether you did
4        or not, by the time you bought the
5        insurance -- not the builder's risk, but
6        I'm talking about after the home was
7        constructed and finished.  By that time
8        when you dealt with Mark King and got the
9        homeowner's insurance, you did know how
10       much it had cost you to build the house?
11   A.  Yes.
12   Q.  Now, can you tell me what you remember
13       about you and Mark King discussing
14       insurance on the house, the homeowner's
15       insurance, the amount of limits, the amount
16       of insurance?
17           MR. WINTER:  Object to the form.
18           Go ahead.
19   Q.  He's objecting because I asked about four
20       questions in one.
21           MR. WINTER:  That's what they
22           teach you in law school to
23           do.  So you can go ahead and

Page 25

1            answer the question.
2            THE WITNESS:  I thought that's
3            what you said.
4    A.  How about repeating the question and let me
5        just hear it again?
6    Q.  Well, we can just break them down one by
7        one.
8            I guess generally just tell me what you
9        recall discussing with Mark King about
10       homeowner's insurance on the new home that
11       you had built.
12   A.  I would have been real concerned about
13       having replacement cost on my home.  This
14       was way back many years before.  Don't
15       remember the exact year.  But at that point
16       in time replacement cost for your home,
17       having your home replaced, was a big -- was
18       one of the things going on and was a
19       buzzword, I guess you would say, in the
20       insurance industry at the time.  And I
21       asked Mark at that time how my policy read,
22       and he said I had replacement cost on the
23       home.

Page 26

1  Q. What do you recall, if anything, about
2      amount of insurance, dollar figures being
3      discussed?
4  A. Do not remember any dollar amount.
5  Q. Okay.
6  A. I know he came out. If I remember
7      correctly, it was in '97. And this was one
8      of the things Peggy was talking about when
9      he came out with his little measuring
10     device, rolling wheel, went around the
11     house, measured the house and left. But,
12     now, the only reason I know that is because
13     Peggy told me that. I was not at home at
14     the time. I was at work.
15  Q. All right. I think I know the answer to
16     this, but back in the early '70s after the
17     home was built and you were talking to Mark
18     King about the initial insurance on the
19     house, do you recall there being any
20     discussion about the square footage of the
21     configuration of the house?
22  A. No, I do not.
23  Q. Do you recall whether Mark King personally

Page 27

1      visited the site after the home was built
2      to look at it, inspect it, measure it,
3      anything of that nature?
4  A. Not to my knowledge.
5  Q. Do you recall anything else that we haven't
6      already touched upon being discussed in
7      your meeting with Mark King about getting
8      initial insurance on the house?
9  A. No, I do not.
10  Q. Now, once you got the insurance from State
11     Farm, you got an insurance policy?
12  A. True.
13  Q. Did you stick it in that folder we talked
14     about?
15  A. True.
16  Q. Have you kept documents that old? Do you
17     think you have the original policy?
18  A. Probably not. I think all the policies
19     that I have have been shared with my
20     lawyer.
21  Q. Now, in addition to an insurance policy,
22     you would have gotten what companies call a
23     declaration page or a declaration sheet.

Page 28

1      Do you know what I'm talking about?
2  A. Yes, sir.
3  Q. I showed one to your wife. It's one page
4      and it's got information on there. When
5      you initially got the insurance, do you
6      remember getting a declaration page?
7  A. Yes.
8  Q. And do you remember there being a dollar
9      figure on that declaration page?
10  A. Yes.
11  Q. Now, did you read your insurance policy
12     when you got it?
13  A. I looked over the declaration page and
14     other information that comes with it, the
15     little booklet.
16  Q. Right.
17  A. I'm not sure if a lawyer could interpret
18     what it says.
19  Q. Did you attempt in the policy to find out
20     whether it addressed the replacement cost
21     topic that you told me about?
22  A. I think it says something to the effect of
23     actual claim loss or actual loss on the

Page 29

1      claim or something along those lines.
2  Q. Yeah. There's different --
3  A. Two places, one place over here and one
4      place over here, and both of them say
5      actual loss.
6  Q. One of them -- one provision in there talks
7      about you being paid actual cash value up
8      to the limits until the house is replaced
9      and then paying replacement cost. Do you
10     remember that at all?
11  A. No, I do not.
12  Q. Okay. That's fine. But you do --
13  A. I just remember reading one line on there
14     that says -- and based upon Mr. King's
15     representation to me that my home would be
16     insured and replaced if something happened
17     to it if it was a complete loss.
18  Q. Right.
19  A. And on the policy it's saying actual loss.
20     I forgot what the terminology is. But it's
21     the actual -- the word actual is used there
22     and it's used over on the right-hand side.
23  Q. Okay. Now, I don't expect you to remember

Page 30

1   now, but back when you got that declaration
2   page, you've already told me you remember
3   there being a dollar figure on it.
4   A.  Yes.
5   Q.  You obviously had in your mind what it cost
6   you to build the house?
7   A.  Right.
8       MR. WINTER:  Object to the form.
9   Q.  Was there any difference between the amount
10  that you had spent to build the house
11  versus the amount that was set forth on
12  that declaration page?
13      MR. WINTER:  Object to the form.
14      If you remember.
15          Let me just ask you this
16      question because I'm not sure
17      if he understands what you're
18      saying.  And if you do, that's
19      fine, but I'm not certain.
20          When you say dollar
21      amount, are you talking about
22      the dollar amount of the
23      policy for the year?

Page 31

1       MR. JACKSON:  Yeah, on the
2       declaration page.  It's got
3       like a dwelling coverage and
4       it's got a dollar figure.
5       MR. WINTER:  Do you have the
6       document that you're talking
7       about?
8       MR. JACKSON:  I don't have the one
9       from 1970, no.  Otherwise I
10      would show it to him.
11      MR. WINTER:  From my
12      conversations, I don't think
13      y'all are talking about the
14      same thing.
15      MR. JACKSON:  I think he
16      understands what I'm talking
17      about.  It's what I showed --
18      it's the thing I showed to
19      Ms. Jones, an example of one.
20      MR. WINTER:  Okay.  Maybe it's --
21      I was thinking the one you're
22      talking about from 1970.
23      MR. JACKSON:  No.  Well, I am

Page 32

1       talking about the one from
2       1970.  But just by way of
3       example, this one is the year
4       '97 to '98, and it's got
5       dwelling and then it's got a
6       dollar figure right there
7       beside dwelling.
8       MR. WINTER:  Right.
9       MR. JACKSON:  It's got a dwelling
10      extension and it's got your
11      personal property listed.
12  Q.  And I think we have established that when
13      you applied for insurance with State Farm
14      back with Mark King in the early '70s you
15      did get an insurance policy and you got an
16      initial declaration page?
17  A.  I'm sure I did.  I'm sure I did.
18  Q.  And I think you said you looked at it.  And
19      so my question now is -- and I don't expect
20      you to remember exactly what the dollar
21      figure was.  What I'm asking is, did you
22      notice there to be any kind of substantial
23      difference between what the dollar figure

Page 33

1       was and what the amount was that you had
2       built the house for?
3   A.  I don't remember.
4   Q.  Okay.
5   A.  I mean, to be honest.
6   Q.  And following up with that, do you recall
7       having any discussion with Mark King after
8       you got the 1970 declaration page about
9       that issue, about, look, it cost me -- I
10      know what it cost me to build the house.
11      It cost this much, and the dollar figure on
12      this piece of paper says this.  Did you
13      have any discussion like that with Mark
14      King?
15  A.  I don't remember any.
16  Q.  That's fine.  Now, the way the State Farm
17      homeowner's policies work, you've got a
18      right to cancel it.  You don't have to keep
19      it.  They've got a right to cancel it.
20      They don't have to renew you.  But if
21      neither one of y'all do anything, it's
22      what's called an automatic renewal policy.
23      The premium may go up.  The amount of

1  insurance may go up, but it is
2  automatically renewed from year to year.
3  Were you aware of that?
4  A.  Yes.
5  Q.  And it did continue to be renewed over the
6  years from 1970 all the way up to the date
7  of the fire; correct?
8  A.  Correct.
9  Q.  Now, each year, then, as the renewal came,
10  did you get information from State Farm, a
11  new policy and a new declaration page?
12  A.  I did.
13  Q.  Now, from year to year each year did you
14  have any discussion with Mark King about
15  your insurance and the amount of insurance
16  you had?
17  A.  The only time I remember having
18  conversations about the insurance amount
19  was after he was out there and measured the
20  house and called me and told me what he was
21  going to insure it for, and based upon
22  his -- what I call or thought was
23  expertise, I agreed with him.

1  Q.  And you're talking about 1997?
2  A.  '97, yes.
3  Q.  Roughly?
4  A.  Roughly.  I mean, it probably was in the
5  later part -- on over because my policy
6  renewed in November -- October.  Excuse
7  me.
8  Q.  That's fine.  Okay.  So let me just ask,
9  then, because it may shorten things.  Is
10  what you're telling me that you don't
11  really recall having any involvement or
12  discussion with Mark King between the early
13  '70s when you first got the insurance up to
14  '97 when he came out to the house?
15      MR. WINTER:  Object to the form.
16      Go head.  You can answer the
17      question.
18  A.  I do not remember any direct conversations
19  with Mr. King other than the fact that we
20  had along the way just in casual
21  conversation, meeting at ball games, things
22  of this nature -- I had mentioned to him
23  about the replacement cost and he said I

1  was covered.  And then from that, basing
2  upon him being an -- I thought qualified to
3  render that judgment, I relied upon it.
4  Q.  Okay.
5  A.  But the last policy I remember is not like
6  that declaration page you got there.  We
7  got the one that was the policy that was in
8  effect at the time of the fire.
9  Q.  I've got that one, I believe.
10  A.  I believe it's different terminology on it.
11  Q.  Yeah.  We'll get to that in a minute.  Let
12  me see if I do have it.  I think I do.
13      Yeah, I do.  We'll get to that in a
14  minute.
15      All right.  Let me make sure I'm
16  understanding you now.  Let me just ask
17  directly.  Around the time the insurance
18  policy renewed -- and your policy period, I
19  think, runs from October to October.
20  A.  Right.
21  Q.  Around that time when the policy renewed
22  did you have an annual meeting with Mark
23  King where you and he would sit down and

1  address what the amount of the insurance
2  was?
3  A.  I did not.
4  Q.  Did you have a telephone conversation with
5  him at least once a year about what the
6  amount of the insurance was on the
7  declaration page?
8  A.  Not once a year.
9  Q.  All right.
10  A.  I did have some conversations with him
11  along those lines, I mean, at various
12  times, but not on a normal basis.
13  Q.  Just whenever you would run into him?
14  A.  Whenever I would run into him.
15  Q.  I understand.  So each year when you got a
16  new policy, got a new declaration page, you
17  would stick it in that folder?
18  A.  I did.
19  Q.  As years passed would you -- let's say, you
20  know, like 1980.  By then you would have
21  ten of them.  Would you throw some of the
22  older ones away --
23  A.  Yes.

Page 38

1 Q. -- to make room in the folder?
2 A. Right.
3 Q. Any rhyme or reason to how far back you
4    kept documents?
5 A. No, not really.
6 Q. Okay. And since this fire has occurred
7    you've turned your file over to Mr. Winter?
8 A. Yes.
9 Q. The file that you had at the office?
10 A. A copy of my file.
11       MR. WINTER: Yeah, I think so. I
12          don't know if I included the
13          policies I had because you
14          already had the policies.
15       MR. JACKSON: I don't think you
16          did.
17       MR. WINTER: I didn't think so.
18 A. I think you got most -- as far back as I
19    went.
20 Q. Okay. And that folder would have had both
21    the declaration pages and the policies?
22 A. No, I don't believe that any -- the little
23    booklet that comes with it, I don't believe

Page 39

1    there was over one or two of those in the
2    folder. I mean, like I say, when you can't
3    understand something, it's kind of -- seems
4    unnecessary to keep something you don't
5    understand or can't even read.
6 Q. On occasions -- and this is, you know, the
7    way these things copy. I mean, they're on
8    a full eight-and-a-half-by-11. But this is
9    a booklet form unfolded. So when you would
10    get a policy in that booklet form from
11    State Farm, did you look at it before you
12    put it in the folder?
13 A. Yes.
14 Q. I understand what you're saying about not
15    understanding everything and all that, but
16    you did when you got it at least look
17    through it --
18 A. Yes.
19 Q. -- before you put it in the folder?
20 A. Yes.
21 Q. Now, your wife, Peggy, and I discussed
22    various additions/remodels that y'all had
23    done to the home. And she kind of gave me

Page 40

1    a chronology, although she didn't remember
2    some of the dates. But to your knowledge
3    did she get the chronology accurate?
4 A. Yes. The only thing I would add is we
5    built a deck on the back of the house, too,
6    that she did not mention.
7 Q. She said that y'all first enclosed the
8    original carport or made a den out of that
9    and kind of added on some additional space
10    in '74, '75
11 A. Correct.
12 Q. Who was involved, the builder? Who was
13    involved in that?
14 A. Thaxton Brannon.
15 Q. I'm sorry?
16 A. Thaxton Brannon.
17 Q. Brown or Browning?
18 A. Brannon, B-R-A-N-N-O-N.
19 Q. Brannon. I'm sorry.
20 A. He's deceased now.
21 Q. Now, did you have plans drawn up for that,
22    or did he -- was he a good enough builder
23    that he just came and added on without any

Page 41

1    plans?
2 A. He drawed it on a grocery sack.
3 Q. I'm not surprised.
4 A. That's the truth.
5 Q. Yeah.
6 A. And he hung it up on the side of the wall
7    where you take the brick off and this is
8    what the contractor -- his crew worked on.
9       (Brief interruption.)
10 A. That's what his crew worked on was the
11    brown grocery sack with the single-line
12    drawing on it.
13 Q. Now, you had discussions with Thaxton
14    Brannon about what it was going to cost him
15    to do that?
16 A. Yes.
17 Q. He gave you an estimate?
18 A. Yes.
19 Q. You agreed to it?
20 A. Yes.
21 Q. In the discussion about how much it was
22    going to cost, was it in terms of just, you
23    know, a flat dollar figure or was it

Page 42

1  expressed in terms of so many dollars a
2  square foot or what?
3  A.  Flat dollar figure.
4  Q.  You were already aware that the original, I
5  guess, imprint -- is what they call it --
6  of the house was about 80 by 30?
7  A.  True.
8  Q.  And you were aware of this den -- once it
9  was finished, you were aware of the size of
10  that addition?
11  A.  Yes.  Right.
12  Q.  Approximately how big was it?
13  A.  I added on approximately 16 feet to the end
14  of my home.
15  Q.  To the entire end?
16  A.  To the entire end.
17  Q.  So the 30?
18  A.  Right.
19  Q.  So it's basically 16 by 30?
20  A.  Right.  Well, I mean, the carport was
21  included in that room.  In other words, the
22  carport and all was in two rooms, a den and
23  a sewing room which was on part of the

Page 43

1  house.
2  Q.  Yeah.  Your wife said you enclosed the
3  existing carport but then also added on to
4  the end of that carport to make it a larger
5  area?
6  A.  Right.
7  Q.  So how much additional space besides the
8  carport was added on?
9  A.  16 by 30.  I believe that's correct.
10  Q.  Did you have any discussion with Mark King
11  about that addition after it was done?
12  A.  Yes.  I told him I was building onto my
13  home.
14  Q.  Told him you were going to or had done it?
15  A.  I told him I was in the process of doing
16  it.
17  Q.  Did that notification to King result in any
18  discussion or anything being done about the
19  insurance on the house?
20  A.  If I remember correctly, the policy amount
21  went up afterwards.
22  Q.  Okay.  On the next renewal.  Is that what
23  you're talking about?

Page 44

1  A.  On the renewal because we were finishing up
2  just as renewal was coming up.
3  Q.  Besides telling King that you were adding a
4  den, adding on to the house, do you recall
5  any discussions with King about the
6  homeowner's insurance at that time?
7  A.  No, I do not.
8  Q.  Okay.  Do you remember roughly what it cost
9  you to do that addition to the den when all
10  was said and done?
11  A.  No, I do not.
12  Q.  Not even a rough figure?
13  A.  Rough figure, five, $6,000.
14  Q.  Five, 6,000.  All right.  Next on the
15  chronology was adding back a carport which
16  I take to be an open-ended carport that you
17  drive up into --
18  A.  True.
19  Q.  -- and a storage room?
20  A.  True.
21  Q.  What approximate date was that?
22  A.  Somewhere around the '80 time frame, early
23  '80s.

Page 45

1  Q.  The carport, it wasn't heated and
2  air-conditioned, was it?
3  A.  No.  Not at that time, no.
4  Q.  But it was affixed to the house?
5  A.  Yes.
6  Q.  In other words, you would leave the carport
7  and you had a door that you would go right
8  to the house?
9  A.  Correct.
10  Q.  And then the storage room was contiguous to
11  the carport?
12  A.  Right.
13  Q.  And so how big was the storage room?
14  A.  It was 25 by 8, I believe.
15  Q.  That's a good size.  Do you remember how
16  big the carport was?
17  A.  The whole addition was the 30 by 20.  Maybe
18  it was 20 by 8.
19  Q.  And it was a double carport?
20  A.  Right.
21  Q.  Do you remember what that carport and
22  storage addition cost?
23  A.  I do not.

Page 46

1  Q.  Any rough recollection of --
2  A.  No.  Because I did it in phases.  I did it
3     with several people.  I had a contractor
4     pour the concrete and get the slab ready.
5     I had someone else put the roof up.  I had
6     a third person, the bricklayer, to do the
7     brickwork.
8  Q.  So you almost just acted as your own
9     general contractor?
10 A.  Right, I was acting like more or less my
11    own general contractor.
12 Q.  And you knew back then -- back when this
13    was done you would have known what it cost
14    to --
15 A.  Right.  Yeah.
16 Q.  Did you have any discussion with Mark King
17    after it was done or while it was being
18    done?
19 A.  I notified him that I was adding a carport
20    onto my home, but I do not remember any
21    specific conversation.
22 Q.  Okay.  So the follow up -- and I think I
23    know the answer to it -- is you don't

Page 47

1     recall there being any specific
2     conversations about the amount of insurance
3     on the homeowner's insurance?
4  A.  No.
5  Q.  And then she said around '89, '90 you
6     enclosed that carport and storage room and
7     made a playroom out of it?
8  A.  That's true.
9  Q.  And who was that person involved in doing
10    that work?
11 A.  That was one of those do-it-yourself
12    projects.
13 Q.  Oh, okay.
14 A.  With some outside help from carpenters and
15    things of that nature, friends of mine.
16 Q.  So there was no actual square footage
17    added.  It was a matter of enclosing that
18    carport and making one big room out of it?
19 A.  Right.  At that point you entered the
20    playroom and go into the den and so on and
21    so forth.
22 Q.  Do you remember how much that cost to do
23    that?

Page 48

1  A.  No, I do not.
2  Q.  You knew back then?
3  A.  I knew back then, but not ...
4  Q.  Any discussion with King about the fact
5     that you had enclosed the carport and
6     storage room?
7  A.  Yes.  There was a discussion, and I think
8     that was what ultimately led to him coming
9     to my home in early '97 to do the
10    measurements and everything since I had
11    made several additions.
12 Q.  Okay.  Unless I got the chronology wrong
13    here, this carport and the storage room
14    being enclosed into the playroom happened
15    around '89, '90?
16 A.  Right.
17 Q.  So am I understanding you correctly that he
18    did not come out around that '89, '90 time
19    frame to measure?
20 A.  No, sir.  He was notified, but I don't
21    remember him coming out.  I'm not going to
22    say he didn't, but I don't remember it.
23 Q.  Then Ms. Jones told me that after y'all did

Page 49

1     that you added another carport?
2  A.  Right.
3  Q.  And approximately when was that done?
4  A.  Prior to '97.  Somewhere in the '95, '96
5     range.
6  Q.  Okay.
7  A.  It was immediately after we got through
8     with the renovation of the kitchen, the
9     living room, the den, a dining room and a
10    hallway.
11 Q.  So she may have gotten that a little out of
12    order because she's got that next.  She's
13    got the remodeling --
14 A.  The renovation happened, and then right
15    after that we added the carport area back
16    on.
17 Q.  I got you.  Okay.  Let's stick with the
18    chronology you remember, and I'll come to
19    the double carport here in a minute.  Let's
20    talk about that kitchen/dining room
21    renovation.  Who did that, what contractor?
22 A.  Homer Taylor Construction.
23 Q.  Did you have plans drawn for that?

Page 50

1   A.  Did not have any plans, no.
2   Q.  Did you meet with Mr. Taylor to get pricing
3       and that kind of thing?
4   A.  Yes, I did.  In fact, I got pricing from
5       more than one contractor.
6   Q.  If I understood Ms. Jones correctly, there
7       was no additional square footage actually
8       added when the kitchen and dining room was
9       remodeled; is that right?
10  A.  That's correct.
11  Q.  It was more of the amenities of the
12      cabinetry, the appliances, the
13      configuration of things?
14  A.  The floors.  The floors.
15  Q.  The flooring.  Okay.
16  A.  Including the living room in with the
17      kitchen and ...
18  Q.  And how much did that --
19  A.  I can tell you exactly on that one.
20      $40,000.
21  Q.  Okay.  Did you have any discussion with
22      Mark King about that remodeling?
23  A.  Yes, I did.

Page 51

1   Q.  When did you have it?
2   A.  Somewhere in that time frame.  I believe
3       the policy says something about you need to
4       notify them when you make changes.
5   Q.  Do you recall whether there was any
6       discussion with Mark King about the
7       insurance on the home, the amount of
8       insurance, anything of that nature in
9       conjunction with this kitchen, dining room
10      remodeling?
11  A.  No, I do not.
12  Q.  Then we come back to the double carport.
13  A.  Right.
14  Q.  Oh, I'm sorry.  Yeah, you already told me
15      Homer Taylor.  Did he give you an estimate
16      up front as to what he thought it was going
17      to cost?
18  A.  Yes.
19  Q.  End up being more?
20  A.  By the time I added appliances on, yes.  Of
21      course, he didn't quote the appliances.
22  Q.  He just gave you a flat figure on what it
23      is you talked to him about?

Page 52

1   A.  Right.
2   Q.  The double carport, who built that?
3   A.  Andalusia Roofing Company.
4   Q.  And it was a double carport?
5   A.  It was -- it was a double carport, but it
6       was not in the conventional sense a
7       carport.  It was a metal roof tied --
8       attached to the house.  But it was a metal
9       roof stand-alone type structure.
10  Q.  All right.  And approximately how big was
11      that?
12  A.  It was a double carport.  I think it was --
13      if I remember correctly, it was like a
14      20-by-20.
15  Q.  Okay.  And I would guess -- you correct me
16      if I'm wrong -- but Andalusia Roofing
17      Company probably priced carports based upon
18      the size, didn't they?
19  A.  Right.
20  Q.  They offered different sizes for different
21      prices?
22  A.  Different sizes, different prices.
23      And at the same time that we were

Page 53

1       constructing the double carport I put a
2       12-by-24 metal building attached to the
3       carport at the end of the driveway.
4   Q.  Okay.
5   A.  I don't think Peggy mentioned that.
6   Q.  Yeah.  She did not.
7       I'm sorry.  You said 12 by 24?
8   A.  Yeah, 12 by 24.
9   Q.  All right.  Then she's got -- or I asked
10      her and she told me about two bathrooms
11      being remodeled.
12  A.  True.
13  Q.  At separate times?
14  A.  Back to back.  I mean, finished one and
15      started the other one.
16  Q.  Did you do those yourself?
17  A.  Me and my son did, Marcus, ceramic tile and
18      all.
19  Q.  Any discussion with Mark King regarding
20      remodeling the bathrooms?
21  A.  I did not.  In fact, I believe Mark at that
22      time may have been retired.  It may have
23      been Ron Nall.

Page 54

1   Q.  Any discussion with Nall about that?
2   A.  No.
3   Q.  And then you added the deck.  That's the
4       last thing?
5   A.  Right.
6   Q.  Now, you mentioned that somewhere you think
7       that the kitchen -- I'm sorry -- that the
8       enclosing of the carport and the storage
9       room, making that a playroom, is what
10      eventually led to King coming back out to
11      the house?
12  A.  I think so, yes.
13  Q.  But am I remembering correctly that when he
14      came back out the house was closer to the
15      remodeling of the kitchen and the dining
16      room?
17  A.  It was closer to that than it was the
18      other.  But those two things did not -- the
19      remodeling didn't -- added no square
20      footage.
21  Q.  Right.  And then you made a reference to
22      the fact that you weren't home, but your
23      wife told you that Mark King had come out

Page 55

1       with a circular wheel and had measured the
2       house?
3   A.  True.
4   Q.  And you told me about a conversation that
5       you had with King after that?
6   A.  Well, probably several conversations, just
7       off-the-cuff conversations that you and I
8       might have about the coverage, if I had
9       coverage, replacement coverage.
10  Q.  I thought you were telling me, though,
11      about one that you had with him after he
12      came out and measured.
13  A.  I do remember having one with him
14      afterwards.
15  Q.  Tell me what you remember about that.
16  A.  Other than the fact that he told me what he
17      give me as a number for insurance
18      coverage -- and, of course, I'm not an
19      appraiser.  I have no idea one way or the
20      other whether the number he gave me was
21      correct or wrong or whatever.  I relied
22      upon his judgment and expertise.
23  Q.  Okay.

Page 56

1   A.  He told me this was the number after he had
2       measured the house and this was -- we
3       didn't mention square footage nor --
4   Q.  I was going to ask that as a follow-up is
5       whether he told you what he had measured.
6   A.  He did not.
7   Q.  And did you ask him what he had measured?
8   A.  No, I did not.
9   Q.  At the time of the conversation you did
10      have an idea about what the square footage
11      was?
12  A.  Oh, yes.  Oh, yes.
13  Q.  Did you also in your mind have an idea
14      about what you thought the home was worth?
15  A.  Not really.
16  Q.  You did not?
17  A.  Because the home was not for sale.  There
18      was not a -- I mean, he told me I had
19      adequate insurance to cover me and it was
20      covered for replacement cost.  I had no
21      reason to be asking questions.
22  Q.  Now, stating the obvious, you did know that
23      the various additions and remodels that

Page 57

1       y'all had done and the cost of those by the
2       time King came out and measured, had the
3       conversation --
4   A.  Oh, yes.
5   Q.  -- you knew the original construction price
6       of the home.  What was it?
7   A.  Seventeen-five.
8   Q.  $17,500?
9   A.  Right.
10  Q.  So you knew, you know, how much more you
11      had put into the house as the years went
12      by?
13  A.  True.  Right.
14  Q.  And you're telling me that King gave you
15      some kind of figure in the conversation,
16      this is what I've calculated the insurance
17      is to replace the house?
18  A.  That's true.  And I think I probably
19      already received that declaration page
20      prior to our discussion even.
21  Q.  The one for that policy period?
22  A.  The one for that policy period, yes.
23  Q.  Did you -- object is not the right word.

1     Did you question -- did you have any
2     further conversation with King about the
3     amount that he had come up with?
4 A.  No.
5 Q.  I mean, did the amount strike you as being
6     either high or low?
7 A.  Not really. I relied upon his expertise
8     telling me that this is what the -- I guess
9     if I had been in a buyer's market or a
10     seller's market I would have known more
11     about the cost of housing. Because I
12     received sticker shock when I rebuilt the
13     house.
14 Q.  Yeah. Now, in your position with AEC in
15     charge of accounting and finance, over the
16     years have you gotten information on things
17     that AEC may be building? I mean, you
18     would pay the bills for --
19 A.  Pay the bills basically is all.
20 Q.  Is that the extent of your involvement in
21     it is paying the bills? I mean, are you
22     involved in the bidding process?
23 A.  No.

1 Q.  Somebody else does that?
2 A.  True.
3 Q.  So connected with your work, would you have
4     any reason to know what the prevailing
5     costs per square feet of commercial
6     buildings are?
7 A.  I would not.
8 Q.  These various contractors, trade workers
9     that you worked with over the years on the
10     additions, the remodels of the house, did
11     you ever have any conversations with any of
12     them about cost per square footage of
13     additions, things of that nature?
14 A.  Not until I started building the new home.
15 Q.  Okay. I guess you could calculate knowing
16     how much money it cost you and how large
17     the addition was. You could have
18     calculated the cost per square foot of a
19     particular addition?
20 A.  Yes.
21 Q.  All right. From year to year as this
22     policy was being renewed all the way up to
23     the date of the fire when you got the

1     declaration page, did you ever think that
2     the amount set forth on the declaration
3     page may not be enough?
4           MR. WINTER: Object to the form.
5           You can answer the question.
6 A.  Go ahead and answer it?
7 Q.  Yeah.
8 A.  No, not really. Because when you rely upon
9     an expert -- in other words, I'm relying
10     upon Bryan to be my expert lawyer right
11     now. And I relied upon Mr. Mark King and
12     Mr. Ron Nall to be my expert from the
13     insurance side.
14 Q.  When you got these declaration pages from
15     year to year, did you ever think that the
16     insurance amount set on the declaration
17     page for the house was too much, too high?
18 A.  No.
19 Q.  Over the years from the early '70s after
20     you built this house and moved into it, did
21     you have friends, coworkers, family members
22     that bought houses, built houses that you
23     became aware of just in, you know, general

1     conversation?
2 A.  Yeah.
3 Q.  Did you ever have any discussions with them
4     about the sizes of their homes and how much
5     it cost to build a house or to buy a house?
6 A.  No. I didn't feel like it was my -- my --
7     information I need.
8 Q.  And it may not be, you know, your place to
9     ask, but in conversation sometimes folks
10     just --
11 A.  Well, in conversation I may have heard some
12     numbers, but, I mean, as far as ever
13     thinking, well, that's a lot more or a lot
14     less than what I've got in mine, I never --
15     I have become acutely aware of that since
16     2004.
17 Q.  Okay. You know just about everybody in the
18     Straughn community. Over those years from
19     '70 up to '04 were there other people in
20     the Straughn community building houses?
21 A.  Yes.
22 Q.  Ever have any discussion with them about
23     what it cost --

Page 62

1   A.  I only had one that I could tell you that
2       I know exactly what I paid for his house,
3       because he was in the process of building
4       his when I built my original one.  He built
5       his a little bit cheaper that I built mine.
6   Q.  Back in the early '70s?
7   A.  Back in the early '70s.  I regard financial
8       matters as a personal matter, not
9       something ...
10  Q.  Sure.  Sure.
11          MR. WINTER:  Off the record.
12          (Off-the-record discussion.)
13  Q.  After the conversation that you've already
14      told me about with Mark King after he came
15      out and measured -- and you've already told
16      me about that conversation -- leading up to
17      the date of the fire, do you recall having
18      any other conversations with King about
19      your homeowner's insurance?
20  A.  I do not.
21  Q.  Okay.  Now, at some point in time King
22      retired?
23  A.  True.

Page 63

1   Q.  Nall took over his book of business?
2   A.  Yeah.
3   Q.  He became your servicing agent?
4   A.  True.
5   Q.  Did you have any conversations with Ron
6       Nall about your insurance up to the date of
7       the fire?
8   A.  The only conversation -- well, you can't
9       hardly really classify it as a
10      conversation.  I had a letter from Mr. Nall
11      informing me that he wanted to meet with me
12      at three o'clock on a Thursday afternoon --
13      I don't remember what day of the week -- at
14      three o'clock to discuss my insurance
15      coverages and go over and see if there's
16      anything that needed to be added to my
17      portfolio.  I called Mr. Nall's office and
18      told him if he wanted to talk to me, I
19      would be glad to meet him, but it would
20      have to be after five in the afternoon,
21      that I worked from eight to five and I was
22      not going to take off just to come at his
23      convenience to discuss my policy.

Page 64

1   Q.  And you continued to get renewals up
2       until --
3   A.  That was shortly after Mr. Nall became my
4       agent that I got -- but I never heard any
5       further thing -- any further comment from
6       him about scheduling an appointment.
7   Q.  Now, do you recall having any conversation
8       with Mark King along the way as the years
9       passed about the homeowner's policy
10      changing from what was called replacement
11      cost or guaranteed replacement cost to
12      where it was going to be an amount of
13      limits as opposed to guaranteed replacement
14      cost?
15  A.  I do not.
16  Q.  All right.  After you contacted the two
17      contractors that you contacted after the
18      fire and instructed them to -- or asked
19      them to prepare estimates and send them
20      directly to Mr. Hackett, you had a
21      conversation with Mr. Hackett after he got
22      those estimates, did you not?
23  A.  Not to discuss the estimates.  The only

Page 65

1       thing, just that he had gotten them from
2       them.
3   Q.  And, now, at some point in time did
4       Mr. Hackett explain to you how much
5       insurance the homeowner's policy was going
6       to pay with regard to the house?
7   A.  I think most of those communications went
8       through Marcus.
9   Q.  Marcus Jones?
10  A.  Right.
11  Q.  Your son?
12  A.  Right.  But I do know that Mims told me
13      that there was a limit as to how much they
14      were going to pay.  They were going to pay
15      "X" amount plus 10 percent, 20 percent,
16      whatever the percentage add-on was.
17  Q.  Right.
18  A.  And I held those checks that he did send me
19      for some time until State Farm wrote me a
20      letter telling me that legal counsel
21      advised me -- said what it's supposed to
22      say that I was not signing away any rights
23      by cashing the checks and proceeding to try

Page 66

1    to build a home. And I only started a home
2    in January after my house fire in July.
3    During that time I was living in a mobile
4    home very cramped to -- waiting until ...
5  Q.  Until you got permission to go ahead and
6    cash the checks?
7  A.  Yeah.
8  Q.  Now, when was it that you got your son
9    Marcus involved in this claim activity?
10  A.  He helped me write some letters, compose
11    some letters not too many months after we
12    got into this thing. I don't remember
13    exactly the date.
14  Q.  Okay.
15  A.  And basically all he was trying to do was
16    help me get information.
17  Q.  Before you got Marcus involved in it had
18    Mims Hackett in dollar amounts -- in terms
19    of dollar amounts told you how much the
20    insurance policy would pay and how much the
21    estimates were?
22  A.  He had not told me the estimates and he has
23    not told me the estimates till today when

Page 67

1    you told me the first time I knew for sure
2    is what the estimates were.
3  Q.  So until today's deposition you had not
4    heard the dollar amounts of those
5    estimates?
6  A.  I knew roughly what they were. I knew they
7    were in excess of $200,000.
8  Q.  Mims Hackett told you that?
9  A.  Mims Hackett told me they were in excess of
10    $200,000.
11  Q.  So he just made a general reference that
12    both estimates were in excess of $200,000?
13  A.  That both estimates were in and they were
14    in excess -- and they were fairly close
15    together.
16  Q.  Both over 200?
17  A.  Both over 200,000.
18  Q.  And then did he also tell you in that same
19    conversation how the policy worked, that it
20    was going to pay so much in limits plus so
21    much percent?
22  A.  I think that was the same conversation.
23  Q.  All right. And in that conversation, based

Page 68

1    upon that, you realized that what he was
2    telling you was that he was telling you the
3    insurance policy wasn't going to pay you as
4    much as the estimates?
5  A.  Right.
6  Q.  And what was your reaction to that?
7  A.  Why not, because I had been told I had
8    replacement cost.
9  Q.  And what did Mims say about that?
10  A.  He said that the policy had changed
11    sometime before, and I think he even gave
12    me a date maybe. And I told him that my
13    agent had not imparted that to me, that I
14    had been told repeatedly that I had
15    replacement cost on the policy.
16  Q.  Okay. Do you remember anything else
17    discussed between you and Mims Hackett
18    about that particular issue?
19  A.  Not about that particular issue. We talked
20    about the contents several times. We
21    talked about the landscaping. We talked
22    about the living expense, the storage
23    building expense.

Page 69

1  Q.  Sure. Now, I guess the way I should ask
2    this is, did that conversation with Mims
3    where he was telling you that the estimates
4    both were over 200 and the insurance policy
5    wasn't going to pay that much, did that
6    cause you to get Marcus involved?
7  A.  Yes. I think that was probably -- when I
8    got him involved, he helped me write --
9    compose some letters and things of that
10    nature.
11  Q.  And he requested some information?
12  A.  Information from State Farm in Birmingham.
13    He had quite a bit of trouble getting any
14    copies of some of the things he was asking
15    for.
16      MR. WINTER: Mike, before we go
17        into this, just so we're
18        clear, I'm going to instruct
19        him not to talk about his
20        conversations with Marcus
21        because Marcus, as you know,
22        is a licensed practicing
23        attorney and I think he was

Page 70

1        acting as his dad's attorney.
2   Q.  Did you consider Marcus to be acting as
3       your attorney at the time that you got him
4       involved in it?
5   A.  Well, I would have to because he's a
6       lawyer.
7           MR. WINTER:  Just answer the
8           question.
9   Q.  I mean, I understand he's your son, but
10      he's also a lawyer.
11  A.  Right.
12  Q.  I mean, is the reason you went to him
13      because he was a lawyer?
14  A.  Yes, to help me compose letters and things
15      of that nature, I mean, know more how to
16      say what I'm trying to say.
17  Q.  Right.  And you know that he requested
18      information from State Farm?
19  A.  I do.
20  Q.  Did he eventually get some information?
21  A.  Yes, he did.
22  Q.  Did he share that with you?
23  A.  Yes, he did.  In fact, I got copies, I

Page 71

1   believe -- probably got copies of anything
2   he got from State Farm.
3           MR. WINTER:  I'm not trying to
4           hide anything from you.  I
5           don't know the answer to any
6           of those questions.
7           MR. JACKSON:  Yeah.  You know, I'm
8           not going to push that point.
9           You know, I think Marcus is
10          probably a witness.  I don't
11          know, you know, where this is
12          going to go, but if it goes
13          far enough, we'll probably
14          take his deposition just about
15          his dealings with the State
16          Farm people, not conversations
17          with Mr. Jones.
18          MR. WINTER:  Right.  I guess my
19          point is, Mike, is that he
20          didn't ask his other son or
21          daughter to help him.  He
22          asked his attorney son.
23          MR. JACKSON:  Right.  Exactly.

Page 72

1   Q.  All right.  I sent some written questions
2       to you and Ms. Jones.  Y'all provided
3       answers and you signed off on them.  You've
4       seen those before, have you not?
5   A.  Yes.
6   Q.  And one of the questions --
7   A.  I don't remember reading them lately, but I
8       guess I did.
9   Q.  One of the answers to the questions has in
10      part here that Mr. King did not accurately
11      measure the square footage of our house?
12  A.  Right.
13  Q.  When did you learn that?
14  A.  After the fire I went to Mr. Ron Nall's
15      office to talk to him.  He was not in.  And
16      I asked at that time could I have a copy of
17      the policy.  And his secretary or young
18      lady who works for him there provided me
19      with those sheets.  And I believe my
20      attorney has a copy of those.
21          MR. WINTER:  They should be in
22          your -- the computer
23          printouts, the screen

Page 73

1           printouts.
2   Q.  Now, when you went to Nall's office, was
3       that after the conversation with Hackett?
4   A.  Yes.  I went after that, yes.
5           (Defendant's Exhibit 1 and 2 were
6           marked for identification.)
7   Q.  Okay.  I'm marking here what we're going to
8       mark as Exhibits 1 and 2.  They are hard
9       copies of what appear to be something on a
10      computer screen, in other words, that
11      somebody would call up on a computer screen
12      and then hit print and get a hard copy of
13      it.
14  A.  Exactly what happened.
15  Q.  And are those documents there -- did you
16      get those from Ron Nall's office?
17  A.  I did.
18  Q.  And was there something on there that you
19      looked at or saw with regard to square
20      footage?
21  A.  Yes, on the back.  Square footage, 2128.
22  Q.  Okay.
23  A.  In other words --

Page 74

1  Q.  Did you notice that --
2  A.  This is the date -- this is the date I got
3     it, on September 1, 2004.
4  Q.  Did you notice that square footage figure
5     in Nall's office?
6  A.  I believe I did.  I'm not positive of that.
7  Q.  Did you have any discussion there in the
8     office with anybody?
9  A.  No.  He was not there.  The young lady was
10    just strictly a telephone receptionist.
11 Q.  And she was meeting your request for this
12    information?
13 A.  Right.
14 Q.  Did she give you anything in addition to
15    these two pieces of paper?
16 A.  She may have given me the declaration
17    page.  I'm not positive of that.  Which
18    would have been the declaration page for
19    the last policy year.
20 Q.  The one that would have been for the '04 to
21    '05 policy period?
22 A.  Right.  Well, '03, '04.
23 Q.  October.  Yeah, that's right.

Page 75

1           (Defendant's Exhibit 3 was marked
2              for identification.)
3  Q.  I'm marking this as Exhibit 3.  Do you
4     think it's the same as what I marked as
5     Exhibit 2?
6  A.  Yeah.
7  Q.  Yeah, it is.  But it's stapled to something
8     else.  Do you know what the front page --
9     where that came from?
10 A.  I don't ...
11        MR. WINTER:  Can we go off the
12           record?
13        MR. JACKSON:  Sure.
14           (Off-the-record discussion.)
15 Q.  Okay.  You told me you didn't have any
16    conversation right then when you got this
17    piece of paper.  After you got the piece of
18    paper and saw this square footage 2128, did
19    you have any conversation with anybody at
20    State Farm after that point?
21 A.  I'm not sure one way or the other.  I
22    believe that I imparted that knowledge to
23    Mims Hackett, but I would not stake my life

Page 76

1     on it.
2  Q.  All right.  Do you remember any response
3     that Mims Hackett made if you told him
4     that?
5  A.  No, I do not.
6  Q.  Have you ever had a conversation with Mark
7     King about this issue?
8  A.  No, I have not.
9  Q.  Have you ever had a conversation with Nall
10    about what you found out about the square
11    footage?
12 A.  Tried to.  And Mr. Nall, being the jerk he
13    is, I was not able to have a conversation
14    with him.
15 Q.  I saw a couple of documents in here I
16    wanted to ask you about.  This one here
17    which I think -- let me show them to you
18    first before I mark them and ask you if
19    they go together or if they are separate
20    documents.
21 A.  They're documents from the Covington County
22    Courthouse in the property taxation where
23    they do the reappraisals and everything.  I

Page 77

1     went and got these to show that when the
2     various things was done to the house that
3     they had recorded it on there in their
4     assessment process.
5           MR. WINTER:  Did that go with it?
6           THE WITNESS:  That goes with it
7              too.
8  Q.  All of these should be together as one
9     document?
10 A.  Right.
11 Q.  So it's four pages total?
12 A.  Correct.
13 Q.  I'm going to put it on an area where
14    there's no writing so I don't cover
15    anything up.
16           (Defendant's Exhibit 4 was marked
17              for identification.)
18 Q.  So you went to Covington County property --
19 A.  Assessment.  You know, where they do the
20    reassessments each year.
21 Q.  And you got all four of these documents
22    that I've marked as Exhibit 4 at the same
23    time; is that right?

Page 78

1   A. Right.
2   Q. What did you ask for?
3   A. I just asked for a copy of the appraisal
4       records so that I could see when the
5       additions were made and changes were made.
6       As you notice, they say down there when
7       changes are made -- it's kind of hard to
8       see. It would probably be -- I don't --
9       they got it off of microfiche and made
10      copies for me.
11  Q. Okay.
12  A. Because there was some questions of Ron
13      Nall's as to when I did the addition to the
14      house and if I had done the addition to the
15      house.
16  Q. So was the main reason you went to the
17      assessor's office to get documentation
18      showing when the changes had been made?
19  A. Right. Verification of what I was stating.
20          (Defendant's Exhibit 5 was marked
21          for identification.)
22  Q. All right. I show you here Exhibit 5.
23      It's a letter from Mims Hackett to you and

Page 79

1       Ms. Jones. It's dated September 1, '04.
2       And there's stapled to that some checks. I
3       want you to look at it first. It starts
4       off by saying this follows -- I think it
5       says follows a telephone conversation we
6       had on September 1. And then you see on
7       that first page it's got an amount for
8       dwelling coverage limit and then the 20
9       percent above that for a total of 140,000.
10  A. Right.
11  Q. That's consistent with the conversations
12      you had previously had with Mims Hackett?
13  A. Right. And I think if you notice the date
14      on this --
15  Q. Yes. So you went immediately to Nall's
16      office?
17  A. Right.
18  Q. Okay. Do you remember roughly when it was
19      that you went to the assessor's office?
20  A. No, I do not. Somewhere in that
21      neighborhood, time frame.
22  Q. Okay. I'm going to show you some
23      additional documents here.

Page 80

1           (Defendant's Exhibit 6 was marked
2           for identification.)
3   Q. I'll show you what I'll mark here as
4       Exhibit 6. And I will tell you -- I'm not
5       playing tricks with you. This was prepared
6       January 17th of 2005. It's basically a
7       recreation of the declaration page that was
8       sent for the '96, '97 policy period; okay?
9   A. Okay.
10  Q. And I think I know the answer to this
11      question. Do you have a specific
12      recollection of having gotten this
13      particular declaration page?
14  A. I do not.
15  Q. But you don't have any doubt to -- you
16      don't have any reason to doubt that you got
17      a declaration page for the '96, '97 policy
18      period?
19  A. Right.
20  Q. And when you did get those, they followed a
21      format similar to this with dollar figures
22      set forth for various coverages; correct?
23  A. Correct.

Page 81

1           MR. WINTER: Object to the form.
2           But you can answer.
3           (Defendant's Exhibit 7 was marked
4           for identification.)
5   Q. Now, I was not sure. I want to make sure I
6       understand. I'm going to go ahead and mark
7       this as Exhibit 7. This is the actual
8       policy for that policy period, the '96, '97
9       policy period. Along the way you made a
10      reference of having gotten, you know, two,
11      three, four of these what you call
12      booklets, policy booklets.
13  A. Something like that, right.
14  Q. They're not in eight-and-a-half-by-11
15      format when you get them. And they're like
16      on onion skin, right, thin paper?
17  A. Right.
18  Q. Am I understanding you correctly that you
19      did not get a new policy each renewal?
20  A. I wouldn't guarantee you one way or the
21      other.
22  Q. Okay. That's what I was trying to
23      understand.

Page 82

1  A.  I remember getting some of these.
2  Q.  Right.
3  A.  I remember getting one this year.
4  Q.  Right.
5  A.  Which I tried to read and couldn't
6     understand.
7        (Defendant's Exhibit 8 was marked
8        for identification.)
9  Q.  Now, I'm going to show you what I've marked
10     as Defendant's Exhibit 8 which is the
11     declaration page for the following policy
12     period from '97 to '98.  And, again, do you
13     have a specific recollection of getting
14     this one?
15  A.  No, I do not.
16  Q.  And you see that the amount for the
17     dwelling here is going up from 91,100 to
18     93,200?
19  A.  Uh-huh (positive response).
20  Q.  Generally speaking, did you notice the fact
21     that the dwelling amount was increasing
22     year to year?
23  A.  Yes, I did.

Page 83

1  Q.  And was also the premium increasing from
2     year to year?
3  A.  True.
4        (Defendant's Exhibit 9 was marked
5        for identification.)
6  Q.  All right.  I'm going to show you what I'm
7     going to mark as Exhibit 9.  It's a
8     declaration page for '98 and '99.  It's got
9     limits now on the dwelling of 95,000.
10     Again, it's a recreation.  It was prepared
11     in January of '05.
12        First question, do you have a specific
13     recollection of getting this one?
14  A.  I do not.
15  Q.  Do you have any reason to doubt you didn't
16     get one?
17  A.  I do not.
18        (Defendant's Exhibit 10 was marked
19        for identification.)
20  Q.  Now I'll mark this separately.  It's part
21     of -- it's two pages.  Part of what I'm
22     going to show you is Exhibit 11 here in a
23     second.  I've marked it as Exhibit 10.

Page 84

1     It's two pages at the top of which says
2     important notice about changes to your
3     policy.  Take a minute and look at that.
4        Okay.  Now, you have had an opportunity
5     to review Exhibit 10.  Now, having had an
6     opportunity to review it, first question,
7     do you have a recollection of receiving a
8     notice like that?
9  A.  I do not.
10  Q.  At any point in time?
11  A.  At any point in time.
12  Q.  You see on this particular notice in the
13     heading reductions or eliminations of
14     coverage, that guaranteed extra coverage
15     and guaranteed replacement cost coverages
16     are being eliminated.  Have you read that?
17  A.  I read that.
18  Q.  As you're sitting here today seeing it you
19     understand what it's saying?
20  A.  Vaguely, yes.
21  Q.  That the coverage is being changed from a
22     guaranteed replacement cost coverage to
23     being one where it's a stated limits policy

Page 85

1     plus an increased amount if you elect to
2     take it?
3  A.  Yeah.
4  Q.  And you've already told me you didn't have
5     any discussion with King at any time about
6     any changes to the policy coverage?
7  A.  I did not.
8  Q.  Now, on this declaration page -- and I
9     think you made a little reference to this
10     earlier about the one that was in effect in
11     '03, '04.  You said the format was
12     different.  You notice on this declaration
13     page down here where it's got loss
14     settlement provisions, there are some
15     things listed that are not listed on the
16     declaration page from the previous year.
17     Do you see that?
18  A.  Yes.
19  Q.  When you got the declaration page, did you
20     have any discussion with Mark King about
21     what was going on with this policy, what is
22     this option ID, anything like that?
23  A.  I did not.  This is not the same format as

Page 86

1    the one that I had for '03, '04.
2  Q. Okay. We're going to see that one in a
3    minute because I'm going chronologically.
4        MR. WINTER: What year is that?
5        MR. JACKSON: This is for '98,
6          '99. And I think we had
7          marked as Number 8 the '97,
8          '98.
9  Q. So you didn't have any discussion with King
10   about any changes or what have you to the
11   declaration page?
12  A. No.
13  Q. Or to the policy?
14  A. No.
15       (Defendant's Exhibit 11 was marked
16       for identification.)
17  Q. Now, this is Exhibit 11 now. Now, that's a
18   copy of the policy, Exhibit 11. It would
19   have been in the onion skin, you know,
20   smaller format than it's being reproduced
21   on this eight-and-a-half-by-11 piece of
22   paper. Do you have a recollection of
23   receiving a policy back in the '98, '99 --

Page 87

1  A. Not specifically. I'm not saying I did or
2    didn't.
3  Q. All right. If you did -- consistent with
4    your previous answer, if you did get one,
5    would you have looked at it before you put
6    it in your folder?
7  A. Probably glanced through it. Not in detail
8    because if I read it right now I wouldn't
9    be able to tell you what it said.
10  Q. Okay. That's fair. And I'm going to be
11   reading upside down, so bear with me. But
12   this is out of Exhibit 11, page 11 of the
13   insurance policy. It's in the section that
14   says loss settlement, and it addresses
15   dwelling. And it says replacement cost
16   loss settlement similar construction. We
17   will pay the cost to repair or replace with
18   similar construction and for the same use
19   on the premises shown in the declarations,
20   the damaged part of the property covered
21   under section I, coverages, coverage A,
22   dwelling, except for wood fences subject to
23   the following. And paragraph one, until

Page 88

1    actual repair or replacement is completed,
2    we will pay only the actual cash value at
3    the time of the loss of the damaged part of
4    the property up to the applicable limit of
5    liability shown in the declarations not to
6    exceed the cost or repair or replace --
7    excuse -- or replace the damaged part of
8    the property.
9        Paragraph two, when the repair or
10   replacement is actually completed, we will
11   pay the covered additional amount you
12   actually and necessarily spend to repair or
13   replace the damaged part of the property
14   or -- can't read that -- and -- or an
15   amount up to the applicable limit of
16   liability shown in the declarations,
17   whichever is less.
18       Okay. Now, having looked at it today
19   and me reading it to you, do you understand
20   what that's saying?
21  A. Not really.
22  Q. It's going to pay the lesser of the limits
23   on the declaration page or your actual

Page 89

1    replacement cost?
2        MR. WINTER: Object to the form.
3          I think you asked a question
4          and he answered it and then
5          you followed it up with a
6          clause but not a question.
7  Q. Okay. He's got an objection. And my
8    question is, as we're sitting here and as I
9    read it and you're reading it here at the
10   deposition, do you understand that what
11   it's saying is that the policy will pay the
12   lesser of the replacement cost of the house
13   or the limits on the declaration page,
14   whichever is less?
15       MR. WINTER: Object to the form.
16  A. I don't know whether I do or not. Not from
17   what's written there, I mean ...
18       (Defendant's Exhibit 12 was marked
19       for identification.)
20  Q. All right. This is Exhibit 12. This is
21   the next declaration page for the years '99
22   to 2000. Again, my first question is, do
23   you have a recollection of having received

Page 90

1      it --
2    A.  Not really.
3    Q.  -- back in '99?
4    A.  No.
5    Q.  Have any reason to doubt that you did not
6         get one?
7    A.  I don't have a reason to doubt it.
8    Q.  That's fine.  And you see there's a change
9         from the earlier one, the amount and the
10        premium both going up?
11   A.  Right.
12   Q.  That was --
13   A.  I would have noticed that, sure.
14   Q.  That was routine for both the amount of the
15        coverage and the premium to go up, wasn't
16        it?
17   A.  Yeah.
18            (Defendant's Exhibit 13 was marked
19            for identification.)
20   Q.  Exhibit 13 is the policy for that
21        particular period there, again, in the
22        onion skin format booklet form.  Do you
23        recall getting the policy?

Page 91

1    A.  Not specifically.
2    Q.  Consistent with your earlier answers, if
3         you did get it, would you have briefly
4         opened it and looked at it before you put
5         it in your folder?
6    A.  Yes, sir.
7            (Defendant's Exhibit 14 was marked
8            for identification.)
9    Q.  This is Exhibit 14, the 2000, 2001
10        declaration page, again, noting the
11        coverage amount and the premium both
12        increasing.
13   A.  Yes.
14   Q.  Do you have a recollection of getting that
15        one?
16   A.  Not particularly, no.
17   Q.  Any reason to doubt you got one?
18   A.  No.
19            (Defendant's Exhibit 15 was marked
20            for identification.)
21   Q.  And Exhibit 15 would be the policy for that
22        particular policy period?
23   A.  I believe that's the policy -- the agent

Page 92

1      changed maybe.
2    Q.  2000, 2001.  Let's see.  That's got Nall
3         Insurance Agency down there at the bottom
4         of that.
5            Do you have a specific recollection of
6         receiving what I've marked as Exhibit 15,
7         the policy?
8    A.  No.
9    Q.  If you did get one, consistent with your
10        earlier answers, you would have opened it
11        and looked at it before you put it in your
12        folder?
13   A.  Probably so, yes.
14            (Defendant's Exhibit 16 was marked
15            for identification.)
16   Q.  16 is from 2001 to 2002.  Now the limit is
17        up to 103,800, and the premium is obviously
18        more as well.
19   A.  Right.
20            (Defendant's Exhibit 17 was marked
21            for identification.)
22   Q.  17 is the insurance policy that coincides
23        with that policy period.

Page 93

1            If I understand your answers correctly,
2         you do recall receiving some policies
3         during the years, but you don't remember
4         which years?
5    A.  Right.  I remember receiving the
6         declaration page.  I mean, I can remember
7         those.  But I don't remember ...
8            (Defendant's Exhibit 18 was marked
9            for identification.)
10   Q.  Okay.  18 is the declaration page from '02
11        to '03.  The limit now is up to 107,200.
12            Looking at some previous ones, under
13        this block down here that's kind of in the
14        bottom left corner under loss settlement
15        provisions, in that particular section
16        there seems to be more listed.  Did you
17        notice that when you got the declaration
18        page that there was more listed?
19   A.  No.  I read this top line up here that said
20        replacement cost similar construction and
21        that's what I hung my hat on.
22   Q.  Right.  Okay.  Do you understand that even
23        though that the insurance policy in force

Page 94

1  and effect in '03 -- excuse me -- '04 when
2  the fire occurred -- even though there was
3  a limit on that policy, that the policy did
4  provide for replacement cost coverage up to
5  the limit? Do you understand that?
6          MR. WINTER: Object to the form.
7  A. I was looking for replacement cost period.
8  Q. Do you understand the difference between
9  actual cash value and replacement cost?
10         MR. WINTER: Object to the form.
11 A. Actual cash value?
12 Q. Yeah.
13 A. I guess not.
14 Q. Okay. Replacement cost to you, I take
15 it -- you correct me if I'm wrong.
16 Replacement cost to you means whatever it
17 costs to replace the house; right?
18 A. Right. The same size, same description,
19 same everything.
20 Q. Right.
21 A. And I did not build the same house, the
22 same description, but I built something
23 close. No, I did not anticipate them

Page 95

1  paying 327,000. I expected them to pay
2  somewhere around the two estimates that was
3  given to them to replace the house that I
4  had.
5  Q. Okay. You saved me some questions on
6  that. I appreciate you going ahead and
7  telling me that because I was going to ask
8  some questions about that.
9          (Defendant's Exhibit 19 was marked
10         for identification.)
11 Q. All right. This is 19, which is the policy
12 that coincides with the policy period for
13 18. I'm just, you know, asking you the
14 same questions just because I started this
15 process and I want to go ahead and end it.
16 Similar question, do you have a
17 recollection of getting what I marked as
18 19?
19 A. No, I do not.
20 Q. But if you got it, consistent with your
21 answers, you would have looked at it before
22 you put it in your file?
23 A. Yeah.

Page 96

1          (Defendant's Exhibit 20 was marked
2          for identification.)
3  Q. And then here is 20, which I believe is
4  going to be the one that was in force and
5  effect at the time of the fire.
6  A. Right.
7  Q. '03 to '04. Now, a couple of different
8  times you've made a reference to the fact
9  that the format was different. Tell me
10 what you're talking about.
11 A. I have a copy somewhere in this stuff that
12 I --
13         THE WITNESS: You know what I'm
14         talking about, Bryan?
15         MR. WINTER: I think it's a -- do
16         you mind if I jump in here?
17         MR. JACKSON: No.
18         MR. WINTER: I think what he's
19         talking about is the first
20         page of the bill, that cover
21         letter that you looked at
22         before.
23         MR. JACKSON: Oh, that was with

Page 97

1  that other exhibit. I haven't
2  taken it apart. It's with 3.
3          MR. WINTER: And I have a copy of
4          it in my file. Let me pull it
5          out of the file and see if I
6          can find it here.
7          MR. JACKSON: Well, for the
8          record, just housekeeping, I'm
9          going to go ahead and take
10         away this front page on
11         Exhibit 3. And Exhibit 3 will
12         be a one-page document now
13         that we've established that
14         the front page should not have
15         been with it.
16         (Defendant's Exhibit 21 was marked
17         for identification.)
18 Q. And while Mr. Winter is looking through his
19 file, let me just show you here Exhibit
20 21.
21 A. 21.
22 Q. Is this what you were talking about that
23 you thought was a different format?

Page 98

1  A. No, no. No. This is a different format of
2     this -- this information right here, that
3     you see right there.
4  Q. Was in a different format. Okay.
5  A. Yes.
6        MR. WINTER: On my copy of that
7           I've got a front page.
8           Somehow it got misstapled. I
9           apologize.
10       MR. JACKSON: That's fine.
11       MR. WINTER: Yeah, that one was
12          all stapled together. I think
13          that's -- is that what you're
14          talking about?
15       THE WITNESS: Yeah.
16 A. Where it says loss up here, not loss down
17    here anyplace. It says replacement cost
18    and it gives a -- no -- yeah, the actual
19    loss sustained. I mean, it just -- the
20    whole thing just appeared to me that I
21    would have replacement cost. I mean --
22       MR. WINTER: Do you want to make a
23          copy of that?

Page 99

1        MR. JACKSON: Yeah.
2        (Off-the-record discussion.)
3  Q. After you rebuilt the house across the
4     street -- diagonally across the street, you
5     got insurance for that house?
6  A. (Witness nods head.)
7  Q. You kept it with State Farm?
8  A. Yes, through Mr. Ron Nall for a short
9     period of time.
10 Q. I guess the question I would ask is based
11    upon the fact that this situation occurred
12    and State Farm didn't give you what you
13    thought you were going to get in terms of
14    replacement cost, why did you go back to
15    State Farm for insurance on the new house?
16 A. That's the only time I've ever been
17    disappointed with State Farm. I've been
18    with State Farm with car insurance, with
19    house insurance all this period of time.
20    I've never filed a claim on this policy
21    until this time. And all the other things
22    I'd ever had had been with automobiles, and
23    they've always been extremely nice to me.

Page 100

1     And at that point I had no reason not to go
2     back to Ron. That situation changed
3     shortly thereafter. But I'm still with
4     State Farm. I'm just with a different
5     agent.
6  Q. Who is your current agent?
7  A. Tim Bryan.
8  Q. You talked about the auto claims that you
9     had and, you know, the folks were nice to
10    you. In terms of Mims Hackett, I mean, was
11    he pleasant? Was he easy to deal with?
12 A. Oh, yeah.
13 Q. Did you have any problems with him?
14 A. I didn't have any problems with Mims
15    Hackett. I mean, he just stated what he --
16 Q. He was the messenger?
17 A. He's just a messenger. No need to kill the
18    messenger.
19       (Defendant's Exhibit 22 was marked
20          for identification.)
21 Q. Okay. As I understand it, Exhibit 22 is
22    what you were talking about was a little
23    bit different format on the declaration

Page 101

1     page than what I had been showing you.
2  A. Correct. And what I thought on this says
3     replacement cost and loss and this, that,
4     and the other, I assumed that to mean if
5     the item -- the house was completely
6     destroyed, then it would be replaced. And
7     if I had any other claim like a small fire
8     or something like that up to that point it
9     would be paid in total -- not the
10    replacement. If the whole house burned
11    down.
12 Q. And let me make sure I'm understanding what
13    you're saying. If you had a small fire
14    that didn't destroy the whole house, were
15    you thinking that you were going to get
16    $108,000?
17 A. No, no, no. I'm saying they were going to
18    pay up to that. Not necessarily pay that.
19    They were going to pay whatever it cost to
20    fix the --
21 Q. Up to that?
22 A. Up to that.
23 Q. But if it was totally destroyed, they would

Page 102

1    go past that amount?
2  A.  Right.  And replace --
3  Q.  No matter what the replacement cost was?
4  A.  Right.
5  Q.  As long as it was with similar
6    construction, similar size.  You understood
7    that?
8  A.  Right.  Yes.  Yes, I understood that.
9  Q.  You understood if you had a 2,000
10    square-foot house you couldn't get a 3,000
11    square-foot house and they would pay it?
12  A.  Right.  Exactly right.  I understood that.
13  Q.  And if you didn't have crown molding, it
14    doesn't mean you could get crown molding on
15    your replacement?
16  A.  That's exactly right.
17  Q.  I understand.  Now, let me ask this first.
18    These various declaration pages that I've
19    been showing you the various years that
20    I've marked as exhibits --
21  A.  Yes.
22  Q.  -- is it your recollection that those were
23    all in the format similar to this 22?

Page 103

1  A.  I just remembered that one because that's
2    the last one I got and that's the one I
3    dealt with quite a bit in relation to the
4    fire.  I had that one in front of me many
5    days.
6  Q.  All right.  On the bottom of this one it's
7    got a couple of things I wanted to ask you
8    about.  One says -- I'll read it and then
9    let you see it and so you can read it for
10    yourself.  I'm going to read it out loud.
11    It says notice.  Effective with this
12    renewal, the coverage A loss settlement
13    endorsement, FE-5273, has been removed from
14    your policy.  Please see the enclosed
15    important notice.  And that's right here.
16    Do you remember reading that when you got
17    this declaration?
18  A.  I do not remember reading that, no.
19  Q.  Have any idea what it's talking about?
20  A.  I guess it's referring to some form.
21  Q.  And I take it from what you've already
22    answered, you didn't call Ron Nall and ask
23    him what does this mean?

Page 104

1  A.  No, I did not.
2  Q.  And by that Mark King has retired?
3  A.  Oh, yes.  He retired back in -- I believe
4    he -- what did you say awhile ago?
5  Q.  It was like '01 or something like that.
6  A.  '01, something like that.
7  Q.  Then the next one has got a paragraph that
8    says the State Farm replacement cost is an
9    estimated replacement cost based on general
10    information about your home.  It is
11    developed from models that use cost of
12    construction materials and labor rates for
13    like homes in the area.  The actual cost to
14    replace your home may be significantly
15    different.  State Farm does not guarantee
16    that this figure will represent the actual
17    cost to replace your home.  You are
18    responsible for selecting the appropriate
19    amount of coverage and you may obtain an
20    appraisal or a contractor estimate which
21    State Farm will consider and accept if
22    reasonable.  Higher coverage amounts may be
23    selected and will result in higher

Page 105

1    premiums.
2      I just read that out loud.  It's right
3    here right below that other notice.  Did
4    you read that when you got this declaration
5    page?
6  A.  No, I do not remember reading that.
7  Q.  As I read it and you've got it here in
8    front of you today, do you understand it?
9  A.  Yes, I -- maybe.  I wouldn't say I
10    understand every bit of it, but I
11    understand most of it.
12  Q.  All right.  Do you understand that part
13    that says you're responsible for selecting
14    the appropriate amount of coverage and you
15    may obtain an appraisal or a contractor
16    estimate?
17  A.  Yes.  But with the exclusion being that
18    you've got somebody who represents
19    themselves as an expert as to what it
20    should be.  And they told me what the
21    number should be, so that was the number I
22    went with.
23  Q.  Now, I notice on this particular

Page 106

1    declaration page and, I think, some of the
2    other ones, too, there's mortgagee listed.
3    Was there a mortgage on the house?
4  A.  There was a home equity loan, a small
5    amount.
6  Q.  At the front end or on the remodeling?
7  A.  On the remodeling. The front end loan was
8    paid off.
9  Q.  Paid off?
10  A.  Yeah. It had been paid off years before.
11  Q.  So there was some mortgage associated with
12    it?
13  A.  Yes. There was a --
14  Q.  You paid that off?
15  A.  First Federal Savings and Loan, I think,
16    was the original mortgagee and then they
17    sold it a billion and one times.
18  Q.  Then to do some of the remodeling/additions
19    you got an equity line?
20  A.  Right.
21  Q.  You paid that off?
22  A.  Right.
23  Q.  As of the date of the fire, was there

Page 107

1    any --
2  A.  There was some outstanding amount on the
3    equity loan at the time.
4  Q.  There was?
5  A.  There was. And it was paid off shortly
6    after the fire.
7  Q.  Now, in connection with that equity loan
8    that you took out, what bank did you take
9    that out from?
10  A.  Covington County Bank.
11  Q.  Was there an appraisal associated with it?
12  A.  I think there was. I'm not positive. The
13    reason I'm saying not positive, the banker
14    who I did business with there moved it over
15    from Wachovia. He was a Wachovia employee,
16    went to work for this private bank, and he
17    moved my loan over -- asked me to move my
18    loan over. There probably was an
19    appraisal.
20  Q.  Let me make sure I'm understanding. Did
21    you originally get it at Wachovia?
22  A.  I originally had it at Wachovia through a
23    friend of mine who worked at Wachovia and

Page 108

1    who resigned and moved over to the
2    Covington County Bank. And at that time I
3    moved my loan over to Covington County
4    Bank.
5  Q.  And who was the banker, the name of the
6    banker?
7  A.  The name of the banker was Robert Cramer.
8  Q.  All right. Since there wasn't a mortgage
9    or after you paid the mortgage off, you got
10    the annual tax assessments, didn't you?
11  A.  Yes.
12  Q.  And then you also -- instead of this being
13    sent to the mortgage company it was sent
14    directly to you, the renewals and the
15    premium payments?
16  A.  Right. And I had it on bank draft
17    organized through Mr. King, Mr. Nall.
18  Q.  Okay. Now, am I correct that -- I've got
19    this Exhibit 22 because on this bottom
20    right-hand corner it says please see
21    reverse side for important information. Am
22    I correct that this Exhibit 22 in the
23    original format would have been one piece

Page 109

1    of paper front and back?
2  A.  I would not be in any position to tell
3    you. I would assume based on that that it
4    was, but I'm not going to tell you it was.
5    THE WITNESS: Do you have the
6      original?
7    MR. WINTER: I don't believe so.
8  A.  I don't think -- somewhere along the line
9    the original is there somewhere.
10    MR. WINTER: I don't know the
11      answer to that question,
12      Mike.
13  A.  I don't either.
14  Q.  Now, you told me what it cost. I think it
15    was 327,000 to build that home.
16  A.  Right.
17  Q.  You got -- toward the dwelling, anyway, you
18    got 140,000 some-odd, as I recall?
19  A.  Yeah. Right.
20  Q.  You took out a mortgage to finance the
21    construction. How much was the mortgage?
22  A.  $190,000.
23  Q.  Is that with Covington County Bank?

Page 110

1   A.  No.  It's with Regions.
2   Q.  And what term have you got it on?
3   A.  30 years.
4   Q.  30 years.  What interest rate is your
5       mortgage rate on?
6   A.  I believe it's 5.875.
7   Q.  Fixed?
8   A.  Fixed.
9   Q.  I wish I had that rate.
10  A.  That was a good rate.  We got it on the day
11      before it went up to six.
12  Q.  You've already addressed this.  You said
13      that what you would expect -- what you
14      expect out of State Farm -- expected out of
15      State Farm was to pay according to the
16      original estimates that you got after Mims
17      Hackett asked you to get estimates?
18  A.  True.
19  Q.  Okay.  And I think roughly -- I mean,
20      they're different, so the average of those
21      two and the amount of insurance that you
22      actually got -- I think you've even
23      calculated that in your answers to

Page 111

1       interrogatories -- is ...
2           MR. WINTER:  I don't think you
3           have it in the answers.
4           THE WITNESS:  I don't think I had
5           it because I didn't know what
6           the numbers were.
7           MR. WINTER:  He didn't know the --
8   A.  I didn't know the estimates.
9   Q.  Oh, okay.  I got you.
10  A.  Looks like somebody else put that in there
11      because I didn't -- I did know they were in
12      excess of 200,000 because Mims had said
13      that.  He said they were close together.  I
14      didn't even realize they were -- whatever
15      you read awhile ago difference -- 15,000 or
16      so difference.
17  Q.  Actually it is in the answers.  It's on
18      page five.  In answer to number 14 it's got
19      in here that State Farm paid $140,227.20.
20  A.  Right.
21  Q.  And then $12,854.60 for settlement of the
22      carport and the workshop.
23  A.  Right.

Page 112

1   Q.  It says the estimated cost to rebuild our
2       home was approximately $207,000.  These
3       estimates were provided directly to State
4       Farm at the request of Mims Hackett.
5   A.  See, I was --
6   Q.  And the difference between the two is
7       $53,918.20.
8   A.  Obviously Mims must have shared with me
9       that it was 207 because that's not even the
10      number or either one of the two estimates.
11      I mean, he must have said 207 is where I
12      come up with that number from.
13  Q.  And that's what I was going to ask, where
14      did the number come from.
15  A.  I had no -- till you read the two numbers
16      out this morning, that's the first time
17      that I had -- I'm sure Mr. Sasser would
18      have shared with me if I had asked him, but
19      I didn't have any need to ask him.
20  Q.  So with that updated information, just
21      following this line of questions, I will
22      tell you that Scott Dutton -- and have told
23      you -- that the Scott Dutton Construction

Page 113

1       estimate was 237,840.  Wyatt Sasser was
2       213,456.
3   A.  Okay.
4   Q.  Do you accept the Wyatt Sasser as being an
5       estimate for rebuilding that house with
6       like kind of quality and materials?
7   A.  Would I?
8   Q.  Yes.  I mean, do you accept that estimate
9       as being --
10  A.  Oh, yeah.
11  Q.  That's what that represents?
12  A.  He's the contractor.  I don't know.
13  Q.  Okay.  And if it is, then you would be
14      expecting State Farm to have paid you the
15      difference between what it did pay, the
16      140,227 and the 213,456?
17  A.  Well, what Mims Hackett had told me was
18      they'd take the two estimates and average
19      them together and come out with an average
20      number for the two estimates.
21  Q.  Okay.
22  A.  And that's what he had told me before I
23      even got the estimate, when he asked me to

Page 114

1    get the two estimates. So I don't know
2    what that average is. It's more than 213.
3  Q.  All right. And obviously the mortgage is
4    for more than that difference?
5  A.  Right.
6  Q.  But you're not looking to State Farm for
7    that entire $190,000 mortgage?
8  A.  No, no.
9  Q.  All right. Now, in addition to the fire --
10 A.  I won't sit here and tell you what I would
11   take difference. But I will tell you that
12   I had told State Farm what I would do, but
13   I told them it was not 190,000. That was
14   before Mr. Nall quit having anything to do
15   with me, being the jerk that he is. Are
16   you aware he cancelled my insurance?
17 Q.  I knew that you had a new agent. I knew
18   the policy had been moved.
19 A.  He called me up and told me my insurance
20   was cancelled. And I said, Ron, you cannot
21   do that. I said, you got to at least give
22   me time to find me another agent and get me
23   some more insurance. And he said that,

Page 115

1    yes, I can. I said, well, can you give me
2    48 hours? He said, yes. In less than 24
3    hours Mr. Tim Bryan had taken my policy.
4  Q.  Another State Farm agent?
5  A.  Yes.
6  Q.  Is he also in Andalusia?
7  A.  He's also in Andalusia. I explained to him
8    what was going on. He wanted to know. We
9    spent probably an hour on the phone. I
10   told him the whole history all the way
11   back. He said, I can't understand Ron. He
12   said that's ...
13 Q.  And you do still have State Farm
14   homeowner's?
15 A.  Yes. And, like I say, I've always been
16   satisfied, but not this time.
17 Q.  And we talked about the financial aspect of
18   the difference between the estimates and
19   the insurance policy. Similar questions to
20   what I asked your wife, Peggy. I
21   understand a fire would be devastating.
22   I've never suffered one, but I've talked to
23   people that have. And I know that alone

Page 116

1    would have an effect on somebody, the
2    actual fire and losing contents and
3    photographs and all that kind of thing.
4    How has this insurance issue, the fact that
5    State Farm paid 140,000 versus more than
6    200,000, affected you?
7  A.  Affected me?
8      Changed my retirement plans entirely.
9    Instead of being able to retire right now,
10   I'm going to have to work a few more years
11   to get this mortgage paid down. It cost me
12   many nights of sleep when I -- when it
13   first happened, but that was just because
14   of the loss of possessions.
15 Q.  Sure.
16 A.  It also made me realize how fortunate I was
17   to have a wife and two grandchildren
18   alive. But it's put a whole new
19   perspective on life, that's for sure.
20 Q.  Have you had to seek any medical treatment
21   or medicines or anything?
22 A.  No, not really. I have so many medical
23   problems. As my wife told you, I recovered

Page 117

1    from chronic lymphocytic leukemia and lost
2    a year of work. And that's the reason 60
3    was a retirement for me.
4  Q.  Right.
5  A.  But that's been put on hold for the time
6    being.
7  Q.  Do you think that Mark -- I mean, I know
8    you think Mark King did not calculate the
9    square footage correctly.
10 A.  Right.
11 Q.  You don't think he did that intentionally,
12   do you?
13 A.  No.
14 Q.  You think he just made a mistake?
15 A.  I think he made a mistake.
16 Q.  You know Mark King, have known him for a
17   number of years?
18 A.  Right.
19 Q.  What kind of character would you say he
20   has?
21 A.  I would say he had a good character.
22 Q.  I mean, you don't think he would
23   intentionally cheat you --

Page 118

1  A.  Oh, no.
2  Q.  -- or anything of that nature?
3  A.  No.
4  Q.  You understand that he got his commission
5      based upon how much insurance you got?
6  A.  Right.
7  Q.  So he would have every reason to get you as
8      much as you would take?
9  A.  Right.
10 Q.  So you --
11 A.  And I took as much as he recommended I
12     take.
13 Q.  All right.  I may have asked this.  Excuse
14     me if I did.  But your son Marcus was
15     involved in this.  And, you know, we'll
16     talk to him for his perspective.  But he
17     requested some information from State
18     Farm.  When he got that, he shared that
19     with you?
20 A.  Yes.
21 Q.  Have you since given that to Mr. Winter?
22 A.  Yes, sir.  Everything that he got.
23        MR. WINTER:  I think I've produced

Page 119

1         it all to you.  If I haven't,
2         if there's something you know
3         about, please let me know.
4      MR. JACKSON:  I don't right now.
5         I mean, I have the same -- you
6         know, other than this one here
7         that's Exhibit 22, I have the
8         same past dec sheets for
9         policies.
10     MR. WINTER:  I have a bunch of
11        those.  I just assumed you had
12        those, so I didn't ...
13     MR. JACKSON:  Yeah.  Well, I would
14        like to know -- see, he didn't
15        keep all the way back to the
16        '70s.  So I want to know how
17        far back he did keep them.
18        But, like I say, Marcus also
19        requested some.  So I don't
20        know the difference.
21     MR. WINTER:  The ones I have, I
22        think, are the ones that
23        Marcus requested and got,

Page 120

1         because none of them are
2         signed or countersigned for
3         real.  I mean, I'll be happy
4         to show you.
5      THE WITNESS:  I had some and
6         didn't have, like I say, that
7         far back.  And I think when he
8         started requesting them, he
9         just requested for the time
10        period he thought we would
11        need.  I mean, I can go back
12        to my file when I get back to
13        Andalusia, Alabama.
14     MR. WINTER:  Yeah, why don't you
15        do that.
16     THE WITNESS:  And see how far back
17        I can go.  I mean, I don't
18        know exactly.
19     MR. WINTER:  All the policies I
20        have are right here, and none
21        of them are -- on the dec
22        pages, none of them are
23        actually signed.

Page 121

1      MR. JACKSON:  And just for --
2      THE WITNESS:  See, I didn't
3         keep -- these little booklets
4         like that, I don't think I've
5         got over one or maybe two in
6         my file.  Because they -- I
7         assume it said basically the
8         same thing from year to year.
9      MR. JACKSON:  I guess what I would
10        ask is whether they're from
11        Marcus.  Otherwise, I would
12        like to get a copy of
13        whatever --
14     MR. WINTER:  We'll check on that
15        and get to you what he has in
16        his file.
17     MR. JACKSON:  Okay.
18 Q.  Ron Nall came out to the scene of the fire
19     after it happened; right?
20 A.  Saw my wife.
21 Q.  You didn't have a discussion with him?
22 A.  No.  I was in San Diego, California.
23 Q.  Have you had any substantive discussion

Page 122

1  with Ron Nall about what the insurance
2  policy would pay or anything of that nature
3  since the fire happened?
4  A.  The only conversation I've had with Ron
5  since the fire was two.  One was about her
6  necklace that she's already told you about
7  and the second one the day he brought me a
8  check for $5,000.  The third one I tried to
9  have with him he would not talk to me.
10  Q.  Okay.  Are you satisfied, Mr. Jones, that
11  you've told me about, whether they were at
12  the ballpark or otherwise, the
13  conversations that you have had with Mark
14  King over the years about your remodeling,
15  additions, and the insurance --
16  A.  As far as I'm aware, yes, to the best of my
17  knowledge.
18  Q.  Your wife told me about the church.  I
19  think it was Mount Zion Methodist that
20  she's attended regularly for 40-something
21  years.  Do you go to that same church?
22  A.  62 of them.
23  Q.  I already asked you about your employment

Page 123

1  history.  Are you a member of any civic
2  clubs down there, any organizations or
3  clubs?
4  A.  I'm a member of the Kiwanis Club, member
5  of the Masonic Lodge, member of the men's
6  club at the church.
7  Q.  Okay.  Anything else besides that?
8  A.  That's all.  In years past I have been
9  involved with baseball, football,
10  basketball.
11  Q.  Like Little League and --
12  A.  Little League
13  Q.  -- high school, booster clubs?
14  A.  Yes.
15  Q.  Is it safe to say that --
16  A.  Coached for nine years.  Coached little
17  boys' football for nine years.
18  Q.  Is it safe to say that everybody at Alabama
19  Electric Co-op knows you and you know
20  everybody there?
21  A.  Yes, all 550 of them.
22  Q.  Pretty much the same for the Straughn
23  community?

Page 124

1  A.  Yes.
2  Q.  You know everybody there and they know you?
3  A.  Yes.
4  Q.  Let me close by just asking this general
5  question.  And this is -- do you feel that
6  you have any responsibility at all for the
7  fact that -- if it is a fact -- that there
8  was not enough insurance on the house to
9  replace it after the fire?
10  A.  Not really based on the fact that when I
11  come to a doctor, I take their word for
12  it.  I go to an insurance agent who
13  purported to be an expert in his field, and
14  I take his advice and that's the coverage
15  that I had.
16  Q.  You have had no conversation with Mark King
17  about the discrepancy between the estimates
18  and the amount?
19  A.  Like I told you to start with, until
20  September 1, I believe the date on that
21  printout, I did not know this was a
22  discrepancy on the information.
23  Q.  And I take it you don't know the exact way

Page 125

1  Mark King used the square footage to
2  calculate the estimated replacement cost?
3  A.  No.
4  Q.  You don't know what factors he used?
5  A.  No.
6  Q.  In the answers to interrogatories there is
7  a statement in there that he used the wrong
8  construction factor.  Do you know what
9  that's talking about?
10  A.  No.
11      MR. WINTER:  Probably should show
12      it to him.
13      MR. JACKSON:  I will.
14  Q.  The answer to number five says Mr. King did
15  not accurately measure the square footage
16  of our house.  We've talked about that.
17  State Farm by and through its agents,
18  Mr. King and Mr. Nall, also did not use an
19  accurate cost factor of construction costs
20  in terms of materials or labor to determine
21  the replacement price in the amount in
22  which our house should have been covered.
23  Do you know what that's talking about?

Page 126

1  A.  The only thing I can think about there is
2     the fact that they didn't give any credit
3     for the addition and the work done on the
4     garage -- I mean, the storage room when it
5     was converted into a playroom.  That would
6     be the only thing.  Because if you'll
7     notice on one of his -- on -- what was that
8     that I saw where he just had it listed as a
9     slab or something.
10        I don't remember.  Anyway, I'm not sure
11    he give credit -- well, it's obvious
12    looking at the difference in the square
13    footage that the garage -- the carport
14    that had been enclosed and made into a
15    playroom was not included.  I mean, that's
16    obvious.  I don't know why -- that's been
17    so long ago since I did that.  But I was --
18    I would think that that's what I was
19    referring to.
20  Q.  And here it is again in number ten.  He did
21    not accurately calculate the square footage
22    and did not utilize the proper cost of
23    construction per square foot necessary or

Page 127

1     reasonable to repair or rebuild our home
2     after it was destroyed.
3  A.  I don't remember even writing that to be
4     honest with you.  What is that?
5  Q.  Oh, I'm sorry.
6  A.  What is it dated on that?
7  Q.  September 11, '06.
8        MR. WINTER:  That was way back.
9        THE WITNESS:  Oh, okay.
10       MR. WINTER:  That was when we met.
11       THE WITNESS:  Yeah.  Okay.
12  A.  That was probably just a thought on my
13    part, not necessarily a statement of fact.
14  Q.  I just saw this and I want to make sure
15    that I don't end before I address it.
16    That's number 16.  I'm asking about what
17    you allege State Farm should pay.  And it
18    says in the answer State Farm should have
19    paid us to full cost to rebuild our home.
20    Now, I would take that to be the 327.
21  A.  No, no.  I don't take -- I don't take it
22    that way.  I take it to build the home back
23    that was insured.  And I would think, if

Page 128

1     you wanted to be fair about the matter, you
2     would take the two estimates that was
3     requested and you would average those two
4     together and you would pay the difference.
5     Plus now I have another fee.
6  Q.  I'm sure he comes cheap.
7  A.  He does.  Peanuts.
8        MR. WINTER:  Haven't gotten paid a
9        dime yet.
10       THE WITNESS:  That's why I said
11       peanuts.
12  Q.  Now, I asked how this has had an effect on
13    you or how it has affected you.  Is there
14    any other way that this insurance issue has
15    damaged or harmed or affected you that we
16    haven't talked about?
17  A.  Me personally?
18  Q.  Yeah.
19  A.  No.  I don't think that -- I think more of
20    the damage has been done to the other half
21    of the party.
22  Q.  And you've seen that?
23  A.  I've seen that.  I've seen the sleepless

Page 129

1     nights sitting in the chair wide awake
2     pondering what could I have done
3     differently, was it my fault.  Because I
4     was in San Diego.  She was at home.  She
5     was responsible for the home at that time.
6  Q.  She's not wondering is it my fault that the
7     amount of the insurance wasn't enough?
8  A.  No.  She's wondering about the fire.
9  Q.  She's wondering could I have done something
10    to save some contents out of the fire?
11  A.  Or just save the home period.
12  Q.  Okay.
13  A.  Because it's a very devastating thing.  If
14    you've never been through it, it's like
15    losing a loved one when you've been there
16    35 years.
17  Q.  Sure.
18  A.  It's like losing part of the family.
19       MR. JACKSON:  All right,
20       Mr. Jones.  Thank you for
21       answering my questions.
22       MR. WINTER:  I don't think we need
23       to read and sign.

Page 130

```
 1        (Deposition concluded at
 2        approximately 1:55 p.m.)
 3        * * * * * * * * * *
 4        FURTHER DEPONENT SAITH NOT
 5        * * * * * * * * * *
 6        REPORTER'S CERTIFICATE
 7   STATE OF ALABAMA:
 8   MONTGOMERY COUNTY:
 9        I, Tracye Sadler, Certified Shorthand
10   Reporter and Commissioner for the State of Alabama
11   at Large, do hereby certify that I reported the
12   deposition of:
13        JACOB JONES
14   who was duly sworn by me to speak the truth, the
15   whole truth and nothing but the truth, in the
16   matter of:
17        JACOB N. JONES and
18        PEGGY C. JONES,
19        Plaintiff,
20        vs.
21        STATE FARM INSURANCE
22        COMPANY, et al.,
23        Defendants.
```

Page 131

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3        NORTHERN DIVISION
 4        Case Number 2:05-CV-1119-WKW-SRW
 5   on January 17, 2007.
 6        The foregoing 130 computer-printed pages
 7   contain a true and correct transcript of the
 8   examination of said witness by counsel for the
 9   parties set out herein.  The reading and signing of
10   same is hereby waived.
11        I further certify that I am neither of
12   kin nor of counsel to the parties to said cause nor
13   in any manner interested in the results thereof.
14        This 1st day of February 2007.
15
16
17        _____
          Tracye Sadler, Certified
18        Shorthand Reporter and
          Commissioner for the State
19        of Alabama at Large
20
   21
22
23
```