# EXHIBIT "B"

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JACOB N. JONES and
PEGGY C. JONES,

    Plaintiff,

vs.                     CASE NO.
                       2:05-CV-1119-WKW-SRW

STATE FARM INSURANCE
COMPANY, et al.,

    Defendants.


\* \* \* \* \* \* \* \* \* \* \* \*


      DEPOSITION OF PEGGY C. JONES, taken pursuant to stipulation and agreement before Tracye Sadler, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, in the Law Offices of Beers, Anderson, Jackson, Patty, Van Heest & Fawal, Suite 100, 250 Commerce Street, Montgomery, Alabama, on January 17, 2007, commencing at approximately 10:15 a.m.


\* \* \* \* \* \* \* \* \* \* \* \*

EXHIBIT B



**Page 1**

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3                 NORTHERN DIVISION
 4
 5   JACOB N. JONES and
     PEGGY C. JONES,
 6
            Plaintiff,
 7
       vs.             CASE NO.
 8              2:05-CV-1119-WKW-SRW
 9   STATE FARM INSURANCE
     COMPANY, et al.,
10
            Defendants.
11
12            * * * * * * * * * * * *
13
14       DEPOSITION OF PEGGY C. JONES, taken
15   pursuant to stipulation and agreement before Tracye
16   Sadler, Certified Shorthand Reporter and
17   Commissioner for the State of Alabama at Large, in
18   the Law Offices of Beers, Anderson, Jackson, Patty,
19   Van Heest & Fawal, Suite 100, 250 Commerce Street,
20   Montgomery, Alabama, on January 17, 2007,
21   commencing at approximately 10:15 a.m.
22
23            * * * * * * * * * * * *
```

**Page 2**

```
 1              APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4   Mr. Bryan P. Winter
     ADCOX-WINTER, LLP
 5   Attorneys at Law
     611 Helen Keller Boulevard
 6   Tuscaloosa, Alabama  35404
 7
     ON BEHALF OF THE DEFENDANT:
 8
     Mr. Micheal S. Jackson
 9   BEERS, ANDERSON, JACKSON, PATTY,
     VAN HEEST & FAWAL, P.C.
10   Attorneys at Law
     Suite 100
11   250 Commerce Street
     Montgomery, AL  36104
12
13   ALSO PRESENT:
14   Mr. Jacob Jones
15
16            * * * * * * * * * * *
17
18
19
            EXAMINATION INDEX
20
21   BY MR. JACKSON . . . . . . . . . . 4
22
       (No exhibits marked to this deposition.)
23
```

**Page 3**

```
 1                STIPULATIONS
 2       It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of PEGGY JONES is taken pursuant to the
 5   Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Tracye Sadler,
 7   Certified Shorthand Reporter and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16       It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23       It is further stipulated and agreed by and
```

**Page 4**

```
 1   between the parties hereto and the witness that the
 2   signature of the witness to this deposition is
 3   hereby not waived.
 4
 5           * * * * * * * * * * * *
 6
 7       THE COURT REPORTER:  Usual
 8           stipulations?
 9       MR. WINTER:  We would like to read
10           and sign if that's all right.
11
12
13              PEGGY JONES
14    The witness, after having first been duly sworn
15   to speak the truth, the whole truth, and nothing
16   but the truth, testified as follows:
17                EXAMINATION
18   BY MR. JACKSON:
19   Q.  Ms. Jones, we met right before the
20       deposition.  I'm Mike Jackson and I'm
21       representing State Farm Fire & Casualty
22       Company and also Ron Nall right now.  Your
23       lawyers filed a pleading in the court
```

Page 5

1  trying to get or trying to add Mark King as
2  a defendant. Right now he's not a party,
3  so I just wanted to let you know that I"m
4  representing State Farm and Ron Nall right
5  now. And I asked to take your deposition
6  to ask you questions about this case and
7  then what you may know or add to the case.
8  If I ask you something that you don't
9  understand, tell me. It's not a marathon.
10 If you need to take a break, tell me;
11 okay?
12     Okay. Normally in my paper discovery I
13 ask some background information which I
14 failed to do in this case, so I have to --
15 that normally shortens the deposition. But
16 since I didn't do it, I need to get some
17 background information on you.
18     Let's start with you stating your full
19 name for the record.
20 A. Well, let's see how you want this. It's --
21 I sign it two different ways. I sign Peggy
22 C. Jones. Is that what you want?
23 Q. That's fine. And you're married to Jacob

Page 6

1  Jones?
2  A. Right.
3  Q. And how long have you been married?
4     MR. JONES: 41.
5     MR. WINTER: You can't answer that
6        question, but I'm glad you
7        could.
8  A. 41.
9  Q. Normally when the husband is down here and
10    gets that question, you know, they don't
11    know and the wife is the one that knows.
12    So that's interesting. That's fine.
13 A. I just know when it comes.
14 Q. And what's your street address?
15 A. 30595 Straughn School Road.
16 Q. And is that the same street address as the
17    former residence that was damaged by fire?
18 A. Same street but different numbers.
19 Q. Different numbers?
20 A. Uh-huh (positive response).
21 Q. Okay. Was the replacement home built on a
22    different lot?
23 A. Right.

Page 7

1  Q. So what was the address?
2  A. 206 -- I don't remember.
3  Q. Okay. Well, it's in the records. That's
4     fine. How far away from the old lot was
5     the new home?
6  A. Across the road. Well, diagonally across
7     the road.
8  Q. Were you born and raised in Covington
9     County?
10 A. Yes.
11 Q. Go to school down there?
12 A. Yes.
13 Q. How far did you go in school?
14 A. Went to the 12th grade.
15 Q. What high school?
16 A. Red Level.
17 Q. Red Level High School.
18 A. But I didn't finish the 12th. I got my
19    GED.
20 Q. Okay. You finished the 11th, started the
21    12th, stopped, and then just later got a
22    GED?
23 A. (Witness nods head.)

Page 8

1  Q. Okay. You have already done -- and I
2     should have gone over this. You've done
3     something very common to witnesses and that
4     is nodding your head because that's a way
5     of communication. But the court reporter
6     can't take down a head-nod. And so if you
7     do that, I'm going to ask you to follow
8     that with either a yes or no, whichever way
9     you're nodding your head; okay?
10 A. Okay.
11 Q. And please don't think I'm being rude to do
12    that. We just have to have a record of
13    what you're communicating to me with your
14    head-nod.
15       Also it's very tough for a court
16    reporter to distinguish between uh-huh and
17    huh-uh. They can do it, but it's tough on
18    them. And so if you do that -- and
19    typically a lot of people in the south, you
20    know, speak that way -- I'll say is that a
21    no or is that a yes so we're clear on which
22    one that was; okay?
23 A. Okay.

Page 9

1   Q. So you got your GED. Have you worked since
2      leaving Red Level High School anywhere?
3   A. Yes.
4   Q. Are you currently working anywhere?
5   A. No.
6   Q. Just tell me briefly what your employment
7      history has been after you left Red Level
8      High School.
9   A. I worked at Alatex for about two years.
10     And then I went to school to be a
11     cosmetologist, and that didn't work out.
12     And then I worked for Judy Bond in Red
13     Level for 21 years.
14  Q. And what is Judy Bond?
15  A. It's -- was a sewing factory. A sewing
16     factory.
17  Q. No longer in operation?
18  A. No longer.
19  Q. So you worked there 21 years?
20  A. Uh-huh (positive response).
21  Q. Okay. Anyplace after that?
22  A. I substituted for -- in the cafeteria
23     system in Andalusia.

Page 10

1   Q. Various schools?
2   A. Yeah. Yes, sir.
3   Q. They would just call you when they need
4      you?
5   A. Uh-huh (positive response). Yes, sir.
6   Q. And that would be like the Andalusia school
7      system including high school, elementary
8      school, different schools in that system?
9   A. The middle school, the two elementary
10     schools, and high school.
11  Q. So you would probably know a lot of the
12     administrative people that work in those
13     schools that you substituted, like the
14     principals, assistant principals?
15  A. No.
16  Q. More of the cafeteria people?
17  A. Yes, sir.
18  Q. Are you still doing that if they call on
19     you?
20  A. No.
21  Q. So when is the last time you actually had
22     any kind of work at all? How many years
23     ago?

Page 11

1   A. '97 probably. I think. I'm not sure.
2   Q. Were you substituting in the cafeterias at
3      the same time you were working at Judy
4      Bond?
5   A. No.
6   Q. So was the last actual job you had the
7      substitute job?
8   A. Yes.
9   Q. So you've been a homemaker since 1997?
10  A. Yes.
11  Q. All right. Very good. How long -- going
12     backwards in time, how long have y'all
13     lived on Straughn School Road?
14  A. Let's see. In the house?
15  Q. Well, no. Just on that road. I know that
16     this house that y'all -- I think y'all got
17     into this house around 1970, '71, something
18     like that.
19  A. Okay. We lived on Straughn School Road --
20     let's see. March -- I'm trying to think
21     how old my baby son is.
22        THE WITNESS: How old is he,
23     Jake?

Page 12

1   A. He can't answer, can he?
2         MR. WINTER: Do your best.
3   A. 30-something years.
4   Q. Okay. Were you living on Straughn School
5      Road before the house -- living in the
6      house that was damaged by the fire?
7   A. Before the house?
8   Q. Yes, ma'am.
9   A. Yes.
10  Q. And what kind of dwelling were you living
11     in before that house?
12  A. A rental.
13  Q. A rental home. All right. And that is
14     Straughn School Road, and the reason it's
15     called Straughn School Road is because
16     there's a high school on that road?
17  A. Right.
18  Q. And is that known in Covington County as
19     the Straughn community?
20  A. Yes, sir.
21  Q. And if it's like Honoraville up here in
22     Montgomery County, everybody in Honoraville
23     knows everybody. Does everybody in the

Page 13

1    Straughn community know everybody else?
2  A. Used to.
3  Q. All right. Actually Honoraville may be in
4    Covington County.
5       MR. JONES: Crenshaw.
6       MR. JACKSON: You're right. It is
7         Crenshaw.
8  Q. Okay. Do you have a church that you
9    regularly attend?
10 A. Yes, sir.
11 Q. What is it?
12 A. Mount Zion Methodist Church.
13 Q. And how long have you regularly attended
14   that church?
15 A. 41 years.
16 Q. And is that in the Straughn community?
17 A. Yes, sir.
18 Q. All right. Are there any other
19   organizations or associations or clubs that
20   you are a member of that you regularly
21   attend?
22 A. No, sir.
23 Q. Garden clubs or anything like that?

Page 14

1  A. No, sir.
2  Q. Now, you've got some grown children?
3  A. Yes, sir.
4  Q. And who's the oldest?
5  A. Allen.
6  Q. And then is Marcus next?
7  A. No. Renee.
8  Q. Renee. Then who?
9  A. Then Marcus.
10 Q. Anybody after him?
11 A. No.
12 Q. How old is Allen?
13 A. 40.
14 Q. And Renee?
15 A. 39.
16 Q. And Marcus?
17    That's what you were asking awhile
18   ago. 30-something?
19 A. He has to be about 36.
20 Q. That's what he was holding up, so you did
21   good.
22    We talked a little bit about Marcus
23   before the deposition. I understand he was

Page 15

1    an accountant and is now a lawyer and is
2    now working at Mercedes up in Vance?
3  A. Yes.
4  Q. Lives up in the Birmingham area?
5  A. Yes.
6  Q. So I know about him. Renee, is she
7    married?
8  A. Yes.
9  Q. And what's her married name?
10 A. Meeks.
11 Q. And is she working?
12 A. Yes.
13 Q. Where?
14 A. Goody's.
15 Q. Up here in Montgomery?
16 A. No. In Andalusia.
17 Q. Oh, Goody's in Andalusia. And her
18   husband's name is what?
19 A. Wayne.
20 Q. And does he work?
21 A. Yes.
22 Q. What does he do?
23 A. He drives a truck.

Page 16

1  Q. Like an independent trucker that leases out
2    to various people?
3  A. I have no idea.
4  Q. But he's not like -- well, I guess Dorsey
5    is not a trucking company. They used to
6    make trailers. But, I mean, he doesn't
7    drive regularly, for example, like
8    Wal-Mart, truck drivers that drive nothing
9    but Wal-Mart loads. He drives --
10 A. He drives -- he works for somebody.
11 Q. Okay.
12 A. I can't tell you --
13 Q. Just don't know who it is?
14 A. I just can't tell you who it is.
15 Q. Is it that outfit in Troy? What do you
16   call it?
17 A. Wiley?
18 Q. Yeah. Wiley Sanders?
19 A. No.
20 Q. All right. Allen. Does he work?
21 A. Yes. He owns Sears in Andalusia.
22 Q. In Andalusia. And is Allen married?
23 A. Yes.

Page 17

1  Q. What's his wife's name?
2  A. Debbie.
3  Q. Does she work?
4  A. No. She helps out at the store sometimes,
5     but that's all.
6  Q. Do you have any relatives in Covington
7     County?
8  A. Yes.
9  Q. What was your maiden name?
10 A. Castleberry.
11 Q. What are the last names of relatives that
12    you have that are in Covington County?
13 A. Last names?
14 Q. Uh-huh (positive response).
15 A. The Fowlers, more Castleberries, Smiths,
16    distant kin Turners.
17 Q. Turner?
18 A. Turners.
19 Q. Okay. Smith is more a pretty common name.
20    So with regard to the Smiths, what is the
21    relationship with you to --
22 A. My mother was a Smith.
23 Q. Mother was a Smith. And what was her name?

Page 18

1  A. Inez.
2  Q. And did she grow up and live in Covington
3     County?
4  A. Yes.
5  Q. What community does she live in?
6  A. Red Level.
7  Q. Red Level. All right. So are the Smiths
8     that you're related to over that way in Red
9     Level?
10 A. Uh-huh (positive response). Yes, all of
11    them are over that way.
12 Q. Okay. Very good. Any others that you can
13    think of?
14 A. No.
15 Q. Okay. Do you have any relatives in
16    surrounding counties like Pike or Crenshaw?
17 A. Not that I know of.
18 Q. Okay. I'll try to do it this way. Ron
19    Nall is an agent down in Andalusia now.
20    Have you ever had any discussions with Ron
21    Nall up to -- not including, but up to the
22    day that the home was destroyed by fire?
23 A. No.

Page 19

1  Q. Telephone or personal, either way?
2  A. No.
3  Q. No conversations with him. Okay. Had you
4     had any kind of business dealings at all
5     with Ron Nall up to the date of the fire?
6  A. No.
7  Q. Now, with regard to insurance matters and
8     specifically insurance on the home, were
9     you involved in that at all back when Mark
10    King was y'all's agent, or did you let
11    Jacob handle that?
12 A. He handles that.
13 Q. Did you ever have any personal discussions
14    with Mark King about insurance in the past?
15 A. No.
16 Q. Did Mark King ever come to the house and
17    speak with Jacob and you sat down at the
18    table also and listened in or anything like
19    that?
20 A. No.
21 Q. So you would say that Jacob handled all of
22    the insurance matters with Mark King?
23 A. Yes.

Page 20

1  Q. And you don't recall having any
2     conversations with Mark King about
3     insurance; am I correct about that?
4  A. Right.
5  Q. Now, with regard to how y'all run the
6     household, who is in charge of paying the
7     bills?
8  A. He is.
9  Q. And how long has that been the case?
10 A. Since we married.
11 Q. Who is in charge of filing and keeping up
12    with stuff?
13 A. He is.
14 Q. How long has that been the case?
15 A. Since we've been married.
16 Q. Okay. So if anything came in from State
17    Farm regarding insurance matters, whether
18    it was automobile, homeowner's, what have
19    you, would that be something that Jacob
20    would look at and tend to and follow up?
21 A. Yes.
22 Q. Did he ever show you anything that he got
23    from State Farm in the mail? Did you ever

Page 21

1    read any insurance policies or anything
2    like that?
3  A. No.
4  Q. Did Jacob ever discuss with you insurance
5    matters? For example -- and I'm talking
6    about before the house --
7  A. Before the house --
8  Q. -- burned. Did he ever talk to you about
9    the amount of insurance that was on the
10   house or anything like that?
11 A. Yes.
12 Q. All right. Let me just ask some
13   preliminary questions. I think I may have
14   asked this. I'm sorry to be repetitive.
15   But with regard to the insurance on the
16   house, did you ever read an insurance
17   policy that State Farm sent?
18 A. No.
19 Q. Each year when insurance is renewed, along
20   with the policy State Farm sends what is
21   called a declaration sheet. It's one page
22   and it's got information on it. To your
23   knowledge did you ever read any declaration

Page 22

1    pages or declaration sheets that were sent
2    by State Farm?
3  A. No.
4  Q. Okay. I'm going to just show you what one
5    looks like. And I'm not suggesting that it
6    ought to change your answer or anything
7    like that, but just so you can see kind of
8    what the format looked like. It would be
9    one sheet of paper, and I'm just showing
10   you an example. I'm not even going to mark
11   it as an exhibit. I'm just showing you
12   that to see, now that you have seen the
13   format and what it looks like, did it
14   change your answer to the question.
15 A. No.
16 Q. Okay. Do you know Mark King?
17 A. Yes.
18 Q. Do you know who he is?
19 A. Yes.
20 Q. Do you know him personally?
21 A. Well, describe what you mean by personally.
22 Q. Well, would you consider him to be a social
23   friend?

Page 23

1  A. No.
2  Q. You know who he is?
3  A. Yes.
4  Q. That's fine. How do you know Mark King?
5    What do you know about him? How do you
6    know him?
7  A. He was our insurance agent.
8  Q. Did you ever meet him in person?
9  A. Yes.
10 Q. There were occasions when he came to the
11   house?
12 A. When he came and measured the house.
13 Q. I think you said you never did talk to him
14   on the telephone about insurance matters;
15   I'm correct about that?
16 A. That's right.
17 Q. And even when he came to the house, did you
18   actually get involved in the conversations
19   about the insurance matters or was it more
20   just a greeting and then moving on and
21   letting Jacob and Mark tend to things?
22 A. Jake and Mark tend to things.
23 Q. But you have a recollection of him coming

Page 24

1    out to the house and actually measuring the
2    house?
3  A. Well, yeah.
4  Q. And this was before the fire?
5  A. Before the fire.
6  Q. But in terms of what his measurements were
7    or what he and Jacob discussed after he
8    measured or while he measured and all that
9    kind of thing, you weren't part of that
10   conversation; am I correct about that?
11 A. You're correct.
12 Q. Do you recall -- before the fire, now, do
13   you recall Mark King coming out to the
14   house on more than one occasion where he
15   measured the house?
16 A. No.
17 Q. But you do recall at least one time that he
18   did do it?
19 A. Yes.
20 Q. Now, I think, looking at State Farm's
21   records, the year either 1970 or 1971 is
22   when y'all first got insurance on the house
23   from State Farm. Does that sound right to

Page 25

1  you?
2  A. Yes.
3  Q. When is it that you recall Mark King coming
4     out to the house and measuring?
5  A. I don't remember.
6  Q. Was it closer to then, back when y'all
7     bought the house, or was it along the way?
8  A. It was after we did the -- built on.
9  Q. After you added to the house?
10 A. Yes.
11 Q. Tell me what you remember about that, that
12    trip by Mark King to the house after y'all
13    did that.
14 A. He just come by and said he was going to
15    measure the house to update the insurance.
16 Q. Did he come by on occasion when Jacob was
17    not home or was home?
18 A. Jake wasn't at home.
19 Q. And if I understood your previous answers
20    correctly, you didn't walk around with him
21    while he did his measurements?
22 A. No.
23 Q. And did he discuss with you what he

Page 26

1     calculated the size of the house to be
2     after he measured --
3  A. No.
4  Q. -- before he left that particular day?
5  A. No.
6  Q. Did he even -- did y'all even have any
7     conversation at all before he left or did
8     he just measure and then you were inside
9     and after he got through measuring he left?
10 A. He just left.
11 Q. And I asked you a question a minute ago
12    about whether you recall any discussions
13    with Jake about amounts of insurance on the
14    house, and you said yes. So I want to talk
15    about that a little bit.
16       Would a conversation like that just be
17    in passing, or did y'all have intentional
18    sit-down conversations to talk about things
19    like that, insurance or finances or
20    whatever?
21 A. Well, Jake got sick, and so we talked about
22    things then. And he told me that the
23    insurance was -- if anything ever happened

Page 27

1     to the house, the house was supposed to be
2     replaced.
3  Q. Okay. Were any specific dollar amounts
4     mentioned or just that statement that if
5     anything happened to the house it was
6     supposed to be replaced?
7  A. Supposed to be replaced.
8  Q. And when was it that Jake got sick?
9  A. '97.
10 Q. And I don't mean to pry, but what was the
11    illness?
12 A. Chronic lymphocytic leukemia.
13 Q. Leukemia?
14 A. CLL is what it's called.
15 Q. So did y'all talk about a bunch of stuff,
16    finances and -- you know, in addition to
17    house insurance, car insurance, life
18    insurance, all those kind of issues?
19 A. Yes.
20 Q. And do you recall any more being discussed
21    about insurance on the house other than
22    what you've already told me?
23 A. No.

Page 28

1  Q. In other words, it was -- I'm not
2     suggesting there was a check list. But
3     y'all were going over different things, and
4     when it came to insurance on the house,
5     Jake told you that the insurance on the
6     house is supposed to replace the house in
7     the event anything happens to it?
8  A. Yes.
9  Q. When was it in '97 that Jake was diagnosed?
10       MR. WINTER: If you can remember.
11 Q. Yeah, if you can remember.
12 A. About September.
13 Q. Okay. And I should have said that at the
14    beginning too. The purpose of this is to
15    ask you questions. I don't want you
16    guessing. You know, if you don't know the
17    answer to something, that's fine.
18 A. Well, I just remember him getting real sick
19    in September. That's what I remember.
20 Q. Now, when that happened, then, when he got
21    sick and was being treated for that
22    condition, the leukemia, did you take over
23    handling the bills and insurance matters

Page 29

1  and that kind of thing?
2  A. I brought them to the hospital, and he told
3  me what to pay and how much.
4  Q. Okay. And how long was Jake in the
5  hospital in '97 being treated?
6  A. From September of '97 to the first of
7  February of '98 in between. We were in and
8  out of the hospital.
9  Q. Right.
10 A. Between them times.
11 Q. Okay. Were there occasions when he would
12 get ill and have to go to the emergency
13 room, things of that nature?
14 A. Yes.
15 Q. So has Jake been back in the hospital since
16 February of '98?
17 A. Yes.
18 Q. For this condition?
19 A. No.
20 Q. Is this condition here in remission, then?
21 A. Yes.
22 Q. Good. All right. Besides this, you know,
23 period of time when you gathered up the

Page 30

1  mail and took it to the hospital, have you
2  ever otherwise been involved in getting
3  bills, paying bills, reviewing
4  correspondence from insurance companies,
5  filing it away, anything like that?
6  A. No, sir.
7  Q. All right. And you mentioned that prior to
8  the house that was destroyed by fire y'all
9  lived in a rental home; is that correct?
10 A. Yes.
11 Q. And who was the landlord on that rental?
12 Do you remember?
13 A. Mr. Ratford.
14 Q. And was the house on Straughn School Road
15 that y'all --
16 A. Well, it wasn't Straughn School Road then.
17 It was County Road 43.
18 Q. Yeah. That emergency stuff changed county
19 roads to street names.
20 A. Yeah.
21 Q. It used to be, I guess, Rural Route 2, Box
22 214-A?
23 A. Yes, sir.

Page 31

1  Q. So that was the address where the house
2  that was damaged by fire was located, Rural
3  Route 2, Box 214-A?
4  A. Yes.
5  Q. So I understand why you don't remember the
6  street name -- I mean, the street numbers.
7     Was this house here on Rural Route 2,
8  Box 214-A -- when y'all moved into it in
9  the early '70s, was that the first house
10 that y'all had owned?
11 A. No.
12 Q. It's not. Okay. What house had you owned
13 before then?
14 A. One over in Red Level.
15 Q. Do you remember who the insurance was with
16 on that house?
17 A. Probably State Farm.
18    MR. WINTER: Only if you
19    remember.
20 A. Okay. I don't remember, then. Ask Jake.
21 Q. What street, if you remember, was the Red
22 Level home on?
23 A. Highway 84.

Page 32

1  Q. Was it a box number or was it a street
2  number address?
3  A. It was a street address.
4  Q. Do you remember what it was?
5  A. No.
6  Q. Was that the first house that y'all had
7  owned together?
8  A. Well, no, not if you count a trailer.
9  Q. Is the trailer/mobile home -- is that the
10 first house that y'all lived in after y'all
11 got married?
12 A. Yes.
13 Q. And where was it set up? Was it on some
14 land or in a mobile home park or what?
15 A. Park.
16 Q. And where was it located? What city?
17 A. Troy.
18 Q. All right. And then did you move from that
19 mobile home to Red Level to this house that
20 you told me about on Highway 84?
21 A. No.
22 Q. What was in between?
23 A. We lived with his parents.

Page 33

1  Q. And were you living with his parents at the
2     time that you bought this home in Red Level
3     on Highway 84?
4  A. No.
5  Q. Well, let me just ask it this way: Between
6     the mobile home and the house on Highway 84
7     in Red Level, did y'all own any other
8     homes?
9  A. No.
10 Q. All right. Do you know whether or not
11    there was insurance on the mobile home?
12 A. No, I don't know.
13 Q. Okay. I'll ask Jake.
14    When you bought the house on Highway 84
15    in Red Level -- and you may not remember
16    now, but back then did you remember what
17    the purchase price of that house was?
18 A. No, sir.
19 Q. You didn't. Not even back then did you
20    know?
21 A. We bought it at auction.
22 Q. Bought it from an auction. Okay.
23    MR. WINTER: Remember, it's not a

Page 34

1     memory contest. He's going
2     way back. He's before I was
3     born right now.
4     THE WITNESS: He's going way back,
5     I'll tell you.
6  Q. Was it the type of auction that's conducted
7     on the courthouse steps?
8  A. Yes.
9  Q. Kind of a foreclosure auction?
10 A. Yes.
11 Q. All right. Did you go to the auction, or
12    did just Jake go?
13 A. No, I didn't go.
14 Q. You didn't go. Okay. Now, this home on
15    Rural Route 2, Box 214-A, was that built
16    new or did y'all buy it?
17 A. It was built.
18 Q. Y'all built it from the ground up?
19 A. Yes.
20 Q. And did y'all use a general contractor to
21    build it?
22 A. Yes.
23 Q. Do you remember who the contractor was?

Page 35

1  A. Gene Page.
2  Q. Gene --
3  A. Gene Page.
4  Q. Page, P-A-G-E?
5  A. Yes.
6  Q. And in terms of dealing with Mr. Page to
7     get the home built, did Jake handle all
8     that?
9  A. Yes.
10 Q. Did Jake do any of the work himself?
11 A. No.
12 Q. The general contractor did it all?
13 A. Yes.
14 Q. Were you involved in the negotiations with
15    Mr. Page on how much it was going to cost
16    to get the house built?
17 A. No.
18 Q. Were you involved in the designing of it,
19    how you wanted the kitchen, anything like
20    that?
21 A. Yes.
22 Q. You were involved in that. Did you have a
23    meeting with Mr. Page where you sat down at

Page 36

1     a table and had plans and gave your input
2     on how you wanted things to be?
3  A. Yes.
4  Q. Over the years when y'all would get tax
5     assessments or property tax notices or
6     anything like that, would Jake handle all
7     that?
8  A. Yes.
9  Q. Now, over the years after that home was
10    built y'all added to it and/or remodeled.
11    Am I right about that?
12 A. Yes.
13 Q. What is the first thing y'all did to change
14    the home?
15 A. We added a den.
16 Q. And I'm not going to hold you down to a
17    specific date, but approximately when was
18    that that y'all added a den?
19 A. About '74, '75, somewhere along in there.
20 Q. All right. That was not -- or was it a
21    conversion of a carport as opposed to
22    actually adding onto the home? Which was
23    it?

Page 37

1   A.  Both.
2   Q.  It was both at the same time?
3   A.  Yeah. We had a carport and then we went
4       out from the carport and added on.
5   Q.  So when you answered my question added a
6       den, the addition of the den included
7       closing in the carport?
8   A.  Yes.
9   Q.  So you closed in and added to the size of
10      the carport to make that a den?
11  A.  Yes.
12  Q.  All right. I got you. And what is the
13      next thing that y'all did to change the
14      home size or remodeling or whatever?
15  A.  I guess we added the carport and storage
16      room.
17  Q.  Okay. So because you had enclosed a
18      carport to make that a den, you added back
19      a carport and a storage room. And when
20      approximately was that?
21  A.  I don't know.
22  Q.  But it was after '74, '75; right?
23  A.  Yes.

Page 38

1   Q.  All right. What is the next thing that
2       y'all did to change the house?
3   A.  We enclosed the carport and storage room.
4   Q.  Y'all like enclosing carports, don't you?
5       Enclosed both the carport and the
6       storage room?
7   A.  Yes.
8   Q.  And made that one big room?
9   A.  Yes.
10  Q.  What do you call that room? A great room?
11  A.  Great room -- playroom.
12  Q.  Playroom. And approximately when was
13      that?
14  A.  About '89, '90.
15  Q.  And anything else after that that y'all did
16      to change the house?
17  A.  We added another carport.
18  Q.  And when was that done?
19  A.  I don't know.
20  Q.  Okay. But it was after '89 or '90
21      obviously?
22  A.  Yes.
23  Q.  Anything else after that?

Page 39

1   A.  We redid the kitchen and dining room.
2       Remodeled it, I guess.
3   Q.  Kitchen and dining room?
4   A.  Yes.
5   Q.  And approximately when was that?
6   A.  I don't know.
7   Q.  Was it the kind of remodel with regard to
8       the kitchen that involved tearing out all
9       of the cabinets and countertops and
10      replacing them with new?
11  A.  Yes.
12  Q.  So they gutted the kitchen?
13  A.  Yes.
14  Q.  How about the dining room?
15  A.  Well, no, we didn't gut the dining room.
16      But we did gut -- we have a living room
17      next to the kitchen. So we took out the
18      wall between the kitchen and the living
19      room.
20  Q.  Yeah. I'm getting ready to do that
21      myself.
22      Okay. So you got new cabinetry, new
23      countertops, new appliances?

Page 40

1   A.  Yes.
2   Q.  Just a total redo?
3   A.  Yes.
4   Q.  And approximately when was that?
5   A.  I have no idea.
6   Q.  But it was before the fire occurred?
7   A.  Yes.
8   Q.  Anything after the remodel of the kitchen
9       and dining room?
10  A.  No, sir.
11  Q.  I saw some reference somewhere in here --
12      and I guess it's in the claims file -- to
13      redo or remodel of a hall bathroom.
14  A.  Yes. We redid our bathroom and the hall
15      bathroom.
16  Q.  So you redid two bathrooms at different
17      times?
18  A.  Yeah, at different times.
19  Q.  Did either one of them involve increasing
20      the size of the bathrooms as opposed to
21      changing the configuration of what was
22      already there?
23  A.  No.

Page 41

1  Q. Okay. Anything else you can recall about
2     changing the house by way of either adding
3     on or remodeling since the early '70s when
4     y'all built it?
5  A. We added central heat and cooling.
6  Q. Was that in conjunction with one of these
7     remodels?
8  A. Yes.
9  Q. Or add-ons. Which one was it?
10 A. I don't know.
11 Q. Okay. And you had said earlier -- and we
12    talked about it -- the fact that you
13    remember Mark King coming out and making
14    measurements at the house. Was it after
15    one of these remodels or add-ons we talked
16    about?
17 A. Yes.
18 Q. And do you remember which one it was?
19 A. It was after we had enclosed the carport.
20 Q. The first time?
21 A. Uh-huh (positive response).
22    No. Second time. Excuse me. I forgot
23    that ...

Page 42

1  Q. All right. Let me make sure I'm
2     understanding what you're saying. Are you
3     saying -- what you said is that y'all
4     enclosed a carport, made that a den?
5  A. Right.
6  Q. And after that you added a new carport and
7     a storage room and then you enclosed that
8     one?
9  A. Yes.
10 Q. Is it the second time and after that one
11    that Mark King came out?
12 A. It was after the playroom.
13 Q. Okay. Jake can tell me about the people
14    that were involved in these add-ons, the
15    contractors and all of those people?
16 A. Yes.
17 Q. Were you involved in any meetings with any
18    of these contractors that were doing this
19    work at the stage where prices were being
20    discussed, how much it was going to cost?
21 A. No.
22 Q. Now, after the fire occurred -- I know that
23    there was a lot of activity. I know y'all,

Page 43

1     I think, rented a mobile home. You had to
2     do a contents inventory listing out all the
3     property you could remember being in the
4     home, you know, dealing with an adjuster
5     named Mims Hackett, you know, a whole lot
6     of activity. Did Jake handle most of that
7     or were you involved in that?
8  A. He handled it. I wrote what I could
9     remember down.
10 Q. Do you recall having any discussions with
11    anybody that you identified as being a
12    State Farm person after the fire occurred?
13 A. Ron Nall come out.
14 Q. Do you know that -- do you remember the
15    name Mims Hackett?
16 A. No.
17 Q. Ron Nall came out there to the
18    site after the fire occurred?
19 A. The -- yes.
20 Q. And you recall having a conversation with
21    Ron?
22 A. Yes.
23 Q. Okay. Tell me what you remember about it.

Page 44

1  A. Well, I had a necklace that I couldn't
2     find, and that's -- and it was insured.
3     And he told me if I couldn't find it he
4     would have me a check the next day. And
5     that's about all.
6  Q. Okay.
7  A. And if there was anything we needed to
8     contact him.
9  Q. All right. Was that the only conversation
10    you remember having with Ron?
11 A. Yes.
12 Q. Any subsequent telephone conversations you
13    remember having with Ron?
14 A. No.
15 Q. Now, I know as the claim proceeded that
16    your son Marcus had some conversations and
17    wrote letters and that kind of thing with
18    some people from State Farm. Are you aware
19    of that, the fact that he did that?
20 A. Yes.
21 Q. Were you involved in any discussions with
22    your son Marcus about what he was talking
23    to the State Farm people about?

Page 45

1   A. No.
2   Q. Now, at one point in time Marcus asked for
3      some documents from State Farm, and I think
4      those were provided. Did Marcus ever share
5      with you the documents that he got from
6      State Farm?
7   A. No.
8   Q. In terms of the estimates that were
9      obtained after the fire occurred from
10     contractors -- or two estimates that were
11     obtained, were you involved in that at all,
12     getting those estimates?
13  A. What do you mean estimates?
14  Q. To rebuild the house.
15  A. No.
16  Q. Jake did that?
17  A. Jake did that.
18  Q. All right. Do you remember that at some
19     point in time you became -- or were made
20     aware of the fact that the insurance that
21     State Farm was providing -- on the house
22     itself, now, not on the contents inside the
23     house -- on the house itself was not as

Page 46

1      much as the estimates that y'all had gotten
2      on the house to rebuild it? Were you ever
3      made aware of that?
4   A. Yes.
5   Q. How were you made aware of that?
6   A. Jake told me.
7   Q. Tell me what you remember about that. What
8      did Jake tell you?
9   A. Just that they had mismeasured the house
10     and they wasn't going to pay off like we
11     thought they were, was led to believe they
12     were.
13  Q. Did he say any more details about this
14     issue about mismeasurement, how he came to
15     find that out, how he knew that?
16         MR. WINTER: I don't -- let's hold
17           on for one second. I'm not
18           trying to hold you up. I
19           don't really know what she
20           remembers of this, but I don't
21           know if we can go into what
22           they said to each other. That
23           might be privileged.

Page 47

1         MR. JACKSON: On what --
2         MR. WINTER: Marital privilege.
3         MR. JACKSON: Marital privilege?
4           You know, I hadn't really
5           looked at that. All I can --
6           all I can say is going from
7           experience, handling bunches
8           of these suits, no opposing
9           counsel has ever raised that
10          as a possibility. I'm not
11          saying it doesn't apply. I'm
12          just saying that I've always
13          gone into conversations and
14          nobody has ever raised an
15          objection to it.
16        MR. WINTER: Let's not ask them
17          those and let me talk to them
18          and make sure there's nothing
19          that I should be raising an
20          objection to.
21            I'm not trying to
22          preclude you because I think
23          they're straightforward honest

Page 48

1           people. But I just need to go
2           over that with them and find
3           out what that information may
4           be and whether I need to raise
5           that at this time.
6         MR. JACKSON: All right.
7   Q. Now, with regard to the home that was
8      rebuilt, were you involved at all in the
9      designing, the planning of that, the
10     configuration of it, how the kitchen would
11     look, anything like that?
12  A. Yes.
13  Q. Were you involved in any discussions with
14     the builder about how much it was going to
15     cost?
16  A. Not until he told us.
17  Q. Did you have a sit-down meeting somewhere
18     with the builder where he laid out how much
19     it was going to cost?
20  A. Yes.
21  Q. Generally speaking, did y'all go through an
22     architect or just the builder -- just deal
23     with the builder only, no architect?

12 (Pages 45 to 48)

Page 49

1   A. We had a lady that drew up the plans.
2   Q. You did. Okay. Had a home designer. Do
3      you know whether she was actually an
4      architect or just a house designer?
5   A. I have no idea.
6   Q. But you had somebody draw up some plans for
7      you?
8   A. Yes.
9   Q. Did you have meetings with that person and
10     tell her what you wanted and she tweaked
11     things and changed the plans until she got
12     them to the point that you wanted them?
13  A. Yes.
14  Q. And then you started working with the
15     builder with that set of plans about
16     getting that house built?
17  A. Yes.
18  Q. Did y'all talk to more than one builder?
19  A. No.
20  Q. What builder was it?
21  A. Wyatt Sasser.
22  Q. I think you said Mr. Gene Page had built
23     the house back in the early '70s. Was he

Page 50

1      still around?
2   A. Yes. But I don't think he built houses
3      anymore. I'm not sure.
4   Q. So to your knowledge Wyatt Sasser is the
5      only builder that you dealt with about
6      building your replacement house?
7   A. To my knowledge.
8   Q. Okay. So you do recall having a meeting
9      where the person from Wyatt Sasser -- let
10     me ask this first since I'm not from
11     Andalusia. Is that a person's name, Wyatt
12     Sasser, or is that a business name?
13  A. That's his name.
14  Q. That's his name. Okay.
15  A. And his business name, too, I guess.
16  Q. So you recall having a meeting with Wyatt
17     Sasser -- you and Jake and Wyatt Sasser --
18     sitting down with those plans that had been
19     drawn for you?
20  A. Yes.
21  Q. And who was it that drew the plans?
22  A. Denita Messick.
23  Q. How do you spell the last name, your best

Page 51

1      guess?
2   A. M-E-S-S-I-C-K.
3   Q. That's what I would have guessed too. Is
4      she in Andalusia?
5   A. Yes.
6   Q. So you got her plans and sat down with
7      Wyatt Sasser. And tell me just generally
8      what that meeting was about. Was he laying
9      out to you how much it was going to cost?
10  A. Yes.
11  Q. And based upon that did y'all make changes
12     to either, you know, things like crown
13     molding or the finishes or anything like
14     that in the house?
15  A. No.
16  Q. All right. Did you pretty much accept the
17     price that he was quoting to you based on
18     those plans?
19  A. As far as I know.
20  Q. Okay. So there were no major changes to
21     the plans that had been drawn by Denita
22     Messick in terms of changing things to try
23     to save money or anything like that with

Page 52

1      Wyatt Sasser?
2   A. No.
3   Q. Now, you've already told me that the house
4      was built on a piece of property that's
5      diagonal across the street. Did y'all
6      already own that land?
7   A. Yes.
8   Q. Would you say that the home that was built
9      on this current location, on the current
10     lot, is about the same home that you had or
11     would you say it's bigger, or how would you
12     characterize it?
13  A. I think it's -- I really don't know.
14  Q. Is it about the same in terms of -- for
15     example, like flooring. I mean, was there
16     carpet in the home that was destroyed and
17     hardwood now? Any changes like that?
18  A. Well, all of it's -- except for the kitchen
19     and bathrooms are hardwood now where in the
20     old one just the -- part of it was
21     hardwood. Part of it was hardwood.
22  Q. Okay. Did you get back the same kind of
23     kitchen that you had after you remodeled

Page 53

1  the other house?
2  A. What do you mean the same kind?
3  Q. About the same kind of cabinetry,
4     appliances, all that kind of thing?
5  A. Yeah.
6  Q. Upgrade any in the kitchen?
7  A. No. The cabinets was upgraded. I don't
8     know.
9  Q. That's what I'm asking. Just in your
10    opinion were there other areas of the home,
11    rooms or what have you, that you considered
12    were upgraded with the new construction?
13       MR. WINTER: Object to the form.
14 Q. You can answer. He's just objecting to the
15    way I phrased the question.
16       MR. WINTER: I guess my question
17         is that -- I don't understand
18         the question. That's why I'm
19         struggling with it. Because,
20         you know, what they used to
21         build stuff 20 years ago and
22         what they use to build stuff
23         now --

Page 54

1        MR. JACKSON: Well, but –
2        MR. WINTER: At Home Depot – you
3          know, you go in a Home Depot
4          today and it's different than
5          a hardware store was 30 years
6          ago.
7             So was there an upgrade
8          on the dishwasher, yeah. The
9          dishwasher is going to be
10         different because it's
11         electronic. So it's kind
12         of -- I'm just objecting to
13         the word upgrade so to speak.
14         Of course, everything was
15         upgraded to build a new
16         house. It's going to be
17         upgraded.
18       MR. JACKSON: All right.
19 Q. Do you have any knowledge of the size of
20    the new home, the square footage of the new
21    home?
22 A. How big it is?
23 Q. Yes, ma'am.

Page 55

1  A. No, sir.
2  Q. Understanding what Mr. Winter said about
3     things being upgraded or updated or what
4     have you, in your mind did you have about
5     the same kind of appliances in the new
6     construction of the kitchen that you had
7     after you remodeled the kitchen in the old
8     home?
9  A. You talking about like stove,
10    refrigerator?
11 Q. Yes, ma'am.
12 A. Yes.
13 Q. After you did all the remodeling to the
14    original home, the one that was destroyed
15    by fire, you had that new den. You had a
16    playroom. You added another carport. Did
17    you have those kind of rooms in the
18    construction of the new house, like a
19    playroom, a den?
20 A. Yes.
21 Q. Did you have a carport or a garage in the
22    new house?
23 A. Yes.

Page 56

1  Q. What did you have in the new house?
2  A. A garage.
3  Q. A garage. The carport that you had on the
4     old house, the last carport that you had,
5     was it single or double or what size was
6     it?
7  A. Double.
8  Q. And the garage, what size is it?
9  A. Double.
10 Q. What was the exterior on the old home? Was
11    it wood or brick?
12 A. Brick.
13 Q. How about the new home?
14 A. Brick.
15 Q. Now, when the new home was built, did you
16    have anything to do with getting insurance
17    on the new home?
18 A. No.
19 Q. Jake handled all that?
20 A. Jake handled it.
21 Q. Okay. I asked you about Mims Hackett. You
22    told me you don't really remember him. So
23    you don't remember any conversations that

Page 57

1  you may have had with a man named Mims
2  Hackett?
3  A. No.
4  Q. Is there anybody else that you would
5     identify with State Farm that you had any
6     discussion with after the fire besides Ron
7     Nall?
8  A. No.
9  Q. And you've told me everything you remember
10    discussing with Ron Nall?
11 A. Yes.
12 Q. Now, do you have any relatives that either
13    bought homes or built homes since 1970
14    after y'all built this home here?
15 A. Do I have relatives that have built homes?
16 Q. Yes. Either bought homes or built homes
17    since y'all moved into this home in the
18    early '70s.
19 A. Yes.
20 Q. Have you had any discussions with any of
21    them about the cost to them to either buy
22    or to build their homes?
23 A. No.

Page 58

1  Q. I need to ask you how this -- I guess this
2     experience of going through this, the home
3     fire and then the rebuild and all that and
4     the issue about not having enough insurance
5     to pay for everything, what effect that has
6     had on you. How has that harmed you in any
7     way or damaged you or what effect has that
8     had on you?
9  A. Well, I lose sleep over it. A lot of
10    nights I don't get but a couple of hours of
11    sleep. I'll wake up and tell Jake that I
12    think maybe there was something I could do
13    or could have got stuff out, but at the
14    time I was just concerned about getting the
15    boys out.
16 Q. Sure. And I don't want to minimize it at
17    all. I have not gone through it. I
18    understand that a home fire is very
19    devastating. You lose a lot of things in
20    the fire itself.
21 A. Yes.
22 Q. And I know that that would have an effect
23    on somebody. I guess what I'm asking or

Page 59

1  would ask you to do, if you can -- and if
2  you can't, tell me that you can't -- is the
3  effect that the actual fire has had on
4  you -- I mean, that experience I know was,
5  you know, devastating -- versus this issue
6  that we're here to discuss now which is,
7  you know, that allegedly there was not
8  enough insurance to replace the house, how
9  that has affected you. Do you understand
10 what I'm asking?
11 A. Yeah, I think so.
12 Q. Okay. So when you told me that you've lost
13    sleep, there's times when you've awakened
14    up and you've had discussions with Jake
15    about getting, you know, contents out of
16    the house to be saved from the fire. I
17    mean, I understand that. But with regard
18    to this issue that we're talking about
19    here, the amount of insurance that State
20    Farm provided to y'all, how has that
21    affected you, if it has?
22 A. It has. Been real depressed over it
23    because -- wondering how we were going to

Page 60

1  pay for the house and ...
2  Q. Okay. Is that concern, wondering how
3     you're going to pay for the house -- is
4     that still something that you think about
5     or is that something that was more back
6     when the house was rebuilt?
7  A. There are not many days -- many weeks don't
8     go by that I don't think about it.
9  Q. Okay. How else, if any way, has it
10    affected you?
11 A. I don't -- just mostly been depressed a lot
12    and worrying about different things.
13 Q. Okay. And when you say different things,
14    different than how y'all are going to pay
15    for the house?
16 A. Well, yeah, it cost a lot to rebuild. And
17    Jake would have retired. Now he can't.
18    And, I mean, we had plans, and they
19    don't -- didn't pay out when they -- we had
20    to rebuild a house.
21 Q. Plans like things you were going to do
22    after he retired, those kind of plans?
23 A. Yeah.

Page 61

1  Q. Did y'all have plans once Jake retired
2     to -- let me back up.
3        If this house on -- the one I'm talking
4     about that was destroyed by the fire, if
5     that house had not been destroyed by the
6     fire, were there any plans once Jake
7     reached retirement to sell that house and
8     to move somewhere else?
9  A. No.
10 Q. Were there any plans to sell the house and
11    travel?
12 A. No.
13 Q. What kind of plans did y'all have once Jake
14    reached retirement after he retired?
15 A. We were going to travel, but, I mean, we
16    would still come home.
17 Q. Okay. Anything else?
18 A. No.
19 Q. So would you say that those plans that
20    y'all had are not going to happen or
21    they've been delayed? Are y'all still
22    planning on doing that when Jake does
23    retire?

Page 62

1  A. I don't think he's going to retire.
2  Q. Is it because he likes work or is it
3     because of the fact that y'all have a
4     mortgage that needs to be paid off now?
5  A. Because we've got a mortgage that needs to
6     be paid off.
7  Q. Did Jake handle all the financing in terms
8     of the mortgage and the terms of it and how
9     many years it would be and all that kind of
10    stuff?
11 A. Yes.
12 Q. I'm not going to ask you what, but did
13    y'all discuss that before things were
14    finalized? Did he discuss with you various
15    financing options, years on mortgages,
16    monthly payments, that kind of stuff?
17 A. He just told me what they were.
18 Q. He just told you the end result, what it
19    was going to be?
20 A. (Witness nods head.)
21 Q. Okay. I'm not suggesting that there is,
22    but is there any other way that this
23    insurance issue and there not being enough

Page 63

1     insurance to build the house has affected
2     you, or have you told me everything?
3  A. Well, my nerves. I have a problem with my
4     nerves and sleeping and just getting real
5     depressed. I guess that's ...
6  Q. Since the fire occurred have you gone to a
7     doctor for any of those conditions?
8  A. Yes.
9  Q. What doctor have you gone to see?
10 A. Dr. Joanne Smith.
11 Q. Joanne Smith?
12 A. Uh-huh (positive response).
13 Q. And where is she located?
14 A. Andalusia.
15 Q. Are you on any prescription medicine for
16    any of the conditions that you told me
17    about, the depression or nerves or sleep?
18 A. Yes.
19 Q. Do you know what kind of doctor Dr. Smith
20    is? Is she a general family doctor?
21 A. Yes.
22 Q. What prescription medicines are you taking?
23 A. I can't tell you, but I got it.

Page 64

1  Q. Okay.
2  A. You want all of them?
3  Q. Yes, ma'am.
4  A. Besides the vitamins that I take.
5  Q. Okay. It may be just easier for me to get
6     a copy of this made instead of me having to
7     write this down. If you don't mind me
8     doing that, I'll give this back to you and
9     just make a copy of it. And we'll reserve
10    Exhibit 1 to your deposition for that.
11       So this list that you just gave to me,
12    you're taking all of this medication right
13    now?
14 A. Yes. Plus vitamins.
15 Q. Did you start taking all of this medicine
16    all at the same time?
17 A. No.
18 Q. It's been over the years?
19 A. Uh-huh (positive response).
20 Q. All right. And I guess Dr. Smith would
21    have a record of when you started taking it
22    and all that?
23 A. Yes.

Page 65

1  Q. Is she the only doctor you've seen about
2     the conditions that we've talked about
3     here?
4  A. Yes.
5  Q. Is she what you would consider to be your
6     regular family doctor?
7  A. Yes.
8  Q. Like before the fire occurred she was your
9     doctor?
10 A. Yes.
11 Q. Had you had any kind of nerve problems or
12    depression before the fire occurred?
13 A. Wasn't that bad -- as bad.
14 Q. Were you on any medication before the fire
15    occurred?
16 A. Some.
17 Q. And that would have been through Dr. Smith?
18 A. Yes.
19 Q. Okay. I'm sorry. Just to kind of end up
20    and make sure -- I just want to make sure
21    I've given you an opportunity to tell me
22    any other way that you feel that you've
23    been damaged or harmed by this insurance

Page 66

1     issue that we're here discussing that you
2     haven't already told me. I'm not
3     suggesting there is. I just want to make
4     sure that I've gotten everything from you.
5  A. I guess.
6  Q. Okay. Now, earlier on you mentioned about
7     having a discussion with Ron Nall about a
8     necklace that you could not find in the
9     debris.
10 A. Yes.
11 Q. Did you ever find it?
12 A. Yes.
13 Q. You did find it?
14 A. Yes.
15 Q. Was it salvageable to where you could still
16    use it?
17 A. Yes.
18 Q. All right. Now, I know that there is this
19    issue about how much insurance was
20    available on the house itself. But in
21    addition to that y'all had what's called
22    contents coverage, personal property
23    coverage, and you also got some benefits

Page 67

1     that are called additional living expenses
2     for like when y'all had to temporarily be
3     in a mobile home while the house was being
4     built. Are you satisfied with the way
5     State Farm handled the claim and paid the
6     money and the benefits on the things like
7     personal contents and the additional living
8     expense?
9  A. Yes.
10 Q. Okay. And I'll just kind of ask, I guess,
11    a catch-all and see if I have to ask any
12    more questions about this. But are you
13    satisfied with the way the State Farm
14    people handled this claim other than the
15    amount they paid toward the house itself?
16 A. About the contents of the house?
17 Q. Yeah. Everything else other than the
18    amount paid toward the house itself. Do
19    you have any criticisms, complaints, or
20    bothered by the way the claim was handled
21    other than that?
22 A. No.
23 Q. Okay. I think that's all.

Page 68

1          (Deposition concluded at
2          approximately 11:35 a.m.)
3          * * * * * * * * * *
4          FURTHER DEPONENT SAITH NOT
5          * * * * * * * * * *
6          REPORTER'S CERTIFICATE
7  STATE OF ALABAMA:
8  MONTGOMERY COUNTY:
9          I, Tracye Sadler, Certified Shorthand
10 Reporter and Commissioner for the State of Alabama
11 at Large, do hereby certify that I reported the
12 deposition of:
13         PEGGY JONES
14 who was duly sworn by me to speak the truth, the
15 whole truth and nothing but the truth, in the
16 matter of:
17         JACOB N. JONES and
18         PEGGY C. JONES,
19         Plaintiff,
20         vs.
21         STATE FARM INSURANCE
22         COMPANY, et al.,
23         Defendants.

Page 69

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3      NORTHERN DIVISION
 4      Case Number 2:05-CV-1119-WKW-SRW
 5  on January 17, 2007.
 6      The foregoing 68 computer-printed pages
 7  contain a true and correct transcript of the
 8  examination of said witness by counsel for the
 9  parties set out herein. The reading and signing of
10  same is hereby not waived.
11      I further certify that I am neither of
12  kin nor of counsel to the parties to said cause nor
13  in any manner interested in the results thereof.
14      This 1st day of February 2007.
15
16
17      _____
        Tracye Sadler, Certified
18      Shorthand Reporter and
        Commissioner for the State
19      of Alabama at Large
20
21
22
23
```

February 1, 2007

Ms. Peggy C. Jones
c/o Mr. Bryan P. Winter
ADCOX-WINTER, LLP
611 Helen Keller Boulevard
Tuscaloosa, Alabama 35404
In re: Jones vs. State Farm
Dear Ms. Jones:
Enclosed is a copy of the transcript of your deposition taken on January 17, 2007. Please read the transcript and make any corrections on the correction sheet provided specifying the page and line number of each correction.
You will find the original signature page attached to the front of the transcript. Even if there are no corrections, please sign the original signature page and have your signature notarized.

Please return the signature page, correction sheet and transcript within thirty days. The list of corrections will be attached to the original deposition and all parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,


Tracye Sadler Blackwell
Certified Shorthand Reporter

cc: Mr. Mike Jackson, Mr. Bryan Winter

Page 70

```
 1      * * * * * * * * * * * * * *
 2           WITNESS SIGNATURE PAGE
 3      * * * * * * * * * * * * * *
 4
 5  In Re: Jones vs. State Farm
 6
 7      I, PEGGY C. JONES, hereby certify that I
 8  have read the foregoing transcript of my deposition
 9  given on January 17, 2007, and it is a true and
10  correct transcript of the testimony given by me at
11  the time and place stated with the corrections, if
12  any, and the reasons therefor noted on a separate
13  sheet of paper and attached hereto.
14
15
16      _____
        PEGGY C. JONES
17      SWORN TO AND SUBSCRIBED before me this ____
18  day of _____, 2007.
19      _____
        NOTARY PUBLIC
20
        MY COMMISSION EXPIRES:
21
        _____
22
23
```