# EXHIBIT "C"

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JACOB N. JONES and
PEGGY C. JONES,

     Plaintiffs,

Vs.                                    CIVIL ACTION NO.
                                       2:05-cv-01119-wkw
STATE FARM INSURANCE
COMPANY, et al.,

     Defendants.


* * * * * * * * * * *


DEPOSITION OF MARK KING, taken pursuant to

stipulation and agreement before Pamela A. Wilbanks,

Registered Professional Reporter and Commissioner for

the State of Alabama at Large, in the Law Offices of

Albrittons, Clifton, Alverson, Moody & Bowden, 109

Opp Avenue, Andalusia, Alabama, on Thursday, January

18, 2007, commencing at approximately 2:30 p.m.


* * * * * * * * * * *





Page 1

1      THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3           NORTHERN DIVISION
4
5  JACOB N. JONES and
    PEGGY C. JONES,
6
      Plaintiffs,
7
  Vs.          CIVIL ACTION NO.
8        2:05-cv-01119-wkw
  STATE FARM INSURANCE
9  COMPANY, et al.,
10    Defendants.
11
12      * * * * * * * * * * * *
13
14      DEPOSITION OF MARK KING, taken pursuant to
15  stipulation and agreement before Pamela A. Wilbanks,
16  Registered Professional Reporter and Commissioner for
17  the State of Alabama at Large, in the Law Offices of
18  Albrittons, Clifton, Alverson, Moody & Bowden, 109
19  Opp Avenue, Andalusia, Alabama, on Thursday, January
20  18, 2007, commencing at approximately 2:30 p.m.
21
22      * * * * * * * * * * * *
23

Page 2

1
2        APPEARANCES
3
4  FOR THE PLAINTIFFS:
5  Mr. Bryan B. Winter
    ADCOX-WINTER
6  Attorneys at Law
    611 Helen Keller Boulevard
7  Tuscaloosa, AL 35404
8  FOR THE DEFENDANTS:
9  Mrs. Judy Van Heest
    BEERS, ANDERSON, JACKSON,
10    PATTY & VAN HEEST & FAWAL
    Attorneys at Law
11  250 Commerce Street
    Montgomery, Alabama 36104
12
    ALSO PRESENT:
13
    Mr. Jacob Jones
14
15
16      * * * * * * * * * * * *
17      EXAMINATION INDEX
18  BY MR. WINTER . . . . . . . . .  4
19      * * * * * * * * * * * *
20
21
22
23

Page 3

1          STIPULATION
2     It is hereby stipulated and agreed by and
3  between counsel representing the parties that the
4  deposition of MARK KING is taken pursuant to the
5  Federal Rules of Civil Procedure and that said
6  deposition may be taken before Pamela A. Wilbanks,
7  Registered Professional Reporter and Commissioner for
8  the State of Alabama at Large, without the formality
9  of a commission, that objections to questions other
10  than objections as to the form of the question need
11  not be made at this time but may be reserved for a
12  ruling at such time as the said deposition may be
13  offered in evidence or used for any other purpose by
14  either party provided for by the Statute.
15     It is further stipulated and agreed by and
16  between counsel representing the parties in this case
17  that the filing of said deposition is hereby waived
18  and may be introduced at the trial of this case or
19  used in any other manner by either party hereto
20  provided for by the Statute regardless of the waiving
21  of the filing of the same.
22     It is further stipulated and agreed by and
23  between the parties hereto and the witness that the

Page 4

1  signature of the witness to this deposition is hereby
2  waived.
3
4      * * * * * * * * * * * *
5      MARK KING
6    The witness, after having first been duly
7  sworn to speak the truth, the whole truth and nothing
8  but the truth testified as follows:
9      EXAMINATION
10  BY MR. WINTER:
11  Q.  Mr. King, my name is Bryan Winter and I'm
12  working for Mr. and Mrs. Jacob Jones here
13  concerning their claim against State Farm that
14  arose out of the house fire they had that
15  burned their house to the ground.  We're going
16  to take your deposition today.  Bear with me,
17  if you could.
18    Have you ever had your deposition taken
19  before?
20  A.  No, sir.
21  Q.  Let me explain to you what's going on here.
22    The deposition is taken under oath just as

Deposition of Mark King

January 18, 2007

Page 5

1     you've got to tell the whole truth and nothing
2     but the truth so help you God. And I think
3     you know that, and you're going to do that.
4     But in a deposition, it's important to
5     actually say your answers because the court
6     reporter can't take down a head nod and it's
7     hard for her to figure out a uh-huh versus a
8     huh-uh. If you don't understand a question,
9     please tell me that you don't understand it,
10    and I'll do my best to rephrase it. Lawyers
11    may object to the form of the question, but
12    you can still answer the question. That's
13    just technically for the judge.
14         MS. VAN HEEST: Unless the lawyer
15            instructs you not to.
16    Q.  And I can't imagine the lawyer instructing you
17    not to because I wouldn't ask you anything
18    that's unfair. I'm just trying to find out
19    the facts on this thing.
20         So if you would -- if you need to take a
21    break, just tell me. If you need a drink,
22    tell me. You just want to stretch your legs,
23    tell me. We'll do whatever you need to do.

Page 6

1     This isn't a memory contest, and it certainly
2     isn't an intelligence test. If it's all right
3     with you, let's begin.
4          Would you please state your full name for
5     the record, sir.
6     A.  Mark Anthony King.
7     Q.  And where do you live, Mr. King?
8     A.  2501 Easley Drive, Andalusia, Alabama.
9     Q.  Have you lived here in Andalusia all your
10    life?
11    A.  Basically.
12    Q.  And how long were you a State Farm agent for?
13    A.  Twenty-four years.
14    Q.  And did you go to school -- high school?
15    A.  I went to high school and college.
16    Q.  Where did you graduate high school from?
17    A.  Andalusia.
18    Q.  Is that Andalusia High School?
19    A.  Uh-huh (positive response).
20    Q.  And how about college?
21    A.  Livingston University.
22    Q.  Up there in --
23    A.  West Alabama.

Page 7

1     Q.  Sumter County?
2          And after college what did you do? What
3     year did you graduate from college first?
4     A.  '71.
5     Q.  What did you do after college?
6     A.  I went to work for Alatex, Incorporated here
7     in Andalusia.
8     Q.  What did they make?
9     A.  Made shirts.
10    Q.  And how long were you with them?
11    A.  About two years.
12    Q.  What did you do after that?
13    A.  Sold heavy equipment.
14    Q.  What did you sell it for?
15    A.  Tractor and Equipment Company out of
16    Birmingham.
17    Q.  What kind of equipment did y'all sell?
18    A.  It was International Harvester.
19    Q.  All farming equipment or did you do some --
20    A.  It was construction equipment.
21    Q.  How long did you do that for?
22    A.  About three years.
23    Q.  What did you do after that?

Page 8

1     A.  Went to work for State Farm.
2     Q.  And were you an agent --
3     A.  Yes.
4     Q.  -- to start off?
5     A.  Yes.
6     Q.  What was your first job? Just took over a
7     State Farm agency?
8     A.  Yes, sir.
9     Q.  Did they -- What year was that?
10    A.  1977.
11    Q.  Were you a trainee agent at one point?
12    A.  Yes, sir.
13    Q.  And then did you become a full agent after
14    that?
15    A.  Yes, sir.
16    Q.  How long were you a trainee agent?
17    A.  I think it goes for two years.
18    Q.  Were you ever an adjuster or anything or --
19    A.  No.
20    Q.  -- did you just go right in the agency
21    business?
22    A.  No. Just strictly agency.
23    Q.  As a State Farm agent, did you sell all types

Page 9

1    of policies?
2    A.  Well, not every kind of insurance of insurance
3        to be had but basically home, health, life and
4        auto.
5    Q.  And you started in 1970 --
6    A.  '77.
7    Q.  So about 1979 you became a full agent with
8        State Farm, right?
9            MS. VAN HEEST:  Object to the form.
10   A.  Yes.
11   Q.  As an agent with State Farm with respect to
12       homeowner's policies and casualty policies,
13       you had the right to bind the company, didn't
14       you?  The authority to bind the company?
15           MS. VAN HEEST:  Object to the form.
16   A.  Yes, sir.
17   Q.  And on occasion did you do that when you wrote
18       a policy?
19   A.  Did I do what?
20   Q.  Bind the company.
21           MS. VAN HEEST:  Object to the form.
22   A.  You're talking about -- I put binding coverage
23       on the house, yes.

Page 10

1    Q.  You know Mr. and Mrs. Jones, don't you?
2    A.  Oh, yeah.
3    Q.  Known them for a long time?
4    A.  Yeah.
5    Q.  Did y'all's kids grow up together at all?
6    A.  No.
7    Q.  You were their insurance agent, weren't you?
8    A.  Yes, sir.
9    Q.  For a long time?
10   A.  Yes, sir.
11   Q.  Do you remember the different homes that you
12       insured for Mr. Jones?
13   A.  One is all I know of.
14   Q.  Is that the one out on Straughn School Road?
15   A.  Yes, sir.
16   Q.  You originally wrote that policy way back
17       when?
18   A.  I don't remember when.
19   Q.  It was a long time ago?
20   A.  Yeah.
21   Q.  They were a good customer of yours for a long
22       time, weren't they?
23   A.  They were.

Page 11

1    Q.  Do you have occasion to remember going out
2        and -- Do you remember Mr. Jones got sick with
3        the leukemia?
4    A.  I don't remember when it was, but I remember
5        him getting sick.
6    Q.  Do you remember about that time going out and
7        measuring their house?
8    A.  No, sir.
9    Q.  Do you have any memory of doing any
10       measurements of their house?
11   A.  Yes, sir.
12   Q.  Tell me about that.  When was the last time
13       you remember measuring their house?
14   A.  We had a mandatory inspection of all of our
15       fire policies somewhere around 1984.
16   Q.  1984?
17   A.  I think -- Not '84.  I'm sorry.  '94.
18   Q.  Was that after Hurricane Andrew?
19   A.  It was right after Hurricane Opal.
20   Q.  Why did they do a mandatory inspection like
21       that?
22           MS. VAN HEEST:  Object to the form.
23   A.  I couldn't tell you why they did it.

Page 12

1    Q.  So you had a -- around that time you think you
2        went out and inspected Mr. and Mrs. Jones'
3        house?
4    A.  Yes, sir.
5    Q.  When you did that inspection, what types of
6        things did you do during that inspection?
7    A.  Just look at it and measure it and make sure
8        we got everything like the State Farm called
9        for.
10   Q.  How did you measure it?
11   A.  With a roller tape.
12   Q.  Is that one of those little devices that has a
13       wheel on it?
14   A.  Uh-huh (positive response).
15   Q.  Is that a yes?
16   A.  Yes.  Excuse me.
17   Q.  I'm not trying to be rude.  I want to make
18       sure I get it on the record.
19   A.  I understand.
20   Q.  What you do is go around the outline of the
21       house?
22   A.  On the outside of the house, yes, sir.
23   Q.  And then you sit down and write it up, and you

Page 13

1  figure out how many square feet of the house?
2  A. That's correct.
3  Q. And you think your best memory is the last
4     time you did that was 1994, on or about there?
5  A. I'm guessing about that time.
6  Q. And could it have been a little later -- a
7     couple of years later or did you get them all
8     done after they required that right away?
9        MS. VAN HEEST: Object to the form.
10 A. No. I had to do it just as soon as they
11    required it.
12 Q. Do you remember anytime going back out there
13    after and re-inspecting the house?
14 A. I don't remember specifically.
15 Q. Was there a chance you might have and just not
16    remember today?
17 A. That's correct.
18 Q. If you did an inspection of the house, would
19    you have noted it anywhere, put it down in the
20    computer system maybe?
21       MS. VAN HEEST: Object to the form.
22 A. Yes, sir.
23 Q. Let me show you something here. I'm not much

Page 14

1  for tricking folks. I jut want to see if this
2  might refresh your recollection. I'm going to
3  show you what's been marked as Defendant's
4  Exhibits 1 and 2 to these depositions here.
5        MS. VAN HEEST: Those are dated
6           September 1, 2004.
7  Q. You don't have to take my word on it, but I'm
8     just going to tell you what the testimony has
9     been so far from Mr. Jones, that he went down
10    to Mr. Nall's office on September 1, 2004 and
11    they printed those off the computer screen,
12    those two documents. If you take a look at
13    those documents, do you recognize those
14    computer screens at all? Is that the type of
15    information that you might have had on the
16    computer when you were an agent?
17       MS. VAN HEEST: Object to the form.
18          At a certain point in time?
19       MR. WINTER: Just --
20 A. That would be basically what we had that would
21    come up on the main screen, yeah.
22 Q. If you'll look at Defendant's Exhibit 2 in the
23    right-hand corner -- I'm just asking you this

Page 15

1  to refresh your recollection -- do you see
2  where it says there R-E-I-N-S-P?
3  A. Re-inspection?
4  Q. Yes, sir.
5  A. Uh-huh (positive response).
6  Q. What does that mean to you?
7  A. It means I went out and looked at in '97.
8  Q. Did you have a habit, custom or practice of
9     doing inspections in a certain way that you
10    might have done there in '97?
11       MS. VAN HEEST: Object to the form.
12 A. If I looked at his in '97, it was by his
13    request or the company's request.
14 Q. Now, when you went out to look at the house,
15    do you have any memory as we sit here today of
16    measuring it with the tape?
17 A. Not in '97. I don't have any recollection.
18 Q. You might have? You just might not remember
19    it?
20 A. That's correct.
21 Q. And you wouldn't have any reason to doubt
22    Mr. and Mrs. Jones, that they thought that you
23    went out there in '97 and measured the house

Page 16

1  at that time, would you?
2        MS. VAN HEEST: Object to the form.
3           He wasn't present during their
4           testimony.
5        MR. WINTER: I'm just saying --
6  Q. If Mr. and Mrs. Jones -- If Mrs. Jones
7     remembered you going out there and measuring
8     the house, you don't have any memory that
9     would say you didn't do that, do you?
10       MS. VAN HEEST: Object to the form.
11 A. That's correct.
12 Q. I'm not trying to play any games. I just want
13    to make sure that there's no --
14       MS. VAN HEEST: I know, but there
15          are certain things alleged in the
16          lawsuit against Mr. King, and he
17          wasn't present at their
18          depositions. So I just want to
19          make sure the record is
20          protected.
21       MR. WINTER: I understand.
22 Q. Just so you know, I'm just trying to get the
23    facts. I'm not making any judgments or

Page 17

1    opinions or anything. I just want to figure
2    out what happened. That's what we're trying
3    to do.
4        Why do you measure a house?
5    A. Why?
6    Q. Yes, sir.
7    A. To determine the square footage in the house
8       so we can figure the replacement cost on it.
9    Q. Why in 1997 or 1994 was it important to
10      figure -- Let's go back to 1994 first.
11       In 1994 you don't know why State Farm
12      wanted you to measure -- do the inspections of
13      the houses, right?
14        MS. VAN HEEST: Object to the form.
15   A. They required mandatory inspections on
16      everything in the state of Alabama to the best
17      of my knowledge.
18   Q. But you don't know why they were asking for
19      that?
20   A. Basically because they feel like that people
21      had made improvements and things might have
22      changed since the initial insurance.
23   Q. Did Hurricane Opal hit the state of Alabama?

Page 18

1    A. Yes.
2    Q. Where did that come ashore? In Mobile or
3       somewhere?
4    A. Came up right through here.
5    Q. Did it? That was one before my time so I
6       apologize for my ignorance there.
7        So after Hurricane Opal, they must have
8       got a lot of claims.
9        MS. VAN HEEST: Object to the form.
10   A. I'm sure they got a lot of claims, but that
11      wasn't why they required the inspection. The
12      inspections were already required prior to
13      Opal hitting.
14   Q. Was it after Hurricane Andrew that they
15      decided to --
16   A. I don't even remember when Andrew hit.
17   Q. I remember Andrew. That was '94, I think.
18        MR. WINTER: Am I right?
19        (Brief off-the-record discussion.)
20   Q. So you need the square footage of the house in
21      order to accurately calculate the replacement
22      value. Would that be fair to say?
23        MS. VAN HEEST: Object to the form.

Page 19

1    A. That's correct.
2    Q. If the square footage of the house wasn't
3       accurately calculated, it could negatively
4       impact the replacement value of the policy.
5        MS. VAN HEEST: Object to the form.
6    A. That's correct.
7    Q. Wouldn't that be correct?
8        MS. VAN HEEST: Object to the form.
9    A. That's correct.
10   Q. Assume for me, if you would, that, in fact,
11      that the square footage of the house was less
12      than there actually was for whatever reason.
13      What do you think State Farm should do about
14      that?
15        MS. VAN HEEST: Object to the form.
16   A. I'm sorry. I didn't quite understand exactly
17      what you were asking.
18   Q. If there was a mistake in the square footage
19      and the house was underinsured because the
20      square footage was incorrect, do you think
21      State Farm should do something about that?
22        MS. VAN HEEST: Object to the form.
23   A. Yes. They should make the change.

Page 20

1    Q. What change would they make?
2        MS. VAN HEEST: Object to the form.
3    A. They would made a change based on the square
4       footage.
5    Q. Of what the actual square footage of the house
6       was at the time?
7        MS. VAN HEEST: Object to the form.
8    A. Right.
9    Q. And that would be a fair thing to do, wouldn't
10      it?
11        MS. VAN HEEST: Same objection.
12   A. It would all have to be recalculated again and
13      discussed with the policyholder and brought
14      the insurance in line with what the
15      replacement cost was. And I say in line.
16      They give us a percentage that we could
17      deviate at one time.
18   Q. I guess what I'm saying here in this situation
19      is where the Joneses are alleging that square
20      footage that's in the system -- What was the
21      square footage that was in the system, sir, as
22      of September 1, 2004?
23   A. Square footage of 2128.

Page 21

1  Q.  And I think what the Joneses are saying was
2      there was a mix-up on the square footage of
3      the house.
4          MS. VAN HEEST:  Object to the form.
5          The complaint speaks for itself.
6          MR. WINTER:  I understand.
7  Q.  And that actually there was a lot more square
8      footage to the house than 2100.
9          MS. VAN HEEST:  Same objection.
10 Q.  Unfortunately nobody seemed to realize that
11     until after the house burned down.
12         MS. VAN HEEST:  Same objection.
13 Q.  Assume that that's -- If that's correct and
14     nobody realized it until after the house
15     burned down, what do you think the appropriate
16     thing would be to do?
17         MS. VAN HEEST:  Same objection.
18 A.  That's not for me to say.
19 Q.  Do you think it would be fair to fix the
20     mistake?
21         MS. VAN HEEST:  Same objection.
22 A.  That depends on whose mistake it was.
23 Q.  Whose mistake do you think it was?

Page 22

1          MS. VAN HEEST:  Same objection.
2  A.  I don't know when it was made.  We initially
3      insured it in, I believe it said, '81.  And
4      then when I went back out there in '94, I
5      believe it was, I don't think we had anything
6      that was out of line.  And Jake and I always
7      talked about his square footages and his
8      replacement cost and his cost of the
9      insurance.  Jake was more active I think than
10     most policyholders in knowing what he had.
11         So, you know, I don't know that we had --
12     When it was inspected in '97, I don't know,
13     you know, whether he had the 2128 or more at
14     that time, but I know that if it said I
15     inspected it, then I looked at it and we added
16     accordingly.
17 Q.  Do you have any recollection of speaking with
18     Mr. Jones or Mr. and Mrs. Jones about the
19     square footage you calculated after March 11,
20     1997?
21         MS. VAN HEEST:  Object to the form.
22 A.  I don't have any specific recollection of it.
23     I just know Jake and I talked about his

Page 23

1      coverage.  He was very active in his insurance
2      coverage.
3  Q.  When you originally sold Mr. Jones the policy
4      in 199 -- way back when -- let's just talk
5      about it that way -- what type of policy was
6      it on his home?
7  A.  Homeowner policy.
8  Q.  Was it for a guaranteed replacement cost
9      policy?
10 A.  I don't think we had guaranteed replacement
11     cost at that time.
12 Q.  Was there a time when you did get a guaranteed
13     replacement cost policy?
14 A.  I think so.
15 Q.  Did you sell that type of policy to Mr. Jones?
16 A.  I can't remember.
17 Q.  Do you remember talking to Mr. Jones about the
18     replacement cost of the type of policy you
19     sold him?
20 A.  I don't have any specific recollection of any
21     detail that we talked about.
22 Q.  Would it be fair to say that Mr. Jones asked
23     you to insure his house for the replacement

Page 24

1      cost of the house?
2  A.  No, it wouldn't be fair.
3  Q.  What did Mr. Jones ask you to do?
4  A.  I don't remember other than insure his ho use.
5  Q.  Now, when you became a State Farm agent, were
6      you paid for soliciting insurance policies or
7      actually selling policies?
8          MS. VAN HEEST:  Object to the form.
9  A.  Actually selling policies.
10 Q.  They didn't just pay you to go see potential
11     customers.  They paid you to sign them up,
12     right?
13         MS. VAN HEEST:  Object to the form.
14 A.  That's correct.
15 Q.  And way back when did State Farm -- was the
16     motto back then Like a Good Neighbor, State
17     Farm Is There?  Has that been the motto for a
18     long time?
19 A.  As far as I can remember.
20 Q.  So you were State Farm's good neighbor here in
21     Andalusia?
22         MS. VAN HEEST:  Object to the form.
23 A.  One of them.

Deposition of Mark King

January 18, 2007

Page 25

1  Q.  When you started how many State Farm insurance
2      agents were there in town?
3  A.  Three of us.
4  Q.  Did that number stay about the same through
5      your time when you were an agent?
6  A.  No. They finally reduced down to two.
7  Q.  And when you were an agent, did you have a
8      habit of providing your customers and
9      prospective customers with State Farm
10     goodies? When I say goodies I mean like
11     pencils, pens, key chains and those types of
12     things.
13         MS. VAN HEEST: Object to the form.
14 A.  We've occasionally done stuff like that. Plus
15     road atlases.
16 Q.  And you also send them a calendar from time to
17     time maybe?
18 A.  Yes, sir.
19 Q.  You also send them birthday cards and things
20     like that?
21 A.  I don't think I ever did the birthday cards.
22 Q.  Were you allowed to sell other insurance
23     besides State Farm insurance as a State Farm

Page 26

1      agent?
2          MS. VAN HEEST: Object to the form.
3  A.  Yes, sir.
4  Q.  Did you do that?
5  A.  I did it with Baldwin Mutual.
6  Q.  And did State Farm have to approve you selling
7      insurance?
8          MS. VAN HEEST: Object to the form.
9  A.  Absolutely.
10 Q.  Did you basically have to follow all of State
11     Farm's rules and regulations in order to be a
12     State Farm agent?
13         MS. VAN HEEST: Object to the form.
14 A.  Yes, sir.
15 Q.  And if you didn't follow those rules and
16     regulations, they stopped you from being a
17     State Farm agent, didn't they?
18         MS. VAN HEEST: Object to the form.
19 A.  That's correct.
20 Q.  Did you have a State Farm sign out in front of
21     your office?
22 A.  Yes, sir.
23 Q.  Did you advertise as a State Farm agent?

Page 27

1          MS. VAN HEEST: Object to the form.
2  A.  Yes, sir.
3  Q.  On TV?
4  A.  No.
5  Q.  How about on the radio?
6  A.  In the early years I think I might have.
7  Q.  Did you ever get up and talk to groups about
8      their insurance needs from time to time?
9  A.  I have done it, yes, sir.
10 Q.  And as such did you tell them about State Farm
11     policies?
12         MS. VAN HEEST: Object to the form.
13 A.  No, sir.
14 Q.  You just talked about insurance in general?
15 A.  Insurance in general.
16 Q.  Now, as a State Farm agent, did you help
17     people determine what their insurance needs
18     were?
19 A.  Yes, sir.
20 Q.  Like in life insurance you might help them
21     figure out how much life insurance they need?
22 A.  Yes, sir.
23 Q.  And in car insurance you would take a look at

Page 28

1      their car and tell them how much car insurance
2      they might need?
3          MS. VAN HEEST: Object to the form.
4  A.  That works a little different than life
5      insurance.
6  Q.  How about homeowner's insurance? Did you help
7      them figure out how much homeowner's insurance
8      they needed?
9  A.  Yes, sir.
10 Q.  Now, when you started with Mr. and Mrs. Jones
11     way back when, how did you figure out what the
12     replacement value of a house was?
13         MS. VAN HEEST: When he started with
14     Mr. Jones?
15 Q.  When you first wrote a policy with Mr. Jones
16     way back when --
17         MS. VAN HEEST: I just didn't hear
18     you.
19 Q.  -- how did y'all figure it out?
20         MS. VAN HEEST: Object to the form.
21 A.  I don't remember the detail on it, but I know
22     I went out and measured it and figured
23     replacement cost figures on it. And I offered

Page 29

1   Jake what I had come up with. That's
2   routine. I do that with everybody.
3   Q. That was what you did through the years? You
4       would go out and measure the house, and then
5       compute the replacement cost and tell them
6       what it was?
7   A. That's correct.
8   Q. Now, did State Farm provide you -- when you
9       said before you had to follow rules and
10      regulations of State Farm, did they provide
11      you with manuals on their rules and
12      regulations?
13          MS. VAN HEEST: Object to the form.
14  A. Yes, sir.
15  Q. And you had to read those?
16  A. Yes, sir.
17  Q. Did you have to take a test on them?
18  A. I think we did initially, but I don't remember
19      exactly.
20  Q. Did you have to go for periodic training with
21      State Farm in order to do things the State
22      Farm way?
23          MS. VAN HEEST: Object to the form.

Page 30

1   A. Yes, sir.
2   Q. And when you wrote a policy for a customer for
3       State Farm, did you have to sign that policy
4       and deliver it to them?
5          MS. VAN HEEST: Same objection.
6   A. That's correct.
7          MS. VAN HEEST: When you say
8             deliver, to State Farm or the
9             customer?
10         MR. WINTER: To the customer.
11  Q. Did you deliver --
12         MS. VAN HEEST: Did you hand the
13            policy to the customer or did
14            State Farm mail it out after you
15            sent the application in?
16         THE WITNESS: We either handed it to
17            them or we mailed it to them.
18  Q. Do you remember doing that with Mr. Jones,
19      sending him his policy or hand-delivering his
20      policy to him?
21  A. We either mailed it or I hand-delivered it. I
22      normally mail them.
23  Q. When people came to see you, you represented

Page 31

1   yourself as State Farm's agent in Andalusia,
2   right?
3          MS. VAN HEEST: Object to the form.
4   A. That's correct.
5   Q. You didn't have a Baldwin Mutual sign outside
6       your office, did you?
7          MS. VAN HEEST: Object to the form.
8   A. No, sir.
9   Q. You didn't have Baldwin pens or pencils or
10      anything like that?
11  A. No, sir.
12  Q. What percentage of your policies that you
13      wrote or serviced were State Farm as compared
14      to Baldwin?
15         MS. VAN HEEST: Object to the form.
16  A. There's really no comparison because we only
17      wrote with Baldwin Mutual what we could not
18      place with State Farm.
19  Q. So as a secondary market?
20  A. Right. And there was very little of it.
21  Q. And so basically State Farm allowed you to
22      write with them only what State Farm wouldn't
23      write?

Page 32

1          MS. VAN HEEST: Object to the form.
2   Q. Would that be fair to say?
3   A. Anything State Farm carried we could not write
4       with Baldwin Mutual.
5   Q. Did you have authority to write checks on
6       behalf of State Farm to insureds when they
7       made claims?
8          MS. VAN HEEST: Object to the form.
9   A. Yes, sir.
10  Q. And did you have authority to accept payments
11      from insureds for State Farm?
12  A. Yes, sir.
13  Q. And from time to time did you help insureds
14      set up automatic withdrawals from their bank
15      account with State Farm?
16         MS. VAN HEEST: Object to the form.
17  A. Yes, sir.
18  Q. And did you accept calls and help people get
19      their claims adjusted when they had a claim?
20         MS. VAN HEEST: Object to the form.
21  A. Yes, sir.
22  Q. Did you have somebody at State Farm who you
23      had to report to on a regular basis?

Page 33

1           MS. VAN HEEST: Object to the form.
2    Q.  Like a district manager or a state manager?
3           MS. VAN HEEST: Object to the form.
4    A.  We had a district manager.
5    Q.  And did he come by and visit you from time to
6         time?
7    A.  Yes, sir.
8    Q.  Did he have -- If he wanted to, could he look
9         over your ledgers and your accounts?
10          MS. VAN HEEST: Object to the form.
11   A.  Yes, sir.
12   Q.  Did you have that "good neighbor" service that
13        they advertise on TV now where if I called
14        Mr. King, my State Farm agent, 24 hours a day,
15        7 days a week, 365 days a year, I would get
16        State Farm if you weren't available? Did they
17        have that when you were an agent?
18   A.  That came in about the last year I was with
19        State Farm.
20   Q.  But you had that service available for your
21        customers, right?
22   A.  Yes.
23   Q.  Did you have an actual contract with State

Page 34

1         Farm?
2    A.  Yes, sir.
3    Q.  And did that get -- did you get that when you
4         first started with State Farm?
5    A.  Yes, sir.
6    Q.  And did that get renewed on an annual basis?
7    A.  No, sir.
8    Q.  Was it just -- can you tell me -- Did you have
9         one contract and that lasted the whole time?
10          MS. VAN HEEST: Object to the form.
11   A.  Yes, sir.
12   Q.  Did they ever send you any addendums or
13        additions to it?
14   A.  I can't recall.
15   Q.  Do you still have a copy of that contract by
16        chance?
17   A.  No, sir.
18   Q.  Do you have any of your office paraphernalia
19        records?
20   A.  No, sir.
21   Q.  You just gave it all up? Left it there?
22   A.  Yes, sir.
23   Q.  Why did you leave State Farm, sir?

Page 35

1    A.  I got fed up with the management.
2    Q.  What do you mean by that?
3    A.  It's too long. You ain't got time to listen
4         to it.
5    Q.  Can you give me -- I'm not laughing at you.
6         I'm laughing -- I can understand.
7    A.  Let me put it this way. I was fortunate
8         enough to be of an age and enough years in
9         with State Farm that I could retire, and I was
10        glad to get away from the management part of
11        it.
12   Q.  Was it your having to manage the business or
13        was it having to deal with management above
14        you that was the problem?
15          MS. VAN HEEST: Object to the form.
16   A.  Management above me. Plus, they wanted a new
17        contract, and I didn't want to give them a new
18        contract.
19   Q.  What kind of contract did they want?
20          MS. VAN HEEST: Object to the form.
21   A.  Something to benefit them and not me.
22   Q.  So they were trying to change the terms of the
23        contract after it was already in place?

Page 36

1           MS. VAN HEEST: Object to the form.
2    A.  Right.
3    Q.  And they sent it to you?
4    A.  I looked at it, yes, sir.
5    Q.  Did you have a chance to negotiate it with
6         them at all?
7           MS. VAN HEEST: Object to the form.
8    A.  There wasn't any negotiation about it.
9    Q.  State Farm either says do what we tell you to
10        do or you're out, right?
11          MS. VAN HEEST: Object to the form.
12   A.  No. They just -- They wanted you to sign a
13        new contract, and there was undue pressure put
14        on you if you didn't sign it.
15   Q.  What happened if you didn't sign?
16   A.  Well, they threatened to fire me and
17        everything else every time I turned around, so
18        I decided I'd leave.
19   Q.  That doesn't sound very fair after all the
20        years you were there with them.
21          MS. VAN HEEST: Object to the form.
22   Q.  Was it fair?
23   A.  I didn't like it.

Page 37

1  Q.  Did you ever use a computer program to figure
2     out the replacement value of a home?
3        MS. VAN HEEST: Object to the form.
4  A.  If I'm not mistaken, that's what we did the
5     last few years I was there.
6  Q.  Do you remember what the name of that computer
7     program was?
8  A.  No, sir.
9  Q.  Did State Farm provide you with that program?
10       MS. VAN HEEST: Object to the form.
11 A.  Yes, sir.
12 Q.  Did they ever tell you how they figured out
13    whether it was accurate or not?
14       MS. VAN HEEST: Object to the form.
15 A.  No, sir.
16 Q.  You just used it?
17 A.  I just used what they gave me to work with.
18 Q.  Did you rely on that program?
19       MS. VAN HEEST: Object to the form.
20 A.  I had to.
21 Q.  You expected that program to be accurate and
22    truthful, correct?
23       MS. VAN HEEST: Object to the form.

Page 38

1  A.  Yes, sir.
2  Q.  And in order for that program to be accurate
3     and truthful, you had to input certain
4     footage, right?
5  A.  Right.
6  Q.  One of them was square footage?
7  A.  That's correct.
8  Q.  And then you figured out what the replacement
9     value of the home was and you provided that to
10    the customer. Would that be fair to say?
11 A.  That's fair.
12 Q.  Did the customers rely upon that value that
13    you gave them?
14       MS. VAN HEEST: Object to the form.
15 A.  I don't know whether they relied on it or not,
16    but that's what we had.
17 Q.  But when you provided them with the estimate,
18    there was no reason for them to doubt you, was
19    there?
20       MS. VAN HEEST: Object to the form.
21 A.  I've been doubted before.
22 Q.  I understand that. I guess what I'm saying is
23    this. You're a man of a lot of experience in

Page 39

1     life. And when you go to your doctor, you
2     listen to your doctor about what you need to
3     do for your medicine, right?
4  A.  That's correct.
5  Q.  And when you go to your lawyer, you listen to
6     your lawyer what you need to do about your
7     legal affairs, right?
8  A.  Right.
9  Q.  And when you -- You were an insurance agent,
10    but if you went to an insurance agent, you
11    would expect them to know what you needed for
12    your insurance affairs, wouldn't you?
13       MS. VAN HEEST: Object to the form.
14 A.  I would expect them to give me some
15    recommendations, yes, sir.
16 Q.  And that's the kind of agent that you wanted
17    to be, somebody who could provide reasonable
18    recommendations to your customers? That's why
19    you were in business, wasn't it?
20 A.  Yes, sir.
21 Q.  And that's what you tried to do, wasn't it?
22 A.  Yes, sir.
23 Q.  And you did it with the tools that were

Page 40

1     provided to you, right?
2  A.  That's correct.
3  Q.  And the tool that you used to determine
4     replacement value was the computer program,
5     correct?
6        MS. VAN HEEST: Object to the form.
7           At what point are you talking
8        about? because he said that came
9        in the last year and --
10          MR. WINTER: I understand. You
11       objected to the form. Bring it
12       up with the judge. I'm sorry.
13 Q.  I don't mean to be rude, but what we're
14    supposed to do is object to the form. And
15    then if you have a problem with it, we take it
16    up with the judge and we don't bother you with
17    it.
18       Before you had the computer program, how
19    did you figure out what the replacement value
20    of the home was?
21 A.  We had some kind of little sliding scale
22    calculator-like thing.
23 Q.  Like a slide rule from the old days?

Page 41

1    MS. VAN HEEST: Object to the form.
2    A. Uh-huh (positive response).
3    Q. Like when I was in elementary school and we
4    used to have that slide rule?
5    A. I don't know if it was in elementary school
6    back then or not.
7    Q. I look older than I am. So take it for
8    whatever that's worth.
9    MS. VAN HEEST: Object to the form.
10   Q. Now, I'm trying to understand a little bit
11   about this replacement value. You said when
12   you first offered it, there wasn't a
13   guaranteed replacement value policy.
14   A. I'm not sure that there was.
15   Q. Was there a time when State Farm did offer a
16   policy that would replace your home, had a
17   guaranteed replacement value with it?
18   A. Yes, sir, there was.
19   Q. Do you remember about when that was?
20   A. No, sir.
21   Q. Do you remember when they got away from that
22   guaranteed replacement value?
23   MS. VAN HEEST: Object to the form.

Page 42

1    A. Yes, sir. I think in the late '90s is when
2    they got away from it.
3    Q. Do you know why they might have done that?
4    MS. VAN HEEST: Object to the form.
5    A. No, sir.
6    Q. How did they notify their customers of that or
7    did they notify their customers of that?
8    MS. VAN HEEST: Object to the form.
9    A. They sent out notices to every customer.
10   Q. Did you send them out personally or did the
11   state --
12   MS. VAN HEEST: Object to the form.
13   Q. -- did the State Farm home office?
14   A. State Farm sent them out.
15   Q. So they would have come from the home office?
16   MS. VAN HEEST: Object to the form.
17   A. Regional office.
18   Q. So you would have no knowledge of whether or
19   not one of your customers would have actually
20   received that form?
21   MS. VAN HEEST: Object to the form.
22   A. Not everybody would receive it.
23   Q. Let me ask it to you this way. In your life

Page 43

1    has there ever been a bill that you didn't get
2    that you didn't realize you didn't get until
3    the next bill came?
4    MS. VAN HEEST: Object to the form.
5    A. I can't recall.
6    Q. Just because State Farm may have sent it
7    doesn't mean that everybody would have
8    received it, would it?
9    MS. VAN HEEST: Object to the form.
10   A. Depends on the pony express.
11   Q. Depends on the mail system, doesn't it?
12   MS. VAN HEEST: Object to the form.
13   Q. Would you agree with me sometimes people don't
14   get notices that they are supposed to get
15   because of the mail?
16   MS. VAN HEEST: Object to the form.
17   A. That's a possibility.
18   Q. As we sit here today, you don't know whether
19   or not Mr. and Mrs. Jones got any such notice,
20   do you?
21   MS. VAN HEEST: Object to the form.
22   A. I think they did.
23   Q. How do you think -- Why do you think that?

Page 44

1    A. I think Jake and I talked about it.
2    Q. Tell me about that conversation.
3    A. I'm not -- don't remember any specifics, but,
4    like I said, Jake was very active in knowing
5    what he had. And when that changed, we talked
6    about what we needed to do on his house
7    insurance, if anything.
8    Q. And what did you need to do when this changed?
9    A. I don't know if we did anything or not.
10   Q. Have you had an opportunity to talk to Jake
11   about his home burning down at all?
12   A. I didn't even know he had lost his home until
13   I got suit papers. I was totally unaware of
14   it. I've been totally away from it for five
15   years when that happened.
16   Q. I need to go back and ask some questions, kind
17   of family, personal questions. Right now this
18   case is sitting in Montgomery in federal
19   court. But based upon what State Farm's
20   attorney was asking, I have a feeling it may
21   come back here to Covington County so I'm
22   going to ask you some questions. I hope this
23   doesn't bore you. Just bear with me.

| | Page 45 | | Page 47 |
|---|---|---|---|
| 1 | Are you married, sir? | 1 | Q. What about your sons? Do they work? |
| 2 | A. Yes. | 2 | A. Yes. |
| 3 | Q. And your wife's name is ... | 3 | Q. Where do they work at? |
| 4 | A. Lynn King. | 4 | A. They have King Building here in Andalusia. |
| 5 | Q. And she works in a court reporting business? | 5 | Q. And those are your three children, right? |
| 6 | A. Yes, sir. | 6 | A. Uh-huh (positive response). |
| 7 | Q. And how long has she been doing that? | 7 | Q. And do you have grandchildren? |
| 8 | A. About two years. | 8 | A. Yes, sir. |
| 9 | Q. Before that did she work? | 9 | Q. Do they live in Covington County as well? |
| 10 | A. She's been in school quite a while. | 10 | A. Yes. |
| 11 | Q. When did y'all get married? | 11 | Q. Are they in school or are they grown up and |
| 12 | A. About ten years ago. | 12 | out of school? |
| 13 | Q. Now, you grew up around these parts. What was | 13 | A. I ain't that old. My grandson is a sophomore |
| 14 | your mama's maiden name? | 14 | at Straughn and my granddaughter is three |
| 15 | A. Donaldson. | 15 | years old. |
| 16 | Q. Where did she live in Covington County? | 16 | Q. Do you have any brothers or sisters that live |
| 17 | A. She lives in the assisted living here -- | 17 | in Covington County? |
| 18 | assisted living home on 660 Moore Road. | 18 | A. No. |
| 19 | Q. Where did she grow up? Is there a certain | 19 | Q. How about the surrounding area? Any live in |
| 20 | area of Covington County she grew up in? | 20 | the surrounding area? |
| 21 | A. Here in Andalusia basically. | 21 | A. Not in this county. |
| 22 | Q. And how about your dad? Where was he from? | 22 | Q. How about Pike or Crenshaw or -- |
| 23 | Was he from here? | 23 | A. Escambia County. |

| | Page 46 | | Page 48 |
|---|---|---|---|
| 1 | A. He was from here, yes. | 1 | Q. Escambia County? |
| 2 | Q. Which area of Covington did he grow up in? | 2 | A. Baldwin County. |
| 3 | A. Just general Andalusia. | 3 | Q. What about your wife? Does she have any |
| 4 | Q. Do you have any children, sir? | 4 | children? |
| 5 | A. Yes, sir. | 5 | A. She's got two boys. |
| 6 | Q. How many children do you have? | 6 | Q. And what are their names? |
| 7 | A. I have three. | 7 | A. Bryan and Dustin. |
| 8 | Q. And do they live in Covington County? | 8 | Q. What is Bryan's last name? |
| 9 | A. Yes, sir. | 9 | A. Ship. |
| 10 | Q. What are their names? | 10 | Q. And what about Dustin? |
| 11 | A. Marcie, Anthony and Walter. | 11 | A. Ship. |
| 12 | Q. Anthony and Walton would be Anthony King and | 12 | Q. Where does Bryan work at? |
| 13 | Walton King? | 13 | A. He works in Evergreen. |
| 14 | A. Walter King. | 14 | Q. Who does he work for up there? |
| 15 | Q. Walter King. | 15 | A. He works for this import/export wood business |
| 16 | Is that correct? | 16 | over there. |
| 17 | A. Uh-huh (positive response). | 17 | Q. And what about Dustin? |
| 18 | Q. And what is Marcie's name now? Is Marcie | 18 | A. Dustin works for UPS. |
| 19 | married? | 19 | Q. Does she have any brothers or sisters in the |
| 20 | A. She's a James. | 20 | area? |
| 21 | Q. Marcie James. | 21 | A. She has some in Butler County. |
| 22 | Where does Marcie work? | 22 | Q. Are her parents still living? Her parents? |
| 23 | A. She works at Western Outlet store. | 23 | A. No. They are deceased. |

Deposition of Mark King                                                                                 January 18, 2007

Page 49

1   Q. Let's talk -- I need to find out a little bit
2       about your wife's work history. You said she
3       was a court reporter and before that she went
4       to school. Did she work anywhere before that?
5   A. She worked in my State Farm office for a few
6       years.
7   Q. How about before that?
8   A. State Farm office in Evergreen.
9   Q. Now, when you left State Farm, what year was
10      that?
11  A. 2001.
12  Q. How many people did you have working in your
13      office at that time?
14  A. Two, I think.
15  Q. What are their names?
16  A. Carolyn McGowan was one of them. I don't
17      remember who the last one was.
18  Q. Eloise Adams or Candy? Either one of those?
19  A. Huh-uh (negative response).
20  Q. Where was your office located at?
21  A. 430 Bypass West.
22  Q. Do you attend church regularly?
23  A. Yes.

Page 50

1   Q. Where do you attend church?
2   A. Southside Baptist Church.
3   Q. And how about your wife?
4   A. Same place.
5   Q. How about your children? Where do they go to
6       church?
7   A. I'm not sure that they go to church anymore.
8   Q. How about your wife's children? Do you know
9       anything about where they might go?
10  A. No.
11  Q. Have you ever served in the Armed Forces, sir?
12  A. Yes, sir.
13  Q. Which force were you in?
14  A. I was in Army aviation.
15  Q. That's neat. Did you fly?
16  A. Yes, sir.
17  Q. What years did you serve?
18  A. '63 to '67.
19  Q. Were you in helicopters?
20  A. Yes, sir.
21      (Brief off-the-record discussion.)
22  Q. Let me ask you this question. When you were a
23      State Farm agent, did you ever make a mistake

Page 51

1       as an agent?
2           MS. VAN HEEST: Object to the form.
3   A. Sure.
4   Q. What did you do when you found out you made a
5       mistake?
6   A. Corrected it.
7   Q. Did you ever let a mistake hurt the insured?
8           MS. VAN HEEST: Object to the form.
9   A. Not to my knowledge.
10  Q. You wouldn't want that to happen, would you?
11          MS. VAN HEEST: Object to the form.
12  A. No, sir.
13  Q. And if you had made a mistake as a State Farm
14      agent and it hurt the insured, would you try
15      and get State Farm to make it right?
16          MS. VAN HEEST: Object to the form.
17  A. I would, yes, sir.
18  Q. Do you belong to any civic organizations?
19  A. No, sir.
20  Q. How about any church groups or anything like
21      that?
22  A. What are you talking about church groups?
23  Q. Like the masons or Kiwanis or anything like

Page 52

1       that.
2   A. I'm a mason.
3   Q. Do you belong to the VFW or the American
4       Legion?
5   A. I belong to the Disabled American Veterans.
6   Q. Would you explain to me when you measured a
7       house back in your day, what did you take --
8       what counted as part of the house when you
9       measured the house -- When you used to measure
10      the square footage of the house? Was it all
11      the living space of the house -- enclosed
12      living space that counted as square footage?
13          MS. VAN HEEST: Object to the form.
14  A. Do you include the garage?
15  Q. That's my question. Would a garage count?
16      Let's start this way.
17      If it was an unenclosed garage or a
18      carport, would that count as living space to
19      be included?
20  A. No.
21  Q. What if the garage was enclosed? Would that
22      be included?
23  A. I think it was, but I'm not positive.

Page 53

1  Q.  But other areas of the home that were enclosed
2     with windows and heat, that would be included?
3  A.  Absolutely.
4  Q.  Utility rooms, if they were inside --
5     connected to the inside like the laundry
6     room?  That would be included, right?
7  A.  Yes, sir.
8  Q.  And did you make allowances if bathrooms had
9     been renovated and were redone with new tile
10    and things like that?  Did you input that into
11    your calculation?
12       MS. VAN HEEST:  Object to the form.
13  A.  When you're initially insured, you do a
14    walk-through inspection and look and see if
15    there's anything other than what might be
16    standard.  And if there was anything that was
17    a deluxe-type fixture, then, you know, you
18    would make allowances for something like
19    that.  But just because a bathroom or
20    something had been renovated, it doesn't take
21    away from the square footage.
22  Q.  There wouldn't be any increased value for --
23  A.  No, sir.

Page 54

1  Q.  It's really a function of square footage then
2    is what you're telling me?
3       MS. VAN HEEST:  Object to the form.
4  A.  Uh-huh (positive response).
5  Q.  Is that a yes?
6  A.  Yes, sir.
7  Q.  How did you determine the number to multiply
8    the square footage by?
9       MS. VAN HEEST:  Object to the form.
10  A.  That's given to me from State Farm.
11  Q.  You never had any discussions, then, with any
12    local builders as to what number you would
13    use, would you?
14       MS. VAN HEEST:  Object to the form.
15  A.  No, sir.
16  Q.  And you didn't have any discussions with the
17    hardware store folks, did you?
18       MS. VAN HEEST:  Object to the form.
19  A.  No, sir.
20  Q.  You just strictly relied upon State Farm's
21    estimate?
22       MS. VAN HEEST:  Object to the form.
23  A.  Yes, sir.

Page 55

1  Q.  And you multiplied that estimate by the square
2    footage?
3       MS. VAN HEEST:  Object to the form.
4  A.  Yes, sir.
5  Q.  And you relied upon State Farm's information?
6       MS. VAN HEEST:  Object to the form.
7  A.  Yes, sir.
8  Q.  Do you know if State Farm had any local
9    variations to that number?
10       MS. VAN HEEST:  Same objection.
11  A.  It varied from county to county or, you know,
12    areas from -- What we use here wouldn't be the
13    same thing used in Montgomery or Birmingham.
14  Q.  When you initially got your insurance license,
15    did State Farm sponsor you for that?
16  A.  Yes, sir.
17  Q.  Did you have other people in your office that
18    were agents?
19  A.  Yes, sir.
20  Q.  Did State Farm sponsor them too?
21  A.  Yes, sir.
22  Q.  Did any of those people that worked in your
23    office have authority to bind the company?

Page 56

1       MS. VAN HEEST:  Object to the form.
2  A.  Yes, sir.
3  Q.  But they would still answer to you, didn't
4    they?
5  A.  Yes, sir.
6  Q.  And you, in turn, would answer to State Farm?
7       MS. VAN HEEST:  Object to the form.
8  A.  Yes, sir.
9  Q.  Did you have to use State Farm applications?
10  A.  Yes, sir.
11  Q.  Do you remember as we sit here today when
12    Mr. Jones first came in to get his insurance
13    with you?
14  A.  I don't remember the exact day, no, sir.
15  Q.  Do you remember -- have a memory of the
16    conversation itself?
17  A.  No, sir.
18  Q.  Do you have any specific memory of any
19    conversations with Mr. Jones after that 1994
20    inspection about his insurance?  Let me ask it
21    to you this way.
22  A.  I don't have anything specific, but, like I
23    said, Jake was very active in what his --

Page 57

1  about his business, especially his insurance
2  business with me. And I don't think there was
3  a change made anywhere that we didn't talk
4  about it.
5  Q.  Well, tell me about that. When you say
6  active, what do you mean by that? Let's talk
7  about the homeowner's policy.
8  A.  When I say active, I'm talking about, you
9  know, he -- Most people take it out and just
10  leave it. And when Jake got a change, whether
11  it was in the money or whether it was in the
12  coverage, he was on the phone to me. We
13  talked about it or he came to the office, one
14  way or the other.
15  Q.  So when Mr. Jones -- you remember Mr. Jones
16  made some additions to his house over there on
17  Straughn School Road, don't you?
18          MS. VAN HEEST:  Object to the form.
19  A.  I can't remember everything, but I do remember
20  him taking in a porch. That's the only thing
21  that I can -- I think I can remember about it.
22  Q.  He had a porch and he made it into a room?
23  A.  I think he took a carport and made it into a

Page 58

1  porch -- an enclosed-type porch or something
2  like that.
3  Q.  Do you remember him calling it a playroom at
4  all?
5  A.  No, sir.
6  Q.  But he enclosed the porch?
7          MS. VAN HEEST:  Carport.
8  Q.  So he took a carport and made it into part of
9  the house. Is that what you're saying?
10  A.  He made a porch out of it is all I can
11  remember.
12  Q.  Do you remember if it was enclosed or not?
13  A.  He enclosed it some which way, but I don't
14  remember exactly what.
15  Q.  Do you remember going out there and measuring
16  it?
17  A.  I remember going out there.
18  Q.  When he made the carport into whatever he made
19  it into, do you remember inspecting the house
20  for that or doing any measurements for that?
21          MS. VAN HEEST:  Object to the form.
22  A.  I don't recall whether I measured it or not,
23  but I remember going out and looking at it.

Page 59

1  And I'm sure if I went, I measured it. I may
2  not have measured the whole house all over
3  again, but I measured what I had.
4  Q.  And that's what you believe you would have
5  added on as square footage of the house,
6  right?
7  A.  Yes, sir.
8  Q.  Do you remember if that was before 1994 or
9  after?
10  A.  I don't remember.
11  Q.  That's fair enough. If you don't remember,
12  you can't testify to something you can't
13  remember.
14      Do you remember any other changes to the
15  house that you might have gone out there and
16  looked at?
17  A.  I don't recall any.
18  Q.  Did you ever provide -- As we sit here today,
19  do you have any memory of providing Mr. Jones
20  with how many square feet his house was
21  insured for?
22          MS. VAN HEEST:  Object to the form.
23  A.  I'm sure that we looked at it, especially when

Page 60

1  we initially insured it, and I know we did it
2  in '94.
3  Q.  And did you provide him with any form or
4  anything that said how many square feet there
5  were?
6  A.  Not in writing maybe, but we talked about it.
7  Q.  Did you ever go out and visit the Joneses'
8  home when Mr. Jones wasn't present and do any
9  measurements? Do you remember doing that?
10  A.  I can't remember him being there.
11  Q.  He was at work during the day, right?
12  A.  Probably.
13  Q.  And you were at work during the day. So he
14  wouldn't necessarily be there when you were
15  there, right?
16  A.  That's correct.
17  Q.  I may have asked this. I want to make sure I
18  got this right, though. You don't know of any
19  document that is sent to an insured that
20  specifies the square footage that their home
21  is insured for, do you?
22          MS. VAN HEEST:  Object to the form.
23  A.  I don't recall.

| | Page 61 |
|---|---|
| 1 | Q. You don't remember sending any form out like |
| 2 | that, though, do you? |
| 3 | A. No, sir. |
| 4 | Q. After you put those numbers into the computer |
| 5 | program, you don't send a printout from that |
| 6 | computer program to folks, do you? |
| 7 | MS. VAN HEEST: Same objection. |
| 8 | A. No, sir. |
| 9 | Q. Do you ever look at tax records when you |
| 10 | figure out how much square footage is in a |
| 11 | home? |
| 12 | MS. VAN HEEST: Object to the form. |
| 13 | A. Tax records? |
| 14 | Q. Yes, sir. The property tax records. |
| 15 | A. No, sir. |
| 16 | Q. When you were an agent, did they have this |
| 17 | Option ID coverage on a home? |
| 18 | A. Yes, sir. |
| 19 | Q. Tell me what that is. |
| 20 | A. I don't know what it is. |
| 21 | Q. Was that something that you had to pay extra |
| 22 | for? |
| 23 | A. No, sir. |

| | Page 62 |
|---|---|
| 1 | Q. That just came as part of your price, right? |
| 2 | A. As far as I can tell. |
| 3 | Q. So when somebody came in to get homeowner's |
| 4 | insurance and they got homeowner's insurance, |
| 5 | they got the Option ID as part of the package? |
| 6 | MS. VAN HEEST: Object to the form. |
| 7 | A. As far as I know. |
| 8 | Q. Mr. King, I'm going to show you what's been |
| 9 | marked previously as Defendant's Exhibit |
| 10 | Number 6. Take all time you need to review |
| 11 | that, Mr. King. |
| 12 | A. Okay. What you want to know? |
| 13 | Q. Have you had enough time to review that, sir? |
| 14 | A. I've looked at it about as thoroughly as I |
| 15 | can. |
| 16 | Q. Do you see on the bottom right-hand corner |
| 17 | there where it says countersigned and then it |
| 18 | says your name, Mark A. King? |
| 19 | A. Uh-huh (positive response). |
| 20 | Q. Is that correct? |
| 21 | A. Yes, sir. |
| 22 | Q. Did you routinely countersign policies -- |
| 23 | declarations of policies such as this? |

| | Page 63 |
|---|---|
| 1 | MS. VAN HEEST: Object to the form. |
| 2 | A. Yes, sir. |
| 3 | Q. Tell me how that happened. Tell me -- Did the |
| 4 | policy come to you and then you would sign it |
| 5 | and provide it or either hand-deliver it or |
| 6 | mail it -- |
| 7 | A. Yes, sir. |
| 8 | Q. -- to the insured? |
| 9 | MS. VAN HEEST: Object to the form. |
| 10 | A. Yes, sir. |
| 11 | Q. Was that the habit, custom and practice that |
| 12 | you had throughout the term of your agency for |
| 13 | State Farm? |
| 14 | MS. VAN HEEST: Object to the form. |
| 15 | A. Yes, sir. |
| 16 | Q. In order for that policy to be good, did you |
| 17 | have to sign it? |
| 18 | MS. VAN HEEST: Object to the form. |
| 19 | A. No, sir. |
| 20 | Q. It could go straight to the customer and it |
| 21 | would still be good? |
| 22 | MS. VAN HEEST: Object to the form. |
| 23 | A. Yes, sir. |

| | Page 64 |
|---|---|
| 1 | Q. But you liked to do that to make sure they |
| 2 | knew that your name was on it? |
| 3 | MS. VAN HEEST: Object to the form. |
| 4 | A. I don't know. They just always did it. |
| 5 | Q. And you signed your name on the bottom of |
| 6 | those policies back in those days? |
| 7 | A. Yes, sir. |
| 8 | Q. Now, let me ask this question, sir. With |
| 9 | respect to these declaration pages here, did |
| 10 | you have a habit of going through the policy |
| 11 | itself with the insured? |
| 12 | A. No, sir. |
| 13 | Q. Did you ever read the policies that you were |
| 14 | selling? |
| 15 | A. Yes, sir. |
| 16 | Q. Were they easy to understand? |
| 17 | A. Not necessarily. |
| 18 | Q. Did you have to be a Philadelphia lawyer to |
| 19 | understand them? |
| 20 | MS. VAN HEEST: Object to the form. |
| 21 | A. Close to it. |
| 22 | Q. Now, does State Farm provide you with |
| 23 | pamphlets that explain what the policy says? |

Page 65

1    A.  Yes, sir.
2    Q.  Why did you ha ve a pamphlet that had to
3        explain what the policy says?
4            MS. VAN HEEST:  Obje ct to the form.
5    A.  It was a policy.  It was in pamphlet form.
6    Q.  We re there any other pamphlets that State Farm
7        had that kind of explained what the policy
8        said in layman's terms?
9            MS. VAN HEEST:  Obje ct to the form.
10   A.  Not tha t I know of.
11           MS. VAN HEEST:  While  you're doing
12           tha t, I'm going to state --
13           MR. WINTER:  No.  No.  I'm going to
14           obje ct --
15           MS. VAN HEEST:  The n we need to take
16           a break.
17           MR. WINTER:  I'm not going --
18           MS. VAN HEEST:  The n we need to take
19           a break.
20           MR. WINTER:  We  can take a break,
21           but --
22           MS. VAN HEEST:  Le t's take a break.
23           MR. WINTER:  -- I just wa nt --

Page 66

1            Before you take a break, though,
2        we're going to go on record that
3        we're not going to go out there
4        and tell --
5            MS. VAN HEEST:  What I talk to my
6        client --
7            MR. WINTER:  -- tell the client what
8        he should have said.  Okay?
9            MS. VAN HEEST:  That is -- I cannot
10       believe you're even implying
11       that.  What I say to my client is
12       privileged.  What you say to your
13       client is privileged.
14           MR. WINTER:  I have no problem with
15       that.
16           MS. VAN HEEST:  And we both know
17       those exhibits were produced
18       yesterday, and they are dated
19       2005.
20           MR. WINTER:  Right.
21           MS. VAN HEEST:  And they were
22       produced in response to
23       discovery, not his signature on

Page 67

1        there.
2            MR. WINTER:  I never said his
3        signature was on there.  I said
4        back -- The record will speak for
5        itself as to what it said.  I
6        asked him if he routinely
7        countersigned these, and he said
8        yes.  So the record will speak
9        for itself.  If he wants to come
10       back and change it, that's fine.
11           MS. VAN HEEST:  I'm not asking him
12       to come back and change it, and I
13       can't believe you're implying
14       that or that I would tell my
15       client what to say.
16           MR. WINTER:  I said it straight out,
17       and it's on the record.  I'm not
18       going to imply anything.
19           MS. VAN HEEST:  Well, you already
20       have, and I do take offense to
21       it.
22           MR. WINTER:  I apologize if you're
23       offended by it.  Let me ask him

Page 68

1        more questions about --
2            Do you want to take a break
3        now?
4            MS. VAN HEEST:  Yes, I do.
5            MR. WINTER:  That's no problem
6        whatsoever.
7            Let's take a break,
8        Mr. King.
9            Wait.  Before we go off the
10       record, let me ask one other
11       thing.
12           Is Mr. King your client?
13       Are you representing him?
14           MS. VAN HEEST:  Yes, he is my
15       client.
16           MR. WINTER:  I was not aware of
17       that.  I wasn't aware he was your
18       client.
19           MS. VAN HEEST:  You've sued him.
20       You filed a motion to amend to
21       sue him in a complaint.  You
22       served him.
23           MR. WINTER:  Actually, I haven't

Page 69

1    served him. I don't believe he
2    has been served. Maybe he has,
3    but --
4        MS. VAN HEEST: Well, he said the
5        first notice of the fire loss was
6        when he got suit papers. That
7        was his testimony. That was his
8        testimony.
9        MR. WINTER: I wasn't in it then
10       either.
11   (Brief recess.)
12       MR. WINTER: Please forgive me if I
13       implied that you were trying to
14       change Mr. King's answer in any
15       way.
16       MS. VAN HEEST: Thank you.
17       MR. WINTER: I apologize.
18       MS. VAN HEEST: And I understand we
19       both -- sometimes attorneys get
20       heated.
21       MR. WINTER: I'm wasn't even trying
22       to be heated.
23       MS. VAN HEEST: No. It's the nature

Page 70

1        of the game. Not intentional.
2    Q. I'm going to show you a bunch of exhibits and
3        see if we can kind of wrap this up, Mr. King.
4        The first one I'm going to show you is what's
5        already been marked as Defendant's Exhibit
6        Number 6.
7    A. Okay.
8    Q. We're not even going to talk about the
9        countersignatures right now, but I just want
10       to ask you to take a look at this and take as
11       much time as you need. I believe this is a
12       declarations page from 1996 to 1997.
13   A. Uh-huh (positive response).
14   Q. Have you had enough time to review that
15       document, sir?
16   A. In general, yes.
17   Q. And you were the agent of record during this
18       time for Mr. and Mrs. Jones?
19   A. During the '96 and '97, yes, sir.
20   Q. And during that time period, would you have
21       received a commission on this policy?
22   A. Yes.
23   Q. And that would be a renewal commission or did

Page 71

1        you have to rewrite the policy every year?
2    A. No. Renewal.
3    Q. Let me show you what's been marked as
4        Defendant's Exhibit 8, sir. Take all the time
5        you need to review that.
6    A. Okay.
7    Q. Have you had enough time to review that, sir?
8    A. (Witness nods head positively.)
9    Q. Is that a yes?
10   A. Yes, sir.
11   Q. And this is a declarations for the Joneses'
12       homeowner's policy from 1997 to 1998; is that
13       correct, sir?
14   A. Correct.
15   Q. Would you have been the agent of record on
16       this account at that time?
17   A. Yes, sir.
18   Q. And you would have received a commission based
19       on this policy?
20   A. Yes, sir.
21   Q. And you would have been the servicing agent of
22       record, too, as well, right?
23   A. Yes, sir.

Page 72

1    Q. Let me show you Defendant's Exhibit Number 9,
2        which is the declarations page from October of
3        1998 through 1999. Take all the time you
4        need, Mr. King, to review that.
5            Have you had enough time to review that,
6        sir?
7    A. Yeah. But I'm seeing strange options that I
8        don't recall exactly what they are.
9    Q. Which strange options are you seeing there?
10       because if they are strange to you, they are
11       definitely strange to me.
12   A. The ID and the ordinance law things, I don't
13       remember what they are all about.
14   Q. Say that one more time for me.
15   A. The ordinance law, 10 percent, and the
16       increased dwelling which I guess is that ID
17       coverage that we talked about earlier, I don't
18       remember exactly all -- what that's all about.
19   Q. But at the time did you know what they were
20       about?
21   A. I'm sure I did.
22   Q. Well, were you the agent of record during this
23       period for the Joneses?

Deposition of Mark King

January 18, 2007

Page 73

1    A.  Yes, sir.
2    Q.  And did you receive a commission at this time
3        for the Joneses?
4    A.  Yes, sir.
5    Q.  And you were the State Farm servicing agent
6        during this period for the Joneses on this
7        policy?
8            MS. VAN HEEST: Object to the form.
9    A.  Yes, sir.
10   Q.  Let me show you what's Defendant's Exhibit 12,
11       which I believe is the declarations page from
12       the year 1999 to the year October 2000 --
13   A.  Uh-huh (positive response).
14   Q.  -- for the Joneses homeowner's policy.  Would
15       that be correct, sir?
16   A.  Yes, sir.
17   Q.  Would you take all the time you need to review
18       that, sir?
19   A.  Okay.
20   Q.  Were you the agent of record -- State Farm
21       agent of record during that period of time,
22       sir?
23   A.  Yes, sir.

Page 74

1    Q.  And did you receive a commission from the sale
2        of that policy?
3    A.  Yes, sir.
4    Q.  And were you the servicing agent of record for
5        State Farm during that time?
6    A.  Yes, sir.
7    Q.  If there was an issue during that time period
8        or any of the time periods we discussed, you
9        would be the person ultimately responsible for
10       dealing with that issue for State Farm?
11           MS. VAN HEEST: Object to the form.
12   A.  Yes, sir.
13   Q.  I believe this is one where you still might be
14       involved with it, sir.  But if you will, look
15       at Defendant's Exhibit 16 which is a
16       declarations page for a homeowner's policy
17       from, I believe, 2000 through October of 2001;
18       is that correct?
19   A.  That's correct.
20           MS. VAN HEEST: Well --
21   Q.  Would you take all the time you need to review
22       that?
23           MR. WINTER: I just asked what it

Page 75

1            was first.
2    Q.  Have you had enough time to review that, sir?
3    A.  (Witness nods head positively.)
4    Q.  Is that a yes?
5    A.  Yes, sir.
6    Q.  Now, this policy was issued in October of
7        2000.  Would that be correct, sir?
8            MR. WINTER: Is that 2000?
9            MS. VAN HEEST: 2001.  That's why
10               when you asked him about being
11               agent of record --
12           MR. WINTER: Yes, I'm sorry.
13           MS. VAN HEEST: -- that's why
14               I pointed to make sure he read
15               who --
16           MR. WINTER: I wasn't trying to
17               trick him.
18           MS. VAN HEEST: Right.  Prepared
19               January 17.  It had the agent
20               information on each one, but I
21               thought he retired after that.
22   Q.  Here it is.  I apologize.  My mistake.
23           I'm going to show you what's marked as

Page 76

1        Defendant's Exhibit 14, which is the
2        declarations page from October of 2000 through
3        October 2001, homeowner's policy for the
4        Joneses; is that correct?
5    A.  Yes, sir.
6    Q.  I'm going to ask you this question because I'm
7        not really sure about it.
8            From what I understand, Mr. Nall did not
9        take over as insurance agent for the Joneses
10       until June 1 of 2001.  Would that be --
11   A.  I don't know.
12   Q.  You don't remember?  If this policy was issued
13       in October of 2000, wouldn't you have been the
14       countersigner on it or --
15           MS. VAN HEEST: Object to the form.
16   A.  I don't know.  All I know is I left March of
17       2001.
18   Q.  So when this policy was issued in October of
19       2000, you would have been the renewing agent?
20   A.  Yes, sir.
21   Q.  Would that be fair to say?
22   A.  Yes, sir.
23   Q.  And would it be fair to say that from October

Page 77

1   of 2000 until you left, you would have been
2   the agent of record?
3   A.  Yes, sir.
4   Q.  And you would have received the renewal
5   commission on that?
6   A.  Yes, sir.
7   Q.  And you would have been the servicing agent of
8   record for State Farm?
9   A.  Yes, sir.
10  Q.  And on all of these declaration pages from
11  1996 through this time period, you were the
12  agent of record and servicing agent for State
13  Farm, right?
14  A.  Yes, sir.
15  Q.  I'm just trying to clear one thing up in my
16  mind here that I really don't understand, so
17  let me see if I can get this straight.
18      When you figured out the replacement value
19  of the house, you told that to the prospective
20  insured or the insured, right?
21  A.  Yes, sir.
22  Q.  Did you ever tell them to go out and get their
23  own value as to replacement value of the

Page 78

1   house?
2   A.  I have done it before, yes, sir, when people
3   tell me that they didn't think it was that
4   much.
5   Q.  When they thought it was less than the amount?
6   A.  Right.
7   Q.  Because from what I understand, an insurance
8   agent doesn't want to overinsure a house, do
9   they?
10      MS. VAN HEEST:  Object to the form.
11  A.  No, sir.
12  Q.  That's against policy, isn't it?
13      MS. VAN HEEST:  Object to the form.
14  A.  Yes, sir.
15  Q.  Why is that?
16  A.  You can't insure more than what's there.  But
17  on the other hand, they didn't want them
18  uninsured, either.
19  Q.  Did you ever tell Mr. Jones that he needed to
20  go get an independent estimate?
21  A.  I don't recall ever telling him that, no, sir.
22  Q.  Did you ever have any other insureds that you
23  worked with whose house got burned to the

Page 79

1   ground by fire?
2   A.  Yes, sir.
3   Q.  Did they ever have a problem with this issue
4   concerning not enough money to replace the
5   home?
6   A.  No, sir.
7   Q.  This is the only instance that you can
8   remember?
9   A.  This is the only one that I've had any
10  problems with.
11  Q.  We learned yesterday for the first time during
12  a deposition from Mr. Jackson that the
13  estimates to replace the home that were given
14  to State Farm shortly after the house burned
15  down were 213,000 and 237,000 dollars.  But
16  the home replacement value was only at
17  $116,000 on the policy.  Plus the Option ID
18  was about $140,000.
19      Have you ever heard of a situation
20  happening like that before?
21      MS. VAN HEEST:  Object to the form.
22  A.  No, sir.
23  Q.  And in a situation such as that, what do you

Page 80

1   think should be done?
2       MS. VAN HEEST:  Object to the form.
3   A.  I have no idea.
4   Q.  Fair enough.
5       Do you remember Mr. Jones telling you that
6   he wanted his house insured such that if there
7   was ever a problem with it, that it was burned
8   to the ground, it would be replaced?
9   A.  No, sir.
10  Q.  You don't remember him ever telling you that?
11  A.  No, sir.
12  Q.  You don't remember him telling you he wanted
13  to be fully insured for his house?
14  A.  No, sir.
15  Q.  What do you remember Mr. Jones telling you
16  about how he wanted his home insured?
17  A.  I don't remember any specifics.
18  Q.  So he could have said make sure my house is
19  insured for the full replacement value?  You
20  just don't remember that specifically as we
21  sit here today?
22  A.  I don't remember him ever saying anything like
23  that.

Page 81

1  Q.  But you don't have any memory of specifically
2     what he said, right?
3  A.  I don't specifically remember what our
4     discussions were. Like I said, we talked
5     about coverages a lot. But after we got
6     through talking about them, he knew what kind
7     of coverage he had and what the cost was. And
8     if he had any objections to it, he never
9     raised it.
10 Q.  Mr. Jones was a State Farm customer for a long
11    time for you, wasn't he?
12 A.  Yes, sir.
13 Q.  Paid his bills on time?
14        MS. VAN HEEST: Object to the form.
15 A.  I had to call him a few times on some
16    automobiles.
17 Q.  Did you? Well, that's all right. A few times
18    ain't bad over --
19 A.  You have that kind of thing with everybody.
20 Q.  Over 30 years, that's not a big deal, is it?
21        MS. VAN HEEST: Object to the form.
22 A.  No, sir, it's not a big deal.
23 Q.  And he paid you for it, didn't he, after you

Page 82

1     called him?
2        MS. VAN HEEST: Object to the form.
3  A.  Absolutely.
4  Q.  Were you served with suit papers with the
5     lawsuit?
6  A.  Yes, sir.
7        MR. WINTER: Off the record.
8        (Brief off-the-record discussion.)
9  Q.  If there was a problem with a claim and the
10    person realized it after a claim was made that
11    there may have been a mistake in determining
12    the amount of insurance that the person
13    thought they had, as an agent would you have
14    asked State Farm to investigate that?
15        MS. VAN HEEST: Object to the form.
16 A.  Yes, sir.
17 Q.  Would it be State Farm -- As you understand
18    it, would that be the policy and procedure of
19    State Farm, to investigate that issue?
20 A.  They normally would, yes, sir.
21 Q.  And in your long tenure with State Farm, did
22    you ever have an opportunity to investigate a
23    situation where there was a mistake made in

Page 83

1     getting the appropriate coverage for an
2     insured?
3        MS. VAN HEEST: Object to the form.
4  A.  I can remember one occasion.
5  Q.  Did you talk to State Farm about that?
6  A.  Yes, sir.
7  Q.  Did they make the situation right?
8        MS. VAN HEEST: Object to the form.
9  A.  Yes, sir.
10 Q.  Can you tell me a little bit about that
11    occasion?
12 A.  I didn't write the policy, but the customer
13    thought he had coverage on some jewelry that
14    he had limited coverage on some which way.
15    There was a question about that. And when the
16    jewelry came up stolen or lost, then the
17    coverage that they said they thought they had
18    wasn't there. And we went back and made the
19    loss good.
20 Q.  So State Farm stepped up to the plate and
21    said --
22 A.  Yes, sir.
23 Q.  -- there was obviously a misunderstanding?

Page 84

1        MS. VAN HEEST: Object to the form.
2  A.  Yes, sir. There was a policy written by a
3     previous agent that wasn't of the best
4     reputation --
5  Q.  And --
6  A.  -- is one reason I think they went ahead and
7     did it.
8  Q.  When the mistake or whatever happened --
9     whoever's mistake it was -- State Farm just
10    stepped up to the plate and fixed it?
11        MS. VAN HEEST: Object to the form.
12 A.  Yes, sir.
13 Q.  Was that a long time insured?
14 A.  Yes, sir.
15 Q.  Do you know of any other occasions like that?
16 A.  No, sir.
17 Q.  Was that a fair way to handle it?
18        MS. VAN HEEST: Object to the form.
19 A.  I think so.
20 Q.  Was there any lawsuit filed over that?
21 A.  No, sir.
22 Q.  Did State Farm investigate that issue?
23        MS. VAN HEEST: Object to the form.

Page 85

1  A.  Yes, sir.
2  Q.  Did they provide you with a report of the
3      investigation?
4          MS. VAN HEEST: Obje ct to the form.
5  A.  Oh, no. The y would pick up the phone and call
6      them and talk to them about it, but I don't
7      think they put anything in writing.
8  Q.  Are you aware if they did anything like that
9      in this situa tion?
10         MS. VAN HEEST: Sa me objection.
11 A.  No, sir.
12 Q.  When you retired from State Farm, about how
13     many households did you have?
14 A.  I don't remember.
15 Q.  Can you give me a ballpark? Was it more than
16     a thousand? Less than a thousand? Mr. Nall
17     testified he thought he got about 1200
18     households when you retired and took over your
19     book of business.
20 A.  I just really don't know.
21 Q.  Did you ge t any residual commissions after you
22     retired from the book of business that you
23     gave to Mr. Nall?

Page 86

1          MS. VAN HEEST: Object to the form.
2  A.  I don't think -- No. You would have to ask
3      State Farm how they paid me.
4  Q.  You didn't receive any payments from State
5      Farm afterwards, did you?
6  A.  It was a set amount that they paid me.
7  Q.  A one-time payment?
8  A.  Well, it was an annual -- what they paid me
9      the previous year divided over five years.
10 Q.  Kind of like a severance package?
11         MS. VAN HEEST: Object to the form.
12 A.  I don't know what they call that stuff.
13 Q.  That's fine.
14 A.  It takes a Philadelphia lawyer to figure out
15     what they do.
16 Q.  And when you retired, did Mr. Nall get all
17     your computer systems and all your books?
18 A.  Got everything I had.
19 Q.  And you just gave that all to him?
20 A.  Yes, sir.
21 Q.  Basically it was the same operation; they just
22     changed out the man at the top?
23         MS. VAN HEEST: Object to the form.

Page 87

1  A.  That's correct.
2  Q.  Did you sign any papers selling him the
3      business?
4  A.  No, sir. I can't sell it. It belongs to
5      State Farm.
6          MR. WINTER: I don't think I have
7          any more questions.
8          MS. VAN HEEST: Mr. King, thank you
9          for your time and giving up most
10         of your day. We both appreciate
11         it.
12         (Deposition concluded at
13         approximately 4:00 p.m.)
14

15     * * * * * * * * * * * * *

       FURTHER DEPONENT SAITH NOT
16
       * * * * * * * * * * * * *
17
18     REPORTER'S CERTIFICATE
19 STATE OF ALABAMA:
20 MONTGOMERY COUNTY:
21     I, Pamela A. Wilbanks, Registered
22 Professional Reporter and Commissioner for the State
23 of Alabama at Large, do hereby certify that I

Page 88

1  reported the deposition of:
2          MARK KING
3  who was first duly sworn by me to speak the truth,
4  the whole truth and nothing but the truth, in the
5  matter of:
6          JACOB N. JONES and
7          PEGGY C. JONES,
8          Plaintiffs,
9          Vs.
10         STATE FARM INSURANCE
11         COMPANY, et al.,
12         Defendants.
13         In The U.S. District Court
14         For the Middle District of Alabama
15         Northern Division
16         2:05-cv-01119-wkw
17 on Thursday, January 18, 2007.
18     The foregoing 87 computer printed pages
19 contain a true and correct transcript of the
20 examination of said witness by counsel for the
21 parties set out herein. The reading and signing of
22 same is hereby waived.
23     I further certify that I am neither of kin

Deposition of Mark King

January 18, 2007

Page 89

1  nor of counsel to the parties to said cause nor in
2  any manner interested in the results thereof.
3          This 2nd day of February 2007.
4
5
6
7
8
9
10
11          _____
              Pamela A. Wilbanks, Registered
12           Professional Reporter and
              Commissioner for the State
13           of Alabama at Large.
14
15
16
17
18
19
20
21
22
23