IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JACOB N. JONES and PEGGY C. JONES, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. 2:05-cv-1119-WKW ) |
| STATE FARM INSURANCE COMPANY, et al., | ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COME Defendants Ron Nall and State Farm Fire and Casualty Company (hereinafter "State Farm"), and submit this Reply Brief to the Response filed by the Plaintiffs to the Defendants' Motion for Summary Judgment. Now that the Plaintiffs have conceded that the motion is due to be granted as to Plaintiffs' claims for breach of contract, bad faith, fraud, wanton failure to issue a policy of insurance, and wanton failure to procure a policy of insurance, the only remaining claims are negligent failure to procure insurance and negligent failure to issue a policy of insurance (which Plaintiffs collectively refer to as "negligence claims.").[1]

First, addressing Ron Nall, it is obvious from the Plaintiffs' response that there is no substantial evidence of any valid claim against Ron Nall. Plaintiffs offer only two arguments against Nall. One is that he failed to catch and correct a mistake which the Plaintiffs allege Mark King made

---

[1] Nall and State Farm do not believe there is legal authority to support both claims, only negligent failure to procure insurance. Moreover, there is no dispute a policy was *issued.*

in the 1990's. (Plaintiffs' Response, p. 19, n. 7). The second is that Nall "could be" liable on a successor liability theory for the alleged negligent acts of Mark King. (Id.).

It is clear from the submissions of the parties that Nall undertook no duty to do anything when he became the Joneses' agent in 2001 and never calculated the estimated replacement cost for the Joneses' dwelling. As set forth in the Defendants' original brief, the Joneses obtained a new homeowners policy from State Farm in 1998 (as opposed to the original policy which had been issued in 1981 and renewed annually all the way through 1997). That policy contained a provision which stated that the policy would automatically renew unless one of the parties cancelled it or unless State Farm non-renewed it. Therefore, the 1998 policy continued to renew each year until the loss in 2004. No new application was filled out with Ron Nall and nothing was done with Ron Nall to address coverage. In fact, as set forth in Plaintiffs' response, Nall requested a meeting with Jones to review his insurance coverage and it never took place. Nall had no duty to change the amount of the dwelling coverage; nor could he without the agreement of the Joneses. Thus, Nall is not guilty of any negligent act from 2001 to 2004 and there is no substantial evidence that he is.

Plaintiffs' claim for successor liability against Nall is most obviously answered by the fact that this theory of "successor liability" is not pled in Plaintiffs' Complaint. Nowhere in the Complaint do the Plaintiffs allege that Ron Nall is liable for alleged negligent acts of Mark King.

Because there is no substantial evidence of any negligent act conducted by Nall and Nall is not liable under a "successor liability" theory, Nall is entitled to summary judgment on all the remaining "negligence claims."

State Farm is also entitled to judgment on the negligence claims. The central issue raised by Defendants' motion and Plaintiffs' response is: who has the duty to select the coverage amount?

The question is not who has the duty to make sure that the coverage amount at all times equals the actual replacement cost of the dwelling because that is impossible to determine and no one can fulfill that duty. Knowing what the actual replacement cost is at any particular point in time cannot be known with certainty, due to fluctuating costs, economic conditions, etc. and cannot be known until there is actually a loss.

Plaintiffs suggest in their response that Mark King undertook or agreed to a duty to obtain "replacement coverage" for the dwelling. This ignores King's clear testimony. After asking King how he calculated estimated replacement cost, the following exchange occurred between counsel for Plaintiffs and King:

> Q.  And then you figured out what the replacement value of the home was and you provided that to the customer. Would that be fair to say?
>
> A.  That's fair.
>
> Q.  Did the customers rely upon the value that you gave them?
>
> Ms. VAN HEEST: Object to the form.
>
> A.  I don't know whether they relied on it or not, but that's what we had.
>
> Q.  But when you provided them with the estimate, there was no reason for them to doubt you, was there?
>
> Ms. VAN HEEST: Object to the form.
>
> A.  I've been doubted before.
>
> Q.  I understand that. I guess what I'm saying is this. You're a man of a lot of experience in life. And when you go to your doctor, you listen to your doctor about what you need to do for your machine, right?

    A.    That's correct.

    Q.    And when you go to your lawyer, you listen to your lawyer what you need to do about your legal affairs, right?

    A.    Right.

    Q.    And when you -- You were an insurance agent, but if you went to an insurance agent, you would expect them to know what you needed for your insurance affairs, wouldn't you?

    Ms. VAN HEEST: Object to the form.

    A.    I would expect them to give me some recommendations, yes, sir.

    Q.    And that's the kind of agent that you wanted to be, somebody who could provide reasonable recommendations to your customers? That's why you're in business, wasn't it?

    A.    Yes, sir.

    Q.    And that's what you tried to do, wasn't it?

    A.    Yes, sir.

    Q.    And you did it with the tools that were provided to you, right?

    A.    That's correct.

(Depo. of Mark King, pp. 38-40, attached as Exhibit "C" to Defendants' Motion for Summary Judgment). That testimony does not establish that Mark King undertook a duty to do anything other than provide information and recommendations to the Joneses. King could not do anything without the agreement of Jones.

    Plaintiffs' response states that King "admits that it was the agent's job to" determine the replacement value of the Joneses' home. (Plaintiffs' Response, p. 15). Plaintiffs do not cite any deposition testimony to support this statement. Leaving that aside, Plaintiffs miss the point.

4

Estimated replacement cost is nothing more than that, an estimate. It is one piece of information. It may be the beginning point of what State Farm and the insured would use to determine the limits for the dwelling coverage. However, the Plaintiffs want to turn estimated replacement cost into the "end all, be all" and a guarantee that the limits of the dwelling coverage exactly match, at all times, the exact cost to replace the dwelling in the event of a total loss.

In 1998, the Plaintiffs were provided with the notice which specifically states:

> Your policy now has a stated limit of liability under Coverage A that reflects the maximum that will be paid in case of loss. If Option ID - Increased Dwelling Limit is shown in the Declarations of your new policy, it may provide an additional limit for damaged building structures. However, the most State Farm will pay for loss to property under Coverage A is the stated limit of liability, plus any additional limit provided by Option ID, if shown in the Declarations. The policy no longer provides a guarantee to replace your home regardless of the cost.

(Exhibit "E" attached to Defendants' Motion for Summary Judgment). The policy issued to the Joneses in 1998 did, in fact, include Option ID - Increased Dwelling. Increased Dwelling coverage provided an additional twenty percent (20%) of the dwelling coverage amount set forth on the Declarations Page of the policy *in the event that the replacement cost of the dwelling exceeded the stated dwelling coverage amount set forth on the Declarations Page*. This option by itself put the Plaintiffs on notice that the "stated dwelling coverage amount" may not provide the actual replacement cost to the dwelling. If the dwelling coverage amount at all times equaled the actual replacement cost, there would be no reason to have Option ID - Increased Dwelling. Plaintiffs do not dispute receiving a new policy in 1998 with the notice set forth above and with Option ID - Increased Dwelling and what that coverage provided.

Plaintiffs also did not dispute that beginning in 1999, all renewal certificates had a statement which stated:

> The State Farm replacement cost is an estimated replacement cost based on general information about your home. It is developed from models that use cost of construction materials and labor rates for like homes in that area. The actual cost to replace your home may be significantly different. State Farm does not guarantee that this figure will represent the actual cost to replace your home. You are responsible for selecting the appropriate amount of coverage and you may obtain an appraisal or contractor estimate which State Farm will consider and accept, if reasonable. Higher coverage amounts may be selected and will result in higher premiums.

(Exhibit "F" attached to Defendants' Motion for Summary Judgment). In the face of this clear notice provided to the Plaintiffs and Option ID - Increased Dwelling, there is no way that the Plaintiffs can legitimately argue that King and/or State Farm had a duty to calculate the exact actual replacement cost and to issue a policy with dwelling coverage limits which exactly matched the replacement cost of the dwelling at all times. In fact, the opposite is true. The notice clearly states "you are responsible for selecting the appropriate amount of coverage ... ." Regardless of whether Plaintiffs want to accept it, the duty to select the appropriate amount of coverage rests with the Plaintiffs, not King or State Farm.

The only duty King had and admitted to in his deposition was providing information and recommendations to Jones. Plaintiffs stated in their response that neither King nor State Farm provided *in writing* the measurement of square footage or the construction cost per square foot or the estimated replacement cost. (Plaintiffs' Response, p. 16). There is no duty that the information be provided in writing. The testimony is undisputed that King did, in fact, share this information with Jacob Jones verbally. (Exhibit "C" to Defendants' Motion for Summary Judgment, pp. 22-24,

6

29; 38-39; 57, 59-60). Jacob Jones admitted in his deposition that, whenever King came to the house and measured it (whether that was in 1990 or 1997), King provided to Jones what he had calculated and Jones agreed with it. (Depo. of Jacob Jones, p. 34, L. 13 to p. 35, L. 2, attached as Exhibit "A" to Defendants' Motion for Summary Judgment). Jones said that he agreed with King after King told Jones what King estimated the replacement cost to be. (Id. at p. 34, L. 22-23; p. 105, L. 17-22).

      The fatal error in Plaintiffs' argument that King and State Farm had a duty to guarantee that the limits of the dwelling coverage at all times equaled the replacement cost of the dwelling, *i.e.,* guaranteeing that the limits of the dwelling coverage amount were sufficient to replace the dwelling, is that there is no way that King or State Farm could make that guarantee. Neither King nor State Farm ever pretended to guarantee to the Plaintiffs that the estimated replacement cost equaled the actual replacement cost of the dwelling at all times. In fact, in 1998 and years following, State Farm specifically advised the Plaintiffs that was not the case, that estimated replacement cost was only an estimate, that the actual cost to replace "may be significantly different," and that the Joneses had the responsibility to select the appropriate coverage amount.

      The Plaintiffs contend in their response that Mark King measured the home in both 1994 and 1997 and measured it to be 2128 square feet. (Plaintiffs' Response, p. 12). The most the evidence shows is that a "reinspection by agent" was conducted in March 1997 coupled with an undated notation on a computer screen that the square footage of the dwelling is 2128 square feet. If an inference can be drawn from those two facts that 2128 square feet was measured in 1997, that measurement was before 1998 when a new policy was issued with the notice that there would no longer be any guaranteed replacement cost coverage, that limits would apply to dwelling coverage, and introducing for the first time Option ID - Increased Dwelling. In the years following, the

Plaintiffs were sent a notice specifically advising them that the actual cost to replace the home may be significantly different than the estimated replacement cost and that State Farm does not guarantee that the estimated replacement cost will represent the actual cost to replace the home. The notice further advised the Plaintiffs that they could obtain an appraisal or a contractor estimate which State Farm would consider and accept if reasonable.

Plaintiffs engage in an "apples and oranges" comparison on pages 12 to 15 of their Response. Plaintiffs' first extrapolate $54.91 per square foot as the "improper factor/multiplier" used to determine the replacement cost per square foot of the home. (Plaintiffs' Response, p. 14). Then, Plaintiffs make a leap to state that State Farm provided this figure to King and Nall to use to calculate estimated replacement cost. (Id.). There is absolutely no evidence that $54.91 per square foot is what Mark King used when he estimated replacement cost. Likewise, there is absolutely no evidence that State Farm provided this figure to King. Moreover, if this figure was provided to King in 1997, there is absolutely no evidence that the figure was incorrect in 1997. Since no loss occurred in 1997 and since there was no reason to obtain estimates to replace the Joneses' home, there is no way to know whether $54.91 per square foot in 1997 was correct or incorrect.

Plaintiffs then take the extrapolated figure of $54.91 per square foot and compare that to the "real" cost per square foot in 2004 when the loss occurred. Again, extrapolating this figure by dividing what the Plaintiffs say the square footage was in 2004 (2840) by the estimates obtained to replace the dwelling after the fire loss, Plaintiffs arrived at a figure of $111.76/$100.30 as the "real" cost per square foot. Plaintiffs are apparently contending that Mark King should have used this "real" cost per square foot in 1997 when (if) he measured the dwelling and estimated replacement cost. This is an obvious "apples to oranges" comparison. This argument assumes that the cost per

8

square foot is always the same and was the same in 1997 as it was in 2004. Obviously, that is not the case. The fact that the cost per square foot was more in 2004 than it was in 1997 is hardly surprising. This simply points out that there is no way to guarantee the actual replacement cost at any point in time and that is why it is up to the policyholder to select the appropriate amount of coverage.

Plaintiffs ask the question in brief how can the Plaintiffs be expected to select an amount which would guarantee that they have enough to replace the home in the event of a total loss? The answer is that they cannot, and neither can King nor State Farm. However, that does not change the fact that it is ultimately up to the policyholder to select the appropriate amount of coverage. State Farm has not taken on the risk of providing the difference between the limits of the coverage and the actual replacement cost. Instead, State Farm makes it clear to the policyholder that the policyholder still has that risk. State Farm charged and collected a premium based upon a limit to the dwelling coverage. The risk of any loss greater than that stays with the policyholder, and State Farm tells the policyholder.

There may be a negligent failure to procure insurance claim if Jones had asked for X dollars and State Farm had provided Y dollars of coverage or none at all -- *i.e.,* Jones provided King an application and a premium payment but King never procured an insurance policy at all from State Farm and then a loss occurred. But even if State Farm provided Y dollars of coverage instead of X dollars of coverage, Jones would be charged with knowledge of the difference and would be negligent for accepting it if Y dollars was not adequate. It is no different here. The undisputed evidence is that the Joneses did not get estimated replacement cost in 1981 when the policy was issued. In 1981, the policy was issued for approximately eighty-six percent (86%) of the estimated

replacement cost of the dwelling ($63,450 estimated replacement cost; $55,000 limits). (Exhibit "D" ¶ 7, attached to Defendants' Motion for Summary Judgment). The policy is not going to magically "morph" into a full replacement cost policy as it renews from year to year. Whenever King reinspected/measured the home in 1994 or 1997, King told Jacob Jones what he had calculated the estimated replacement cost to be. Jacob Jones agreed with these figures. Again, the policy automatically renewed until 1998, when a new policy was issued. At that time, Jones got the notice that the dwelling coverage was going to be subject to limits (if he did not know it before then) and got new Option ID - Increased Dwelling coverage. The following years, Jones received the notice making it very clear that it was Jones's responsibility, not State Farm's, to select the appropriate amount of insurance coverage, that State Farm's replacement cost was an estimated replacement cost and was not a guarantee of actual replacement cost. Apparently, the Plaintiffs failed to read the notice as well as the policy; or they agreed with King that the estimated replacement cost he provided to them when he measured in 1994 or 1997 adequately reflected the estimated replacement cost at the time he inspected. The fact that the limit of the dwelling coverage in 2004 did not match the actual replacement cost does not mean that King was negligent in 1994 or 1997 when he estimated the replacement cost then. There was no representation by King in 1994 or 1997 that his calculation of estimated replacement cost matched exactly the actual cost to replace the dwelling; nor was there any representation that, at all times in the future, the dwelling limit would match the actual cost to replace. Plaintiffs have conceded there was no fraud.

     The premise of the Plaintiffs' "negligence claims" is that, had King measured the home correctly in 1994 and 1997 at 2840 square feet, and had State Farm given King the "real" cost per square foot to replace, the Joneses would have had a dwelling coverage limit in 2004 which was

equal to or more than the actual cost to replace the home when the loss occurred in 2004. That argument, however, shifts the responsibility to select the appropriate coverage amount from the Plaintiffs to State Farm, which is a duty which State Farm has not accepted, as reflected by the clear notice provided to the Plaintiffs since 1998. If State Farm had any duty, it was to share with the Plaintiffs its estimated replacement cost which the undisputed facts show King did in 1994 or 1997. If it be a fact that the estimated replacement cost King shared with the Joneses was incorrect in 1994 or 1997 because incorrect square footage was used, that mistake is not actionable in light of the clear notice to the Plaintiffs beginning in 1999 that State Farm's estimated replacement cost was not a guarantee of actual replacement cost and that the Plaintiffs could obtain an appraisal or a contractor estimate for State Farm to consider. Stated another way, had King used 2840 square feet (if he did not) to estimate the replacement cost, the Joneses would still have to decide the appropriate amount. Even with 2840 square feet, the estimated replacement cost could be more or less than the actual replacement cost when a loss occurred. There is no cause of action in either case because the final decision rests with the policyholders, who are charged with knowledge of the value of their homes. Accordingly, neither King nor State Farm had no duty to select the coverage amount, nor could they unilaterally. Responsibility for selecting the appropriate coverage amount is on the Plaintiffs and they assume the risk of that amount not being sufficient to provide the actual replacement cost in the event of a total loss. Absent any duty, there can be no negligence. Therefore, State Farm is entitled to judgment on the remaining "negligence claims" asserted by the Plaintiffs.

## **CONCLUSION**

Because State Farm did not have a duty to select the coverage amount and did not undertake a duty it did not have, it is entitled to summary judgment. Ron Nall is entitled to summary judgment because there is no substantial evidence to support the remaining claims made against him in the Complaint.

**RESPECTFULLY SUBMITTED** this the 14th day of March, 2007.

    s/ Micheal S. Jackson
**MICHEAL S. JACKSON [JACKM8173]**
**MICHAEL B. BEERS [BEERM4992]**
Attorneys for Defendants Ronald Nall and
State Farm Fire and Casualty Company

BEERS, ANDERSON, JACKSON,
 PATTY, VAN HEEST & FAWAL, P.C.
P. O. Box 1988
Montgomery, Alabama  36102-1988
(334) 834-5311
(334) 834-5362 (fax)
mjackson@beersanderson.com
mbeers@beersanderson.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 14, 2007, I electronically filed **DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Marcus Jones, Esq.
LAW OFFICE OF MARCUS JONES
2416 Walking Fern Lane
Hoover, Alabama 35244

Brian P. Winter, Esq.
ADCOX WINTER, LLP
611 Helen Keller Blvd.
Tuscaloosa, AL 35404

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:

                                                         s/ Micheal S. Jackson
                                                         **OF COUNSEL**