ORIGINAL

1

THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JACOB N. JONES and
PEGGY C. JONES,

     Plaintiffs,

Vs.                                    CIVIL ACTION NO.
                                       2:05-cv-01119-wkw
STATE FARM INSURANCE
COMPANY, et al.,

     Defendants.

* * * * * * * * * * * *

**DEPOSITION OF RON NALL**, taken pursuant to
stipulation and agreement before Pamela A. Wilbanks,
Registered Professional Reporter and Commissioner for
the State of Alabama at Large, in the Law Offices of
Albrittons, Clifton, Alverson, Moody & Bowden, 109
Opp Avenue, Andalusia, Alabama on Thursday, January
18, 2007, commencing at approximately 10:15 a.m.

* * * * * * * * * * * *

1

2                              **APPEARANCES**

3

4    **FOR THE PLAINTIFFS:**

5    Mr. Bryan B. Winter
     ADCOX-WINTER
6    Attorneys at Law
     611 Helen Keller Boulevard
7    Tuscaloosa, AL  35404

8    **FOR THE DEFENDANTS:**

9    Mrs. Judy Van Heest
     BEERS, ANDERSON, JACKSON,
10     PATTY & VAN HEEST & FAWAL
     Attorneys at Law
11   250 Commerce Street
     Montgomery, Alabama  36104

12   **ALSO PRESENT:**

13
     Mr. Jacob Jones
14

15

16              * * * * * * * * * * * *

17                  **EXAMINATION INDEX**

18       BY MR. WINTER  . . . . . . . . .    4

19              * * * * * * * * * * * *

20

21

22

23

1                                **STIPULATION**

2          It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of **RON NALL** is taken pursuant to the

5    Federal Rules of Civil Procedure and that said

6    deposition may be taken before Pamela A. Wilbanks,

7    Registered Professional Reporter and Commissioner for

8    the State of Alabama at Large, without the formality

9    of a commission, that objections to questions other

10   than objections as to the form of the question need

11   not be made at this time but may be reserved for a

12   ruling at such time as the said deposition may be

13   offered in evidence or used for any other purpose by

14   either party provided for by the Statute.

15         It is further stipulated and agreed by and

16   between counsel representing the parties in this case

17   that the filing of said deposition is hereby waived

18   and may be introduced at the trial of this case or

19   used in any other manner by either party hereto

20   provided for by the Statute regardless of the waiving

21   of the filing of the same.

22         It is further stipulated and agreed by and

23   between the parties hereto and the witness that the

1  signature of the witness to this deposition is hereby

2  waived.

3

4              * * * * * * * * * * * *

5                      **RON NALL**

6       The witness, after having first been duly

7  sworn to speak the truth, the whole truth and nothing

8  but the truth testified as follows:

9                     **EXAMINATION**

10 **BY MR. WINTER:**

11    Q.    Could you please state your full name for the

12          record, sir?

13    A.    My full name is Ronald Duane Nall, II.

14    Q.    Mr. Nall, my name is Bryan Winter, and I

15          represent Mr. Jones and his wife Mrs. Jones in

16          this case.  We're going to take your

17          deposition today.

18          Have you ever had your deposition taken

19          before?

20    A.    I have.

21    Q.    Could you tell me about that?

22    A.    I was in claims with State Farm, and I was

23          deposed regarding a claim file back in South

```
1        Carolina.
2   Q.   What was the claim?  What type of claim was
3        that?
4   A.   It was an automobile loss.
5   Q.   Having done this before, you understand that
6        you are under oath and you're supposed to
7        answer the questions honestly today as if you
8        were in front of the judge and the jury?
9   A.   I do understand that.
10  Q.   And one of the things that's important that
11       Mr. Jackson mentioned yesterday was because
12       we're taking this down stenographically, you
13       actually have to give the answer and not nod
14       your head or say uh-huh or huh-uh.  So would
15       you do your best to answer the question
16       verbally?
17  A.   I will do my best to answer in complete
18       sentences.
19  Q.   Thank you, sir.
20            If you don't understand my question,
21       because I'm not the most articulate person at
22       times, would you please tell me that you don't
23       understand the question?
```

```
 1   A.   If I do not understand the question, I will
 2        make sure that you're aware of that.
 3   Q.   You're doing a great job thus far.  Thank you.
 4             I have to ask you some background
 5        questions.  Right now this case is currently
 6        pending in Montgomery in federal court;
 7        however, based upon Mr. Jackson's questions
 8        yesterday, I would think that he thinks there
 9        might be a chance it will come back here in
10        and be in Covington County Court.
11             Are you married, sir?
12   A.   I am married, yes.
13   Q.   And your wife's name?
14   A.   Jennifer Leigh Nall.
15   Q.   Is she from Covington County?
16   A.   No, she's not.
17   Q.   Do you have any children, sir?
18   A.   I do.  I have two children.
19   Q.   And their names?
20   A.   Their names are Aubrey Rayanne Nall and
21        Ashland Chaney Nall.
22   Q.   And are they in school?
23   A.   Yes, they are.
```

```
1    Q.   Where do they go to school?

2    A.   They go to Rocky Bayou Christian School.

3    Q.   Is that here in Covington County?

4    A.   No, sir, it's not.

5    Q.   Where is that located?

6    A.   It's in Niceville, Florida.

7    Q.   What is your address here?

8    A.   It is 730 Albritton Road, Andalusia 36420.

9    Q.   And you live there with your wife?

10   A.   I do live there with my wife.

11   Q.   Where did you grow up, sir?

12   A.   For the most part, I grew up in the panhandle

13        of Florida.

14   Q.   When did you move to Andalusia?

15   A.   Moved to Andalusia in November of 2000.

16   Q.   Have you lived in Andalusia since then?

17   A.   Yes, sir, I have lived in Andalusia since

18        then.

19   Q.   At this current address that you gave?

20   A.   No, sir.  We've recently moved to this

21        address.

22   Q.   Where did you live before that?

23   A.   The address that we lived at was 705
```

1          Meadowbrook Drive, Andalusia 36420.

2     Q.   So when you moved to Andalusia, did you move

3          to Meadowbrook Drive?

4     A.   Yes, sir, we moved to Meadowbrook Drive.

5     Q.   And then afterward you moved to your new

6          address where you've just recently moved?

7     A.   Yes.

8     Q.   And I may have asked this before.  What is

9          your wife's name?

10    A.   My wife's name is Jennifer Leigh Nall.

11    Q.   Does Jennifer work?

12    A.   Yes, my wife is employed.

13    Q.   Where does she work at?

14    A.   She is employed at Rocky Bayou Christian

15         School.

16    Q.   And that's in Niceville, Florida?

17    A.   Yes, sir.  The school is located in Niceville,

18         Florida.

19    Q.   How far away is Niceville, Florida?

20    A.   Her commute one way is about an hour and

21         twenty minutes.

22    Q.   And does she commute on a daily basis?

23    A.   Yes, sir, my wife commutes on a daily basis.

1   Q.   Do you attend church regularly here in

2        Andalusia?

3   A.   Yes, sir, I attend church regularly here in

4        Andalusia.

5   Q.   Where do you go to church?

6   A.   I am a member of First Presbyterian Church

7        here in Andalusia.

8   Q.   How about your wife?  Does she attend the same

9        church regularly?

10   A.   My wife attends first -- St. Mary's Episcopal

11        Church.

12   Q.   Is that here in Andalusia?

13   A.   Yes, sir, it is.

14   Q.   Do you belong to any civic groups at all?

15   A.   Yes, sir.  I'm -- I have been a member of

16        Kiwanis.  I am presently on a steering

17        committee to form Habitat for Humanity here in

18        Covington County.

19   Q.   Any others?

20   A.   I am a Masonic Lodge member here in Andalusia

21        also.

22   Q.   Besides Kiwanis, the steering committee for

23        Habitat for Humanity and the Masons, any other

1     civic organizations or organizations that you

2     belong to?

3  A.   No, sir.  No other affiliations.

4  Q.   How about your wife?  Does she belong to any

5     civic organizations?

6  A.   My wife is presently on the steering committee

7     for Habitat for Humanity trying to get that up

8     and running.  I believe that is the only other

9     affiliation that I'm aware of.

10  Q.   Do either one of you belong to groups at

11     church?

12  A.   Yes, sir.  I am presently a member of my choir

13     at church.  We're both involved with the youth

14     ministries with our children at both churches.

15  Q.   Do you have any other -- On your side of the

16     family, do you have any family in the

17     Covington County area?

18  A.   How far would you like to go down the family

19     tree?

20  Q.   Six degrees of separation.  No.

21       Any cousins?  Aunts?  Uncles?

22  A.   I have no immediate family here in Covington

23     County.

```
 1    Q.    What do you mean by immediate?  Brothers,

 2          sisters?

 3    A.    I have no brothers, sisters, parents,

 4          grandparents.  Beyond that my --

 5    Q.    Do you have some cousins here in Covington

 6          County?

 7    A.    Possibly.  Both of my grandparents grew up or

 8          were raised and born in Covington County.

 9    Q.    What were your grandparents' names?

10    A.    My grandmother's name is Christine and her

11          maiden name is Bass.  She is a Nall, of

12          course.  And my grandfather was Eugene Nall,

13          and they both have roots here in Covington

14          County.

15    Q.    And did you mention your other grandparents

16          were from this area, too, or just these

17          grandparents?

18    A.    My other set of grandparents are not from this

19          area.

20    Q.    When you came to Covington County in 2001,

21          were you working for State Farm at that time?

22    A.    Yes, sir, I was employed by State Farm

23          Insurance.
```

```
 1    Q.    Let me talk about your wife's extended
 2          family.  Does she have any extended family in
 3          the Covington County area?
 4    A.    No, sir, my wife does not have any family in
 5          Covington County.
 6    Q.    How about the surrounding communities?
 7          Crenshaw?  Pike?  Troy?  Greenville?  Any of
 8          those areas?
 9    A.    My wife's parents both were raised in
10          Monroeville, which is not too far.
11    Q.    What are their names?
12    A.    My wife's maiden name is Watson.  I do not
13          know my mother-in-law's maiden name, though.
14    Q.    Do you have any extended relatives in the
15          surrounding area that you know about?
16    A.    No, sir, I do not have any family locally.
17    Q.    Let's talk a little bit about your work
18          history.  Where did you go to high school?
19          We'll start there and kind of go forward.
20    A.    I attended Pace High School.
21    Q.    Where is that located?
22    A.    It's located in Pace, Florida.
23    Q.    After Pace High School, what did you do, sir?
```

1   A.   I briefly attended LSU.  Then I spent some

2        time in the United States Army.

3   Q.   How long were you in the Army?

4   A.   I was active in the United States Army for

5        three years and then spent the proceeding five

6        years in the Alabama National Guard.

7   Q.   With the National Guard where were you based

8        out of?

9   A.   I was based out of Mobile, Alabama.

10  Q.   And what did you do for the National Guard?

11  A.   I was a medic in the United States Army.

12  Q.   And were you a medic when you were active?

13  A.   Yes, sir, I was a medic on active duty.

14  Q.   Did you serve overseas at all?  Hold on one

15       second.

16                (Brief recess.)

17  Q.   (Continuing by Mr. Winter) When we left off,

18       we were talking about your service in the

19       United States Army as a medic.  Where were you

20       stationed when you were in the Army active?

21  A.   I was -- My permanent duty station was Fort

22       Ord, California.

23  Q.   Did you go anywhere from there?

1    A.    Traveled a great deal.

2    Q.    Were you stationed in Alabama at all?

3    A.    No, sir.  Not on active duty.  I did not do

4          any time in Alabama.

5    Q.    Stationed overseas that you can tell us about

6          without shooting us?

7    A.    I had a six-month oversea assignment in the

8          Middle East.

9    Q.    What years were you in the U.S. Army?

10   A.    I was --

11                    MS. VAN HEEST:  Active or National

12                    Guard or both?

13                    MR. WINTER:  Active.

14   A.    I was on active duty from February 2, 1987 to

15         February 2, 1990.

16   Q.    And when you were in the reserves, were you

17         ever activated?

18   A.    I was activated for a very brief time

19         incorrectly.

20   Q.    After you left the Army -- active Army, what

21         did you do for full-time work?

22   A.    While I was on status for Alabama National

23         Guard, I was a full-time student.

| | | |
|---|---|---|
| 1 | Q. | Where did you go to school? |
| 2 | A. | I attended Pensacola Jr. College for two |
| 3 | | years. |
| 4 | Q. | Okay. |
| 5 | A. | Then I attended Florida State University. |
| 6 | Q. | What degree did you graduate with? |
| 7 | A. | I have a degree from Florida State University |
| 8 | | in risk management and insurance. |
| 9 | Q. | After you graduated from Florida State, what |
| 10 | | did you do next? |
| 11 | A. | I immediately started employment with State |
| 12 | | Farm Insurance. |
| 13 | Q. | And what was your first job at State Farm? |
| 14 | A. | I was a claim representative. |
| 15 | Q. | What was your next job with State Farm after |
| 16 | | claim representative? |
| 17 | A. | There are promotions inside of claim |
| 18 | | representatives so officially sometimes your |
| 19 | | title changes, but it's the same position: |
| 20 | | senior claim representative, claim specialist. |
| 21 | Q. | The same thing with lawyers. |
| 22 | A. | The next thing I did that was different from |
| 23 | | handling claims was agency. |

1    Q.    When did you become a State Farm trainee

2          agent?

3    A.    My status was changed to State Farm trainee

4          agent on June 1, 2001.

5    Q.    And in that position how were you salaried?

6          Let me see if I can answer it for you.

7              It's my understanding that you're paid

8          directly by State Farm when you're a trainee

9          agent.

10   A.    It's a complicated question, and the reason I

11         say it's complicated is because there are

12         commission dollars that come to you, there are

13         salary dollars that come to you, and there are

14         reimbursement dollars that come to you.  It's

15         very complicated.

16   Q.    Is it fair to say, though, you received a base

17         salary from State Farm in the form of a

18         check -- a periodic check?

19   A.    I received a base salary from State Farm plus

20         commissions and reimbursement dollars for

21         expenses.

22   Q.    So then the commission was on a certain

23         percentage of the policies that you sold?

```
 1   A.   The commission dollars that I received as a

 2        trainee agent are commissionable percentages

 3        off new business written.  That's correct.

 4   Q.   I guess what I'm saying is, though, you get --

 5        the commission dollars is for things that are

 6        actually sold, not for just going out and

 7        making presentations?

 8   A.   Yes.  The only time you receive a commission

 9        is when a policy is sold.

10   Q.   And as a trainee agent, were you responsible

11        for selling life insurance policies?

12   A.   As a trainee agent, I sold a great deal of

13        life insurance policies, sure.

14   Q.   You also sold casualty policies?

15   A.   Yes, sir.  As a trainee agent, we sold

16        property and casualty policies.

17   Q.   And, of course, automobile policies?

18   A.   As a trainee agent, I did sell automobile

19        policies.

20   Q.   That's the whole -- I have State Farm

21        Insurance, too, so that's when you become a

22        Good Neighbor -- that's when they train you to

23        be a Good Neighbor?  You learn the whole State
```

```
 1          Farm method and operation?

 2                    MS. VAN HEEST:  Object to the form.

 3     Q.   You can answer the question.

 4     A.   I don't quite understand the question.

 5     Q.   State Farm's motto is Like a Good Neighbor,

 6          State Farm is there.  You've heard that motto

 7          before?

 8     A.   That is State Farm's main marketing, yes,

 9          motto.

10     Q.   And you live here in Andalusia, and like a

11          good neighbor, you're here for your State Farm

12          customers, right?  Would that be fair to say?

13     A.   Yes.  My agency is here to sell and service to

14          Covington County, correct.

15     Q.   Just as a State Farm customer, you're my Good

16          Neighbor agent in Covington County.  Wouldn't

17          that be fair to say?  If I had a car wreck in

18          Covington County and I needed a State Farm

19          agent, I could pick up the phone and call you,

20          couldn't I?

21                    MS. VAN HEEST:  Are you talking

22                    about for buying insurance or the

23                    claims handling?  because those
```

```
1                              are --

2                 MR. WINTER:  Either --

3                 MS. VAN HEEST:  To notify of the

4                 claim?  Call him?

5    Q.   Notify of the claim.  If I got stuck here in

6         Covington County, I could call you as a State

7         Farm agent and you would be willing to help me

8         out, wouldn't you?

9    A.   Well, as a State Farm agent --

10                MS. VAN HEEST:  I'm going to object

11                    because you know he's an

12                    independent contractor.  We're

13                    using the word "agent," but he's

14                    an independent contractor.

15                MR. WINTER:  Whatever.  You can

16                    object.

17   Q.   Go ahead.

18                MS. VAN HEEST:  Go ahead.

19   A.   As an agent for State Farm in Covington

20        County, I would assist any State Farm

21        policyholder.

22   Q.   How long were you a trainee agent?

23   A.   I was a trainee agent from June 1, 2001 till
```

```
 1              June 1, 2002.
 2      Q.      And what happened on June 1, 2002 in terms of
 3              your agency status?
 4      A.      My status on June 1, 2002 changed to an
 5              independent contractor agent with State Farm
 6              Insurance.
 7      Q.      Let's go back to when you were a trainee
 8              agent.  As a trainee agent, who was your
 9              supervisor?
10      A.      My direct supervisor as a trainee agent was
11              Rich Potter.
12      Q.      And what was Mr. Potter's title?
13      A.      Mr. Potter's title was agency field executive.
14      Q.      Where is he located out of?
15                      MS. VAN HEEST:  Now or back then?
16                      MR. WINTER:  Back then.
17      A.      Mr. Potter's office was in Dothan, Alabama
18              while I was a trainee agent.
19      Q.      As a trainee agent, did you have anybody in
20              the office who supervised you?  Let me step
21              back for a second.
22              Where were you located when you were a
23              trainee agent?
```

21

```
 1    A.    My office is at 112 Hillcrest Drive,

 2          Andalusia, Alabama 36420, and that was the

 3          location while I was a trainee agent.

 4    Q.    And when you were at Hillcrest Drive from June

 5          1, 2001 to June 1, 2002 as a trainee agent,

 6          did you have a sign outside that said State

 7          Farm Insurance?

 8    A.    From June 1, 2001 till June 1, 2002, I had a

 9          sign that has my name on it and also has State

10          Farm Insurance.

11    Q.    And you sold State Farm life insurance as a

12          trainee agent?

13    A.    As a trainee agent, I did sell State Farm life

14          insurance policies.

15    Q.    And you sold property and casualty policies as

16          a trainee agent?

17    A.    As a trainee agent, I did sell property and

18          casualty policies for State Farm Insurance.

19    Q.    And you also sold automobile policies as a

20          trainee agent?

21    A.    As a trainee agent, I did sell automobile

22          policies for State Farm Insurance.

23    Q.    When people came to your office to get
```

1        insurance, they understood that you were an

2        agent of State Farm at that time, correct?

3              MS. VAN HEEST:  Object to the form.

4  A.   As a trainee agent are you referring to?

5  Q.   Yes, sir.

6  A.   As a trainee agent, anybody that would have

7        walked into my office would understand that

8        I'm dealing with State Farm Insurance.

9  Q.   What was your base salary when you were a

10       trainee agent roughly?  Ballpark it for me.

11  A.   I don't remember.

12  Q.   Do you have records that would show what that

13       was?

14  A.   I'm sure that I have records of the income

15       from June 1, 2001 to June 1, 2002.

16  Q.   As a trainee agent, did you have the authority

17       to cosign a policy after it issued?

18  A.   I don't understand your question, cosign a

19       policy.  I don't understand what you're

20       referring to.

21  Q.   I want to show you what has already been

22       marked as Defendant's Exhibit 18, which was

23       provided to me by your counsel yesterday.

```
 1          Take all the time you need, Mr. Nall, to

 2      review that.

 3                  MS. VAN HEEST:  This is the 2005

 4                  declarations page?

 5              MR. WINTER:  Yes, ma'am.

 6              MS. VAN HEEST:  I wanted to make

 7                  sure we identified it --

 8              MR. WINTER:  Yeah.

 9              MS. VAN HEEST:  If we identified it

10                  one way in the deposition, if you

11                  wanted to, to be consistent --

12              MR. WINTER:  It's Defendant's

13                  Exhibit 18.  We'll just call it

14                  the same thing.

15              MS. VAN HEEST:  Okay.  That works

16                  for me.

17  Q.   Do you see on the bottom right-hand corner of

18       that where it says countersigned, Nall

19       Insurance Agency, Inc. (Ron)?

20  A.   I do see the countersign.

21  Q.   Nall Insurance Agency, Inc. (Ron), does that

22       signify you as your agency?

23  A.   As of today, speaking of what is effective
```

24

1      today, Nall Insurance Agency, Inc. is

2      representative of me.

3   Q.  Back in 2001 did you have the authority to

4      countersign policies like are done there?

5              MS. VAN HEEST:  Object to the form.

6              You can answer.

7                   For the record, this isn't

8              signed.  It's just got his name

9              on the bottom.  There's no

10             signature actually on there.

11             MR. WINTER:  I understand.

12             MS. VAN HEEST:  You can answer.

13  A.  Repeat the question, please.

14  Q.  Back in 2001 when a policy was issued by State

15     Farm and cosigned by you, did you have

16     authority -- Let me restate that again.

17         When you were a trainee agent, did you

18     have the authority to cosign a policy like you

19     do now?

20  A.  Define what you mean by cosign.

21  Q.  I don't know what I mean by cosign.  Maybe you

22     can explain to me what that form means,

23     cosigned by Ron Nall Insurance Company.

1   A.   I don't understand your question because

2        you're asking me what cosign means, and I

3        don't know what you're referring to as cosign.

4   Q.   Will you look at the bottom of that page at

5        Defendant's Exhibit 18?  Do you see where it

6        says -- Excuse me.

7             MS. VAN HEEST:  Countersign.

8   Q.   Countersign.  I apologize.

9   A.   I do see where it says countersign.

10  Q.   Do you countersign policies issued by State

11       Farm?

12            MS. VAN HEEST:  Today or 2005?

13            MR. WINTER:  2005.  Whenever that

14                 document is.

15  A.   From June 1, 2001 to June 1, 2002 while I was

16       a trainee, I had the authority to countersign

17       an agent -- a contract or policy, excuse me,

18       for State Farm Insurance.

19            MR. WINTER:  As shown in Defendant's

20                 Exhibit 18 or something similar

21                 to that?

22  Q.   Let me show you what's marked as Defendant's

23       Exhibit 14.  Would you take all the time you

```
 1              need to review that policy?
 2                   Have you had a chance to review
 3              Defendant's Exhibit 14, sir?
 4      A.      I have had a chance to review Defendant's
 5              Exhibit 14.
 6      Q.      And what is Defendant's Exhibit 14?
 7      A.      Defendant's Exhibit 14 is a declarations page
 8              for a homeowner's policy.
 9      Q.      And what dates was that declaration for?
10                   MS. VAN HEEST:  Fourteen?
11                   MR. WINTER:  Exhibit 14.
12      A.      Defendant's Exhibit 14 appears to be a
13              homeowner's policy that has effective dates
14              from October 8, 2000 to October 8, 2001.
15      Q.      Was that during the time that you were a
16              trainee agent?
17      A.      The period of October 8, 2000 to October 8,
18              2001, during that period I was appointed a
19              trainee agent.
20      Q.      Do you see where that declarations page says
21              countersigned by Nall Insurance Agency, Inc.
22              (Ron)?
23      A.      I do see where it says countersigned.
```

1   Q.    What does that mean to you?

2                    MS. VAN HEEST:  For the record, the

3                       date it was prepared, January 17,

4                       2005 in response to a request for

5                       production.

6                    MR. WINTER:  Actually, it wasn't in

7                       response to a request for

8                       production, but that's all

9                       right.  But you can keep

10                      talking.

11                   MS. VAN HEEST:  Sorry.

12                   MR. WINTER:  Let's just let him

13                      answer the questions, and we'll

14                      get through this quicker.

15  A.    Repeat your question.

16  Q.    What does the countersignature by you mean to

17        you?

18  A.    Usually when a countersigned signature is used

19        by me, it is when we produce a new policy.

20        When a renewal policy is presented like this,

21        I do not countersign them.

22  Q.    So is it your statement that you did not

23        countersign this document?

1              MS. VAN HEEST:  For the policy

2                      period October 8, 2000 for (sic)

3                      October 8, 2001, Defendant's 14?

4              MR. WINTER:  Yes, ma'am.

5    A.    For that effective policy period, to the best

6          of my knowledge, I did not countersign this

7          declaration page.

8    Q.    So you're saying that that declaration page

9          provided to us by State Farm in whatever form

10         is inaccurate?

11             MS. VAN HEEST:  Object to the form.

12   Q.    You can answer the question.

13             MR. WINTER:  You can let him answer

14                     the question.

15   Q.    You need to answer the question, Mr. Nall.

16         You need to answer the question.

17             MS. VAN HEEST:  Well, I'm not

18                     certain -- I --

19             MR. WINTER:  With all due respect,

20                     Ms. Heest, if you're going to

21                     object to the form, object to the

22                     form.  But we're not going to

23                     start with the talking objections

1    right now.  The question has been

2    asked.  If there's something he

3    doesn't understand, he can say he

4    doesn't understand it.  But he's

5    just testified that he did not

6    countersign that document.  State

7    Farm has produced a document

8    which they say was countersigned.

9    MS. VAN HEEST:  I think there's some

10   confusion, and, for the record,

11   there's no signature on there.

12   MR. WINTER:  I understand that.

13   MS. VAN HEEST:  If you want to go

14   off the record, I think I can

15   explain the confusion --

16   MR. WINTER:  Well, let's go off the

17   record.

18   MS. VAN HEEST:  -- because he may

19   not understand it.  And I think

20   your question implies something

21   that's not --

22   MR. WINTER:  I'm not trying to imply

23   anything.  I'm just trying to

1          find out if he countersigned the

2          document.

3               MS. VAN HEEST:  And he testified he

4          didn't.  Your follow-up question

5          is what I think is confusing and

6          implies something.  Do you want

7          to go off the record for a

8          second?

9               MR. WINTER:  Sure.

10              (Brief off-the-record discussion.)

11  Q.   Mr. Nall, let's go back on the record with

12       respect to Defendant's Exhibit 14.  Is it your

13       testimony that back in 2001 when this policy

14       was issued and this declarations page was

15       issued that you, in fact, did not countersign

16       this document?

17  A.   During October 8, 2000 and October of 2000 --

18       between October 8, 2001, I did not countersign

19       this policy.

20  Q.   But I think what you were saying was that if

21       you had a new policy issued that you had

22       produced, you would countersign that policy?

23  A.   On new business it is procedure if it is

```
 1            required, like for a closing, that I
 2            countersign new business.
 3      Q.    And why is that required?
 4      A.    Usually a countersignature from the agent that
 5            has the binding authority is required so the
 6            closing attorney will accept it as evidence of
 7            insurance for a closing.
 8      Q.    So with respect to casualty coverage, you have
 9            the authority to bind State Farm.  Would that
10            be fair to say?
11      A.    I have rules and regulations of the binding
12            authority that I have with State Farm
13            Insurance, and they differ from product to
14            product.
15      Q.    What are the names of these policies and
16            procedures that guide you with respect to your
17            binding authority?
18      A.    Repeat your question.
19      Q.    Is there a name that -- for these policies and
20            procedures that guide you to when you have
21            binding authority on behalf of State Farm?
22      A.    Yes.  I mean, I have manuals and documents
23            that are provided to me by State Farm on the
```

32

1        binding authority and conditions that I have

2        with State Farm Insurance.

3    Q.  Let's talk about those for a second.  What are

4        the names of those manuals with respect to

5        casualty and property?

6    A.  Are we referring to what is in place today or

7        what was in place --

8    Q.  Let's start in 2001 when you became a trainee

9        agent.  What was the name of the manual back

10       then?  Is it known regularly as something at

11       State Farm?

12   A.  Sure.

13   Q.  What's it called?

14   A.  The manual that I would have used during my

15       trainee agent period would have been called a

16       Fire Underwriting Guide or Manual.

17   Q.  Did the name change throughout the course from

18       then to the present?

19              MS. VAN HEEST:  Object to the form.

20              You can answer.

21   A.  The name did not change but the format did.  I

22       used to have a paper manual and now a great

23       deal of that is computerized.

```
1    Q.    When did that switch occur approximately?
2               MS. VAN HEEST:  Object to the form.
3    A.    It's happened for -- It's a hard answer to
4          question because many of the procedures for
5          different product lines are updated at
6          different times and it's computerized.  To the
7          best of my knowledge, I'd probably say three
8          years ago.
9    Q.    If I asked State Farm to produce the Fire
10         Underwriting Guide or Manual, they would know
11         that I was looking for this set of documents.
12         Would that be fair to say?
13              MS. VAN HEEST:  Object to the form.
14   Q.    If I sat here today and said, do you have a
15         copy of the fire -- do you know what the Fire
16         Underwriting Guide and Manual is, would you
17         say yes or no?
18              MS. VAN HEEST:  For 2001 --
19              MR. WINTER:  Through 2005.
20   A.    Yes, I would understand what you're asking
21         for.
22   Q.    Would you have any problem with helping your
23         attorneys find those documents?
```

1   A.   If my attorney asks me to get them

2        information, I would do everything I can to

3        get them information.

4   Q.   Were there any other documents, manuals,

5        procedures, anything else written that would

6        guide you on when you had authority to bind

7        State Farm fire and casualty?

8                 MS. VAN HEEST:  Object to the form.

9   A.   As a trainee agent, I was provided training

10       information that taught me how to use the

11       information that was in the Fire Underwriting

12       Manual.

13  Q.   What was the name of that information?

14  A.   I do not remember.

15  Q.   Would it be generally referred to within State

16       Farm as training information?

17                MS. VAN HEEST:  Object to the form.

18  A.   To my knowledge I would say it's trainee agent

19       information, training guides, manuals.

20  Q.   Any other terms of art that might be helpful

21       in describing this document?

22                MS. VAN HEEST:  As he understands

23                    it.

1          MR. WINTER:  Yeah.  That's inherent

2              in the question.

3          MS. VAN HEEST:  Okay.  Object to the

4              form.

5   A.   To the best of my knowledge.  That's as close

6        as I can get you to those documents.

7   Q.   I'm not trying to make you come up with

8        information.  I'm not trying to make this a

9        memory contest.  I just want you to tell the

10       truth the best you can.  Do you understand

11       that?

12  A.   I do understand, and I will tell the truth to

13       the best of my knowledge.

14  Q.   I appreciate that.

15         MS. VAN HEEST:  Off the record real

16             quickly.

17         (Brief off-the-record discussion.)

18  Q.   Would you please describe for me as a trainee

19       agent when you had authority to bind the

20       company in fire and casualty?

21         MS. VAN HEEST:  Object to the form.

22  A.   As a trainee agent, there are a number of

23       things that are required of me to bind

1    authority with State Farm Fire and Casualty

2    Company.  As a trainee agent to the best of my

3    memory, there are guidelines that dictate the

4    quality of the house that we're insuring.

5    There are conditions on where the property is

6    located.

7                    (Brief interruption.)

8  Q.  When we last left, I think I was asking you

9    about when you had authority to -- please

10   describe when you had authority to bind the

11   property and casualty claim, and you mentioned

12   the quality of the house and where the house

13   was located.  Are there any other --

14                  MS. VAN HEEST:  You're talking about

15                     as a trainee agent or now when --

16                  MR. WINTER:  Trainee agent.

17 A.  There are many underwriting guidelines.  I'm

18   going to list you a few of them when I'm

19   talking about new business, but there are

20   plenty more I'm not going to remember off the

21   top of my head.

22       We talked about property location,

23   condition and quality of the house, status of

1   the house, the occupancy of the house I should

2   say, the type of heating and cooling in the

3   house roof types.

4 Q. As a State Farm agent, you would go out to the

5   house and look at the house?

6 A. Yes.  Before we can bind authority with State

7   Farm Insurance, I'm required to look at the

8   house before that process takes place.

9 Q. Once you look at a house and determine it

10   meets the State Farm criteria -- for example,

11   quality, location, condition, status, heating

12   and cooling, roof -- and you make a decision

13   that it means the criteria, you have the

14   authority to bind the company, correct?

15     MS. VAN HEEST:  Object to the form.

16     You can answer.

17 A. As a trainee agent, I can bind coverage within

18   my authority.

19 Q. And what is the level of your authority?

20 A. The level of my authority --

21 Q. As a trainee agent.  I'm sorry.

22 A. As a trainee agent, I don't remember

23   specifically.  There's a dollar number, but,

1    of course, State Farm reserves the right to

2    review what I do.  I don't remember the

3    number.  I think if -- the best of my memory

4    is it's a million dollars authority on a

5    single-dwelling house.

6    Q.    As a trainee agent?

7    A.    As a trainee agent.  That authority is to the

8    best of my knowledge what I remember it to be.

9    Q.    Once you became -- After your trainee agent

10    period ended, did you become a full agent for

11    State Farm with full authority?

12            MS. VAN HEEST:  Object to the form.

13    A.    On June 1, 2002 I became an independent

14    contractor for State Farm, and my authority in

15    regards to writing homeowner's insurance did

16    not change.

17    Q.    What does the term "independent contractor"

18    mean to you?

19            MS. VAN HEEST:  Object to the form.

20    A.    The term "independent contractor" means to me

21    that I operate an insurance business within

22    the guidelines -- within certain guidelines

23    that State Farm produces to me as long as it's

39

1    within the terms and conditions of the
2    contract that I signed with them.
3  Q.  What is the name -- Is there a name to the
4    contract that you signed with State Farm?
5         MS. VAN HEEST:  Object to the form.
6  A.  There is a name to the contract that I
7    signed.  I had have to -- To be honest with
8    you, I don't know what it is off the top of my
9    head.  I would have to get that information
10    for you.
11  Q.  When did you sign that contract?  Was it prior
12    to June 1 of 2002?
13  A.  It was a few weeks prior to June 1, 2002
14    effective June 1, 2002.
15  Q.  Have you signed any subsequent contracts or
16    addendums to that contract?
17  A.  There have been a few addendums to that
18    contract.
19  Q.  Did you have to sign them or did State Farm
20    just send those to you and say, this is an
21    addendum to the contract?
22         MS. VAN HEEST:  Object to the form.
23  A.  To the best of my knowledge, they were just

40

1   sent to me saying that they were an addendum

2   to the contract.

3  Q.  So you didn't have an opportunity to negotiate

4   that contract with them?  That was just what

5   you were told?  Would that be fair to say?

6           MS. VAN HEEST:  Object to the form.

7               You can answer.

8  A.  To the best of my knowledge, I was sent those

9   addendums to the contract.

10 Q.  And you accepted those addendums?  Did you

11  accept those terms and conditions?

12          MS. VAN HEEST:  Object to the form.

13 A.  I did accept those terms and conditions.

14 Q.  Does being an independent contractor agent for

15  State Farm mean anything else to you?

16          MS. VAN HEEST:  Object to the form.

17 A.  I don't understand what you're asking me.

18 Q.  Well, what does the term "independent

19  contractor agent" mean to you?

20          MS. VAN HEEST:  Object to the form.

21 A.  The term "independent contractor agent" with

22  State Farm means to me that I am an

23  independent party in a contract with State

1          Farm Insurance through the contract, that I

2          will abide by those contracts and agreements

3          to that contract and sell and service business

4          according to that contract through State Farm

5          Insurance.

6     Q.   When you have people come into your office to

7          deal with insurance issues, do you provide

8          them with a copy of this contract?

9                    MS. VAN HEEST:  Object to the form.

10                   You can answer.

11    A.   When I write a new homeowner's policy, once we

12         have completed the policy, I provide them with

13         a policy copy that I have at my office along

14         with a declarations page to that policy.

15    Q.   Do you provide them with a contract between

16         you -- Do you provide any of your insurance

17         customers that you sell State Farm products

18         to, do you provide them with the contract that

19         you have with State Farm?

20                   MS. VAN HEEST:  Object to the form.

21                   You can answer.

22    A.   The contract that I have between myself and

23         State Farm I do not provide to customers.

1    Q.    Do you have any customers who ask you if you

2          are an independent contractor agent for State

3          Farm?

4                      MS. VAN HEEST:  Object to the form.

5                      You can answer.

6    A.    I've never had a customer ask me if I'm an

7          independent contractor with State Farm

8          Insurance.

9    Q.    Do you do surveys of why people come to you,

10         customer service surveys?

11   A.    I don't have any surveys that I use for

12         customers trying to get information how they

13         got to me, no.

14   Q.    In your opinion why do people come to the Ron

15         Nall Insurance Agency for insurance?

16                     MS. VAN HEEST:  Object to the form.

17   A.    Well, I'm not sure.  I think you would have to

18         ask each customer what their opinion is of why

19         they've decided to do business with me or with

20         State Farm Insurance.

21   Q.    Do you think in part it's because you do

22         represent State Farm Insurance?

23                     MS. VAN HEEST:  Object to the form.

1                          You can answer.

2    A.    Once again, I think you would have to ask each

3          individual what their motivation was for doing

4          business with me as State Farm Insurance.

5    Q.    Well, let me ask you a couple of things.  You

6          have a State Farm Insurance sign outside your

7          office?

8    A.    I do have a State Farm Insurance sign outside

9          my office.

10   Q.    And do you send out State Farm -- do you

11         provide your customers or prospective

12         customers with State Farm paraphernalia?

13                     MS. VAN HEEST:  Object to the form.

14                          You can answer.

15   Q.    Let me rephrase that.  Do you provide

16         prospective customers with State Farm

17         marketing items such as pencils, Koozies,

18         calendars, brochures?

19   A.    On different occasions I do provide customers

20         or potential customers State Farm approved

21         marketing items and remembrance items.

22   Q.    So State Farm has to approve those marketing

23         and remembrance items?

1              MS. VAN HEEST:  Object to the form.

2  A.   All of the marketing items that I use are

3       State Farm approved.

4  Q.   You're not allowed to give them out by

5       contract without having their approval,

6       correct?

7              MS. VAN HEEST:  Object to the form.

8              You can answer.

9  A.   I don't know.  I don't know the answer to that

10      question.  I only use State Farm approved

11      marketing materials.

12 Q.   What types of marketing materials do you use?

13 A.   There's a great number of materials that I use

14      to include fliers and brochures and

15      remembrance items like pencils and pens and

16      key chains and those kind of things.

17 Q.   In fact, you send out a calendar to your

18      customers that says State Farm.

19 A.   I do not send out calendars to my customers.

20 Q.   How about birthday cards to customers?

21             MS. VAN HEEST:  That say State Farm

22             or just him sending out birthday

23             cards?

1          MR. WINTER:  Let's take it one at a

2               time.

3          MS. VAN HEEST:  Thank you.

4    Q.    Do you send out birthday cards to customers?

5    A.    I do send out birthday cards to customers.

6    Q.    Are they State Farm cards?

7    A.    The cards that I do send out are State Farm

8          cards, correct.

9    Q.    And you provide pencils you said?

10   A.    I provide pencils.

11   Q.    And they have State Farm on them?

12   A.    They do have the State Farm logo on them.

13   Q.    Do they have Ron Nall Insurance Agency on them

14         too?

15   A.    They do not have Ron Nall Insurance Agency on

16         it.

17   Q.    And you provide key chains with State Farm on

18         them?

19   A.    I do provide key chains that say State Farm on

20         them.

21   Q.    And do they say Ron Nall Insurance Agency on

22         them?

23   A.    They do not say Ron Nall Agency on them.

1  Q.  What other types of -- What is a remembrance

2      item?  That's a new term for me.

3  A.  Well, a remembrance item is a give-away item

4      that you give to a customer or potential

5      customer that is branded with State Farm

6      Insurance.

7  Q.  And what types of items are those?

8  A.  There's a great deal of remembrance items.

9  Q.  What's your favorite?

10 A.  My favorite remembrance items are pencils and

11     key chains and pens, just little things that

12     help customers remember you.

13 Q.  Do you make house calls to folks?

14              MS. VAN HEEST:  Object to the form.

15 A.  Define what you mean folks.

16 Q.  Do you go visit customers at their homes?

17 A.  Are you talking about existing customers?

18 Q.  Yes, sir.

19 A.  Sometimes I do visit existing costumers at

20     their home.

21 Q.  Do you ever reinspect homes after there have

22     been additions to them?

23              MS. VAN HEEST:  Object to the form.

```
1                    You mean if he's notified that
2                 there's been an addition?
3          MR. WINTER:  Yes, ma'am.
4          MS. VAN HEEST:  I just get -- I'm
5              easily confused.
6                 Go ahead.
7    A.   I do sometimes reevaluate homes.
8    Q.   And why do you do that?
9    A.   Usually I reevaluate homes for existing
10        customers because they feel that there's
11        either a material change made to the house
12        that changes the value or they do not believe
13        they have enough insurance presently.
14   Q.   When you do those evaluations, do you ever
15        measure a house to determine square footage?
16   A.   Every time that I do an evaluation on a house,
17        I measure the square footage.
18   Q.   Do you have one of those little measuring
19        wheels?
20   A.   I do have an orange measuring wheel with a
21        State Farm logo on it.
22   Q.   It has a State Farm logo on it?
23   A.   Yes.
```

1   Q.   Do you walk around the outside of the house?

2        How do you use that when you measure a house?

3   A.   I use the measuring wheel to do perimeter

4        measurements, correct.

5   Q.   And when you say perimeter measurements, you

6        basically walk the outline of the house to see

7        what the outline is?

8   A.   When I measure a house, I walk the outside of

9        the perimeter of the house to get the

10       measurements of the perimeter.

11  Q.   And that would give you the square footage of

12       the house through a computation?

13  A.   By measuring the house, it's a part of getting

14       the square footage of the house.

15  Q.   Is that something that is done according to

16       State Farm policy?

17                  MS. VAN HEEST:  Object to the form.

18  A.   You can answer.

19  Q.   Let me ask you this question since your lawyer

20       objected.

21            Why do you do that?

22  A.   Well, I would measure the house to try to

23       determine the accurate square footage of the

49

1     house so that when we assist a customer in
2     determining what the cost to rebuild a house
3     might be, to be as accurate as possible to get
4     those -- that information.
5  Q.  And State Farm provides you with the little
6     walking machine, right?
7  A.  No, sir, State Farm doesn't provide me with a
8     little walking machine.
9  Q.  You had to buy it?
10  A.  I actually had to buy the measuring wheel.
11  Q.  Did you put the farm logo on it or do you buy
12     it from State Farm?
13  A.  I put the State Farm logo on it.
14  Q.  And after you get these measurements, the
15     square footage of the house, what do you do
16     with those measurements?
17  A.  After I attempt to determine what the square
18     footage of the house is, along with a number
19     of other variables, I then take that
20     information and I have a computer program that
21     I input the information into to assist me in
22     trying to determine what replacement cost of a
23     house would be.

```
 1   Q.   What is name of the computer program?
 2   A.   It's called Exact Value.
 3   Q.   Have you been using that same computer program
 4        since you started with State Farm as a trainee
 5        agent?
 6   A.   No, sir, I've not used that program for the
 7        complete time I've been an agent.
 8   Q.   When you became a trainee agent, what was the
 9        name of the program you used then?
10   A.   I don't remember the name of the program that
11        we used at that time.  It is different than
12        the one we use presently, though.
13   Q.   When did you make the changeover to this new
14        program?
15   A.   We've been using Exact Value for approximately
16        two years.
17   Q.   What was the reason for the change?
18   A.   I do not know the reason for the change.
19   Q.   Was that a State Farm decision to make that
20        change?
21   A.   It was a State Farm decision to make that
22        change.
23   Q.   And they informed you that you needed to start
```

1          using this new Exacto program?

2                    MS. VAN HEEST:  Object to the form.

3      A.   They did inform me and also offered training

4          on the program.

5      Q.   What's the difference between the old program

6          and the new program in your mind as an agent?

7      A.   You would have to ask State Farm what the

8          differences are.  I don't know technically

9          what the differences are between the two

10         programs.

11     Q.   From a user's perspective, though, from an

12         expert perspective --

13                   MS. VAN HEEST:  Object to the form.

14                   MR. WINTER:  I got her all nervous

15                        because I said "expert".  I'm

16                        sorry.  I shouldn't have said

17                        expert.

18     Q.   You're pretty much an expert in insurance,

19         though, now that we've talked about it.  Let's

20         talk about that.

21                   MS. VAN HEEST:  Object to the form.

22                        Do you mean like an expert in --

23     Q.   In your opinion, would you consider yourself

1      an insurance expect?

2                    MS. VAN HEEST:  Object to the form.

3                    You may answer.

4   A.  Well, I think that I'm knowledgeable about

5       insurance, especially the insurance that I

6       work with on a day-to-day basis.  I would take

7       your word to it that I'm an expert, but I deal

8       with it every day.

9   Q.  You've got a lot more knowledge than the

10      average Joe about insurance, though, wouldn't

11      you say?

12  A.  I would probably say that I'm more

13      knowledgeable of insurance than the normal

14      person on the street.

15  Q.  You're educated in insurance from Florida

16      State, right?

17  A.  I do have a degree in risk management

18      insurance from Florida State University.

19  Q.  You've been trained by State Farm as an

20      insurance agent, right?

21  A.  I've had a lot of training from State Farm

22      Insurance.

23  Q.  And you're definitely experienced in insurance

1  |  as your work as a State Farm adjuster and

2  |  agent, correct?

3  A.  I do have some experience in insurance.

4  Q.  Would it be fair to say that since you're

5  |  educated and trained and experienced in

6  |  insurance that you have significantly more

7  |  knowledge than the average Joe in insurance?

8  |      MS. VAN HEEST:  Object to the form.

9  A.  I would probably say I have more knowledge

10  |  than the typical person on the street of

11  |  insurance.

12  Q.  That's why people come to you see, isn't it?

13  |      MS. VAN HEEST:  Object to the form.

14  A.  I'll let you ask those people why they come to

15  |  see me for insurance needs.

16  Q.  You represent yourself to the community as

17  |  being a person of knowledge with respect to

18  |  insurance, correct?

19  |      MS. VAN HEEST:  Object to the form.

20  |      You can answer.

21  A.  I represent myself as an insurance agent for

22  |  State Farm Insurance to the public.

23  Q.  Have you ever been asked to give talks to

```
 1              groups about insurance?  For example, a civic
 2              group or a church group or anything like that.
 3     A.       I've never been asked by a group to speak
 4              regarding insurance.
 5     Q.       Have you ever given any seminars at any State
 6              Farm programs about insurance?
 7     A.       I've never given any seminars to the public
 8              regarding any State Farm products.
 9     Q.       Have you ever taught any classes in insurance?
10     A.       I've never taught any classes regarding
11              insurance.
12     Q.       Do you sell insurance for any other companies
13              than State Farm?
14     A.       I have an agreement -- a contract with Baldwin
15              Mutual Insurance.
16     Q.       Did State Farm approve that?
17     A.       State Farm approves --
18                       MS. VAN HEEST:  Object to the form.
19     A.       -- my agreement with Baldwin Mutual Insurance
20              every year.
21     Q.       What type of insurance do you sell for Baldwin
22              Mutual?
23     A.       We sell actual cash value homeowner policies
```

1    through Baldwin Mutual Insurance.

2    Q.    How does it differ from the State Farm

3          policy?

4                        MS. VAN HEEST:  Object to the form.

5                        You may answer.

6    A.    An actual cash value policy with Baldwin

7          Mutual is a depreciated-type policy.

8    Q.    Could you put that in layman's terms for me?

9    A.    An actual cash value policy handles -- has a

10         different valuation system when it handles a

11         claim regarding the contract with the company,

12         and it is based on depreciation as opposed to

13         replacement cost.

14   Q.    So there's a difference between the term of

15         art in the insurance agent -- insurance

16         business of actual cash value versus the term

17         of art of replacement cost?

18                        MS. VAN HEEST:  Object to the form.

19                        You can answer.

20   A.    Yes.  There are two distinct type policies out

21         there.

22   Q.    Would you explain to me what a replacement

23         policy is?

1    A.    A replacement cost policy to the best of my

2          knowledge is a valuation form that, during a

3          claim scenario, tries to put an insured back

4          to whole by replacing in today's dollars what

5          the cost of something that's damaged or lost

6          is up to a certain dollar amount.

7    Q.    Did you ever explain what a replacement policy

8          was to Mr. and Mrs. Jones while you were

9          either a trainee agent or a regular agent in

10         Andalusia?

11   A.    To my knowledge I have not had a conversation

12         regarding replacement cost valuation with

13         Mr. Jones or Mrs. Jones.

14   Q.    Did you ever have a conversation with Mr. and

15         Mrs. Jones concerning their homeowner's policy

16         with State Farm prior to the fire?

17   A.    To the best of my knowledge, I've not had any

18         conversation with Mr. and Mrs. Jones about

19         their homeowner's policy prior to the loss.

20   Q.    Now, as a trainee agent we were talking a

21         little bit about your authority, and I think

22         you explained it to me.  With respect to

23         homeowner's insurance, casualty and property

1        insurance -- let's talk about it that way --

2        what changed from when you were a trainee

3        agent to a regular agent for State Farm?

4               MS. VAN HEEST:  Object to the form.

5  A.   Specifically -- I want to make sure I

6        understand your question --

7  Q.   Yes, sir.

8  A.   -- correctly.

9  Q.   Please do.

10  A.   Are you asking what -- Specifically what are

11       you talking about what changed?

12  Q.   What changed -- what happened -- What were the

13       differences between being a trainee agent for

14       State Farm and a regular agent for State Farm?

15              MS. VAN HEEST:  Are you talking

16                about in addition to the contract

17                that he's testified to earlier

18                with you?

19            MR. WINTER:  Right.

20              MS. VAN HEEST:  Object to the form.

21                You may answer.

22  A.   Are you talking about homeowner's insurance

23       specifically?

1   Q.   Yes, sir.

2   A.   Are you talking about the guidelines and

3        authority I might have with State Farm

4        Insurance?

5   Q.   Let me put it this way.  As a trainee agent,

6        you went to the office every day, didn't you?

7   A.   As a trainee agent, I went to the office most

8        every day.

9   Q.   As a trainee agent, you sold insurance, right?

10            MS. VAN HEEST:  Object to the form.

11  A.   As a trainee agent, I sold insurance to the --

12       as to the agreement I had with State Farm.

13  Q.   And you serviced insurance, contracts, as a

14       trainee agent?

15            MS. VAN HEEST:  Object to the form.

16  Q.   These are pretty straightforward questions.

17       I'm not trying to trip you up.

18  A.   As a trainee agent, I did service the policies

19       that were in my book of business.

20  Q.   And you went out and tried to grow the

21       business, get a bigger book of business,

22       correct?

23  A.   As a trainee agent, I tried to sell as much

```
 1              insurance as I possibly could.
 2     Q.       Well, when you went from a trainee agent to
 3              a -- what was the title after trainee agent?
 4              Was it independent contractor agent?
 5     A.       Yes.  I would consider myself as of June 1,
 6              2002 an independent contractor agent with
 7              State Farm Insurance.
 8     Q.       Let me ask you this.  When you go out and
 9              visit folks to sell insurance, you don't walk
10              up to them and say, Hi, I'm Ron Nall; I'm an
11              independent contractor agent for State Farm,
12              do you?
13                       MS. VAN HEEST:  Object to the form.
14     A.       Are you talking about today?
15     Q.       You might today.  But before you met with your
16              lawyer, did you go out on a regular basis and
17              say, I'm Ron Nall, independent contractor
18              agent for State Farm?
19                       MS. VAN HEEST:  Object to the form.
20     Q.       Did you say that?  You can answer the
21              question.
22                       MS. VAN HEEST:  You can answer, but
23                          I do object to the implication
```

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

```
 1                    that he didn't know he was an

 2                    independent contractor until --

 3               MR. WINTER:  I understand that.  I'm

 4                    not trying --

 5    A.   Typically I present myself to the public as

 6         Ron Nall.

 7    Q.   And when you hand out your business card to

 8         them, it says State Farm, right?

 9    A.   My business card does show my name with State

10         Farm on there, correct.

11    Q.   Does your business card say independent

12         contractor agent?

13               MS. VAN HEEST:  Object to the form.

14    A.   My business card says Ron Nall, Agent.

15    Q.   Do you have a copy of your business card with

16         you today?

17    A.   I do not have a copy of my card with me.

18    Q.   But it doesn't say independent contractor

19         agent, does it?

20               MS. VAN HEEST:  Object to the form.

21    A.   My business card does not say independent

22         contractor agent.

23    Q.   Now, State Farm -- do you have authority for
```

1          State Farm to write a check -- as an agent, do

2          you have authority to write a check to a

3          customer making a claim?  Let me simplify it.

4               Do you ever write checks to customers?

5    A.    As a State Farm agent, I have within certain

6          guidelines draft authority for State Farm

7          Insurance.

8    Q.    What's the level of authority?

9    A.    The level of authority that I have depends on

10         product line.

11   Q.    Homeowner's insurance.

12   A.    The level of authority that I have to handle a

13         claim within State Farm guidelines that are

14         presented to me is $5,000.

15   Q.    And that's a State Farm check?

16                   MS. VAN HEEST:  Object to the form.

17                   You can answer.

18   Q.    When you write the check, is it a State Farm

19         check?

20                   MS. VAN HEEST:  Are you talking

21                   about is State Farm going to

22                   reimburse him for it?  Is it

23                   something that says State Farm on

62

1                          it?

2    Q.    Who owns the account, you or State Farm?

3    A.    The drafts that I write for claims, those

4          funds come out of a State Farm account.

5    Q.    And you sign the checks?

6    A.    I sign the drafts that are -- that I use for

7          claims, draft authority.

8    Q.    Is there anybody else in your office that has

9          authority to sign that check?

10   A.    There's nobody in my office other than myself

11         that has that authority.

12   Q.    And that money comes out of a State Farm

13         account, correct?

14   A.    The money on the drafts that I write for State

15         Farm claims within guidelines comes out of a

16         State Farm account.

17   Q.    What are the names of those guidelines that

18         control your authority to write checks?

19               MS. VAN HEEST:  Object to the form.

20   A.    Agent's Draft Authority Guideline Manual,

21         something like that, is the governing body.

22   Q.    If I asked for something like that, you would

23         know what I meant, correct?

1              MS. VAN HEEST:  Object to the form.

2    A.   If you asked me that in those languages, I

3         would understand what you're trying to get at.

4    Q.   Do you have to keep a ledger of the checks

5         that you write?

6              MS. VAN HEEST:  Object to the form.

7    A.   I do not keep a ledger of the checks that I

8         write.

9    Q.   What records do you keep of the checks that

10        you write?

11   A.   I don't keep any record of the checks that I

12        write.

13   Q.   Does somebody from State Farm review the

14        drafts that you make?

15             MS. VAN HEEST:  Object to the form.

16   A.   Yes.  There is a department within State Farm

17        that reviews the drafts that I write.

18   Q.   Have you ever been censured for

19        inappropriately writing a draft?

20   A.   To the best of my knowledge, I've never been

21        censured for a draft that I've written for

22        State Farm Insurance.

23   Q.   You do your best to follow the State Farm

1        guidelines in all that you do, don't you?

2  A.   I try to be as accurate as possible when I

3        handle a claim or any situation for State Farm

4        Insurance.

5  Q.   Because you enjoy being a State Farm agent,

6        don't you?

7  A.   I enjoy being a State Farm agent.

8  Q.   And you're basically their local

9        representative in Andalusia, aren't you?

10          MS. VAN HEEST:  Object to the form.

11  Q.   Or one of them at least?

12  A.   I'm an independent contractor agent for State

13        Farm in Andalusia.

14  Q.   Where is State Farm based out of?

15  A.   State Farm's --

16          MS. VAN HEEST:  Object to the form.

17  A.   -- headquarters is in Bloomington, Illinois.

18  Q.   Now, are you listed as an agent for State Farm

19        on their website?

20          MS. VAN HEEST:  Object to the form.

21  A.   On the StateFarm.com website, I can be located

22        as an agent.

23  Q.   Does that website say you're an independent

1  contractor agent or just that you're an agent?
2              MS. VAN HEEST:  Object to the form.
3              You can answer.
4  A.  I don't honestly know if it refers to me as
5  agent or independent contractor agent.
6  Q.  In your opinion, why is it important for you
7  to be known as an independent contractor agent
8  rather than a State Farm agent?
9              MS. VAN HEEST:  Object to the form.
10             He has testified that he has a
11             contract with them.
12             MR. WINTER:  Let him answer the
13             question.  You've objected to the
14             form.
15             MS. VAN HEEST:  You can answer.
16  A.  I am an independent contractor agent.  It does
17  not matter to me if I'm -- It's not important
18  to me.
19  Q.  Are you allowed to go out and sell insurance
20  for whomever you want without getting State
21  Farm's approval?
22             MS. VAN HEEST:  Object to the form.
23  A.  To the best of my knowledge, I have to have

1        State Farm's approval on any business that I

2        write other than State Farm and Baldwin

3        Mutual.

4  Q.  Now, when you work with somebody to sell

5        insurance -- when you sell insurance, do you

6        help them fill out an application?

7  A.  Part of my duties as a State Farm agent is to

8        assist customers with applications for

9        insurance to State Farm.

10  Q.  And do those applications on it say State Farm

11        Insurance on the top or do they say Ron Nall

12        Insurance Agency?

13           MS. VAN HEEST:  Object to the form.

14  A.  Can you produce a document you'd like me to --

15  Q.  I don't have one with me.  Do you have a State

16        Farm -- When you fill out a State Farm

17        application for insurance, does it say State

18        Farm on it?

19  A.  I would have to see each document, but I'm

20        sure that most of those documents say State

21        Farm Insurance with my name as the servicing

22        agent.

23  Q.  And if somebody calls your office, how is the

1          phone answered?

2     A.   The standard greeting that we use at our

3          office is State Farm Insurance, Ron Nall's

4          office.

5     Q.   How many people work for you in your office?

6     A.   I have three employees at my office.

7     Q.   Are any of those folks agents?

8     A.   Define what you mean by agents.

9     Q.   Do they sell insurance?  Let me step back.

10         Are they licensed by the State of Alabama

11         as agents?

12    A.   Some of the people in my office have a license

13         with the State of Alabama and some of them do

14         not.

15    Q.   The ones that have a license by the State of

16         Alabama, were they sponsored for that license

17         by State Farm?

18              MS. VAN HEEST:  Object to the form.

19    A.   The people that I have licensed that work at

20         my office are sponsored by me.

21    Q.   You pay those people.  They don't work for

22         free, right?

23    A.   I do pay those people.

1    Q.   And do you pay them with State Farm checks or

2        with Ron Nall checks?

3               MS. VAN HEEST:  Object to the form.

4    A.   They are paid with checks that have my name on

5        them.

6    Q.   Now, as you mentioned before, part of your

7        duties as a State Farm agent is to go out and

8        measure people's homes, correct?

9               MS. VAN HEEST:  Object to the form.

10   A.   Part of my duties as a State Farm agent is to

11       assist potential clients in procuring

12       insurance with State Farm Insurance.

13   Q.   And after you measure their homes, do you

14       provide them with any documentation as to the

15       size of their homes?

16   A.   When I am working with a potential client to

17       write a homeowner's policy, after we have

18       measured the house and put the information in

19       the Exact Value software as I described to you

20       earlier, we review that document with the

21       potential customer.

22   Q.   When you provide that estimate to the

23       customer, tell me what happens when you --

1      tell me generally what happens when you sit

2      down with a customer to review that estimate.

3   A.  In general terms we review that document for

4      accuracy to try to make sure that we get a

5      realistic description of what their house is

6      and how it might -- make sure that all the

7      information is accurate, to make sure that the

8      replacement cost is as complete and accurate

9      as it can possibly be.  Then typically we talk

10      to the customer about what their opinions of

11      what we've produced to them is.

12   Q.  Is it your belief that the customers depend on

13      your expertise when determining what kind of

14      insurance they need?

15              MS. VAN HEEST:  Object to the form.

16              You can answer.

17   Q.  You know they are looking to you for guidance,

18      right?

19              MS. VAN HEEST:  Object to the form.

20   A.  Are you talking about what type of policy to

21      put them in?

22   Q.  Type of policies, limits, those types of

23      things.  Customers are looking for your

1      guidance on that, isn't it?  Isn't that one of

2      those things you offer is guidance?

3                    MS. VAN HEEST:  Object to the form.

4   A.  As a State Farm agent, it's my job to educate

5      them on what options are available to them.

6      But in regards to, like, replacement cost,

7      we're very clear that I'm just there to assist

8      them, that the final decision is theirs.

9   Q.  How many customers do you know that have

10     computer programs which tell them what the

11     replacement value of their home is?

12                   MS. VAN HEEST:  Object to the form.

13  A.  I don't know.  You would have to ask each and

14     every one of those customers.

15  Q.  Have you ever had a customer that had a

16     computer program like you did?

17                   MS. VAN HEEST:  Same objection.

18  A.  I've never asked a customer if they had a

19     computer program like that.

20  Q.  As we sit here today, you can't think of one

21     customer that's said, well, I ran it through

22     my computer program and I got a different

23     price, can you?

1              MS. VAN HEEST:  Same objection.  You

2           can answer.

3    A.   I've never had a customer tell me that before.

4    Q.   Now, if somebody has a claim or something bad

5         happens to somebody and they call you up as a

6         State Farm agent, you take their call, don't

7         you?

8    A.   Well, if anybody calls me, I'm always

9         available to talk to any customer or client or

10        potential client.

11   Q.   As a matter of fact, you're part of the Good

12        Neighbor service, aren't you?

13             MS. VAN HEEST:  Object to the form.

14   A.   When you say Good Neighbor service, I don't

15        understand what you mean.

16   Q.   Is there a service with State Farm that one of

17        your clients can call you 24 hours a day on

18        your number and be connected to State Farm?

19   A.   I have a system in place in my office which we

20        call CRC that connects customers that call my

21        office after hours to a representative at

22        State Farm Insurance.

23   Q.   So 24 hours a day, seven days a week, 365 days

1    a year, if the customer calls your number,

2    they are going to get somebody with State

3    Farm?

4              MS. VAN HEEST:  Object to the form.

5    A.   If a customer calls 24 hours a day, 7 days a

6    week, it's my hope that they will catch either

7    me, somebody at my office or somebody with

8    State Farm Insurance.

9    Q.   And State Farm provides that service through

10   you, right?

11             MS. VAN HEEST:  Object to the form.

12   A.   It is one of the services that is provided to

13   me as a State Farm agent.

14   Q.   Do you have to pay State Farm extra for that

15   service?

16   A.   To the best of my knowledge, it is part of the

17   independent contract -- it's part of that

18   agreement that they will provide that for me.

19   Q.   And State Farm provides you with policy

20   manuals, correct?

21             MS. VAN HEEST:  Object to the form.

22   A.   Define what you mean by a policy manual.

23   Q.   You have policy manuals in your office, don't

1          you?

2     A.   Tell me what you mean by a policy manual.

3     Q.   Do you have manuals that tell you about

4          different types of policies and products

5          offered by State Farm?

6                    MS. VAN HEEST:  Object to the form.

7                    You can answer.

8     A.   I have provided to me mostly in computer

9          format information about the policies that we

10         sell.

11    Q.   And State Farm provides you with computer

12         programs as to different types of policies and

13         evaluations of policies, correct?

14                   MS. VAN HEEST:  Object to the form.

15                   You can answer.

16    A.   State Farm provides me with information about

17         the policies that I sell.

18    Q.   Now, if somebody calls you with a claim, do

19         you contact the adjuster on behalf of your

20         client?

21    A.   No.  When I'm presented with a claim scenario,

22         if it is a type claim that is -- that I can

23         handle, we work on that.  If it's a claim that

1       is beyond my authority or scope, I then

2       forward it on electronically to a claims

3       department and then they handle the claim from

4       there.

5  Q.   There are certain claims that you can handle

6       in-house, though, on behalf of State Farm.

7       Would that be fair to say?

8                    MS. VAN HEEST:  Object to the form.

9                         You can answer it.

10  A.  There are certain types of claims within

11      certain guidelines that I handle for State

12      Farm Insurance.

13  Q.  And you can accept payments on behalf of State

14      Farm, can't you?

15                   MS. VAN HEEST:  Are you talking

16                        about for policies?

17                   MR. WINTER:  Yeah.

18  A.  Part of the duties that I have as a State Farm

19      agent is to assist customers getting payments

20      to State Farm Insurance.

21  Q.  So you can accept payments on behalf of State

22      Farm for those policies, correct?

23                   MS. VAN HEEST:  Object to the form.

1    A.    I accept payment on behalf of State Farm to

2          forward to them.

3    Q.    Are there instances where you can accept

4          payments on behalf of State Farm and that

5          binds the company?

6                    MS. VAN HEEST:  Object to the form.

7                    You can answer.

8    A.    Part of the binding authority that I have with

9          certain policies is accepting a premium.  It

10         is part of the binding authority.

11   Q.    What type of policies is that part of the

12         authority for?

13   A.    I think we have 78 policies.  I mean, you're

14         talking about a general --

15   Q.    Generally.

16   A.    Most property and casualty policies.

17   Q.    And what about homeowner's policies?

18   A.    Part of the binding process that I have with

19         State Farm Insurance to bind coverage is to

20         accept a premium.

21   Q.    Do you advertise on television or radio in the

22         area?

23   A.    Today?

1    Q.    In the past five years.

2    A.    I've never advertised on radio.  Let me take

3          that back.  I've never advertised on TV at

4          this point.  I've had a few advertisements on

5          the radio in some years past but not recently.

6    Q.    Do they play the little State Farm jingle Like

7          a Good Neighbor?

8                    MS. VAN HEEST:  Object to the form.

9                    (Off-the-record discussion.)

10   A.    The advertisements that I use -- Anytime I use

11         an advertisement that says State Farm, I use

12         company-approved marketing materials.  And

13         within radio commercials, they actually have

14         radio commercials that they tag your name on

15         the end.  And those are the ones I've used

16         when I've done radio.

17   Q.    Do you have to make periodic reports to State

18         Farm?

19                    MS. VAN HEEST:  Object to the form.

20                    You can answer it.

21   A.    Could you be more specific on reports?

22   Q.    Under your State Farm contract, do you have

23         reporting -- periodic reporting requirements

1  to folks who oversee you?

2       MS. VAN HEEST:  Object to the form.

3        Are you talking about oversee and

4        supervise them or does he report

5        policies sold?

6  Q. Do you ever make any reports to State Farm?

7  A. I make claim reports to State Farm when we

8   present claims to them.  But other types of

9   reporting like activity or what's going on,

10   there's no reporting that goes on between me

11   and State Farm.

12 Q. You don't have to tell them how many calls

13   you've made to try and sell insurance?

14      MS. VAN HEEST:  Object to the form.

15 A. No, they did not oversee the operations that I

16   do at my office.

17 Q. So they really don't care how many --

18 A. You're going to have to ask them.

19 Q. -- people you solicit?  They just want to know

20   how many policies you've sold?

21      MS. VAN HEEST:  Object to the form.

22 A. They do not want to know how many policies

23   I've sold.

1   Q.   How do they know how much to pay you?

2             MS. VAN HEEST:  Object to the form.

3   A.   They only pay me on business as it is written

4        and accepted by State Farm Insurance.

5   Q.   Let me ask you about that a little.  You said

6        accepted by State Farm.  Were any of the

7        policies that were issued to Mr. and

8        Mrs. Jones during your tenure as a State Farm

9        agent all accepted by State Farm?

10           MS. VAN HEEST:  Object to the form.

11              I'm objecting because I'm

12              unclear.

13           MR. WINTER:  I'm using his language.

14           MS. VAN HEEST:  You can answer.

15   A.   The policies that were issued to the Joneses

16        were written before I became a State Farm

17        agent so you would have to ask the prior

18        insurer.

19   Q.   Did you have any conversations with Mr. and

20        Mrs. Jones prior to the fire?  Let's take it

21        individually.

22        Did you have any conversations with either

23        Mr. or Mrs. Jones prior to the fire?

```
 1                    MS. VAN HEEST:  Object to the form.
 2   A.    I'm sure I had some conversations with
 3         Mr. Jones.  I saw him at Kiwanis from time to
 4         time so I'm sure I had some conversations with
 5         him.
 6   Q.    Do you remember any of the specifics of those
 7         conversations?
 8   A.    I don't ever remember talking to him about
 9         insurance.
10   Q.    Let's talk about -- So as we sit here today --
11         let me make sure I've got this down on the
12         record -- you don't have any memory right now
13         of having any conversations with Mr. Jones
14         about insurance prior to the fire?
15                    MS. VAN HEEST:  Object to the form.
16   A.    To my knowledge I do not remember having any
17         conversations with their insurance prior to
18         the fire.
19   Q.    They could have happened?  You just don't
20         remember it?
21                    MS. VAN HEEST:  Object.
22   A.    To the best of my knowledge, I do not remember
23         having any conversations about insurance with
```

1      the Joneses.

2  Q.   So it would be fair to say there might have

3      been a conversation or two, but you -- just in

4      the course of those five years or however many

5      years, you just might not remember that?

6            MS. VAN HEEST:  Object to the form.

7  A.   To the best of my knowledge, I do not remember

8      having any conversations about insurance with

9      the Joneses.

10          (Brief recess.)

11  Q.  (Continuing by Mr. Winter) Mr. Nall, with

12      respect to -- once you became a full agent,

13      how were you compensated at that time?

14            MS. VAN HEEST:  Object to the form.

15  A.   On June 1, 2002 when I became an independent

16      contractor with State Farm, the compensation

17      that I received from State Farm is commissions

18      and bonuses.

19  Q.   The commissions, is any of that based upon

20      retained business, when policies are resold on

21      an annual basis?

22            MS. VAN HEEST:  You mean renewed?

23            MR. WINTER:  Renewed.

```
 1    A.    When State Farm decides to renew a policy

 2          inside my book of business, I am paid a

 3          renewal commission.

 4    Q.    And what percentage commission is that?

 5    A.    Which product line would you like?

 6    Q.    Let's say homeowner's policies like this one,

 7          like Defendant's Exhibit 14.

 8    A.    The commissions that I'm paid on renewals vary

 9          based on a few different factors.  But as a

10          general rule of thumb, the renewal commission

11          I receive on homeowner's is about 10 percent.

12    Q.    Every time a policy renews on a homeowner's

13          policy like this, the rule of thumb would be

14          that you get 10 percent of that premium?

15    A.    The renewal commission of 10 percent is based

16          on the premium.

17    Q.    And did you, in fact, recommend a commission

18          on the renewals of Mr. and Mrs. Jones'

19          homeowner's policy?

20                MS. VAN HEEST:  Object to the form.

21    A.    Specifically, I don't look at each renewal

22          commission, but I would assume while they were

23          in my book of business that I received renewal
```

1          commissions at renewal.

2     Q.   Let's kind of talk about that book of

3          business.

4               When you started in 2001, was Mr. King in

5          business at that time?  Let me step back.

6               Do you know Mr. Mark King?  Did you know

7          Mr. Mark King before you became an agent here

8          in Andalusia?

9     A.   I did know -- get to know Mr. Mark King before

10         I became an agent.

11    Q.   Was that through your work as an adjuster?

12    A.   No, sir.

13    Q.   How was it?

14    A.   When I relocated here in November of 2000,

15         there was a period of time between that date

16         and June 1, 2001 that I got to know Mr. King.

17    Q.   How did you get to know him?

18    A.   Basically showing up at his office and bugging

19         him.

20    Q.   And where were you working at between the time

21         you first arrived here and June 1 of 2001?

22         What were you doing for a living?

23    A.   I was basically a student for State Farm

83

1        trying to learn how to become a State Farm

2        agent.

3   Q.   I'm probably just a little slow here.  Let's

4        go back to your work history.  We talked about

5        you being a claims representative.  When was

6        the last day -- You're good with the dates so

7        I'm going to ask you this.  When was the last

8        day you were a claims representative for State

9        Farm?

10   A.   I don't remember the specific date.  I can get

11       you generically close.  It would have been in

12       2000, probably somewhere around mid-year.

13   Q.   And after that what did you do after you

14       weren't a claims representative anymore?

15   A.   At that point in time, I was still an employee

16       of State Farm.  I don't know if it technically

17       has a title to what I was doing, internship or

18       whatever you want to call it.  I was in the

19       process of relocating here and going through

20       the training course that State Farm puts

21       potential agents through.

22   Q.   Where is that training course located?

23   A.   Are you asking where I did my training at?

1    Q.    Yes, sir.

2    A.    A good bit of the training that I did was

3          self-study.  I had -- I spent about every

4          other week up at Birmingham where our regional

5          office is located doing a number of training

6          up there.  Between there and self-studies were

7          most of it.

8    Q.    And it was during this time between being a

9          trainee agent -- the time that you weren't a

10         claims adjuster and you became a trainee agent

11         that you moved here to Andalusia?

12   A.    That's correct.

13   Q.    And you got to meet Mr. King because you were

14         an industrious young lad and you were knocking

15         on his door?

16   A.    At that point that I moved here, Mark had

17         already put in his resignation.  It was

18         effective -- would have been effective June 1,

19         obviously 2001.  He was still the agent of

20         record during that period of time, but

21         obviously knowing that I'm going to be the new

22         agent in town, I tried to build a relationship

23         with him to get to know him.

```
 1    Q.    So State Farm -- you moved here with the
 2          understanding that you were going to be taking
 3          over his agency.  Would that be fair to say?
 4    A.    When I moved here, I was already told that I
 5          was going to be appointed trainee agent once
 6          the training was complete.
 7    Q.    And would you be servicing Mr. King's book of
 8          business?
 9    A.    The policies that are in an agent's book of
10          business are owned by State Farm Insurance,
11          and it was my understanding that a portion of
12          his business would be appointed to me when I
13          became a trainee agent.
14    Q.    Did they tell you what portion of that?
15                MS. VAN HEEST:  Object to the form.
16    A.    They gave me some rough numbers on the policy
17          counts that were inside the book of business,
18          but they couldn't tell me specifically how
19          many policies would be appointed.
20    Q.    Well, let's talk about that a little.  How
21          many -- When you took over whatever number of
22          book of business, how many life insurance
23          policies did you have of Mr. -- how many life
```

1    insurance policies did you inherit from State

2    Farm?

3                    MS. VAN HEEST:  Object to the form.

4                    You can answer.

5    Q.   You know what I mean, don't you?

6    A.   State Farm appointed me the book of business,

7         and specifically I can't tell you how many

8         individual life policies, homeowner's

9         policies, auto policies were in that book of

10        business.

11   Q.   But you said they gave you some rough

12        estimates of what it would be.  Do you

13        remember what those rough estimates were?

14                    MS. VAN HEEST:  Object to the form.

15   A.   To the best of my knowledge, I remember that

16        there were about 1200 existing households.

17        Specific policy counts, I can't remember.

18   Q.   In your experience does a household usually

19        have all their policies with State Farm or do

20        people break them up?

21   A.   There's no specific.  I mean, some have one

22        auto and some have ten policies.  There's no

23        way to know that.

87

```
1   Q.   But at least each one of those households have

2        at least one policy of insurance with State

3        Farm?

4   A.   Yes.  To count as a household, it would at

5        least have to have one policy existing in it.

6   Q.   When you took over -- became a trainee agent

7        and took over this book of business, how many

8        employees did you have?

9   A.   On June 1, 2001, I had three employees that

10       were working for me.

11  Q.   Were they the same three employees that had

12       worked for Mr. King?

13  A.   No, sir, they were not the same three

14       employees that worked for Mr. King.

15  Q.   Which employees -- Who were your three

16       employees on June 1, 2001?

17  A.   One of the ladies I employed, her name was

18       Carolyn McGowan, another was Eloise Adams, and

19       the third was Sandy Boyd.

20  Q.   Did Ms. McGowan work for Mr. King?

21  A.   Ms. McGowan did work for Mr. King.

22  Q.   How about Eloise Adams?  Did she work for

23       Mr. King?
```

1   A.   She did not.

2   Q.   Where did they come from?

3              MS. VAN HEEST:  Object to the form.

4                  You can answer.

5   Q.   Where did she work before?

6   A.   Ms. Adams worked for a State Farm agent in

7       Enterprise.

8   Q.   And what about Ms. Cindy?

9   A.   Sandy.  Sandy Boyd also worked for Mark King.

10   Q.   Did you hire any other additional people?

11   A.   No, sir.  Those three were the three that I

12       hired.

13   Q.   Did you locate in the same office or did you

14       have a new location?

15   A.   I moved to a new location.

16   Q.   Do you get a car with your job?  Does State

17       Farm provide a car like Alfa does or

18       Progressive I saw riding down the road?

19             (Brief off-the-record discussion.)

20   Q.   Did State Farm provide you with a car?

21              MS. VAN HEEST:  At what period of

22                time?

23   A.   No.  Did not at any point in time.

1    Q.    What year did you become an adjuster with

2          State Farm?  I apologize if I -- I'm trying to

3          get --

4    A.    My first year as an adjuster with State Farm

5          was 1995.

6    Q.    And where were you located as an adjuster?

7    A.    I started in Columbia, South Carolina.

8    Q.    How did you come to be in Columbia, South

9          Carolina?  Did State Farm move you there or

10         was there a pretty girl?

11                    MS. VAN HEEST:  Object to the form.

12                    MR. WINTER:  She can object to the

13                       form.

14   A.    The regional office -- I was in Tallahassee --

15         living in Tallahassee, and the regional office

16         for what they called the southeast region was

17         in Jacksonville, Florida where I interviewed.

18         The southeast region consisted of north

19         Florida and South Carolina and so they were

20         recruiting for both positions and had a need

21         for me in South Carolina.

22   Q.    And how long did you work in South Carolina?

23   A.    We stayed in Columbia for approximately two

```
 1              and a half years.
 2    Q.    And you were married at that time to your
 3          current bride?
 4    A.    Yes, sir, that is correct.
 5    Q.    When did y'all get married?
 6    A.    We got married on August 7th, 1992.
 7                   (Brief off-the-record discussion.)
 8    Q.    What was that date?  I apologize.
 9    A.    August 7, 1992.
10    Q.    And so you were in Columbia, South Carolina
11          approximately two and a half years.  Where did
12          you go after that?
13    A.    We relocated back into Florida.  I was working
14          at a claims office out of Fort Walton Beach,
15          Florida.
16    Q.    How long were you there?
17    A.    Approximately a year and a half.
18    Q.    Where did you go after that?
19    A.    State Farm decided to close down that claims
20          office, and I took a transfer to Pensacola,
21          Florida.
22    Q.    How long were you there?
23    A.    Approximately two years.
```

1    Q.    Where did you go after that?

2    A.    Andalusia, Alabama.

3    Q.    As an adjuster were you aware the different

4         types of homeowner's insurance that State Farm

5         had for its customers during that time period?

6              MS. VAN HEEST:  Object to the form.

7    A.    My duties as a State Farm adjuster were auto

8         strictly, and my knowledge at that point in

9         time of homeowner's and homeowner's types was

10       limited.

11    Q.    So were you aware that State Farm changed the

12       type of homeowner's policy in 1996 --

13           MS. VAN HEEST:  Object to the form.

14           You can answer.

15    Q.    -- back then?

16    A.    I had no knowledge of that, being from the

17       state of Florida, that Alabama changed its

18       requirements in 1997 or '98.

19    Q.    Now you're aware, though, that there was a

20       change in the policy format back somewhere

21       between 1995 and 1999?  Are you aware of that

22       now?

23    A.    I have been told there was a change in that

1        period of time.

2    Q.   Tell me what you understand about that

3        change.

4                MS. VAN HEEST:  Object to the form.

5    A.   Actually, I have very little knowledge of the

6        material changes that were made in the policy

7        back then.  Since I've been an agent, it's

8        been the same existing policy.  So to look

9        back and see historically what changed before

10       I became an agent has not been very relevant

11       to me.

12   Q.   Fair enough.

13            Let's talk about your interactions with

14       the Joneses after the fire.  Tell me, if you

15       would, the first time that you discussed the

16       fire at the Joneses' house with them.

17   A.   With specifically them?

18   Q.   Yes.

19   A.   We got a phone call the day of the fire, and

20       to the best of my knowledge, Mr. Jones was out

21       of town.  I believe that I spoke with his two

22       sons, and we reported the claim over to the

23       claims department.  I made a visit to the home

1   site shortly after that where I met with

2   Mr. Jones' two sons -- that's Allen and

3   Marcus -- and his wife Peggy.

4 Q. Okay.

5 A. Then I believe Mr. Jones came back the next

6   day or the day after, and I met with them

7   again at the home site.

8 Q. Who was at that meeting?

9 A. Say that again.

10 Q. Who was at that second meeting?  The first

11   meeting you had was with Allen, Marcus and

12   Peggy?

13 A. Yes.  And it was a brief meeting.  Whether it

14   was the day or day after, I can't remember.

15   But Mr. Jones was there along with his wife,

16   and I don't believe -- the grandchildren might

17   have been there.  I had a brief conversation

18   with Mr. Jones, and then the claim rep that

19   was handling it showed up within five minutes

20   or so of me being there.  And I basically let

21   them do their business.

22 Q. Did you write any checks to the Joneses?

23 A. When the claim representative, Mims Hackett --

1    I believe is his name -- showed up at the

2    scene, he had forgot to bring his draft.  And

3    later on that afternoon, Mr. Hackett called my

4    office and asked if I could issue a check I

5    believe in the amount of $5,000 to the

6    Joneses, which I did at his discretion.

7              (Brief off-the-record discussion.)

8  Q.   So you wrote a check in the amount of $5,000?

9              MS. VAN HEEST:  As to what he

10                  believed.  The check will say

11                  whatever the amount is.  I think

12                  it was 4,000, but the check will

13                  say --

14             THE WITNESS:  5,000.

15             MS. VAN HEEST:  It was 5,000.

16                  Whatever the check says is what

17                  it is.

18  Q.   Did you have any other conversations after the

19    second one?  Did you have any other

20    conversations with Mr. and Mrs. Jones?

21             MS. VAN HEEST:  You mean about the

22                  fire or about the policy or

23                  anytime?

```
 1                    MR. WINTER:  We'll get to the
 2                    policy.  Let's just talk about
 3                    the fire right now.
 4    A.   To the best of my knowledge, I did not
 5         personally have any other conversations
 6         regarding the claim with the Joneses.
 7    Q.   Let's talk about the first conversation with
 8         Allen, Marcus, Peggy Jones.  What did y'all
 9         talk about?
10    A.   To the best of my memory, nothing specific,
11         other than I had already submitted the claim
12         over to State Farm so that they could start
13         working on it and that they would have
14         somebody out there, you know, quickly so that
15         we could get this started -- this process
16         started.  I believe on my way over to that
17         conversation I had already spoken with Mims
18         Hackett, and I knew he was coming right behind
19         me or the same day.
20    Q.   You went to the house, though, and you saw it
21         was a total loss at that time?
22                    MS. VAN HEEST:  Object to the form.
23    A.   I did go out to the home site to see the
```

1          damage and to speak with Mr. and Mrs. Jones.

2     Q.   I mean, there was no question, though, that

3          this was a total loss, was there, in your

4          mind?

5                    MS. VAN HEEST:  Object to the form,

6                         because he adjusted auto claims,

7                         and I think the decision on a

8                         total loss would be a claims

9                         thing.

10    Q.   The house was burned to the ground, wasn't it?

11    A.   When I got to the home site, the house was

12         severely damaged and well over my authority to

13         handle anything so obviously the claim needed

14         to go to the claims department.

15    Q.   The second occasion when you were speaking

16         with Mr. and Mrs. Jones, tell me what y'all

17         talked about then.

18    A.   To the best of my memory, our conversation was

19         just a courtesy follow-up just to say, you

20         know, here I am; what can I do to help.  I

21         knew Mims already had the claim.  I remember

22         talking with both Mr. and Mrs. Jones about the

23         photos they had in their hallway that were

1  mounted, the pictures and the memories and the

2  different things.  But there were more of

3  those kind of conversations going on because I

4  knew that they had already been in touch with

5  Mims.  And typically when I deal with a

6  situation that the claims people are already

7  in process handling the claim, I'll ask what I

8  can do to assist, those kind of conversations,

9  but Mims basically has the claim.  He's

10  telling them what he needs them to do, what he

11  requires them to do, and I'm just there to say

12  hello and sorry and what can we do from here.

13  Q.  Best you can remember, you only had those two

14  conversations concerning the claim itself with

15  Mr. and Mrs. Jones?

16  A.  Yes.  To the best of my memory, those are the

17  only two conversations I remember having with

18  them.

19  Q.  Not a trick question.  Just trying to find

20  out.

21  Did you have any other conversations with

22  Mr. and Mrs. Jones other than about the claims

23  after the fire?

1   A.   The only conversations that I remember having

2        with either Mr. and Mrs. Jones after the fire

3        is when they decided to start the process of

4        rebuilding their house.

5   Q.   Tell me about those conversations.

6   A.   For the most part, there's a lady that's in my

7        office that handled 99.9 percent of that.

8   Q.   Which name is that?

9   A.   Her name is Helen Pancake.  Her husband's

10       nickname is Flip.

11  Q.   Tell me about -- Did you specifically have any

12       conversations with Mr. and Mrs. Jones about

13       rebuilding their house?

14  A.   Not to the best of my memory.  I'm fairly

15       sure -- I may have said hello, that kind of

16       thing; how is it going.  I don't remember

17       specifically anything because they were in the

18       process of a builder's risk-type policy where

19       there's actually nothing there.  There's no

20       house.  They are just starting to build.

21       Obviously I wouldn't have to go out and look

22       at the house because there's no house there so

23       I'm pretty sure that Helen wrote or started to

1    write the builder's risk policy, and I had no

2    involvement with that.

3 Q.  So what they were talking to Helen about was a

4    new policy to cover the house they were

5    building?

6 A.  About to build, correct.

7 Q.  Did you have any other conversations other

8    than about the claim or rebuilding the house

9    with Mr. and Mrs. Jones?

10           MS. VAN HEEST:  Before it was

11               rebuilt or after or any --

12           MR. WINTER:  During.  Anytime after

13               the fire.

14 A.  The only conversation I remember having with

15    Mr. Jones is that when I received information

16    regarding this lawsuit, I contacted him and

17    told him that I felt that there was a conflict

18    of interest being his agent and being involved

19    in a lawsuit with him and that it was in his

20    best interest to find another State Farm agent

21    to assist him.

22 Q.  So you told him two things:  One, that you

23    thought it was a conflict because of the

```
 1              lawsuit, right?
 2   A.    (Witness nods head positively.)
 3   Q.    Is that correct?
 4   A.    To the best of my knowledge on that
 5         conversation was that I did feel it was a
 6         conflict, and he needed to find somebody else
 7         to assist him.
 8   Q.    Did you say anything else during that
 9         conversation?
10   A.    No, sir.  It was a very short conversation.
11   Q.    Did you give him any time lines in finding a
12         new agent?
13   A.    No, sir, not to the best of my knowledge.
14   Q.    Did you tell him you were going to cancel his
15         policies?
16   A.    Absolutely not.
17   Q.    So as we sit here today, you have no memory of
18         telling him that you were going to cancel his
19         policy with State Farm?
20   A.    I remember my conversation with Mr. Jones very
21         clearly, and I did not tell him that I was
22         going to cancel his policies.
23   Q.    Any other conversations that you had with
```

1          Mr. Jones other than the two concerning the

2          claim, a conversation about rebuilding the

3          house where you may have said hello, and then

4          the conversation concerning the conflict of

5          interest?

6     A.   No, sir, I do not remember any other

7          conversations with the Joneses.

8     Q.   Do you know of any conversations other than

9          those four -- Do you know of any conversations

10         that members of your staff may have had with

11         the Joneses?

12                   MS. VAN HEEST:  Object to the form.

13    A.   No, sir.  You would have to ask them.  I do

14         not have any knowledge of any other

15         conversations.

16    Q.   They haven't shared with you any conversations

17         that they've had with the Joneses?

18                   MS. VAN HEEST:  Object to the form.

19    A.   Not to the best of my memory.  I do not know

20         of any conversations.

21    Q.   Have you ever made a mistake as a State Farm

22         agent?

23                   MS. VAN HEEST:  Object to the form.

1              You can answer.

2    A.    I make mistakes every day when I'm a State

3          Farm agent, State Farm claims rep or just an

4          average person.

5    Q.    And as an average person, when you make a

6          mistake, what do you try to do about it?

7    A.    Well, when you make a mistake, you've got to

8          identify that you made a mistake and try to

9          make amends and make things right.

10   Q.    Have you ever made a mistake in measuring the

11         size of a house?

12   A.    To my knowledge I can't think of a time I've

13         ever made a mistake measuring a house.

14   Q.    Have you ever heard of that happening before,

15         though?

16              MS. VAN HEEST:  Object to the form.

17              You can answer.

18   A.    To my knowledge I've never had a conversation

19         with an agent or anybody else about

20         mismeasuring of a house.

21   Q.    As an agent, though, if you understood that

22         there was a mistake made in measuring the size

23         of a house, what would you think would be the

1      appropriate thing to do about it?

2                    MS. VAN HEEST:  Object to the form.

3                    You can answer.

4    A.   Well, I actually think it would be difficult

5         for that to happen, and I say that because

6         when I go and measure a house and I talk to

7         somebody about how we come up with the cost

8         from Exact Value, we go over with that

9         customer step by step by step.  Okay?  So I

10        don't have any knowledge of a time that that's

11        ever happened.

12   Q.   You're, obviously from your testimony, very

13        thorough in going over that.  Let's assume

14        that you just made a mistake.  Maybe the wrong

15        number was entered in the computer.  Maybe the

16        wrong number was entered in the application

17        process and the wrong square footage was put

18        into the process.  Okay?

19                    MS. VAN HEEST:  Object to the form.

20                    You can answer.

21   Q.   Assume that for me.  And it was just a mistake

22        made, whether you did it or not.  As an agent

23        what do you think the appropriate thing would

1    be for you to do?

2            MS. VAN HEEST:  Same objection.  You

3                can answer.

4  A.  Since that's never happened, it's hard for me

5      to try to tell you what would happen.  Okay?

6      I've never crossed that bridge before.

7  Q.  What would you do?

8            MS. VAN HEEST:  Are you asking him

9                to speak for someone else, what

10               he would personally do,

11               speculation?

12 Q.  As a State Farm agent, what do you think you

13     would do?

14           MS. VAN HEEST:  Same objection.  You

15               can answer.

16 Q.  Just answer to the best of your ability.  It's

17     probably never going to come into the

18     courtroom anyway.  I just wonder what you

19     think.

20           MS. VAN HEEST:  Same objection.  You

21               can answer.

22 A.  First of all, I would try to verify if there

23     was an inaccuracy.  And then if there was an

1             inaccuracy and I knew there was an inaccuracy,

2             I would probably try to make steps to correct

3             it.

4   Q.   How would you do that?

5                   MS. VAN HEEST:  Same objection.  You

6                       can answer.

7   A.   I would probably meet -- If we're talking

8             about a homeowner scenario, I would probably

9             meet with the homeowner, revisit the home

10            site, redo the first process I did just for

11            accuracy, talk with the homeowner about it and

12            make any corrections that needed to be made.

13   Q.   Just kind of going along the line here as I'm

14            sure your lawyer has explained to you, there's

15            a claim in this lawsuit where Mr. and

16            Mrs. Jones believe that there was an

17            inaccurate measurement of the house and the

18            square footage.  Unfortunately you can't go

19            back and fix it now because the house burned

20            down.  Now that the house has burned down,

21            what do you think the appropriate thing would

22            be to do?

23                 MS. VAN HEEST:  Object to the form.

1          You're asking him to speak for

2          what somebody else would do in a

3          situation he had no involvement

4          in.

5     MR. WINTER:  You objected to the

6          form.  That's all you have to do.

7  Q.  If you can answer the question, answer the

8     question.  And if you can't answer the

9     question, I understand that.  I'm just saying,

10    as a State Farm agent, once you realize that

11    there's been a mistake and the house has

12    burned down to the ground and it's adversely

13    affected one of your clients, what would you

14    do?

15    MS. VAN HEEST:  You're assuming that

16         there's a mistake in your

17         question and not that there

18         isn't --

19    MR. WINTER:  I'm assuming a lot in

20         my question.  So don't guide

21         him.  Object to the form and let

22         him answer the question.

23    MS. VAN HEEST:  Object to the form.

1              You can answer it if you can.

2    A.    Well, I think it's impossible for me to answer

3          that question, and you're talking about a

4          scenario that I had no control over.  Like a

5          lot of things in life, I have control over

6          some things and there's things I don't have

7          control over.  And this is obviously a

8          scenario I had nothing to do with.  I was not

9          a part of it, and I don't know how to answer

10         your question other than talk about the --

11         talk to the people that wrote the policy and

12         find out what happened there.

13   Q.    Let's take a step back, then, and let me see

14         if I can come at it this way.  I'm just trying

15         to understand the process.

16              You inherited a book of business from

17         Mr. King, correct?

18   A.    That is correct.

19   Q.    And one of those policies was the homeowner

20         policy for Mr. and Mrs. Jones, correct?

21   A.    Correct.

22   Q.    Let me ask it this way.  Let me show you

23         what's been marked as Defendant's Exhibit 2.

1           Take all the time you need to review that,

2           Mr. Nall.

3      A.   Okay.

4      Q.   Have you had enough time to review that

5           document?

6      A.   I'm familiar with these type documents.

7      Q.   And what is that document?  Would you identify

8           that for the jury?

9      A.   This document is a printout of a screen that's

10          on the homeowner's policy that talks about the

11          information regarding the homeowner's policy

12          to include the mortgagee.

13     Q.   Do you notice -- So that was a printout from

14          the computer screen on your computer system.

15          Is that fair to say?

16                    MS. VAN HEEST:  Object to the form.

17     A.   It appears to be a printout of a homeowner's

18          policy for State Farm Insurance.

19     Q.   What's the date on that?

20     A.   September 1, 2004.

21     Q.   Who is the insured?

22     A.   This is an incomplete document that does not

23          have the insured listed on it.

109

```
 1    Q.    Let me show you what's been marked as

 2          Defendant's Exhibit 1.

 3    A.    Okay.

 4    Q.    Would you take all time you need to review

 5          Defendant's Exhibit 1?

 6    A.    I'm familiar with this type document.

 7    Q.    Does that look like another page of the

 8          screen?

 9    A.    It appears to be.  There's no way to connect

10          them.  There's no policy numbers on each one

11          of them.  There's no name on it that

12          identifies Exhibit 2 to be tied to Exhibit 1.

13    Q.    Let me represent to you and ask you to assume

14          the following, that the testimony has been and

15          will be that Mr. Jones went to your office on

16          September 1, 2004 and asked one of your

17          employees to print out those two documents,

18          which he was told represented his insurance

19          policy in your computer system.  Okay?  Do you

20          understand what I just said?

21    A.    I understand exactly what --

22                    MS. VAN HEEST:  Object to the form.

23                    You can answer.
```

1          MR. WINTER:  I'm not trying to trick

2               him here.  That's what the

3               testimony is and that's where

4               they came from.  I'm really not

5               trying to trick anybody.

6    Q.   You see on the top left corner that that says

7         State Farm on it?

8    A.   I do see that it says State Farm on it.

9    Q.   Is that the type of printout that will be

10        printed out -- Is Defendant's Exhibit 1 and

11        Defendant's Exhibit 2 the type of printouts

12        that can be printed from your computer system

13        at that time?

14             MS. VAN HEEST:  Same objection.  You

15               can answer.

16   A.   That appears to be printouts of the homeowner

17        policy that would come from any State Farm

18        agent.

19   Q.   Y'all use the same computer system, don't you?

20             MS. VAN HEEST:  Object to the form.

21   A.   They are all based on the same programming and

22        are similar.

23   Q.   Do you note anywhere on Defendant's Exhibit 1

1         or Defendant's Exhibit 2 where it identifies

2         the square footage of Mr. and Mrs. Jones'

3         house?

4    A.    Sure.  On Exhibit Number 2, it has --

5    Q.    What is the square footage listed as?

6    A.    It lists it as 2,128 square feet.

7    Q.    Do you know if that square footage is the

8         correct actual square footage of Mr. Jones'

9         house or not?

10             MS. VAN HEEST:  Object to the form.

11               At this time or in 2004?

12             MR. WINTER:  2001 -- September 1 of

13               2004.

14   Q.    Were you made aware at any time that that was

15        the incorrect square footage of the home?

16             MS. VAN HEEST:  Object to the form.

17               You can answer.

18   A.    I was -- I received a call from Marcus Jones

19        after the fire questioning whether the square

20        footage was accurate or not.  I have no

21        working knowledge to know if that square

22        footage is accurate or not.

23   Q.    Did you ever after you received that phone

1       call have an opportunity to go out and measure

2       the base of the Joneses' home that burned to

3       the ground?

4              MS. VAN HEEST:  Object to the form.

5              You can answer.

6  A.  No, sir.  By the time that my conversations

7       with Mr. Marcus Jones took place, to the best

8       of my knowledge that -- it was -- I don't know

9       the status of the slab or anything else, but

10      claims had already handled it.  And we

11      presented those inquiries that Mr. Marcus

12      Jones, the claims, where it properly needed to

13      go.

14  Q.  So you had a conversation with Marcus Jones

15      after the fire, correct?

16  A.  Yes, sir, I did have a conversation with

17      Marcus Jones after the fire.

18  Q.  And in that conversation, he discussed with

19      you the square footage of the home, correct?

20           MS. VAN HEEST:  Object to the form.

21  A.  To the best of my knowledge, he had some

22      concerns that it was inaccurate, but we

23      didn't -- I don't remember actually talking

113

1    numbers or anything like that.  He just said

2    there was a discrepancy that he was concerned

3    about.

4  Q.  And once you were told this by Mr. Jones, what

5    did you respond to him?

6  A.  I'm just going off my memory.

7  Q.  That's all you can do.

8  A.  I know, and I wish the conversation was more

9    vivid.  To the best of my memory, I remember

10    sharing with him this information that was on

11    the computer screen, the same information that

12    you have printed out here.  And he said there

13    was a discrepancy and basically wanted to know

14    who he could talk to about it.  And that's

15    just the vaguest part of the conversation that

16    I remember.

17  Q.  Did you advise him as to who he should speak

18    with?

19  A.  I told him that he needed to present his

20    questions to the claims department, and he

21    went from there.

22          (Brief off-the-record discussion.)

23  Q.  You had a conversation with Marcus Jones, and

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1     during that conversation you advised him to

2     take his questions or issues concerning the

3     square footage to the claims department.

4     Would that be accurate?

5           MS. VAN HEEST:  Object to the form.

6  A.   I did advise Mr. Marcus Jones about his

7     inquiry about the square footage, the

8     inaccuracies of the square footage of the

9     house, to Mims Hackett specifically.

10  Q.   And you had another conversation with

11     Mr. Jacob Jones concerning the square footage?

12  A.   No, sir, I never had a conversation with

13     Mr. Jacob Jones to the best of my knowledge

14     about the square footage.

15  Q.   Did you have any other conversations with a

16     member of the Jones family about the fire?

17           MS. VAN HEEST:  Other than what he's

18              testified to?

19           MR. WINTER:  Yeah.  Other than what

20              he's testified to.

21  Q.   Marcus Allen or anybody else --

22  A.   No, sir.

23  Q.   -- that you can remember?

115

1   A.   To the best of my knowledge, the conversations

2       we've described are all the ones that I can

3       remember.

4   Q.   Did you ever have any conversation with anyone

5       at State Farm concerning the inaccuracies of

6       the square footage of the home?

7                 MS. VAN HEEST:  Object to the form.

8                 You can answer.

9   A.   After Mr. Marcus Jones inquired, I forwarded

10      his inquiry on to Mims Hackett.  At some point

11      at a later date, he sent a letter to my

12      attention asking for information regarding the

13      same subject matter.

14   Q.   The "he" you're talking about is Marcus Jones?

15   A.   Marcus Jones.  Which then I forwarded that

16      letter on to Mims Hackett once again.

17   Q.   If we're correct in our claim that the square

18      footage in the policy is inaccurate, what do

19      you think should be done about that?

20                 MS. VAN HEEST:  Object to the form.

21                 You can answer.

22   A.   Well, I think that that is best left up to

23      State Farm Insurance.  I did not have an

1    active role in dealing with these policies

2    when they were issued.  I don't feel that I am

3    in any way, shape or form the person to ask

4    what should be done about it.  I think that

5    should be left up to State Farm Insurance.

6  Q.  Did you have anything to do with setting up

7    Mr. and Mrs. Jones' automatic withdrawal from

8    their checking account for the payment of

9    these policies?

10 A.  I personally had no involvement with setting

11    up their automatic withdrawal of any of their

12    policies.

13 Q.  Were you aware they had automatic withdrawal

14    at the time when you were their agent?

15 A.  No, sir.  To the best of my knowledge --

16    Obviously they have some kind of format that

17    they make their payments, but I was not aware

18    they had an automatic withdrawal.

19 Q.  Do you help customers set that up from time to

20    time, automatic withdrawal for payment of

21    premium?

22 A.  Typically it's not an activity that I handle

23    personally.

1  Q.  Do you have somebody in your office help them

2      with that?

3  A.  Usually there's a staff person in my office

4      that helps them.

5  Q.  Is that something State Farm prefers to be

6      done?

7              MS. VAN HEEST:  Object to the form.

8  A.  No, sir.  State Farm has mastered the way to

9      take money in any way, shape or form, monthly

10     quarterly.  It does not matter to them.

11 Q.  Does State Farm have a Best Policies Manual,

12     Best Practices Manual?

13             MS. VAN HEEST:  Object to the form.

14                 You can answer.

15 Q.  You know what the Best Practices are?

16 A.  Yes, I do know what Best Practices are.

17 Q.  Does State Farm have a manual or training in

18     Best Practices?

19 A.  I do believe that they do have a Best

20     Practices Manual.

21 Q.  Automatic withdrawal from one's checking

22     account, is that one of those Best Practices

23     by chance?

1           MS. VAN HEEST:  Object to the form.

2                You can answer.

3   A.   To the best of my knowledge, I have no idea

4        what the Best Practices Manual says about

5        automatic draft.

6   Q.   What benefits are there from your perspective

7        for automatic withdrawal?

8           MS. VAN HEEST:  For him?  For the

9                insured?  The customer?

10          MR. WINTER:  For him.

11          MS. VAN HEEST:  For State Farm?  It

12               could be three people in the

13               question.

14          MR. WINTER:  Let me ask the question

15               better.

16  Q.   Are there any benefits to you as a State Farm

17       agent having a customer be on automatic

18       withdrawal?

19          MS. VAN HEEST:  Object to the form.

20  A.   There are no benefits to me as an agent for

21       having somebody pay me in the payment mode of

22       an automatic draft.

23  Q.   Are there any benefits to State Farm?

1              MS. VAN HEEST:  Object to the form.

2              You can answer.

3    A.   I don't know the answer to that.  You would

4         have to ask State Farm if there's any benefits

5         to them.

6    Q.   I'm going to ask this question.  And as

7         usually a defense attorney, I never know why

8         they ask this question.  But I guess I'm

9         supposed to ask it because plaintiff's lawyers

10        always ask it.  Have you ever been arrested?

11             MS. VAN HEEST:  You mean convicted

12                 of a crime?

13             MR. WINTER:  Let me say arrested

14                 first, and then I'll say

15                 convicted of a crime.

16             MS. VAN HEEST:  Then I have to

17                 object under the rules to

18                 "arrested".

19   Q.   Have you ever been convicted of a crime?

20   A.   I have never been arrested.

21   Q.   Have you ever convicted?  Then I guess not.

22   A.   I've never been convicted of a crime.

23             MS. VAN HEEST:  I guess for the

1    record, I would say if there were

2    any parking tickets that might

3    count as something -- You're not

4    including that in your question?

5    MR. WINTER:  Your lawyer is

6    extremely thorough.

7  Q.  Let me ask you a couple of questions about

8    these policies here.

9    MS. VAN HEEST:  Which exhibit

10    numbers?

11    MR. WINTER:  Let me look at it.

12    MS. VAN HEEST:  You'll get to it?

13    Okay.

14  Q.  In Defendant's Exhibit 1, can you explain to

15    me what years with SF stands for, the YRS with

16    SF?

17  A.  To the best of my knowledge, that is the

18    number of years existing that they've had a

19    State Farm homeowner's-type policy.  It's not

20    inclusive of exactly how many years because

21    it's tied into a discount that State Farm

22    gives.  And the reason that that one is nine

23    plus is because the maximum discount is nine

1      plus.  So basically it says that they've been

2      insured with State Farm for more than nine

3      years is the way that reads.

4   Q.  Why is it important to get the accurate square

5      footage of a home?

6            MS. VAN HEEST:  Object to the form.

7   A.  Well, it's obviously important to get the

8      accurate square footage, not only the accurate

9      square footage but the type of house, the

10      quality of the house, so that when you try to

11      help a customer determine what their

12      replacement cost is for that house that you

13      can be as accurate as possible to help them

14      insure against any catastrophies.

15   Q.  Your determination of what the replacement

16      cost would be, does it take into account

17      events happening to building prices and market

18      prices?

19            MS. VAN HEEST:  Object to the form.

20            You can answer.

21   A.  Well, that's a question that you need to ask

22      State Farm because the program that I use

23      calculates -- it's my understanding that it's

122

1      tied to some kind of inflation index, but I

2      don't get that information.  It is calculated

3      into the formula of the program.

4   Q.  Is there any -- In that program is there any

5      factors or variables based upon local indices?

6                   MS. VAN HEEST:  Object to the form.

7                   You can answer.

8   A.  To the best of my knowledge, there's no local

9      variables that I put in other than the house

10      condition, quality type that deals with the

11      market area.

12  Q.  So the square footage in Andalusia, Alabama

13      may be the same as in Evanston, Illinois or

14      Beaufort, South Carolina or Scottsdale,

15      Arizona?

16                   MS. VAN HEEST:  Are you talking

17                   about what he puts in or what

18                   State Farm uses?  because those

19                   are two different questions.

20                   MR. WINTER:  Let me see if I can

21                   understand.

22  Q.  If you put in a 2,000 square foot house in

23      Andalusia, Alabama and you put in a 2,000

1    square foot house in Whippany, New Jersey, do

2    they come out with the same number if all the

3    variables are the same or is there a location

4    index?

5              MS. VAN HEEST:  Object to the form.

6              You can answer.

7  A.  That's a question you're going to have to ask

8    whoever made that computer program or State

9    Farm.  I don't have any working knowledge

10    other than what goes on in my market area

11    where I can sell and service insurance.

12  Q.  And in your market area, are there any local

13    variables that you put in there?

14  A.  No, sir.  To the best of my knowledge, there's

15    no local market area variables into that

16    program that I control.

17  Q.  Do you talk to any building materials

18    companies when you use that program at all?

19    Have you ever talked to any building material

20    companies or contractors or anybody involved

21    in the building trades about the cost of home

22    rebuilding?

23              MS. VAN HEEST:  Object to the form.

1  A.  Specifically related to a policy I'm writing?

2      Is that what you're asking me?

3  Q.  Yes, sir.

4  A.  The computer program that I use factors in

5      those things on the blind side to me.  They

6      change the variables that control cost and

7      everything else, and I do not have

8      conversations with any builders or building

9      supply people regarding this is right or this

10     is right.

11         When I present an Exact Value to a

12     customer, I basically tell them that that's

13     our opinion and if they don't feel that that's

14     accurate that they should get an appraisal on

15     the house.

16 Q.  Have you build -- When you moved to Andalusia,

17     have you ever had an opportunity to build a

18     house yourself?

19 A.  No, sir, I've not built a house in Andalusia.

20 Q.  Did you buy a house?

21 A.  I did buy a house in Andalusia when we moved

22     here.

23 Q.  And do you have any friends or family members

```
 1            who have built houses in the last five years?

 2    A.      Sure, I've had some friends that have built a

 3            house.

 4    Q.      Have you ever discussed with them the cost of

 5            building houses?

 6    A.      Typically other than just what the house cost,

 7            no, sir.

 8    Q.      In your opinion, do you have any knowledge of

 9            what the cost per square foot -- average

10            cost -- Let me try that one again.

11                 Do you have any knowledge of what the

12            average cost per square foot of building a

13            home is in Andalusia, Alabama?

14    A.      No, sir.  To the best of my knowledge, I have

15            no working knowledge of building costs,

16            building labor costs, square footage costs,

17            nothing.

18    Q.      Do you believe that it's reasonable to rely

19            upon the numbers -- the estimates provided to

20            you by your computer program?

21                      MS. VAN HEEST:  Object to the form.

22                      You can answer.

23    A.      I believe, and I represent this when we talk
```

1      to people about homeowner's policies and how

2      much coverage they should have, that State

3      Farm provides me this tool to use, and I use

4      it and I tell them what I'm doing.  We go over

5      it for accuracy, and it is an opinion.  If

6      they don't agree -- Actually, the decision on

7      how much coverage a policyholder has is

8      theirs.  And if they don't agree, they don't

9      feel it's an accurate representation of their

10     house, then there are other alternatives to

11     determine that.  But it's not me.  It's an

12     appraisal or a building contractor or

13     something.

14  Q.   Do you insure your home through State Farm?

15  A.   My home is insured with State Farm Insurance.

16  Q.   When you insured your home through State Farm,

17     did you put a value?  Did you do the Exacto

18     computer system?

19          MS. VAN HEEST:  Object to the form.

20  A.   When I insured my house, I did an Exact Value

21     Cost Guide just like I would do for any other

22     house.

23  Q.   What did that -- Do you remember what that

1          Exact Cost Guide came out to be?

2     A.   You're talking about the amount of coverage?

3     Q.   Uh-huh (positive response).

4     A.   Specifically, no, sir.  I mean, I can get you

5          close, but --

6     Q.   Generally what was it?

7               MS. VAN HEEST:  Object to the form.

8     A.   The house itself was approximately 240,000.

9     Q.   And what did the -- how much did you pay for

10         that house?

11    A.   For the house and the property at the

12         location, we paid $250,000.

13    Q.   But that included the land, right?

14    A.   Included the land, yes, sir.

15    Q.   So do you believe it would be reasonable to

16         rely upon the Exacto system based upon that

17         experience?

18              MS. VAN HEEST:  Object to the form.

19    A.   Based on that experience, I use that as a tool

20         to help determine if I felt that that was an

21         accurate amount.  I did that as a starting

22         point.  I talked with realtors, my realtor

23         that helped me close the house and do a market

1       analysis of the house.  And they all agreed so

2       I decided to use that.  But specifically to

3       take that piece of information and say, this

4       is exact, this is right, I wouldn't recommend

5       that to myself or any client.

6    Q.  How many of your clients that you've written

7       new homeowner's policies for have actually

8       gone out and gotten an appraisal on their

9       house in order to properly insure it?

10          MS. VAN HEEST:  Object to the form.

11              You can answer.

12   A.  Actually the answer is quite a few.  Not

13       because specifically we tell them to go out

14       and get an appraisal but because they are

15       purchasing a new house and an appraisal is

16       being done.  And what we recommend that they

17       do is to take the information that we provide

18       them and the other information like the

19       appraisal on a new sale and determine how much

20       coverage they are comfortable with.

21   Q.  Have you ever written coverage for someone who

22       doesn't have -- isn't buying a new house but

23       just changing insureds to State Farm?

1    A.    Sure.  I've had that -- That scenario happens

2          often.

3    Q.    At least a weekly basis, right?

4    A.    I'm not sure if it's a weekly basis.

5    Q.    Hopefully on a daily basis.

6    A.    It does happen often.

7    Q.    Do those folks go out and get appraisals on

8          their home?

9                    MS. VAN HEEST:  Object to the form.

10                   You can answer.

11   A.    Specifically, I don't know on each one of

12         them.  I know some that have done that, and

13         I'm sure there are others that have not done

14         that.  Specifically I don't know, you know,

15         who and which and how many and what the

16         percentage is.

17   Q.    Do you tell them they need to do that?

18                   MS. VAN HEEST:  Object to the form.

19                   You can answer.

20   A.    When I have those same conversations with them

21         about replacement costs, once again, we

22         provide them with our tool and what our

23         opinion is and encourage them if they disagree

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1       with that or are not comfortable with that to

2       get an appraisal or go get an opinion from

3       somebody in the contracting business.

4  Q.  But you don't tell them you need to go get an

5       appraisal, do you?

6            MS. VAN HEEST:  Same objection.

7  A.  As part of the homeowner process, when we're

8       talking with people with replacement costs, I

9       do encourage them if they are not comfortable

10      with the opinion we give them or if they are

11      just not sure to go and do that process

12      because State Farm will take an appraised

13      value as replacement cost.

14  Q.  I guess what I'm getting at here, though, is,

15      when somebody comes in and wants insurance

16      from you and you run your Exacto program, you

17      don't say, but this may or may not be

18      accurate; if you don't think it's accurate, go

19      get yourself an appraisal, do you?

20            MS. VAN HEEST:  Object to the form.

21             Are you talking about determining

22             the amount of coverage or whether

23             the program is accurate?  Those

```
 1                     are two different questions

 2                     again.

 3   Q.   Other than Mims Hackett, have you discussed

 4        this -- Other than Mims Hackett -- and I'm not

 5        talking about your attorney or your wife --

 6        have you discussed this matter with anyone

 7        else?

 8   A.   No, sir.  To the best of my knowledge, I've

 9        not had any conversation regarding this

10        matter, other than telling somebody I'm going

11        to a deposition or something passing like

12        that.  No, sir.

13   Q.   Have you talked about this case with anybody

14        else at State Farm?

15   A.   The only person that I have discussed this

16        case with is -- I don't know her name.

17        There's a corporate attorney that contacted me

18        and said that they would be turning over

19        counsel to --

20   Q.   I don't want to know about that conversation.

21                     MS. VAN HEEST:  That's privileged.

22                     MR. WINTER:  I know.

23                     MS. VAN HEEST:  I know you know.
```

1    A.    Other than that, I've not had conversations

2          with anybody at State Farm regarding this

3          matter.

4                    MS. VAN HEEST:  And you're talking

5                        about since the lawsuit was

6                        filed?

7                    MR. WINTER:  I'm talking about at

8                        all.

9                    MS. VAN HEEST:  The whole claims

10                       process other than what he's

11                       testified to?

12                   MR. WINTER:  Right.

13                   MS. VAN HEEST:  Any other person.

14                       Okay.

15   Q.    Have you?

16   A.    No, sir.  I've not to the best of my knowledge

17         had any conversations with any other people

18         than we've mentioned so far about this

19         lawsuit.

20   Q.    Did you do any investigation concerning the

21         inaccurate -- allegedly inaccurate square

22         footage?

23                   MS. VAN HEEST:  Object to the form.

1   A.   The only thing that I did regarding the

2        question of the inaccuracy of the square

3        footage was pull up this computer screen when

4        I talked with Marcus Jones and give him that

5        information, and that is it.  Then, of course,

6        I pushed him on to claims who was dealing with

7        the claim at the time.

8   Q.   Do you know of any other investigation that's

9        been done concerning the incorrect square

10       footage?

11           MS. VAN HEEST:  Object to the form.

12  A.   To the best of my knowledge, I'm not aware of

13       any other investigation that's been done

14       regarding the square footage of this house.

15          (Brief off-the-record discussion.)

16  Q.   What was the name of the program you used

17       before you had the Exacto program?

18          MS. VAN HEEST:  Object to the form.

19          You can answer.

20  A.   I don't remember the name of the program.

21  Q.   Do you know how long that program had been in

22       use?

23          MS. VAN HEEST:  Object to the form.

1   A.   No, sir.  It was existing when I started, and

2        I have no knowledge of when they started using

3        the program.

4   Q.   Let me just make sure I understand this

5        correctly.  Defendant's Exhibits 1 and 2, we

6        looked at these earlier.  I want to make sure

7        this is clear for the record.

8             Is it your testimony those are printouts

9        of screens on your computer system for State

10       Farm?

11                 MS. VAN HEEST:  Object to the form.

12                 MR. WINTER:  I'm not trying to ask a

13                 confusing question.  I just want

14                 to know if that's what they are.

15                 MS. VAN HEEST:  His screen looks

16                 like -- At the time, September 1,

17                 2004, would this have been an

18                 accurate printout of those two

19                 screens?

20                 MR. WINTER:  Exactly.

21                 MS. VAN HEEST:  Okay.

22  A.   To the best of my knowledge, they appear to be

23       such.  But, like I said, there's no way for me

1   when it's off the computer screen on two

2   pieces of paper to tie that this one and this

3   one are together.  The dates are the same, and

4   that's the only thing that's the same.  And

5   I'm not trying to say they are not.  I'm just

6   trying to say you're putting two things in

7   front of me and asking me to say are they

8   together.  It looks like that's a correct

9   statement, but ...

10  Q.   I understand.

11       Let me ask you just to kind of see if we

12  can maybe clear this up a little better.

13       Could you explain to me -- Is there

14  anything in there that is similar between

15  Defendant's Exhibits 1 and 2, for example, the

16  current coverage amounts?

17  A.   There are similarities obviously, and, like I

18  said, I'm not trying to question that.  I just

19  want to make it understood that I'm taking

20  your word that those two are connected.  I

21  understand the one sixteen nine and the one

22  sixteen nine.

23  Q.   For example, the year built on both homes --

1          on Defendant's Exhibit 1, the year built was

2          1970.  On Defendant's Exhibit 2, the year

3          built was 1970, correct?

4     A.   That appears to be correct.

5     Q.   And the replacement cost on both of those

6          appears to be $116,900.  Does that look

7          correct?  Or in the current coverage --

8     A.   The current coverage and dwelling amount

9          appear to be both one hundred sixteen nine.

10    Q.   On Defendant's Exhibit 2, what is the

11         R-E-I-N-S-P C-O-M-P-L, 3/11/97 by agent mean

12         to you?

13    A.   To the best of my knowledge -- Since that

14         happened before I became an agent, to the best

15         of my knowledge it means that at some point in

16         time, either it was reviewed or inspected

17         before I became an agent.

18    Q.   Well, this comes off the computer screen that

19         was in your office.  Would that suggest to you

20         that a reinspection to you was completed on or

21         about March 11, 1997 by the agent?

22                   MS. VAN HEEST:  Again, object to the

23                        form.  You can answer.

1   A.   Once again, that happened before I became an

2        agent, and I cannot testify honestly what

3        happened on 3/11/1997.

4   Q.   On Defendant's Exhibit 1, what does home alert

5        F-E-D-B-S-A mean?

6               MS. VAN HEEST:  Object to the form.

7   A.   To the best of my knowledge, that should

8        mean -- fire extinguisher, dead-bolts, smoke

9        alarm should be what those acronyms stand for.

10   Q.   Now, let me just make sure I'm correct on

11        this.  It's your testimony that whenever you

12        do a home insurance policy, you'll go out and

13        measure the home?

14               MS. VAN HEEST:  Object to the form.

15   A.   When I'm approached about writing a

16        homeowner's policy, I will do everything

17        within my power to accurately get the

18        information off the square footage and

19        condition of the house and quality of the

20        house so we can accurately represent our

21        opinion on what replacement cost is of the

22        Exact Value program.

23   Q.   That means you go visit the home, right?

1    A.    I'm required to visit every home before I bind

2          coverage with State Farm Insurance.

3    Q.    Are you required to do that if there's a

4          change in the policy provisions like the

5          square footage of the home or additions in the

6          home or renovations to the home?  Are you

7          required by those policies to go out and visit

8          the home?

9                    MS. VAN HEEST:  Are you assuming

10                       that he's notified of them?

11               MR. WINTER:  Yeah.

12               MS. VAN HEEST:  Okay.

13   A.    If I'm notified of a material change that

14         would change the replacement cost of a home,

15         then I would go out and recomplete the Exact

16         Value program and review that with the

17         customer.

18   Q.    When you write insurance coverage for a

19         customer, do you go over the policy with the

20         customer?

21   A.    Are we talking about a homeowner's policy?

22   Q.    Yes, sir.

23   A.    As a typical rule of thumb, we will answer any

1        questions that a customer has about a policy

2        and in generic terms provide them with what

3        the policy does.  I have a State Farm pamphlet

4        at my office that State Farm gives us to give

5        to customers about what the policy does.  Plus

6        we provide them with a generic policy for

7        reading if they choose to do so.

8  Q.    Why do you have the pamphlet?

9  A.    It is a layman's term, if you will, on how the

10       policy works and acts as opposed to most

11       people not wanting to read a policy.

12  Q.    Why don't they want to read the policy?

13           MS. VAN HEEST:  Object to the form.

14  A.    You would have to ask them, but when I speak

15       with people doing insurance reviews and such

16       and I ask them have they read their policy,

17       typically the answer I get is no.

18  Q.    Have you ever had occasion where people try to

19       read the policy and it's not very easy to

20       read?

21           MS. VAN HEEST:  Object to the form.

22           You can answer.

23  A.    No, sir.  I do have customers that call me

1          with questions, and I do everything within my

2          ability to help them answer those questions.

3    Q.   But policies aren't easy documents to read,

4          are they?

5                    MS. VAN HEEST:  Object to the form.

6                    You can answer.

7    A.   I guess that depends on who is reading them.

8    Q.   Well, yeah.  If you're an insurance agent who

9          is educated, trained and experienced in

10         insurance policies, it might not be so

11         difficult to read.  That would be fair to say,

12         wouldn't it?

13                   MS. VAN HEEST:  Object to the form.

14                   You can answer.

15   A.   I think there's attorneys and a lot of people

16         that read these forms just fine.  And I think

17         if people need help with assisting them with

18         understanding what's in that policy, I'll do

19         everything I can to help them with that.

20   Q.   Absolutely.  But that's why you have a special

21         education with policies that the average Joe

22         may not have, right?

23                   MS. VAN HEEST:  Object to the form.

1        The policy speaks -- You're

2        having him speculate as to what

3        somebody understands and doesn't

4        understand.

5              MR. WINTER:  Just object to the

6              form.  It was a bad question, and

7              the judge will throw it out.

8              Don't try and educate him.

9   A.   You're asking me to speak to an individual's

10       level of comprehension of reading, and I just

11       don't think I'm qualified to do that.  You can

12       go ask the customers if that's something you

13       need to do.

14  Q.   But you have pamphlets, nevertheless, for

15       folks to help them understand the policies?

16             MS. VAN HEEST:  Object to the form.

17  A.   We provide lots of material in our office to

18       help educate everybody on exactly how the

19       policy works.

20  Q.   So from the date that you were a trainee agent

21       June 1, 2001 through the time that Mr. Jones

22       changed his agent of record, you received a

23       commission on the policy sold to Mr. Jones,

1    correct?

2              MS. VAN HEEST:  Object to the form.

3    A.   While his policies were active in my book of

4         business at renewal, I would have received a

5         renewal commission, correct.

6    Q.   Because you were his agent of record at that

7         time?

8              MS. VAN HEEST:  At what period of

9                   time, 2001?

10             MR. WINTER:  One through the time he

11                  changed his agent of record to

12                  Tim Brian.

13   Q.   From the time you were a trainee agent on June

14        1, 2002 until he changed his agent of record

15        to Mr. Brian, you sold Mr. Jones insurance

16        policies, correct?

17             MS. VAN HEEST:  Object to the form.

18                  You can answer.

19   A.   From June 1, 2001 when I became a trainee

20        agent while Mr. Jones' policies were in my

21        book of business, I didn't -- You said that I

22        wrote them.  When they renewed at State Farm's

23        discretion, I received a renewal commission.

1         I didn't -- You don't sell them a policy every

2         year.

3  Q.   But you got a commission off the renewal of

4         those policies?

5  A.   During --

6             MS. VAN HEEST:  Object to the form.

7  A.   During that period we're talking about, if

8         those policies were active and they renewed

9         while they were in my book of business, I

10       would have received a renewal commission.

11  Q.  And during that time, you were Mr. Jones'

12       State Farm agent of record, correct?

13  A.  From June 1, 2001 until he transferred those

14       policies to Tim Brian, I was the servicing

15       agent on Mr. Jones' policies.

16           MS. VAN HEEST:  Off the record.

17          (Brief off-the-record discussion.)

18  Q.  Do you get to see the declarations page before

19       they are sent to Mr. Jones during that time

20       period?

21  A.  The renewals that come from State Farm

22       Insurance go straight from Birmingham and go

23       straight to the customer.

1    Q.    So you don't actually sign the renewal

2          declarations pages?

3    A.    That is correct.  I do not sign renewal

4          policies.

5    Q.    But you sign the original policies that are

6          sent?

7                    MS. VAN HEEST:  Object to the form.

8    A.    When a policy is originated out of my office,

9          if it is required of -- for like a closing,

10         for instance, I will sign those.  But as

11         typical business, it does not even require my

12         signature.

13   Q.    Are all the policy -- homeowner policies that

14         you sell for State Farm in terms of the policy

15         conditions themselves the same?

16                   MS. VAN HEEST:  Object to the form.

17                   You can answer.

18   A.    With State Farm Insurance, I have one

19         homeowner's policy so the conditions and such

20         are the same.

21   Q.    Do all the policies that -- All the homeowner

22         policies that you sell, do they all have

23         Option ID on them?

1                    MS. VAN HEEST:  Object to the form.

2    A.    No, sir.  It's an option.

3    Q.    You pay extra for that option?

4                    MS. VAN HEEST:  Object to the form.

5    A.    No, sir.  There's not a cost associated with

6          Option ID.  The requirement for Option ID is

7          that the policyholder insure the house for 100

8          percent of replacement cost.

9    Q.    Would you say that to me one more time?

10         because I didn't understand that.

11   A.    Option ID does not have a cost associated with

12         it.  The requirement to receive Option ID is

13         to insure the house at 100 percent of

14         replacement cost.

15   Q.    How do you determine what the 100 percent of

16         the replacement cost is?

17   A.    When I sit down with the customer and review

18         writing a homeowner's policy with them, I

19         would go out to the house and we measure it

20         and take all the variables off of the house to

21         include quality and condition.  I put it into

22         the Exact Value program as we've discussed

23         before.  I present that to them and encourage

1          them to look at that, and if they are

2          comfortable with that, to use that; if not, to

3          get an appraisal, something they are

4          comfortable with, since that decision is

5          theirs.

6     Q.   Who makes the final determination as to the

7          100 percent final replacement cost?  Is it you

8          or is it the customer?

9     A.   The replacement cost is actually  --

10         Replacement cost -- If the customer agrees

11         with what we use from the Exact Value program,

12         it will become the replacement cost and that's

13         what we do today.  If they disagree with the

14         Exact Value replacement cost, they have the

15         option of getting an appraisal.  And if it is

16         approved by State Farm underwriting, it

17         becomes the replacement cost.

18    Q.   Are you comfortable with the Exacto Value?

19              MS. VAN HEEST:  Object to the form.

20              You can answer.

21    A.   I am comfortable with using it as part of the

22         equation, as a tool to use and if the customer

23         is not comfortable with it, using appraisal

1    value.

2  Q.  And in your experience, does the Exacto Value

3     give a value that is higher or lower than the

4     actual replacement cost when claims are made?

5            MS. VAN HEEST:  Object to the form.

6            You can answer.

7  A.  We've been using Exact Value for a couple of

8     years give or take a little bit.  And I've not

9     had any of the customers that I've written and

10    used that as part of the replacement cost

11    equation to be -- I've probably only had a

12    couple of total losses -- that have had any

13    problems with the replacement cost.

14 Q.  Do you know of any studies that have been done

15    by State Farm or anyone as to the accuracy of

16    the value provided by the Exacto computer

17    program?

18           MS. VAN HEEST:  Object to the form.

19           You can answer.

20 A.  I'm not aware of any studies that have been

21    done regarding that program and/or the results

22    it provides.

23 Q.  I'm assuming that you believe State Farm would

1          have tested it to make sure it was an accurate

2          program, right?

3                    MS. VAN HEEST:  Object to the form.

4     Q.   I'm just trying to understand where this

5          program came from.

6                    MS. VAN HEEST:  Same objection.

7     Q.   Is it one of those where your guess is as good

8          as mine?

9                    MS. VAN HEEST:  Object to the form.

10                       He's told you already that --

11                   MR. WINTER:  You objected to the

12                      form, now.  Come on.

13    A.   State Farm did not ask me if I thought the

14         Exact Value program was a program that I

15         should use or not.  They said this is the tool

16         that we use, and it's available to you.

17    Q.   Did you investigate any other programs?

18    A.   No.  I did not investigate any other programs

19         because State Farm wants me to use the Exact

20         Value program.

21    Q.   The customer does not pay anything extra for

22         the increased dwelling, correct?

23                   MS. VAN HEEST:  Object to the form.

1    A.    As far as I know, Option ID does not have a

2          cost associated with it.

3    Q.    Does everybody get Option ID?

4                MS. VAN HEEST:  Object to the form.

5    A.    No, not everybody receives the Option ID.

6    Q.    Who would not get the Option ID?

7    A.    A customer that came in that we established

8          replacement cost at 100,000 that said I do not

9          want 100,000, I want $80,000 worth of

10         coverage.  So they have not taken what we

11         think is 100 percent -- what is established as

12         100 percent replacement cost.  They've taken

13         less than that, and they will not get Option

14         ID.

15   Q.    And you make that determination?

16                MS. VAN HEEST:  Object to the form.

17                You can answer.

18   Q.    Who makes the determination who gets it or

19         not?  Is that you?

20                MS. VAN HEEST:  Object to the form.

21   A.    No, sir.  Ultimately it's State Farm

22         Insurance.

23   Q.    How does State Farm know that they are not

1    eligible for Option ID?

2                 MS. VAN HEEST:   Object to the form.

3    A.   Because when we write a homeowner's policy,

4         once the customer and I agree on what

5         replacement -- everybody is comfortable with

6         what replacement cost is, whether it's Exact

7         Value or appraisal, once that's established,

8         then basically either A and B equal each

9         other or -- In other words, the amount of

10        coverage that they have and replacement costs

11        equal each other and you get Option ID or they

12        don't equal each other and you don't get

13        Option ID, as far as I understand it.

14   Q.   Have you ever disagreed with the customer as

15        to the actual value -- the actual replacement

16        value?

17                MS. VAN HEEST:   Object to the form.

18   A.   I have had instances where we have had

19        discrepancies between a customer and myself on

20        what replacement cost should be.

21   Q.   Where they felt the replacement cost was lower

22        than what you came up with?

23   A.   There's been cases of both.

1    Q.    Let's talk about the ones where the customer

2          said the replacement value was lower than what

3          you said.

4    A.    Okay.

5    Q.    Have you had that happen?

6    A.    I have had times where the customer felt that

7          replacement cost was lower than what the Exact

8          Value program told us it would be.

9    Q.    Let's break this down a little here.  I think

10         this is something I'm trying to grasp here,

11         and I'm not the smartest guy in the world so

12         I'm going to try and grasp it.

13              Let me step back a second.  Have there

14         been times since you've been an agent with

15         State Farm where you disagreed -- you and a

16         customer disagreed as to the replacement value

17         of a dwelling?

18   A.    Yes, there have been times when a customer and

19         I disagreed on what Exact Value is telling us

20         replacement cost is and what they feel

21         replacement cost should be.

22   Q.    So there's got to be two types of

23         disagreement:  one, where the customer feels

1          the replacement cost is more than what you

2          believe the replacement cost is, and the other

3          where the customer believes that replacement

4          cost is less than you believe the replacement

5          cost is, correct?

6     A.   I've had both occasions where customers

7          disagree between what the Exact Value

8          replacement cost is, both higher and lower,

9          and what they feel the replacement cost should

10         be.

11    Q.   When customers believe that the replacement

12         cost is more than the Exact Value cost and

13         they want more coverage than the replacement

14         cost value, they are still eligible for Option

15         ID, correct?

16              MS. VAN HEEST:  Object to the form.

17    A.   Well, that's a question you need to ask State

18         Farm because specifically I don't know that

19         scenario.  I don't know how that scenario

20         plays out in regards to Option ID.

21    Q.   Let's say a customer comes in and you run the

22         Exacto number, and the Exacto replacement

23         value is 100,000 but the customer says they

1       want 120,000 in replacement cost.  Are they

2       eligible for Option ID?

3                        MS. VAN HEEST:  Object to the form.

4                        You can answer.

5    A.   Once again, you're going to need -- you need

6         to talk to underwriting at State Farm.  That's

7         not something that I understand.  But -- so

8         you need -- that's who would answer that

9         question.

10   Q.   What if Exacto says 100,000 and the customer

11        says they want 80,000 dollars replacement

12        cost?  Are they eligible for Option ID?

13   A.   To the best of my knowledge, they would not be

14        eligible if everybody agreed on replacement

15        cost.

16   Q.   That's not my question.

17   A.   That's the answer, though.

18   Q.   Let me ask my question again.

19             Let's say that the Exacto program comes up

20        with 100,000, and your -- and the customer

21        wants 80,000.  Would they be eligible for

22        Option ID?  If the customer wants less than

23        the Exacto says, are they eligible for

1        option --

2  A.    Are you --

3             MS. VAN HEEST:  Object to the form.

4  Q.    I'm not pinning it on the numbers.

5  A.    I understand.  Are you specifically saying

6        that the customer feels that the replacement

7        cost is 80,000 or they just want $80,000 worth

8        of coverage?  There's a difference.

9  Q.    Explain the difference to me.

10  A.    If somebody comes in and I run -- I measure

11        the house and do everything and the Exact

12        Value program says replacement cost is 100,000

13        and a customer comes in and says, I don't

14        think the house is worth $80,000, I think I

15        could rebuild it for -- or a hundred thousand;

16        I think I could rebuild it for 80, then you

17        have a discrepancy on what you believe is

18        replacement cost.

19          A customer can come in and I do

20        everything -- the Exact Value says 100,000 and

21        they go, I believe that 100 percent of the

22        replacement cost is $100,000, but I only want

23        $80,000 because that's what my note is.  You

1    have two different scenarios, and I'm not sure

2    what you're asking.

3  Q.   Let's look at each of them.  Let's look at the

4    first one you described where there's a

5    disagreement or discrepancy about what the

6    replacement value of the home is.

7  A.   In that scenario, since we cannot establish

8    replacement cost, we can't agree on it, you

9    have to take another step to determine what

10    replacement cost is.  And what I would do if

11    this was a customer in front of me is I would

12    recommend to them that they get the house

13    appraised, and then we can determine --

14       The first thing you have to do to be able

15    to determine whether they can receive Option

16    ID is you have to agree on what replacement

17    cost is.  Like I said, if they take 100

18    percent of replacement cost, they'll get

19    Option ID.

20  Q.   So if they come in and you've got the Exacto

21    saying 100,000 and they are saying 80,000, you

22    tell them they need to go get an appraisal.

23    Is there a margin of error that you recommend

1      there be an appraisal done?

2                      MS. VAN HEEST:  Object to the form.

3                      You can answer.

4   A.   No, there's not a margin of error.  Typically

5        if you think the house -- If the Exact Value

6        says replacement cost is a hundred thousand

7        and the customer thinks it's 98,000, I would

8        assume -- You would have to talk to them, but

9        I would assume they would take the hundred

10       thousand dollars as replacement cost and go

11       from there.  But if it's a large discrepancy,

12       you would have to ask the customer.  It's what

13       the customer is comfortable with is the final

14       determination on the process that you take

15       once you have a disagreement on what

16       replacement cost is.  They could just go to

17       another insurance company and say I don't want

18       to mess with Ron Nall.

19  Q.   So the customer makes a final determination of

20       what the replacement cost is?

21  A.   The customer has to agree on what the final

22       cost of replacement cost is.  They have to be

23       in agreement with that.

1    Q.    Well, then, let's take the second situation

2          you were talking about, Ron, where they only

3          want $80,000 in coverage.  What happens in

4          that situation?

5                    MS. VAN HEEST:  Object to the form.

6                    You can answer.

7    A.    To the best of my knowledge, we would -- if

8          other guidelines and conditions were met, we

9          would write them a policy for $80,000 and they

10         would not be eligible for Option ID.

11   Q.    So they basically have to -- they have to

12         affirmatively state they are going to get less

13         than the agreed-upon replacement value?

14                   MS. VAN HEEST:  Object to the form.

15                   You can answer.

16   Q.    Is that a fair way to say it?  I'm not trying

17         to put words in your mouth.

18                   MS. VAN HEEST:  Same objection.  You

19                   can answer.

20   A.    When somebody approaches me about writing

21         homeowner's, we do the same steps.  We work on

22         replacement cost.  We start with Exact Value.

23         If there's a disagreement, then you go from

1    there.   State Farm has guidelines from how

2    much coverage -- once replacement cost is

3    agreed upon by the insured of how much

4    coverage I can actually write for them.

5    Q.   What is the Ordinance Law 10 percent, Option

6         OL?   What's that for?

7    A.   To the best of my knowledge, the ordinance

8         coverage deals with situations where you have

9         a loss on a homeowner's policy and the code --

10        the building code has changed and you have to

11        incur extra cost to bring the house to code in

12        part of the repair.   And the State Farm policy

13        allots 10 percent of Coverage A for that.

14   Q.   What is the special limits endorsement?   What

15        is that for?

16              MS. VAN HEEST:   Object to the form.

17   A.   Can you show me the document?

18   Q.   Defendant's Exhibit 12, the bottom left.

19   A.   You would have to -- It's an endorsement to

20        this policy.   The endorsement number is

21        FE5258.   You would have to produce that for

22        me, please.

23   Q.   Do you know what that is?

1                     MS. VAN HEEST:  Object to the form.

2    A.    I need to see the document.  Without seeing

3          it, I think I'm fairly sure what it is, but I

4          need --

5    Q.    Tell me what you're fairly sure it is because

6          I don't have a copy of it.

7                     MS. VAN HEEST:  Do you want me to

8                          look for a copy?

9                     MR. WINTER:  If you've got a copy,

10                         that would be great.

11                    THE WITNESS:  Do you want me to

12                         answer what I think that that

13                         is?

14                    MR. WINTER:  Go ahead.  And if it's

15                         different --

16                    MS. VAN HEEST:  Object to the form.

17                         For the record, the document

18                         speaks for itself.  You can

19                         answer.

20   Q.    I just wondered what it is.

21   A.    To the best of my knowledge, typically a

22         homeowner's policy has some sub limits on

23         separate types of coverages that you have.

1       For example, the most a homeowner's policy

2       will pay under State Farm for firearms is

3       $5,000.  Those are called special limits.

4       They have a jewelry special limit, a firearm.

5       It could be different kinds.  I'm fairly sure

6       that that's what that is.

7              MS. VAN HEEST:  Special liability

8                 coverage, page 3.

9  A.   It's sub limits and the most this policy will

10      pay.

11              MS. VAN HEEST:  That may not be the

12                 policy number there, but to his

13                 testimony, that's what he's

14                 referring to.

15              MR. WINTER:  I understand.  I was

16                 just trying to figure out what

17                 the special limits was, if that's

18                 a separate form.

19  A.   It's an endorsement to that policy.

20           (Brief off-the-record discussion.)

21  Q.   When you received your insurance license in

22      the state of Alabama, were you sponsored by

23      State Farm?

1   A.   To the best of my knowledge, when I went

2         through the licensing process, I was sponsored

3         by State Farm.

4   Q.   Do you know of any documents State Farm

5         provides to an insured which tells them how

6         many square feet their home was insured for?

7                MS. VAN HEEST:  Object to the form.

8                    Are you talking about other than

9                    the declarations sheet and the --

10              MR. WINTER:  I'm talking about any

11                    document.

12   Q.   I don't think there is, but I'm just asking

13         you if you know of any document that State

14         Farm provides to their insureds which tells

15         them how many square feet their house is

16         insured for.

17                MS. VAN HEEST:  Object to the form.

18                    You can answer.

19   A.   Are you talking about today?

20   Q.   I'm --

21   A.   Business as we know it right this second?

22   Q.   Yeah.

23   A.   Not talking about 2001?

1   Q.   Let's talk about today first, and then we'll

2        go back.

3   A.   The procedure, like we've discussed, is I sit

4        down with the customer.

5   Q.   I've got the procedure.  I'm not trying to cut

6        you off.  I'm just trying not to keep you here

7        all day.

8             Do you know of any document that is

9        provided by State Farm to the insured which

10       details the square footage of their home which

11       is being insured?

12                  MS. VAN HEEST:  I think he was

13                       getting to that with what happens

14                       today and what he's testified to.

15  Q.   I'm sorry, then.

16                  MS. VAN HEEST:  Object to the form.

17  Q.   I shouldn't have cut you off.  I apologize.

18  A.   Well, I just want to be specific.  If we do

19       business today and you come to my office

20       today, you're going to have a copy of the

21       Exact Value program that I use which does

22       include the square footage, the type, the

23       quality, whether you've got hard woods,

1    carpet, whatever you have, and that document

2    has square footage on it.  So if you left my

3    office and -- you would understand if we wrote

4    a piece of business or went over that document

5    of what square footage I used to calculate the

6    cost of insurance.

7  Q.  Was that put in place with the exact -- When

8      did that policy come -- When did State Farm

9      folks start doing that?

10          MS. VAN HEEST:  Object to the form.

11 Q.  When did you start doing that?

12 A.  I've done it since I've become an agent either

13      with the Exact Value program that we have in

14      place or the program prior to that.  It had a

15      printout similar, but it was just a different

16      program that we used.

17 Q.  But that's not provided to the customer on a

18      regular basis?  Only at the first time,

19      correct?

20          MS. VAN HEEST:  Object to the form.

21              Are you talking about this or

22              just in general?  I guess I

23              object.

1                    MR. WINTER:  You can object.  I'm

2                    not trying to be contentious

3                    either, please.  Don't take it as

4                    such.

5    Q.   You don't know any document that was sent to

6         the Joneses which told them the square footage

7         that their home was being insured for, do you?

8                    MS. VAN HEEST:  Object to the form.

9                    You can answer.

10   A.   I don't have any knowledge of any of the forms

11        that were sent to the Joneses, whether they

12        had square footage on them or not.

13   Q.   Fair enough.

14            As you do business today, is any form sent

15        to the insured which details how many square

16        feet -- the square footage of the home that's

17        being insured?

18                   MS. VAN HEEST:  Same objection.

19   A.   There's no documents that come out of my

20        office that I have personal knowledge of that

21        have square footage on them other than the

22        ones we've already described.  What comes from

23        State Farm, you'll need to speak with State

```
 1          Farm about.

 2   Q.   Do you know of any that come from State Farm?

 3              MS. VAN HEEST:  Same objection.

 4   A.   Once again, I think to be accurate with you --

 5   Q.   I'm just asking if you know of any forms.

 6   A.   I'm not aware of any that do or don't have any

 7        square footage markings of a homeowner policy.

 8              (Brief off-the-record discussion.)

 9   Q.   Have you ever had a lawsuit filed against you

10        before?

11   A.   I've not been named in any lawsuit.

12   Q.   Has your insurance company been named in any

13        other lawsuits?

14              MS. VAN HEEST:  Object to the form.

15                  His insurance that he has

16                  personally or --

17              MR. WINTER:  No.  His insurance

18                  company that he works at now.

19                  He's an employee --

20              MS. VAN HEEST:  His agency?  The Ron

21                  Nall Agency?

22              MR. WINTER:  Yeah.

23   A.   I thought you were talking about State Farm.
```

1  Q.    Well, we know State Farm --

2  A.    That's exactly what I thought you were saying.

3              MS. VAN HEEST:  That's why I was

4                  clarifying before he answered.

5  A.    I've not been a part of any lawsuits or

6        litigation.

7  Q.    Let me show you Defendant's Exhibit 5.  If you

8        will, take all the time you need to look at

9        that.

10             (Brief off-the-record discussion.)

11             MS. VAN HEEST:  The question on the

12                 table was do you recognize

13                 Defendant's Exhibit Number 5.

14             MR. WINTER:  Yes.

15  A.    I have read this document before.

16  Q.    On page 2 of this document you were cc'd?

17  A.    Yes.

18  Q.    Did you read it at the time it was sent to

19        you?

20  A.    I did read it at the time it was sent to me

21        from claims.

22  Q.    Do you have any reason to disagree with any of

23        the statements made in that document?

1           MS. VAN HEEST:  Object to the form.

2                 You can answer.

3    A.    Since I did not handle the claim and since I

4          don't have working knowledge of what went on

5          between Mims, claims, and the Joneses, it's

6          one of those things that I reviewed to see

7          what claims was doing and then moved from

8          there because I don't have working knowledge

9          of how the claim was proceeding.  I didn't see

10         any discrepancies.

11   Q.    Let me show you what's marked as Defendant's

12         Exhibit 6.  Take all the time you need to

13         review that.

14   A.    Okay.

15   Q.    What is that document?

16   A.    It appears to be a declarations page for a

17         homeowner's policy October 8, 1996 to October

18         8, 1997 for the Joneses.

19   Q.    And you were not an agent for State Farm at

20         that time, correct?

21   A.    I was not an agent for State Farm at that

22         time.

23   Q.    So you would have no knowledge of what

1         happened during that period of time?

2    A.   You're correct.  I would not have any

3         knowledge what happened during that policy

4         period.

5    Q.   Let me show you what's been marked as

6         Defendant's Exhibits 16 and 17.  Take all the

7         time you need to review Defendant's Exhibits

8         16 and 17.

9    A.   Okay.

10   Q.   Have you had an opportunity to review those

11        documents, sir?  I know the policy is

12        obviously long, but ...

13   A.   I've reviewed them.

14   Q.   What is Defendant's Exhibit 16?

15   A.   It appears to be a declarations page for a

16        homeowner's policy October 8, 2001 through

17        October 8, 2002 for Jacob and Peggy Sue Jones.

18   Q.   Was that the policy which you would have

19        received a commission based on the renewal of

20        the policy?

21   A.   To the best of my knowledge, I would probably

22        say that I received a renewal commission when

23        this thing renewed on October 8, 2002, not --

1          Well, maybe 2001.

2     Q.   Is that a yes?

3               MS. VAN HEEST:  He's not sure about

4                    2001.  He said possibly 2002.  It

5                    has both dates on there.

6     A.   It was close to the transition time so --

7     Q.   That renewed in October 8, 2001, correct?

8     A.   Right.  Which is not far off when I became an

9          appointed agent, so I would assume to the best

10         of my knowledge that I did.  But I'm not a

11         hundred percent sure.

12    Q.   Let me show you what's marked as Defendant's

13         Exhibit 18.  Take all the time you need to

14         review that document, sir.

15    A.   Okay.

16    Q.   What is Defendant's Exhibit 18?

17    A.   It appears to be a declarations page for a

18         homeowner's policy October 8, 2002 through

19         October 8, 2003 for Jacob and Peggy Sue Jones.

20    Q.   Was that a policy that you would have received

21         a renewal commission from?

22    A.   It appears to be a policy that I would have

23         received a renewal commission on, correct.

1    Q.    And you would have been the agent of record

2          for that policy?

3    A.    I would have been the agent of record for that

4          policy.

5    Q.    And as such you would have been responsible

6          for servicing that policy?

7                    MS. VAN HEEST:  Object to the form.

8    A.    I was the servicing agent of record during

9          that policy period, correct.

10   Q.    I'll show you what is marked as Defendant's

11         Exhibit 20.  Take all the time you need to

12         review that record.

13   A.    Okay.

14   Q.    What is Exhibit 20?

15   A.    It appears to be a declarations page for a

16         homeowner's policy effective date October 8,

17         2003 through October 8, 2004 for Jacob and

18         Peggy Sue Jones.

19   Q.    Is that the policy period in which Mr. and

20         Mrs. Jones' home -- Let me step back.

21                Would that be the policy that would have

22         covered Mr. and Mrs. Jones' home?

23   A.    You're asking me if that would be the policy

1        in force on their house between October 8,

2        2003 to October 8, 2004?

3   Q.   Yeah.

4   A.   To the best of my knowledge, I would say that

5        it is.

6   Q.   And you were the agent of record on that

7        policy?

8   A.   I do believe I was the agent of record during

9        that policy period.

10  Q.   And you were the servicing agent during that

11       policy period?

12  A.   I would have been the servicing agent on that

13       policy period for this policy.

14  Q.   And you would have received a renewal

15       commission on that policy, correct?

16  A.   I should have received a renewal commission

17       during that policy period.

18  Q.   I'm going to show you Defendant's Exhibit 1

19       and Defendant's Exhibit 2.  This information

20       would have been available to you on your

21       computer system when servicing Mr. and

22       Mrs. Jones' policy, correct?

23           MS. VAN HEEST:  Object to the form.

1    A.    It appears to be the same information that

2          would have been available on my computer

3          regarding their homeowner's policy.

4    Q.    During the time of the homeowner's -- During

5          that time?

6    A.    During --

7    Q.    These were printed out on September 1, 2004,

8          so that was during that policy period,

9          correct?

10   A.    It is a snapshot of the policy as it existed

11         on September 1, 2004.

12   Q.    And that snapshot came off your computer

13         system, correct?

14              MS. VAN HEEST:  Object to the form.

15   A.    I don't have any knowledge of this being

16         printed.  It does appear it was the same

17         information that was on my system.

18   Q.    Do you have any reason to doubt that that's

19         not the information that was on your system?

20              MS. VAN HEEST:  Object to the form.

21   A.    I don't have any reason to doubt that it's --

22         it was printed off our computer system.

23   Q.    Let me ask you something here because I'm just

1        trying to figure something out.  You don't

2        talk to builders about the cost of building,

3        correct, homes that you insure, right?

4                MS. VAN HEEST:  Object to the form.

5                   You can answer.

6  Q.   Let me ask it again.  It hasn't been your

7        habit, custom or practice to talk to builders

8        in the Andalusia area about the cost of

9        building homes, right?

10             MS. VAN HEEST:  Object to the form.

11  A.  Specifically in regard to any one single house

12       or home, I do not speak to builders unless the

13       customer decides to get in touch with a

14       contractor or an appraisal about the cost of

15       building in Andalusia.

16  Q.  So have you talked to builders about the cost

17       per square foot of building a home in

18       Andalusia?

19             MS. VAN HEEST:  Object to the form.

20  A.  I have not had any specific conversations with

21       any builders about the cost of square footage

22       on any specific home related to a homeowner's

23       policy.

1    Q.    Do you have any knowledge whatsoever about the

2          cost of building homes in Andalusia?

3    A.    I do not have a professional opinion on what

4          the building cost per square foot in Andalusia

5          is.

6    Q.    You don't have any opinion that you would want

7          anybody to rely on in determining the cost per

8          square foot.  Is that what you're saying?

9                    MS. VAN HEEST:  Object to the form.

10   A.    I would not tell somebody my opinion of what

11         the cost of square footage is that relates to

12         a professional opinion regarding homeowner's

13         replacement cost.

14   Q.    Assume for me you have a 2,000 square foot

15         house insured for replacement cost, Mr. Nall.

16         Can you do that for me?  Just assume that in

17         your mind.

18   A.    I understand what you're telling me.

19   Q.    Assume for me that, in fact, the house really

20         had 2500 feet of living space.  Okay?

21   A.    I understand.

22   Q.    Would that make a significant difference in

23         the amount of insurance that would be required

1      for replacement cost?

2                        MS. VAN HEEST:  Object to the form.

3                           He testified the insured chooses

4                           the coverage amount.

5                        MR. WINTER:  I understand what he's

6                           testified to.

7   Q.   Does that make a big difference?

8   A.   I think it would definitely make a difference

9        in what -- If I put in two different square

10       footages on the same house into like Exact

11       Value, it would make a difference in the cost,

12       and it would tell me what the replacement cost

13       should be.

14                        MR. WINTER:  I don't have any more

15                           questions.

16                        MS. VAN HEEST:  Thank you very much

17                           for your time.

18                        (Deposition concluded at

19                           approximately 2:00 p.m.)

20                     *  *  *  *  *  *  *  *  *  *  *  *

21                     FURTHER DEPONENT SAITH NOT

22                     *  *  *  *  *  *  *  *  *  *  *  *

23                     REPORTER'S CERTIFICATE

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1  State OF ALABAMA:

2  MONTGOMERY COUNTY:

3       I, Pamela A. Wilbanks, Registered

4  Professional Reporter and Commissioner for the State

5  of Alabama at Large, do hereby certify that I

6  reported the deposition of:

7                    **RON NALL**

8  who was first duly sworn by me to speak the truth,

9  the whole truth and nothing but the truth, in the

10 matter of:

11                    JACOB N. JONES and

12                    PEGGY C. JONES,

13                    Plaintiffs,

14                    Vs.

15                    STATE FARM INSURANCE

16                    COMPANY, et al.,

17                    Defendants.

18                    In The U.S. District Court

19                    For the Middle District of Alabama

20                    Northern Division

21                    2:05-cv-011190wkw

22 on Thursday, January 19, 2007.

23       The foregoing 175 computer printed pages

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1  contain a true and correct transcript of the

2  examination of said witness by counsel for the

3  parties set out herein.   The reading and signing of

4  same is hereby waived.

5          I further certify that I am neither of kin

6  nor of counsel to the parties to said cause nor in

7  any manner interested in the results thereof.

8          This 2nd day of February 2007.

_Pamela A. Wilbanks_
_____
Pamela A. Wilbanks, Registered
Professional Reporter and
Commissioner for the State
of Alabama at Large.